UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

1

2      In re:
                                                    Case No. 20-12791-lgb
3         PB LIFE AND ANNUITY CO., LTD. AND          New York, New York
          RACHELLE FRISBY AND JOHN JOHNSTON,        June 24, 2021
          AS JOINT PROVISIONAL LIQUIDATORS,         10:16 a.m. - 11:38 a.m.
4
                                      Debtor.
5

6            20-12791-SCC, PB LIFE AND ANNUITY CO., LTD. AND
          RACHELLE FRISBY AND JOHN JOHNSTON, AS JOINT PROVIS
7                           - CHAPTER 15 -

8
      MOTION TO COMPEL 1. MOTION FOR A FURTHER ORDER COMPELLING
9   TURNOVER OF BOOKS AND RECORDS AND ATTORNEY FILES PURSUANT TO 11
        U.S.C. 105, 542, 1519(A)(3), 1521(A)(4) & 1521(A)(7)
10

11             BEFORE THE HONORABLE LISA G BECKERMAN
                 UNITED STATES BANKRUPTCY JUDGE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

- A P P E A R A N C E S -

| | |
|---|---|
| 1 | |

For the Joint Provisional     MARTHINUS DREYER
Liquidators and Foreign     Deloitte Ltd.
Representatives, Rachelle    Corner House, 20 Parliament Street
Frisby and John Johnston:    Hamilton, HM 12 Bermuda
                                  (441) 299-1345; (441) 292-0961 fax
                                  marthinus.dreyer@deloitte.com

For the Joint Provisional     NICOLAS KAJON, ESQ.
Liquidators and Foreign     CONSTANTINE DEAN POURAKIS, ESQ.
Representatives, Rachelle    ANDREAS D. MILLIARESSIS, ESQ.
Frisby and John Johnston:    ERIC ROBINSON, ESQ.
                                  Stevens & Lee
                                  485 Madison Avenue, 20th Floor
                                  New York, New York 10022
                                  (212) 319-8500; (212) 319-8505 fax

For Lindberg & Global Growth:    JARED PACE, ESQ.
                                  SETH MOORE, ESQ.
                                  Condon Tobin Sladek Thornton
                                  Nerenberg PLLC
                                  8080 Park Lane, Suite 700
                                  Dallas, Texas 75231
                                  (214) 265-3800; (214) 691-6311 fax

For Colorado Bankers Life    NORMAN KINEL, ESQ.
Insurance Company, Bankers    Squire Patton Boggs
Life Insurance Company,     1211 Avenue of the Americas, 26th Fl
Southland National Insurance   New York, New York 10036
Corporation, and Southland    (212) 407-0130; (212) 872-9815 fax
National Reinsurance        norman.kinel@squirepb.com
Corporation:

For Universal Life Insurance:   MEGHAN DALTON, ESQ.
(listen only)                        CLINTON CAMERON, ESQ.
                                  Clyde & Co LLP
                                  55 West Monroe Street
                                  Chicago, Illinois 60603
                                  (312) 635-7000; 312-635-6950 fax

(Proceedings recorded by electronic sound recording)

PB Life and Annuity Co., Ltd - 6/24/21                    3

1          THE COURT:  I think that takes us next to 20-12791, PB

2     Life and Annuity Co., Ltd.  I believe that today's matter is a

3     motion to compel for further order compelling turnover of books

4     and records and attorney files pursuant to 11 U.S.C. §§ 105,

5     542, 1519(a)(3), 1521(a)(4) & 1521(a)(7).  May I have

6     appearances of counsel, please?

7          MR. KAJON:  Good morning, Your Honor, Nicolas F. Kajon

8     of Stevens & Lee, representing Rachelle Frisby and John

9     Johnston, the joint provisional liquidators or PBLA, Northstar,

10    and Omnia.  With me in court today are my partners, Constantine

11    Pourakis, and Eric Robinson, and my associate, Andreas

12    Milliaressis.  Also, appearing today on behalf of the JPLs is

13    Marthinus Dreyer from Deloitte.

14         THE COURT:  Okay.

15         MR. MOORE:  Good morning, Your Honor, Seth Moore, of

16    the law firm, Condon Tobin Sladek Thornton Nerenberg, on behalf

17    of Greg Lindberg and Global Growth Holdings, Inc.  And also, on

18    the phone is from my firm today is my partner, Jared Pace.

19         THE COURT:  Okay.  Any additional apperaances of

20    counsel?

21         MR. KINEL:  Good morning, Your Honor, this is Norman

22    Kinel of Squire Patton Boggs.  I represent Colorado Bankers Life

23    Insurance Company, Bankers Life Insurance Company, Southland

24    National Insurance Corporation, and Southland National

25    Reinsurance Corporation.

PB Life and Annuity Co., Ltd - 6/24/21                    4

1          THE COURT:  Okay.  Any additional appearances of

2    counsel?

3          (No response.)

4          THE COURT:  Okay.  Counsel for the JPLs, I believe the

5    floor is yours.  It's your motion, so please go ahead and

6    present your motion.

7          MR. KAJON:  Thank you, Your Honor.  This is Mr. Kajon

8    again. Your Honor, it is astounding and frankly, disconcerting

9    that nine months after the appointment of the JPLs and five

10   months after entry of this court's turnover order, the JPLs

11   still do not have complete books and records for the debtors.

12   In fact, the JPLs are missing most of the critical documents

13   that they require to administer the debtor's assets, which

14   consists of over 130 investments in closely held companies, most

15   of which are controlled by Greg Lindberg.  The declaration of

16   Ms. Frisby that we filed earlier this week details the types of

17   documents that should be among the debtor's books and records

18   and that most of these documents have not been turned over to

19   the JPL.

20          The missing documents include financial records of the

21   debtors, loan files, and due diligence records documenting each

22   of the substantial loans issued by and other assets held by the

23   debtors, financial statements, valuations and appraisals, and

24   other documents relating to the debtor's counterparties, bank

25   records, wire transfers, cancelled checks, intercompany

PB Life and Annuity Co., Ltd - 6/24/21                    5

1  transfers, or other records to determine the location of cash

2  assets related to the debtors.  A summary of document

3  deficiencies with respect to four sample investments is provided

4  in Exhibit 7 to Ms. Frisby's declaration.

5          Prior to the appointment of the JPLs, the debtors were

6  owned and controlled by Greg Lindberg, and his holding company,

7  Global Growth, who's headquarters is located in Durham, North

8  Carolina.  The evidence shows that the principal decision makers

9  concerning the debtor's investments were Mr. Lindberg and his

10  top lieutenant, Chris Herwig, both of whom worked out of Global

11  Growth's North Carolina office.  It boggles the mind that Global

12  Growth and Mr. Lindberg could direct the investment of over $1

13  billion by the debtors and not have any records relating

14  thereto.

15          Mr. Lindberg caused the debtors to invest over $1

16  billion in dozens of illiquid closely held enterprises.  To do

17  so, Mr. Lindberg and his underlings must have had access to

18  financial statements, valuations and appraisals, organizational

19  documents and other critical information concerning the proposed

20  counterparties.  Once these investments were made, the senior

21  executives at Global Growth and their underlings should have

22  received financial statements and other information from the

23  counterparties on a regular basis so that they could monitor

24  these investments.  Therefore, it is illogical that Greg

25  Lindberg and Global Growth never had or no longer have these

PB Life and Annuity Co., Ltd - 6/24/21                              6

1    records.

2            Respondents claim in their opposition that they don't

3    have these records and that we have them.  While we were 99

4    percent certain that we did not have these records, we decided

5    to be 100 percent certain.  Attorneys at my firm and the JPL

6    staff at Deloitte, used Relativity and/or Brainspace to screen

7    the one million documents available to us from the hard drives

8    and servers located in Bermuda.  We submitted the declaration of

9    Ms. Frisby and two Steven & Lee attorneys reporting on the

10   results of these document reviews and demonstrating that in fact

11   the JPLs do not currently have access to these documents.

12           In support of their position that they don't have

13   these records, respondents proffered a witness, Anuj Sharma, who

14   swore that most, if not all of the debtor's books and records

15   listed in the turnover order are already in the JPLs possession

16   because these documents are on the laptops and servers located

17   in Bermuda.  Yet, when I took his deposition, Mr. Sharma

18   admitted that he had no idea what books and records were

19   maintained by the debtors Bermuda employees.  Contrary to

20   respondents' assertions, we have ample evidence that respondents

21   do in fact have these records.

22           First:  Ms. Frisby's declaration explains that based

23   on the JPLs' review of available documents and discussions with

24   the debtor's Bermuda employees, it is clear that Global Growth

25   personnel managed the debtor's investments and bank accounts,

PB Life and Annuity Co., Ltd - 6/24/21                    7

1  and therefore, only Global Growth has a full set of records

2  relating thereto, not the Bermuda employees.

3       Second:  Every computer obtained from the debtor's

4  Bermuda employees required a BitLocker recovery key to unlock

5  the individual computer and permit access to the software, data,

6  and other contents therein.  We submitted an email that

7  demonstrates that Global Growth has these keys, yet it has

8  failed to turn them over to the JPLs despite multiple requests.

9       Third:  Respondents proffered the testimony of Mr.

10 Sharma concerning production of records, but he confirmed that

11 all of the information he received about the debtor's

12 investments and loans came from Global Growth personnel in North

13 Carolina.

14      Fourth:  In a recent email exchange, Lisa Hall, the

15 debtor's finance manager, advised that she did not have access

16 to PBLA bank accounts.  Instead, she would generate letters for

17 Christopher Herwig, a senior executive at Global Growth, to move

18 funds out of the PBLA bank accounts.

19      Fifth:  We submitted an email demonstrating that the

20 debtor's Bermuda employees were not aware of sales of the

21 debtor's assets until after the fact and sought details from

22 Global Growth.

23      Sixth:  We submitted another email by a Bermuda

24 employee seeking cash statements from Eric Bostic, then a vice

25 president at Global Growth's offices in Durham, North Carolina.

1    Seventh:  Mr. Bostic testified that where they had

2    third party valuations, they used those figures in the asset

3    lists to reflect the fair market values of the debtor's assets.

4    The asset list that we have reflect dozens of fair market

5    values, therefore, there must be dozens of valuations, very few

6    of which have been turned over to the JPLs.

7    Eighth:  There are discrepancies between what the

8    respondents produced in the North Carolina insurance

9    rehabilitation action and what they produced to us.  For

10   instance, a rating agency known as HR Ratings provided ratings

11   assessments for several multimillion-dollar loan transactions in

12   which PBLA was a lender, which reports presumably were

13   maintained in the ordinary course of business as part of PBLA's

14   loan files.  While numerous such reports were produced by

15   respondents in the North Carolina action to the plaintiffs

16   therein, only four were produced to us.

17   Ninth:  Mr. Sharma testified that he coordinated

18   document production with Eric Bostic, who, until recently, was a

19   Global Growth Vice President in North Carolina.  However, when

20   we deposed him, Mr. Bostic testified that he did not directly

21   interact with Mr. Sharma on this project, and that he only

22   indirectly assisted in responding to Exhibit A of the turnover

23   order.  These and other inconsistencies cast substantial doubt

24   on Global Growth's compliance with the turnover order.

25   Tenth:  Mr. Bostic conceded that he had access to

PB Life and Annuity Co., Ltd - 6/24/21                    9

1   financial statements for at least some of the companies in which

2   the debtors invested.  Yet Global Growth claims not to have

3   these financial statements.

4          Eleventh:  Mr. Bostic also testified that he would

5   assist with and provide ULICO with a quality check of the asset

6   list for the PBLA ULICO trust assets.  ULICO is PBLA's principal

7   creditor, and it is owed in excess of $500 million.  How could

8   Mr. Bostic do this quality check without access to records

9   concerning the debtor's assets?

10         Twelfth:  Mr. Bostic also conceded that Global Growth

11  had organizational documents and corporate resolutions related

12  to companies in which the debtors invested.

13         Based on the foregoing, Your Honor, there is a clear

14  evidentiary record that the JPLs are still missing critical

15  books and records of the debtors; that Global Growth has these

16  records; and that it has not complied with the court's turnover

17  order.  Global Growth clearly had all of these documents.  If

18  they do not have them now, then where did these documents go?

19  If respondent cannot explain all of these discrepancies, then we

20  respectfully submit that we are entitled to a presumption that

21  they are improperly withholding these documents from the JPLs.

22  Therefore, the Lindberg entities should be directed to comply

23  with this court's turnover order.

24         Your Honor, I'd now like to turn my attention to the

25  spurious privilege issues raised by the respondents.  Mr.

PB Life and Annuity Co., Ltd - 6/24/21                    10

1    Lindberg is attempting to assert the debtor's attorney-client

2    privilege based merely on his indirect ownership of the debtors.

3    No court has ever recognized such a right.  A liquidator

4    appointed in Bermuda similar to a trustee appointed in the

5    United States owns and controls the privilege of the

6    corporation.  **CFTC v. Weintraub**, 471 U.S. 343 (1985), was the

7    seminal case on that issue, Your Honor, as I'm sure Your Honor

8    is familiar.  As set forth in the declaration of Mark Diel, the

9    JPLs' Bermuda counsel, that was filed with the court on December

10   21, 2020, Docket Number 23, the JPLs appointment by the Bermuda

11   Supreme Court operates to remove Mr. Lindberg from any capacity

12   whereby he could assert the debtor's privilege or take any other

13   action on behalf of the debtors.  Mr. Diel also testified that

14   the JPLs are entitled to all of the debtor's privileged

15   documents pursuant to both the Bermuda orders in § 174(1) of the

16   company's Act of 1981.

17         Prior to the appointment of the JPLs, Condon Tobin

18   represented PBLA in litigation in New York and North Carolina.

19   New York Rules of Professional Conduct require that upon

20   termination of representation, a lawyer shall take steps to

21   avoid foreseeable prejudice to the rights of the client,

22   including delivering to the client all papers and property to

23   which the client is entitled.  New York ethics committees have

24   relied on **Sage Realty Corp. v. Proskauer Rose Goetz &**

25   **Mendelsohn**, 235 A.D. 2d 355 (1997), in which the Court of

PB Life and Annuity Co., Ltd - 6/24/21                    11

1   Appeals of New York found that client is entitled to the

2   attorney file, including the attorney's work product.  New York

3   Ethics Opinion 766, which we cite in our motion, cited **Sage**

4   **Realty**, and found that as a matter of ethics, upon request by a

5   former client, such as the JPLs, a lawyer must promptly turn

6   over or provide access to the files, which the former client is

7   entitled to possess.

8          The North Carolina Rules of Professional Conduct,

9   which we cite in our motion, imposes similar ethical

10  requirements as New York.  In sum, pursuant to the turnover

11  order, United States and Bermuda statutory authority, and the

12  Bermuda orders, the JPLs are entitled to immediate possession of

13  the debtor's books and records and all the debtor's files held

14  and maintained by the law firms.

15         Mr Lindberg is certainly free to assert privilege

16  based on communications resulting in legal advice personally

17  provided to him in his individual capacity, i.e., not as an

18  officer, director, manager, or in some other official capacity

19  acting for the debtors.  The JPLs, however, are currently, only

20  seeking the debtor's documents, not Mr. Lindberg's personal

21  documents.  So, his personal privilege is not an issue before

22  you today.

23         Respondent's reliance on the **BCE West** case is

24  misplaced.  In **BCE West**, the plan trustee issued a subpoena

25  seeking documents relating to a law firm's representation of a

PB Life and Annuity Co., Ltd - 6/24/21                        12

1    special committee of a board of directions of the debtors.

2    "Special Committee" is an entity wholly separate from the

3    debtors themselves.  Here the JPLs are seeking turnover of the

4    debtor's own records to which the JPLs are clearly entitled.  In

5    the **China Med** case, which we cite in our papers, the district

6    court found that even where a Cayman Islands liquidator sought

7    documents between the debtor's audit committee and counsel, the

8    attorney-client privilege passed to the liquidator.  But we're

9    not asking Your Honor to go that far, we're simply seeking the

10   debtor's privileged documents.  Because the JPLs control the

11   debtor's privilege.  The court need not concern itself with a

12   detailed analysis of Lindberg's assertions of privilege with

13   respect to each of the 2000 which they claim are privilege.

14          While the privilege logs produced by the Lindberg

15   entities and law firms are woefully deficient, they're simply a

16   red herring designed to bog JPLs down in months of litigation

17   over each and every document, and thereby, further impede the

18   JPLs in the performance of their duties just like they are doing

19   now by wrongfully withholding the debtor's books and records.

20   The simple fact remains that Mr. Lindberg has no right to assert

21   any privilege with respect to any of the debtor's files.  Every

22   document identified in the privilege log is marked as protected

23   under both attorney-client privilege and the work product

24   doctrine.  Importantly, Condon Tobin has not, and likely cannot

25   assert that these documents were actually prepared in

PB Life and Annuity Co., Ltd - 6/24/21                    13

1   anticipation of litigation and should be protected from the JPLs

2   since all of the pending litigation is not the JPLs to

3   administer.  If Condon Tobin were to assert that these documents

4   were prepared in anticipation of litigation, it would be for

5   litigation that since September 2020 only the JPLs have the

6   right to bring or defend on behalf of the debtors.

7           The district court in Martin v. Valle National Bank of

8   Arizona, which we cite in our papers, determined that the work

9   product privilege does not allow an attorney to withhold

10  documents from his own client, which here are the JPLs.  Based

11  on the foregoing, the court should reject these specious claims

12  of privilege and order respondents to turn over all previously

13  withheld documents.  Thank you, Your Honor.

14          THE COURT:  Okay.  Mr. Kajon, before I hear the

15  response, I just have a couple of questions for you.  First, are

16  the JPLs, waiving attorney-client privilege on the record today?

17          MR. KAJON:  No, Your Honor, there's no reason to waive

18  the privilege today.  My clients own the privilege and,

19  therefore, they're entitled to documents that are subject to the

20  debtor's corporate privilege.

21          THE COURT:  Okay.  It's hard to tell from the

22  documents, Mr. Kajon, so I'll ask you this.  I'm going to

23  obviously ask the respondents the same question, but have there

24  been any assertions in the context of the discovery process of

25  multiple entity issues?  Listening to your presentation and

PB Life and Annuity Co., Ltd - 6/24/21                    14

1    having read the papers myself, one thing I was questioning is

2    whether or not there was an issue that you had documents that

3    were subject to two entities' privileges.  For example, a

4    debtor's entity of privilege and the other party?  And I'll use

5    as an example here, perhaps, Global Growth if there were

6    intercompany related documents.  And as you know, when you have

7    two privileges that are asserted or two parties who have

8    documents, sometimes it takes a little while to work through

9    those issues.  So, I was wondering if that had been part of the

10   problem.  It didn't seem from the papers that it had, but it's

11   certainly something from your description about how documents

12   were kept in North Carolina that I could see being a problem

13   with debtor/non-debtor issues.

14         Before I went on the bench, I will say, I had a lot of

15   dealings with that because I was debtor's counsel for a portion

16   of a very large public company.  A bunch of subsidiaries that

17   filed for a proceeding in a very large public company.  And so,

18   there were a lot of issues to work through whenever we had to

19   produce documents about who could assert privilege and why.  So,

20   I was just curious if that was a problem here.  It really didn't

21   seem like people had raised that, but it was just something that

22   jumped out at me from the document discussion.  So, has that

23   been an assertion on behalf of Mr. Lindberg and the Lindberg

24   entities?

25         MR. KAJON:  Not at all, Your Honor.  I am aware of the

PB Life and Annuity Co., Ltd - 6/24/21                    15

1   issue; I've dealt with it in other cases; but it has never been

2   raised by Mr. Lindberg, Global Growth, or any of the respondents

3   or, frankly, any other party.  I don't know their response in

4   front of me, but I recall what it says.  The privilege they

5   assert is Mr. Lindberg's privilege in his capacity as a

6   shareholder.  And he's not even a direct shareholder of the

7   debtors, not that that would matter.  He's a shareholder of

8   Global Growth, and I believe there are at least two holding

9   companies between Global Growth and these debtors.  But they're

10  asserting his privilege in his capacity as a shareholder.  And

11  I've never seen anyone assert that in my entire life, and I'm

12  aware of no decision that recognizes any such right.

13        The corporation is a separate legal entity from the

14  individual.  It has its own privilege, separate and apart, from

15  whatever privilege the individual has.  The board of directors

16  or the officers it duly authorizes can assert a privilege on

17  behalf of the corporation.  Mr. Lindberg no longer has any such

18  capacity.  Only the JPLs have the right to assert the debtor's

19  privilege.  And Mr. Lindberg, as a shareholder or an indirect

20  shareholder has no right to assert any privilege with respect to

21  the debtors.  But that's the right they're asserting.  I'm an

22  indirect shareholder, therefore, I can assert the privilege.

23  And it's, frankly, ridiculous, and wholly unfounded.

24        THE COURT:  Okay.  I understand your position.  I've

25  read their papers.  Okay.  All right.  I think I'm going to let

PB Life and Annuity Co., Ltd - 6/24/21                    16

1    the respondents respond to your arguments, and then I'll give

2    you an opportunity to reply.

3              MR. KAJON:  Thank you.

4              MR. MOORE:  Your Honor, Seth Moore of Condon Tobin on

5    behalf of Mr. Lindberg and Global Growth Holdings, Inc.  Your

6    Honor, before I begin, my partner, Mr. Pace, is on the phone as

7    well.  I'm endeavoring to take over several matters for him,

8    including this one, as he and his wife just recently had a new

9    baby.  And so, he's supposed to be on leave.  However, because

10   of his long-standing knowledge of these matters and the complex

11   nature of them, he has graciously agreed to dial in today and be

12   a part of this as well.  I bring that to Your Honor's attention

13   solely because there may be questions and issues were he has

14   knowledge that I'm not up to speed on yet, and I may turn over

15   those specific things to him if that's all right with the court.

16             THE COURT:  It is.  And by the way, congratulations,

17   Mr. Pace.  I know the last time that you were in front of me,

18   you were waiting for the blessed event to happen, so I'm glad to

19   hear that it has happen, and everybody is hopefully healthy.

20             MR. PACE:  Yes, Your Honor.  Thank you very much.  We

21   are now, and I appreciate the court's comments on that.  Thank

22   you so much.

23             THE COURT:  Okay.  Yes, Mr. Moore, I'm fine with, and

24   partner me for using this phrase, with you two tag teaming

25   things.  I understand you are taking over from Mr. Pace.  He was

PB Life and Annuity Co., Ltd - 6/24/21                    17

1  clear about that on the record the last time he had a matter

2  before me, related to this case.  But go ahead, please.  Feel

3  free to present your argument.

4          MR. MOORE:  Thank you, Your Honor.  Your Honor, it

5  appears to me from the request of the JPLs and the assertions in

6  some of their pleadings, I think they have a misunderstanding of

7  what Global Growth is, what it has, and what it does.  Mr.

8  Lindberg is the owner, directly or indirectly, of hundreds of

9  direct companies.  These companies have almost 8,000 employees,

10 and they're located all over the world.  Global Growth Holdings,

11 Inc., one of the holdings companies, is, of course, in North

12 Carolina.  The implicit assumption of the motion, and the reply,

13 and the arguments today is that Global Growth, all these

14 companies are a monolith, managed and controlled out a central

15 management locus there in North Carolina, and that's just not

16 how they operate.  And we've tried to explain that.

17         These companies are, including the debtors, are a

18 loose federation of entities and they go under this family name

19 of Global Growth, the Global Growth family of companies.  But

20 these entities are autonomous.  They have their own management

21 teams, they have their own books and records, their own day-to-

22 day operations that they oversee themselves.  And it's not done

23 centrally out of North Carolina.

24         Your Honor, we have gone over this.  And when I say

25 "we", this firm has gone over the turnover order.  All the

PB Life and Annuity Co., Ltd - 6/24/21                    18

1    particular items in that order.  The additional requests from

2    the JPLs' counsel with our clients.  We've performed a search of

3    what is available to us.  And we have not, and do not take the

4    position that what is available to us shouldn't be turned over.

5    As a matter of fact, Your Honor, the only things that we have

6    that have been withheld are the items subject to privilege,

7    which we'll get to momentarily.  But otherwise, Your Honor,

8    everything our client had and has were kept and are kept on drop

9    box servers.  And in many cases, we just turned the links that

10   our clients have access to, the drop box links, we just turned

11   directly over to the JPLs.  They can click on it and see exactly

12   what our clients see, in exactly the form and manner that their

13   kept.  In the instances where we didn't just turn over the

14   links, we exactly copied the drop box files, again, so that they

15   can be seen by the JPLs in the exact manner and form in which

16   our client seeks them.

17        Your Honor, because the JPLs haven't been able to find

18   these documents or what they expect to be able to find, first of

19   all, assumes that these things exist, and it assumes that these

20   things must be held by Global Growth.  They're simply not.  We

21   have agreed with the JPLs that there are likely documents that

22   these entities are entitled to, relating to their investments

23   and day-to-day operations, out there that we don't have access

24   to, and haven't given it to them because we don't have them to

25   give.  We have repeatedly told them that these entities operate

PB Life and Annuity Co., Ltd - 6/24/21                    19

1   autonomously, that the bulk of their record they're looking for

2   would be located down in Bermuda with those former employees at

3   their location on their servers, their computers, and indeed, we

4   see in their reply, and we heard today that the JPLs have over a

5   million documents they've obtained in that form and manner.

6        Additionally, Your Honor, there are entities, like

7   these debtors, that Mr. Lindberg may ultimately be the owner of,

8   that he doesn't have control over, and cannot access their books

9   and records, like the other insurance companies.  There are many

10  of which are under a North Carolina rehabilitator.  We don't

11  have access to those entities' books and records.  And those

12  entities may have books and records that relate to some of the

13  debtor's investments.  But they're not in our possession,

14  custody, and control, and as such, we can't go obtain those for

15  the JPLs.  The simple fact is, Your Honor, we've turned over

16  everything that we've been able to find in our possession,

17  custody, and control to the JPLs, but for the documents on the

18  privilege logs.'

19       With respect to the privilege issue, Your Honor, Mr.

20  Lindberg hasn't told us that he waives, and hasn't waived the

21  privilege, either his individual privilege or the privilege for

22  the entities that he owns.  This law firm can't waive it for

23  him.  And the court has seen the arguments and our response

24  based on the caselaw.  There are questions in our mind whether

25  or not the JPLs have the privilege, either the attorney-client

PB Life and Annuity Co., Ltd - 6/24/21                    20

1  or attorney work product, and as such, without direct

2  instruction from our client, this firm can't waive and turn over

3  those documents.  And so, Your Honor, there's no nefarious

4  reason for any of this.  As Mr. Kajon said, the assertion of

5  privilege is not a red herring designed to bot anyone down.  The

6  court can see the various correspondence and the efforts that

7  we've gone through to give them what we have.  There's no

8  reason, other than not being able to waive the privilege, that

9  those documents have been retained, Your Honor.  And as such, I

10  think the court should look at the pleadings in front of Your

11  Honor and the various evidence and determine that we've complied

12  with the turnover order and met our burden, and that there's no

13  nefarious reason for asserting privilege as we've done.  Thank

14  you, Your Honor.

15         THE COURT:  Okay.  Mr. Moore, I have some questions

16  for you.  So, you've heard the arguments; you've seen the reply

17  pleadings from Ms. Frisby; and some of the depositions that were

18  taken.  It certainly does seem from some of the depositions that

19  were taken, and in the statements there that there were things

20  that Global Growth handled for the debtors that were not handled

21  by the debtors.  And I say "Global Growth" loosely because I can

22  only rely to what the deponents are saying.  I don't know if

23  they're using Global Growth to mean the entire enterprise or

24  it's really Global Growth, but I'm stuck with what's in the

25  depositions.  So, it does seem to me from the depositions that

PB Life and Annuity Co., Ltd - 6/24/21                    21

1   were produced by the debtors in the reply that there are things

2   that have been handled by Global Growth that were not handled in

3   Bermuda.  At least that's the testimony of parties.  For

4   example, it does seem that decisions relating to loans and

5   investments were not necessarily made in Bermuda and were, in

6   fact, made by "Global Growth".

7            It also seems like there were some other matters

8   relating to bank accounts and withdrawals or transfers of funds

9   that also had to go through Global Growth.  I guess my question

10  for you is, does the privilege information that you're

11  asserting, cover all that information?  Did you produce all of

12  that information?  Because it does seem like there is

13  information in certain specific categories where the decisions

14  were not being made in Bermuda.  And therefore, there's a reason

15  that the information is not there.  And that goes to some other

16  related things like, perhaps, additional valuations of third

17  parties, of assets, and those kinds of things.  So, what is your

18  answer to that?

19           MR. MOORE:  Yes, Your Honor, Seth Moore again.  So,

20  I'll let Mr. Pace correct me if I'm wrong, but my understanding,

21  Your Honor, is that what items we would have control over, what

22  we have turned over are broadly speaking items investment

23  related materials.  And indeed, everything we had and everything

24  we have found has been turned over.  Nothing withheld.  As to

25  your question on what is in the privilege documents, I'm going

PB Life and Annuity Co., Ltd - 6/24/21                    22

1  to let Mr. Pace response to that since he was here and involved

2  when the privilege logs were generated.

3          MR. PACE:  Thank you, Your Honor.  This is Jared Pace.

4  If I may?

5          THE COURT:  Yes.

6          MR. PACE:  Thank you, Judge.  So, the privileged

7  information is related entirely and exclusively to the two

8  pieces of litigation where our firm represented PBLA.  One

9  litigation was in New York with a component of an arbitration in

10 Puerto Rico.  That's with ULICO, the biggest creditor.  And the

11 other litigation is the one that's on trial actually right now

12 in North Carolina, where you do have joint defendants, Greg

13 Lindberg, Global Growth Holdings, Inc., which was formerly known

14 as Academy Association, Inc., along with PBLA.  Mr. Kajon and

15 his firm are actually *pro hac*'ed into that case and represent

16 PBLA in that case.  So, the privileged materials relate

17 exclusively and entirely to those two pieces of litigation.

18 That's what I call privilege; that's what I call work product.

19          Does it relate to services provided by Global Growth?

20 The answer is, that's right.  There were services provided by

21 Global Growth at some point.  Now, we'll have to talk about who

22 Global Growth is.  There were some services provided by Global

23 Growth to the debtors.  And that's the source of information,

24 the source of documents that have been produced.  It's clear in

25 the other side's papers, and it's not as clear in Mr. Kajon's

1   presentation this morning, but our side has actually produced

2   thousands of documents within our possession, custody, and

3   control as they are kept and as they are maintained in the

4   ordinary course of business.  They weren't funneled through a

5   vendor's services, they weren't bates' labelled, they were

6   produced as our clients see them on their screens.  That's what

7   they have.

8          Broad strokes, speaking very broadly, what those are,

9   are investment-related materials.  You can think of the North

10  Carolina corporate office as being more involved in MA or

11  investments.  Less involved, almost not involved much at all in

12  day-to-day operations, banking, financial services, things like

13  that.  Those are maintained, as Mr. Moore said, by the

14  autonomous entities, and that's been consistent, there's been a

15  consistent communication from our client and firm to Mr. Kajon

16  and his firm and his client.  Now, going back and talking about

17  who Global Growth is, someone is on the call today representing

18  the North Carolina insurance companies.  That's important here

19  because some of these investments, PBLA is a lender on some of

20  these investments, at least before those investments were

21  contributed to the reinsurance trust, but they're not the only

22  lender.  There are other insurance company lenders, including

23  these North Carolina insurance companies.

24         The North Carolina insurance companies have zero

25  employees.  No employees whatsoever.  Their operations and

PB Life and Annuity Co., Ltd - 6/24/21                24

1    activities are conducted by another entity called CBIC LLC.

2    That's a management company.  This is where the source and the

3    confusion lie.  Mr. Lindberg is the ultimate owner of all these

4    companies.  And so, I understand Mr. Kajon's confusion,

5    understandable confusion.  If you own those companies, don't you

6    control those records?  And the answer is no.  No, we don't.  We

7    haven't controlled their records really since mid of 2018 when

8    those insurance companies were placed into a supervision,

9    resulting more into a rehabilitation.  And CBIC now, even though

10   they're owned by Mr. Lindberg, are operationally controlled by

11   the rehabilitator, the North Carolina rehabilitator.  CBIC has

12   separate counsel down in that North Carolina case that Mr. Kajon

13   is *pro hac*'ed into.  They know this.  I explained this to Mr.

14   Kajon twice.  As recently as April, and again a few weeks ago.

15          We don't have CBIC records.  There's a good place for

16   you to start, and that would be lender side records.  What a

17   lender would maintain with respect to these investments.  So,

18   that would be a good place for you to start just like us.  If we

19   want records from the North Carolina insurance companies or from

20   CBIC, we have to go through their counsel.  It's weird because

21   our client, Mr. Lindberg owns them all, but because of how

22   they're structured, and the rehabilitations, and the senior

23   sister there, the control piece is missing.  That's why we don't

24   have some of the documents they expect us to have.  That's a big

25   reason why.

1          And then as Mr. Moore explained, another big reason is

2    because it was just a business philosophy of these companies not

3    to micromanage from a central location.  Now, what that means

4    and that's true of all these companies, 130 plus operating

5    companies.  Now, what that means for recordkeeping is there is

6    no folder that says all the books and records of these four

7    debtors.  It doesn't exist.  There is not a centralized location

8    of that.

9          If you want to get into more specific requests, more

10   specific items, which is the process we've been going through

11   with Mr. Kajon and his firm since really October of last year,

12   then that allows our client to do more pinpointed searches for

13   some of these drop box links that we can just turn over

14   wholesale, and that's what we've been doing.  And in fact, in

15   all candor, judge, the reply they filed just a few days ago, I

16   read the reply, I haven't read all the declarations, but the

17   three things that stuck out to me, just like Mr. Kajon said, he

18   was 99 percent sure his client didn't have them, but he wanted

19   to be 100 percent sure, same thing.  The three things that stuck

20   out to me, okay, HR Ratings.  I know I've seen HR Ratings.  I

21   know we've produced HR Ratings.

22         And in fact, we've produced HR Ratings going back to

23   November 13 of 2020.  That was in our very first production to

24   them.  There's also been productions of files called ratings.

25   These ratings have been produced.  But I asked the client about

PB Life and Annuity Co., Ltd - 6/24/21                    26

 1   that.  I said, hey, shouldn't there be more here?  And because

 2   of turnover, there has been a turnover of key people at our

 3   firm, and these records go back a long time, lack structure,

 4   it's incumbent upon us to keep asking.  We don't want to get

 5   into a position where we're telling the court we've produced

 6   everything, then we've got to go produce something else.  That's

 7   why we've limited our certifications, our verifications and

 8   everything to we've done a reasonably diligent inquire.  More

 9   than a reasonably diligent inquire of all the documents we've

10   seen and have produced them as we see them.

11          This is not a situation like a lot of motion to compel

12   situations where you've got one party saying, I've got

13   documents, but they're not entitled to them because of relevance

14   or confidentiality or something like that.  That's not this

15   situation.  If you want the documents, the books, and records of

16   these debtors, you can have them, to the extent we have them.

17   But we can't obviously give you what we don't control.  And you

18   need to understand what it is we don't control.  And we've tried

19   to explain that many, many times to Mr. Kajon and his firm and

20   to Deloitte.  So, that was really longwinded.  I think the only

21   question to me is privilege, but that's my perception and view

22   of what's going on here, and if the court has any further

23   questions for me, I'm happy to try to field them.

24          THE COURT:  I do.  I have a couple.  So, the BitLocker

25   key situation, it does seem like there's still a few missing.

PB Life and Annuity Co., Ltd - 6/24/21                    27

1   And they seem to think that Global Growth has them.  Do you?

2           MR. PACE:  Good question, Your Honor.  I think I

3   started -- this is Jared Pace again.  I think I started listing

4   three things in their reply that jumped out to me as, I need to

5   sure this up with our client.  One was the HR Ratings; the

6   second was the BitLocker keys.  I requested, do we have

7   BitLocker keys, and no one has confirmed that we have BitLocker

8   keys.  Now, what I gleamed from the papers that the Deloitte

9   team has filed is they have obtained these BitLocker keys from

10  multiple key individuals, including, I would point out, the

11  debtor's in-house counsel, and we coordinated this.  And they

12  have access to those key employees' drives.  The only thing I've

13  seen is an inability to access one person's BitLocker

14  information.  And that's an individual named Scott Boug.  He was

15  the CEO of these debtor entities.  And apparently, Deloitte

16  terminated Mr. Boug when they took over without securing the

17  information from him.

18          Our firm, our clients have done nothing in my

19  knowledge to prevent Mr. Boug or to tell Mr. Boug that he can't

20  turn over that information and provide whatever information he

21  has to the JPLs.  We have not done that.  I think I recall some

22  correspondence from Mr. Kajon that said Mr. Boug has actually

23  gone to CBIC seeking advice as to whether or not he should turn

24  over that information.  But once again, we don't control CBIC.

25  We're not standing in the way of them getting the information

PB Life and Annuity Co., Ltd - 6/24/21                    28

1   from Scott Boug, but we don't control Scott Boug either.

2          THE COURT:  Okay.  That sort of answered my question.

3   But it sounds like you're going to have to scour to see if you

4   have any more BitLocker keys around that they're looking for.

5   That certainly still seems like it might be an issue.  You said

6   you were going to doublecheck it.

7          You mentioned this arbitration that's going forward in

8   New York relating to ULICO.  Who are the parties in that

9   arbitration?  Is it just PBLA and ULICO?

10          MR. PACE:  The New York court proceeding is a court

11   proceeding and a spinoff of that is an arbitration that occurred

12   and is still occurring actually, technically speaking, in Puerto

13   Rico.  The only parties to those pieces of litigation

14   arbitration are PBLA and ULICO.  That's it.

15          THE COURT:  Okay.  And your firm never represented

16   ULICO, right?

17          MR. PACE:  No, they're adverse, they're a third party.

18   Not within the Global Growth universe, not owned by Greg

19   Lindberg.

20          THE COURT:  I understand.  My question was just a yes

21   or no answer.  Your firm never represented ULICO in connection

22   with this matter, right?

23          MR. PACE:  That's correct.

24          THE COURT:  All right.  Okay.  I think I'm going to

25   give Mr. Kajon a chance to respond.

1          MR. KAJON:  Thank you, Your Honor.  Nicolas Kajon

2     again.  Your Honor, there are still so many unanswered questions

3     and so many inconsistencies.  When someone stands up in court,

4     and I'm not accusing Mr. Pace or Mr. Moore of any improprieties,

5     but when someone stands up in court and says, we've complied, we

6     don't have anymore documents, we have a hard time believing that

7     when there are multiple emails showing that Global Growth had

8     the documents; when the person who submitted a declaration in

9     support of their response said, you guys have all the documents,

10    but then admitted under oath that in fact he had no idea what

11    documents were available to the JPLs in Bermuda.  Moreover, Mr.

12    Sharma testified that he coordinated with Mr. Bostic that he,

13    Mr. Sharma, looked for responsive documents in India, and Mr.

14    Bostic was leading the team that was looking for responsive

15    documents in North Carolina.  Mr. Bostic said, I'm indirectly

16    involved, and I didn't coordinate with Mr. Sharma.  So, their

17    own witnesses contradict each other.  How thorough was this

18    document search when their own proffered witness thinks that Mr.

19    Bostic was heading a team looking for documents in North

20    Carolina, and Mr. Bostic said no, I wasn't doing that.

21          So, their whole position that we looked really hard

22    and in fact we've given you everything is just undermined by the

23    facts that we have here by sworn testimony, by emails to and

24    from Global Growth.  And I don't know how the hundreds of other

25    companies that Mr. Lindberg owns, and controls were managed, but

PB Life and Annuity Co., Ltd - 6/24/21                    30

1    when the debtor's employees wanted information about bank

2    accounts, or wanted information about the debtor's assets, they

3    communicated with Global Growth.  They did not communicate with

4    the insurance companies that Mr. Pace referred to that are now

5    in rehabilitation.  They asked Global Growth for the documents.

6    They asked Global Growth for the information.  They asked Global

7    Growth for the BitLocker keys, and got it.  And we annexed one

8    of those emails to our papers.  Someone at Global Growth

9    providing them with a BitLocker key in March of last year, which

10   was required because they were going into lockdown and would be

11   working from home.  They needed it for the laptops.  So, their

12   whole explanation is belied by the record.

13           With respect to the privilege issue, it's nice that

14   Mr. Lindberg hasn't waived the privilege, but it's irrelevant.

15   We're not asking him to waive his personal privilege.  Mr. Pace

16   said that his firm represented PBLA in two actions.  Great.

17   That's for the admission.  It's PBLA's privilege.  My clients

18   control it.  Mr. Lindberg doesn't control PBLA's privilege.  And

19   they're not even saying that Mr. Lindberg is asserting PBLA's

20   privilege, they're saying he's asserting his privilege as a

21   shareholder of a company that owns another company, that owns

22   another company, that owns PBLA.  What kind of privilege is

23   that?  That has nothing to do with the debtors.  We're seeking

24   the debtor's records and the debtor's attorneys' files.

25           Mr. Pace's firm represented PBLA in at least two

1   pieces of litigation on behalf of the debtors.  We want those

2   files.  We do not want Mr. Lindberg's personal files.  We're not

3   asking for attorney-client communications between Mr. Lindberg,

4   in his individual capacity, and many of his many lawyers.

5           The issue with respect to micromanaging and they just

6   don't have the documents available to them, we just can't

7   believe because the record before Your Honor undermines that.  I

8   did receive one other document this morning.  On May 12 of this

9   year, Mr. Lindberg was deposed in the North Carolina

10  rehabilitation litigation, and I just received that transcript

11  this morning.  And he testifies for pages about the due

12  diligence process that Global Growth engaged in.  First, he

13  discusses MA transactions, and then he goes into loan

14  transactions, when one of the companies made a loan.  And it

15  sounds like exhaustive due diligence.  It sounds like there were

16  many people involved.  And they all had access to these records.

17  That's what Mr. Lindberg testified to.  That they all had

18  access.  That there were people at Global Growth, there were

19  people companies that were owned by Global Growth who might be

20  involved to deal with this process.  And they all had access to

21  these due diligence materials.  So, there was some kind of

22  sharing system, presumably drop box, because that's what both

23  witnesses testified to.

24          So, there were lots of documents generated during the

25  due diligence process, and we don't have them.  They were shared

PB Life and Annuity Co., Ltd - 6/24/21                32

1  among multiple individuals, so they must be available.  I don't

2  know if there's a central server or a decentralized server.  I'm

3  not a tech guy.  But if multiple parties at Global Growth or its

4  affiliates had these documents, they should still have them, and

5  they haven't been turned over to us.  As you can see from Ms.

6  Frisby's declaration, we have just a very small percentage of

7  the documents that we know must exist.  We don't even have

8  complete loan documents.  But simply having a loan document that

9  PBLA, for instance, made a loan to XYZ for $20 million, okay,

10  that's a starting point.  But there must be a file that goes

11  with those loan documents.  What is XYZ?  What does it own?

12  Where are the financial statements?  What due diligence was done

13  before that loan was made?  And what information did you receive

14  from the borrower after the loan was made?  Those should all be

15  in PBLA's loan files.  And all that information is not in PBLA's

16  loan files.

17       In many instances, we don't have organizational

18  documents with respect to the counterparties, and we don't have

19  corporate resolutions.  Again, we have some, and we describe

20  that in our papers, but we don't have most of it.  We don't have

21  most of the valuations that were done with respect to the

22  counterparties, or the assets owned by the counterparties.

23  These are critical documents that the JPLs require to fulfill

24  their court mandated duties.  There's an ample record before

25  Your Honor that Global Growth has these documents.  For Global

1   Growth's lawyers to stand up in court and say we don't have them

2   without some kind of explanation as to where they went to is

3   just astounding to us.  I expected them to come into court and

4   say, oops, we made a mistake, and we found a whole treasure

5   trove of documents.  Here they are.

6            There is a fulsome record before Your Honor that

7   Global Growth has the documents that we've been seeking for

8   months now.  My firm first requested documents in October of

9   last year.  The JPLs informally requested documents even before

10  that, soon after their appointment.  There's been no explanation

11  of where these documents are and why they're not available, and

12  why they have not been turned over.  And again, there's an ample

13  record that Global Growth has the documents.

14           And again, on the privilege issue, it doesn't belong

15  to Mr. Lindberg.  He can assert his personal privilege.  Mr.

16  Pace admitted that they represented PBLA in those two

17  litigations, so its PBLA's documents, and PBLA's privilege to

18  assert.  A lawyer can't assert a privilege on his own.  Only the

19  client can assert the privilege.  My client can assert the

20  privilege; my client has requested a privileged document; my

21  clients are entitled to the privileged documents.  Thank you,

22  Your Honor.

23           THE COURT:  Okay.  All right.  I guess I'm going to

24  start maybe with the privilege documents here for a second

25  because I have looked at the caselaw.  I'll start by saying that

1  I agree with Mr. Kajon that at least with respect to the debtors

2  themselves and any privileges that might be asserted by the

3  debtors themselves.  With respect to attorney-client privilege,

4  it is clear to me that under the applicable caselaw in this

5  circuit that that privilege belongs to the joint provisional

6  liquidators.  My analysis is similar to the **China Medical**

7  **Technologies** case that was cited to by Mr Kajon.  I  think it's

8  clear here by applying the touch-base doctrine, it seems like

9  the communications took place, many of them, here that we're

10 trying to get, in the United States, that U.S. law would apply

11 to those, and that there's obviously caselaw under both

12 **Weintraub**, under also the **China Medical** case and also under the

13 Bankruptcy Code and the provisions in chapter 15, as well as

14 language in provisions for 542 that would apply in chapter 15

15 that the privilege here does belong to the JPLs, and it would be

16 their choice to waive it or not waive it.  So, I don't believe

17 there's a basis for withholding documents on the grounds that

18 they're subject to attorney-client privilege somehow.

19       Mr. Kajon is also correct, in that after having looked

20 at the caselaw, I haven't found any cases for an indirect or

21 direct shareholder who's been able to assert the company's

22 privilege in a situation where there has been a liquidator

23 appointed and a foreign liquidation.  Or for that matter, a

24 trustee or a liquidator appointed in the United States where

25 that applies.  I also don't believe that the BCE cases are

PB Life and Annuity Co., Ltd - 6/24/21                    35

1    applicable to the situation either, and I think it's

2    distinguishable.  So, my ruling is that the attorney-client

3    privilege belongs to the JPLs, and only they can waive it or

4    assert it.

5            However, this gets a little trickier with the work

6    produce privilege, and I don't know that it's such a clear-cut

7    answer on that in the same way that Mr. Kajon's been arguing on

8    the attorney-client privilege.  On the work product privilege,

9    the caselaw ion the 2nd circuit is very clear that that privilege

10   actually belongs both to the attorney and to the client.  So, to

11   the extent it applies, it is not something that just the client

12   can assert.  And obviously, here, with respect to the client,

13   I'm again finding that the client's ability to assert the work

14   product privilege or to waive the work product privilege, which

15   is really more applicable here, would be the JPLs having that

16   sole right.  So, I agree with Mr. Kajon that only the JPLs could

17   assert the client's right to waive work product privilege here.

18   However, when the attorney is required to disregard work product

19   privilege and turn it over to the client, it is not such a

20   clear-cut issue here to me with respect to the second

21   litigation, in particular, that we're going to talk about.

22           With respect to the firs litigation which seems to

23   only be involving ULICO and PBLA, I think the caselaw is clear

24   that if someone is a former client, they are obligated to turn

25   over documents to the client in that scenario when they cease to

1    be the client.  There are some limited exceptions to that under

2    New York law or for that matter, North Carolina law, but it's

3    fairly generally broadly what Mr. Kajon noted and the caselaw

4    cited in his motion papers.

5            The problem I have is that I can't tell from these

6    documents the way that the privilege log was put together, which

7    I note, I do not believe complies with Judge Chapman's turnover

8    order or, for that matter, our local rule 7034 and what's

9    required.  But I can't tell from that if there's any basis under

10   the law that it falls in any of the exceptions to a former

11   attorney being required to turn over that.  And so, what I would

12   suggest here, I realize this is more work for everybody, but I

13   would suggest that to the extent that the law firms wish to

14   claim work product privilege here, with respect to the ULICO

15   action, it's going to have to be spelled out in the privilege

16   log as to physically the nature of why this is prepared in

17   contemplation of litigation.  And also, I think there has to be

18   briefing on why that wasn't required to be turned over at the

19   time that your representation ceased to the JPLs.  And I don't

20   see any reasons right now based on what I can tell in these logs

21   that there is any such basis for that.  And so, what I would be

22   inclined to do, would be to require you to turn over that

23   information to the extent that the JPLs decide that they wish to

24   waive the work product privilege.  But because there are limited

25   exceptions under the caselaw for times where former attorneys

PB Life and Annuity Co., Ltd - 6/24/21                    37

1    are not required to do that, I think the more reasonable thing

2    here, although it is a delay, is to allow you to (A) revised the

3    privilege log, eliminating attorney-client privilege assertion,

4    limiting it to work product privilege assertion.  And with

5    respect to the ULICO action, explaining why you feel that any of

6    these documents fit within those exceptions.  If you cannot do

7    that, I am going to require all of them to be turned over to the

8    extent that Mr. Kajon's clients, the JPLs, determine to waive

9    the work privilege.

10          So, that's my ruling with respect to that.  I would

11   ask counsel to take a look at the privilege log, redo it with

12   respect to the work product privilege only, explaining why these

13   documents were prepared in contemplation of that litigation,

14   providing more information about the nature of the documents,

15   and then having a separate column explaining why it falls in the

16   category of a former client situation, the former client here

17   being the corporation, and why you're not required to turn over

18   that.  Again, I don't see a basis for it, but I'm going to give

19   you an opportunity to make an argument if there is such a basis.

20          With respect to the second litigation, that's a little

21   more complicated to me.  Because there are different parties

22   that are continuing to appear in that litigation that it seems

23   like, although the law firms still represent.  Obviously, not

24   with respect to PBLA and documents that are only PBLA work

25   product privilege, but I don't know enough about those privilege

1    documents from the privilege log, again, which is woefully

2    deficient, and in my opinion, not in compliance with either

3    Judge Chapman's turnover order or for that matter, the local

4    rule.  But I cannot tell from the privilege log why they're

5    subject to the work product privilege, whether the work product

6    privilege is being asserted, or the attorney-client privilege,

7    for that matter that's being asserted, relates to PBLA, as

8    opposed to some of the other defendants because I think that

9    makes a difference.  And whether or not with respect to those

10   documents, again, now that you're former counsel to PBLA, if

11   they were prepared in contemplation of litigation, the privilege

12   only belongs to PBLA.  It was work product prepared for PBLA in

13   connection with upcoming litigation.  If all those things are

14   true, then I have the same issue about why it shouldn't be

15   produced given the former relationship of PBLA and the caselaw,

16   again cited in Mr. Kajon's motion that relate to what happens

17   when an attorney has a work product privilege and then ceases to

18   represent the client.  And the client is now the party dealing

19   with the litigation, which is the case here for the JPLs on

20   behalf of the corporation.

21        Again, I think what would have to happen with this is

22   a review of the privilege log, relating to that litigation where

23   there is no attorney-client privilege be asserted in the

24   reviewed privilege log.  And with respect to the work product

25   privilege, there is information provided about the work produce

1   privilege where I at least can determine the nature of why it's

2   covered by the work product privilege to start with, and then

3   affirm that the work product privilege only relates to PBLA in

4   that circumstance, or for that matter, the attorney-client

5   privilege only relates to PBLA in that circumstance, and if so,

6   what is the basis for that. And then, again, is there a basis it

7   was prepared solely for PBLA in connection with that litigation.

8   And as counsel to PBLA, which you are now former counsel, why

9   there is any exception to those documents being turned over.

10          I think it's a little more complicated in that

11  litigation only because there are multiple defendants, and the

12  parties' firm is representing some of those defendants.  So, I

13  think that we require more information in order to determine

14  what to do with that.  I think the law is fairly clear on this,

15  I just think the problem is that the facts and the documents

16  that I've been provided for the privilege log don't allow me to

17  figure out if there's any basis for my not wholesale determining

18  that all of these documents should be turned over to the JPLs,

19  even under the work product privilege.  But it is possible in

20  the second litigation that (A) there's either attorney-client

21  privilege where there's joint privilege issues, that's what I

22  raised earlier, or (B) whether or not there's an issue about the

23  work product privilege.  So, that's part one on this.  That has

24  to do with the privilege documents.

25          Part two on my ruling is what to do with the request

PB Life and Annuity Co., Ltd - 6/24/21                    40

1    for the turnover.  So, it does seem to me that even Mr. Pace has

2    acknowledged that there are a handful of things -- I'll use my

3    phrase for what he said -- for the Lindberg entities, where he

4    thinks it is worthwhile for the Lindberg entities, going back

5    and looking at the files again to make sure that they have

6    provided all the information that they have. in their files.

7    So, I would suggest that that occur.

8          I would suggest to the extent that there have been

9    identified in the reply, in particular and in all the papers for

10   the reply, different allegations about documents that were

11   Global Growth's, that there's an explanation given in writing by

12   the Lindberg entities, I'm just using a phrase in the motion, as

13   to why those documents aren't in their possession or don't exist

14   with respect to those specific things identified I the reply.  I

15   think, in fairness to the Lindberg entities, some of the answer

16   might be what's been argued by Mr. Pace and Mr. Moore, that

17   there are other entities that may have this information but are

18   considered to be part of Global Growth as a group but are not

19   actually Global Growth the actual corporate entity or not Mr.

20   Lindberg's property.

21         So, there may be other entities that are related to

22   this.  It certainly sounds like it's possible with respect to

23   some of insurance information, and that may be an answer to some

24   of the reason why some of these documents are not here, because

25   they are not documents that were handled by Global Growth the

PB Life and Annuity Co., Ltd - 6/24/21                    41

1   corporation, but would be handled by other entities, perhaps in

2   the Global Growth entities.  I do think that after the scouring

3   of the further information and the response that needs to be

4   filed with respect to the issues raised specifically in the

5   reply, which I'm going to give the Lindberg entities and Mr.

6   Lindberg the authority to do so, I do think that after that

7   occurs, then the request for a certification is something that

8   could be considered.  I think in a first instance, it's best to

9   allow the Lindberg entities, and Mr. Lindberg, and the law firms

10  to scour their books one more time and see if there's anything

11  else that comes up.  And then I think it's best that they

12  respond in writing to the issues raised in the reply

13  specifically as to what is missing.  And then I think we can

14  determine if there's something else that we need to do after we

15  see those responses.  And that's my ruling as to what needs to

16  happen.  So, I guess we need to talk about timing on some of

17  these things.

18        So, with respect to redoing your privilege log, which

19  is, I understand, pardon me for saying it, no fun, having done

20  them a lot as a lawyer.  To make them more detailed and address

21  the issues I've raised, how long do you think that you will

22  require to do that at Condon?  And I don't know if anybody here

23  is representing Mr. Charles (inaudible).  I will just have them

24  use the same date that we work out for you.  Mr. Pace or Mr

25  Moor, how long do you think you would require?

PB Life and Annuity Co., Ltd - 6/24/21                    42

1          MR. PACE:  Thank you, Judge.  Jared Pace here.  Of the

2    two things we have to do, this one I think is more exclusively

3    within our law firm's control and doesn't require as much client

4    input or communication.  So, I think we ought to be able to

5    handle the privilege log piece faster than probably the next

6    piece.  I would ask for at least 14 days to do that.  And one of

7    the big reasons is the North Carolina case has everyone's

8    attention right now at the law firm and at the client level.  To

9    the extent we need any client input on this, it's going to be

10   very difficult, at a minimum, to get their attention.  That

11   trial is going on right now.  It started on Monday, and it's

12   scheduled to go through Friday of next week, July 2.  And then

13   of course you've got the holiday right after that.  So, I would

14   ask for some time after the holiday for the privilege log piece.

15         THE COURT:  Okay.  So, I think that's the week of the

16   12th.  How about Field Day, the 14th?  That gives about three

17   weeks from today.

18         MR. PACE:  I think that would be a sufficient amount

19   of time, yes.  Thank you.

20         THE COURT:  Okay.  All right.  So, July 14, you're

21   going to provide the revised privilege log with all the things I

22   requested that you do.  Then we need to talk about two things,

23   the scouring for additional documents, and then a written

24   response to the issues raised in a reply responding why you

25   don't have those documents in particular.  And I'm guessing

PB Life and Annuity Co., Ltd - 6/24/21                    43

1    you'll want to scour your documents before you file a written

2    reply.  So, what is the timing you think for that?

3          MR. PACE:  Yes, Your Honor, that piece, I'm going to

4    reply heavily on my clients for that, obviously.  I don't have

5    the documents; I don't have access to their materials.  Client

6    participation again is very distracted, limited, engaged with

7    the MLU case right now.  So, I think the first time I'm going to

8    be able to effectively engage everyone that needs to be engaged

9    on this is going to be some time after the holiday.  They

10   already have the reply.  I mean I've given them the rely;

11   pointed out some of these things that some one needs to be

12   looking for and doublechecking it --

13         THE COURT:  Okay.  Respectively, before I decide

14   whether I'm going to require you to do certifications, issue an

15   order compelling, further compelling, or sanctioning you, just

16   being clear, I do think you would want to file a reply to do

17   this.  So, I think we need to be realistic about it.  I agree

18   with that.  I want to give you a chance to file your documents

19   and file a reply on behalf of your client, explaining these

20   issues.  And when I say, sanctioning you, I mean sanction your

21   client.  I'm sorry.  Just to be clear.  But I think the issue is

22   that you -- you know, this has been going on for a while, it's

23   reasonable to do that.  How about I give you to the 21st for that

24   project?  That would give you a couple of weeks.  Actually,

25   maybe in fairness, how about the 23rd?  So, that would give you

PB Life and Annuity Co., Ltd - 6/24/21                    44

1    about two weeks more from the start after the holiday, two and a

2    half weeks because the holiday will be over on the 5th.  So,

3    you'll have from the 6th through the 23rd to file such a reply.

4    And obviously, if you find additional documents in the meantime,

5    you will produce them before the 23rd.

6              MR. PACE:  Yes, Your Honor, we'll get it done.

7              THE COURT:  Okay.  All right.  Then what I think would

8    make sense is after that, we need to set another date for the

9    hearing with respect to the requests that I haven't dealt with n

10   the motion.  So, I think continuing this motion till the day

11   after the 23rd is appropriate.  I think that would leave us with

12   the week of the 25th.  How do you feel about the 27th, 28th, or

13   the 29th?  I don't know, Mr. Kajon, whether you'll want time to

14   look at the reply, and if you prefer that I schedule it the week

15   of August 2?

16             MR. KAJON:  Your Honor, Mr. Kajon here again.  I think

17   July 29 would be fine.  I checked my calendar while you were

18   figuring out dates, and that gives us six days from the time the

19   reply is filed, which should be sufficient.

20             THE COURT:  Okay.  Does that day work for you, Mr.

21   Moore, and Mr. Pace?

22             MR. MOORE:  Your Honor, this is Seth Moore, I'm

23   available on the 29th.

24             THE COURT:  Okay.  All right.  So, I think that's when

25   we're going to adjourn the motion further to that date.  So, the

PB Life and Annuity Co., Ltd - 6/24/21                    45

1   record should reflect that the revised privilege log with all of

2   the information that I have requested on the record here would

3   be filed by July 14.  That the Lindberg entities will scour

4   their records to see if there are additional documents to

5   produce, and if there are, they will produce them by the 23rd.

6          They will also file a reply by July 23, explaining and

7   responding to all the issues raised in the reply as to the

8   missing information and why it's not available.  And then we

9   will adjourn this hearing and have a subsequent hearing on July

10  23 (sic) with respect to the motion after we've all had an

11  opportunity to look at the privilege log answers, the written

12  reply, and also to the extent there are additional documents

13  that have come to light, they'll have been produced.  And

14  presumably, you'll just reflect that in your reply, Mr. Moore,

15  and Mr. Pace.

16         MR. KAJON:  Your Honor, this is Mr. Kajon again.  I

17  think you just said we'll adjourn the hearing to July 23, when

18  you meant July 29.

19         THE COURT:  No, 29th, I'm sorry.  I'm sorry, July 29.

20  I just want to clarify.

21         MR. KAJON:  I'm sorry, Your Honor, I just an email

22  from my client that the 29th is a bank holiday in Bermuda.

23         THE COURT:  Okay.  Well, then we're not going to have

24  the hearing on a bank holiday in Bermuda.

25         MR. KAJON:  Can we do --

PB Life and Annuity Co., Ltd - 6/24/21                    46

1          THE COURT:  Go ahead.

2          MR. KAJON:  Well, I was going to suggest the 28th.  I

3    don't think one day --

4          THE COURT:  Does that work for you, Mr. Moore?  It's

5    fine for me.

6          MR. MOORE:  Yes, Your Honor, the 28th is okay for me.

7          THE COURT:  Okay.  All right, leave it on the 28th

8    then.

9          MR. KAJON:  The only other question I had, Your Honor.

10   Again, Mr. Kajon here.  Are you going to so order the record?

11   It sounded like that's what you were leading up to.  Or do you

12   want us to submit an order reflecting your rulings?

13         THE COURT:  No, I actually did want you to submit an

14   order.  I just was making it clear so that everybody doesn't

15   leave the hearing not knowing what they're supposed to be doing.

16   Particularly Mr. Moore.  In fact, really mostly for Mr. Moore

17   and Mr. Pace's benefit because I think just about everything,

18   I've asked for additionally falls on their heads.  They are the

19   ones that are going to have to amend their privilege log; they

20   are the ones that will have to get their clients to scour the

21   files for additional documents, and they are the ones that will

22   have to prepare a written reply.

23         MR. KAJON:  Okay.  We will submit an order, Your

24   Honor.

25         THE COURT:  Okay.  Thank you.

PB Life and Annuity Co., Ltd - 6/24/21                    47

1          MR. KAJON:  Thank you.  We'll see you on July 28.

2          THE COURT:  Are there any other issues that anybody

3    wanted to discuss today about this matter?  I just want to make

4    clear before I adjourn the hearing.

5          (No response.)

6          THE COURT:  Okay.  If not, I'm going to adjourn the

7    hearing.  And thank you all.  I appreciate your arguments.  And

8    Mr. Pace and Mr. Moore, I appreciate you doing this additional

9    work that would be helpful to explain what needs to happen next

10   here.  Thank you.  Have a nice day.

11         ALL COUNSEL:  Thank you, Your Honor.

12         THE COURT:  Court is adjourned.

13                            - o0o -

14                          CERTIFICATION

15         I, Rochelle V. Grant, approved transcriber, certify

16   that the foregoing is a correct transcript from the official

17   electronic sound recording of the proceedings in this matter,

18   Case 20-12791-lgb, held on 6/24/21.

19                              _Rochelle V. Grant_

20                              June 26, 2021

21                         AA EXPRESS TRANSCRIPTS
                           195 Willoughby Avenue
22                         Brooklyn, New York 11205
                              (888) 456-9716
23                       aaexpress@court-transcripts.net

24

25