Norman N. Kinel
SQUIRE PATTON BOGGS (US) LLP
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
Email: norman.kinel@squirepb.com

Wes J. Camden
WILLIAMS MULLEN
301 Fayetteville Street, Suite 1700
P.O. Box 1000 (27602)
Raleigh, NC 27601
Telephone: (929) 981-4064
Facsimile: (919) 981-4300
Email: wcamden@williamsmullen.com

**Hearing Date and Time:**
**December 7, 2021 at 10:00 a.m.**
**(Eastern)**

*Co-Counsel for Colorado Bankers Life Insurance Company, Bankers Life Insurance Company, Southland National Insurance Corporation and Southland National Reinsurance Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| **PB LIFE AND ANNUITY CO., LTD.,** *et al.*[1] | Case No. 20-12791 (LGB) |
| Debtors in Foreign Proceedings. | (Jointly Administered) |

**OBJECTION OF COLORADO BANKERS LIFE INSURANCE COMPANY, BANKERS LIFE INSURANCE COMPANY, SOUTHLAND NATIONAL INSURANCE CORPORATION AND SOUTHLAND NATIONAL REINSURANCE CORPORATION TO** *MOTION OF JOINT PROVISIONAL LIQUIDATORS FOR ENTRY OF AN ORDER APPROVING THE USE, SALE, TRANSFER, OR OTHER DISPOSITION OF ASSETS IN THE ORDINARY COURSE OF DEBTORS' BUSINESSES*

---

[1] PB Life and Annuity Co., Ltd., Northstar Financial Services (Bermuda) Ltd., Omnia Ltd. and PB Investment Holdings Ltd., foreign Debtors (collectively, the "Debtors"), are Bermuda limited companies which each have a registered address in Bermuda c/o Deloitte Ltd., Corner House 20 Parliament Street, Hamilton, HM 12, Bermuda, and are jointly administered for procedural purposes, by Order of this Court entered on April 2, 2021 [Dkt. No. 42].

Colorado Bankers Life Insurance Company, Bankers Life Insurance Company, Southland National Insurance Corporation and Southland National Reinsurance Corporation (collectively, the "NC Insurance Companies"), submit this objection (the "Objection") to the *Motion of Joint Provisional Liquidators For Entry of an Order Approving the Use, Sale, Transfer, or Other Disposition of Assets in the Ordinary Course of Debtors' Businesses* [Dkt. 140] (the "Sale Motion") and respectfully represent as follows:

## PRELIMINARY STATEMENT[2]

1.      The Sale Motion should be denied for at least two reasons. First, it is impossible to determine what asset sales can be considered in the ordinary course of business because the definition of the "Proposed Transactions," which the Joint Provisional Liquidators (the "JPLs") of the Debtors wish to effectuate, is entirely amorphous. Second, the JPLs are asking this Court to agree not to supervise any asset sales *outside the ordinary course of business*, which is simply impermissible under the Bankruptcy Code. Specifically, the JPLs seek an order of this Court (a) determining that the "Proposed Transactions" are in the ordinary course of the Debtors' businesses, without describing in details what the "Proposed Transactions" are, (b) **but,** to the extent that any of the "Proposed Transactions" are not in the ordinary course of the Debtors' businesses, authorizing the JPLs to consummate them *without further order of this Court*. *See* Proposed Order [Dkt. 140-1] (the "Proposed Order") at ¶¶ 2, 3.

2.      With respect to their first request, as correctly set forth in the Sale Motion, the JPLs may engage in transactions in the ordinary course of the Debtors' businesses and do not require a "comfort order" to do so. If they did, that relief should have been requested nearly a year ago,

---

[2] Capitalized terms used in this preliminary statement, which are not otherwise defined herein, shall have the meanings ascribed to them either in the Sale Motion or the Objection, as applicable.

2

when these cases were first filed, since the JPLs must have conducted some ordinary course business during the lengthy period since their appointment.  If the JPLs are uncertain about whether the "business" that they intend to conduct is "ordinary," then they should seek a ruling from this Court after presenting all of the relevant facts and evidence which must be evaluated for this Court to rule.

3.      With respect to their second request, the JPLs are asking this Court to blindly cede its bankruptcy code-mandated role of approving any transactions made *outside of the ordinary course of business*.  No authority exists for this Court to abrogate entirely its authority for the benefit of the JPLs.  Likely because they know this to be the case, the JPLs omitted this extraordinary request from the title given to the Sale Motion.  Even more telling, aside from inserting the text of section 363(b) of the Bankruptcy Code (in a paragraph which is a non-sequitur), the JPLs failed even to mention that they are seeking such relief—they simply included it in the introductory paragraph and the "Wherefore" clause of the Sale Motion with no factual predicates or legal discussion whatsoever.  The JPLs then simply added a decretal paragraph in the Proposed Order granting them such authority.  Undoubtedly, this is because the JPLs know that the relief they are seeking is improper, extraordinary and likely unprecedented.  Indeed, the request for advance, carte blanche authority essentially to *liquidate all of the Debtors' assets*—which obviously entirely subsumes the seemingly contrived first request for authority to engage in sales in the ordinary course of the Debtors' businesses—is entirely impermissible.

4.      In sum, as reflected in the Proposed Order, *the JPLs are seeking authority to sell <u>any and all assets (in or out of the ordinary course of business)</u>, without notice to this Court or the Debtors' creditors, for whatever amount, without caps, without this Court's supervision or control, without creditors' input, and without any reporting obligations*.  It is, however, crucial that (a) the

3

sale process be clearly described, (b) the assets to be sold purportedly in the ordinary course of business be clearly defined, and (c) the process pursuant to which the asset sales outside of the ordinary course of business are consummated be transparent and court-approved.

5.    Based on the foregoing and as more fully explained below, it is respectfully submitted that the relief being sought by the JPLs in the Sale Motion should be denied.[3]

## BACKGROUND

### A.    The NC Insurance Companies

6.    Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC") and Colorado Bankers Life Insurance Company ("CBL") are each licensed North Carolina domestic life and accident and health insurers.  Southland National Reinsurance Corporation ("SNRC") is a licensed North Carolina captive insurance company that has engaged in the business of reinsurance.

7.    On June 27, 2019, in the matter captioned *Causey v. Southland National Insurance Corporation, et al.*, 19-CV-8664 (Wake County Superior Court), an Order of Rehabilitation pursuant to Article 30 of Chapter 58 of the North Carolina General Statutes was entered with respect to each of the NC Insurance Companies.  Mike Causey was appointed, in his official capacity on behalf of the State of North Carolina as Commissioner of Insurance, as Rehabilitator for the NC Insurance Companies (the "Rehabilitator").  Pursuant to N.C. Gen. Stat. § 58-30-85(a)(1), the Rehabilitator has the authority to appoint Special Deputy Rehabilitators and on June 27, 2019, he appointed Mike Dinius and John Murphy of Noble Consulting Services, Inc. as Special Deputy Rehabilitators.  The Rehabilitator conferred on them all the powers of the

---

[3] Prior to filing this Objection, counsel for the NC Insurance Companies engaged counsel for the JPLs with respect to their clients' concerns about the relief being sought in the Sale Motion and suggested specific revisions to the Proposed Order which would have obviated the need to file this Objection.  Unfortunately, the JPLs—through their counsel—declined to agree to any of the proposals made by the NC Insurance Companies.

Rehabilitator under the court's June 27, 2019 Order and Article 30 of Chapter 58 of the North Carolina General Statutes.

8.    SNIC, CBL, and BLIC were engaged in the business of selling annuities, life, accident and critical condition insurance policies to consumers in North Carolina and elsewhere. SNRC was a reinsurer for SNIC and CBL.

9.    The NC Insurance Companies satisfied their obligations to policyholders through cash payments or transfers, with their revenues derived from the sale of annuities and insurance policies and the collection of premiums.  The NC Insurance Companies also placed some of their revenues in other investments, to grow the money before their own obligations became due.

10.    The Debtors share a common controlling person with the NC Insurance Companies. Greg E. Lindberg ("Lindberg"), directly or indirectly, through one or more intermediaries, owns 100% of the shares of stock of each of the NC Insurance Companies.  Lindberg is also the sole and exclusive owner of 100% of the shares of Global Growth Holdings, Inc. ("GGHI").  Together, Lindberg and GGHI control in excess of 820 Affiliated Entities.  These entities include various holding companies, as well as Operating Companies that conduct business in a number of different industries.[4]  The "brand name" for this portfolio of companies was Eli Global, but has been rebranded to "Global Growth."  GGHI is, in effect, the master holding company for the Global Growth portfolio.

11.    Private Bankers Life and Annuity Co., Ltd. a/k/a PB Life and Annuity Company Ltd. ("PBLA"), a Bermuda limited company—one of the Debtors in these chapter 15

---

[4] The Lindberg or GGHI-controlled entities, including the Global Growth portfolio, are herein referred to as "Affiliates" or "Affiliated Companies."  The Affiliates that conduct revenue-generating business are referred to as "Operating Companies."  Eli Global, LLC is one of the Lindberg-Affiliated companies, but is not the parent holding company of all the various Operating Companies and is itself a subsidiary of GGHI.

010-9297-4423/12/AMERICAS

proceedings—is an affiliate of GGHI and Lindberg. Along with CBL and SNIC, PBLA serves as agent under certain debt and equity financing arrangements.

12.    A substantial portion of the NC Insurance Companies' investments are debt facilities or equity financing arrangements with entities that are under Lindberg's control. These Affiliated Entities consist of Operating Companies and holding companies, special purpose vehicles and trusts, formed and incorporated in North Carolina, other states and overseas, which created a complex network of interrelated loans, financing arrangements and investments. The Affiliated Entities have credit exposure of at least *$2.1 billion*. Of that amount, the NC Insurance Companies hold approximately $*1.25 billion* of the obligations.

13.    PBLA similarly has substantial direct and indirect investments into the Affiliated Entities. PBLA is holding direct investments in 53 of the Affiliated Entities, including many pass-through entities, which in turn hold 158 investments, including investments in another 78 unique Affiliated Entities, many of which are pass-through entities holding 124 investments in another 27 unique Affiliated Entities, including two Affiliated Entities with $269 million due from Lindberg or entities used by him to fund personal expenses.

14.    Through many layers of holding and pass-through companies, Lindberg ultimately owned the controlling interests, as well as the economic interests, in these non-insurance Operating Companies. The NC Insurance Companies and PBLA only own the loans made to the intermediary companies, which in turn loaned to or invested in Operating Companies through tiers of holding and pass through companies. The NC Insurance Companies, however, have no equity interest, control, or visibility in the non-insurance Operating Companies or the tiers of holding companies above them.

6

15.     For some time, the NC Insurance Companies' had experienced liquidity issues which, by June 2019, had became severe enough to warrant them being placed in rehabilitation. The success or failure of the NC Insurance Companies' rehabilitation will depend on whether the Lindberg-controlled Operating Companies can generate sufficient revenue to repay affiliated investments, so that the NC Insurance Companies can meet their long-term obligations to policyholders and creditors.  If the Affiliated Entities fail to repay their debts, the NC Insurance Companies' only alternative will be to foreclose on the debts and to initiate the liquidation of the companies and their assets—which will result in a substantial shortfall.[5]  Similar concerns regarding the Debtors' affiliated investments led to the Debtors being placed in liquidation in Bermuda, and these Chapter 15 proceedings being initiated.

**B.      The MOU and the North Carolina Action**

16.     In an effort to have the Affiliated Entities repay their debts, the NC Insurance Companies and Lindberg, on behalf of himself and numerous entities, entered into a Memorandum of Understanding (the "MOU") on June 27, 2019.  The MOU sets forth a plan to reorganize many, although not all, of the Affiliated Entities under a newly-formed holding company governed by an independent board.  Through this centralized board, the parties planned to restructure the Affiliated Entities' loan obligations and to improve management to ensure that the Operating Companies' revenue would be sufficient to service their debt to the NC Insurance Entities and other debtholders.  More importantly, the MOU binds the board to manage the Affiliated Entities in the best interests of the NC Insurance Companies' policyholders.

---

[5] Such a process would inevitably lead to losses of account value to policyholders.  State guaranty funds would pay claims only up to the amount of the state guaranty fund limits.  Policyholders with account values in excess of the state guaranty fund limits would suffer the most severe losses.  The NC Insurance Companies' general creditors would suffer total losses.

17.     Specifically, the MOU sets forth various agreements among the parties regarding: (i) the immediate partial amendment of certain loans; (ii) a reorganization of the Specified Affiliated Companies under a new holding company; and (iii) a global restructuring and further modification of certain loans.

18.     The MOU and ancillary agreements represent a series of transactions intended to protect the best interests of the NC Insurance Companies' policyholders and to increase the long-term equity value of certain of the Affiliated Operating Companies.  The operating and holding companies central to these transactions are referred to herein as the "Specified Affiliated Companies."

19.     One of the agreements entered into in connection with, and on the same day as, the MOU was an Interim Amendment to Loan Agreements (the "Interim Loan Amendment") that deferred debt payments by the Affiliated Entities.  The Interim Loan Amendment, among other terms, deferred payment of principal and interest from affiliates to the NC Insurance Companies until the second quarter of 2020.  Because of this deferral, the NC Insurance Companies and other lenders have not collected approximately $100 million in payments that otherwise would have been due since June 27, 2019.  In addition, as part of the overall transaction, CBL reduced to writing a loan to Academy Financial Assets, LLC—a Lindberg-controlled intermediary pass-through company without revenue-generating activities that previously had been made in the amount of $15 million, increased the amount to $40 million, and structured the loan as a revolving line of credit.  Also on the same day, with the parties' consent and as part of the overall transaction

described above, the Court in North Carolina entered an Order of Rehabilitation in *Causey v. Southland National Insurance Corporation, et al.*, 19-CV-8664 (Wake County Superior Court).[6]

20.    The defendants in the North Carolina Action (the "Defendants")[7] agreed to restructure the Specified Affiliated Companies to become subsidiaries, either directly or indirectly, of a newly-formed holding company—NHC Holdings, LLC ("NHC")—on or before September 30, 2019.

21.    The deadline to reorganize the relevant companies under the new holding company was September 30, 2019.  The Defendants failed to perform their obligations, however, proffering a variety of reasons for why they were unable to do so under the MOU.  A number of these reasons directly contradict the express representations and warranties that the Defendants made to the NC Insurance Companies during the contract negotiations.  By contrast, Lindberg and his companies accepted without protest over $100 million in benefits under the MOU.

22.    As a result of the Defendants' failure to perform under the MOU, on October 1, 2019, the Special Deputy Rehabilitator initiated a North Carolina State Court civil action entitled *Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company, in Rehabilitation, Colorado Bankers Life Insurance Company, in Rehabilitation, and Southland National Reinsurance Corporation, in Rehabilitation, v. Greg E. Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, and Private Bankers Life and Annuity Co., Ltd. a/k/a PB Life and Annuity Company, Ltd.*, *Gen. Court of Justice, Superior Court Division (Wake County), No. 19 CVS 013093* (the "North Carolina Action").

---

[6] Upon the filing of the Order of Rehabilitation on June 27, 2019, title to the NC Insurance Companies assets vested in the Rehabilitator pursuant to N.C. Gen. Stat. § 58-30-80(a).  The court in North Carolina also entered an Order the same day granting a moratorium on policy surrenders and other relief pursuant to N.C. Gen. Stat. § 58-30-85(b).

[7] The Defendants are Greg E. Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, and Private Bankers Life and Annuity Co., Ltd. a/k/a PB Life and Annuity Company, Ltd.

9

23.     On May 4, 2021, this Court entered an order formally recognizing the Bermuda proceeding as PBLA's main proceeding (the "Recognition Order"), preventing anyone other than the JPLs from taking certain actions against PBLA or PBLA's property located in the United States.  The Recognition Order specifically provided, however, that the North Carolina Action could proceed against all Defendants other than PBLA, while providing that "nothing that may occur in the [North Carolina Action] shall have any res judicata or collateral estoppel effect" against PBLA.  Recognition Order at 5.

24.     A trial of the North Carolina Action took place from June 21, 2021 through June 30, 2021.  The NC Insurance Companies believe that the evidence presented at trial proved that, contrary to the positions of the non-PBLA Defendants, (a) the MOU is a valid enforceable agreement; (b) the Defendants are estopped from denying the validity, terms, or enforceability of the MOU; (c) the Defendants breached the MOU; (d) the NC Insurance Companies are entitled to an order directing specific performance of the MOU; and (e) the NC Insurance Companies are entitled to damages for the Defendants' breach of the MOU and fraud.  The North Carolina Action is currently *sub judice*.

C.    **The Sale Motion**

25.     In the Sale Motion, the JPLs explain that the Debtors, as insurers and reinsurers, are regularly engaged in the purchase, sale, transfer, and other dispositions of assets related to the operation of their respective insurance businesses.  According to the JPLs, "the ordinary course transactions that the Debtors previously engaged in, and which the JPLs propose to continue engaging in, included: (i) the investing and reinvesting of policyholders' and investors' premiums, (ii) the funding and rebalancing of trust accounts, (iii) investing reinsurance proceeds, and (iv) selling and/or liquidating of certain assets or investments of both the Debtors and the Debtors'

10

non-debtor subsidiaries to reduce the risk of investment portfolios held for the benefit of policyholders and investors (the "Proposed Transactions")."  Sale Motion at ¶ 11.

26.    The JPLs further aver that the Debtors hold over 100 investments in the United States, comprised of collateralized loans and preferred, common and other equity investments in Operating Companies, special purpose vehicles, limited liability companies and holding companies.  The JPLs allege that in the ordinary course of the Debtors' businesses, the Debtors regularly sell, assign or otherwise dispose of such investments to maximize return to policyholders. According to the JPLs, the continued sale, use, transfer or other disposition of assets of the Debtors and of the Debtors' non-debtor subsidiaries located in the United States is required for them to carry out their obligations under the Bermuda Orders.  Sale Motion at ¶ 12.

27.    As detailed above, the Debtors' investments include (a) loans to the same Affiliated Entities as the NC Insurance Companies, (b) loans to the NC Insurance Companies, and (c) indirect loans to both through complex layers of syndication.  Any action taken on any one of these loans will have collateral impacts, many of which may not be obvious without a fulsome understanding of the overall debt structure.  Moreover, a common term of the loan agreements for the Affiliated Entities restricts the lender from taking any action without obtaining consent from the Loan Agent, *which is one of the NC Insurance Companies for the overwhelming majority of PBLA's loans to the Affiliated Entities*.

28.    The JPLs further state that, absent the relief requested in the Sale Motion, they would be required to draft a separate motion for approval of every sale, transfer or disposition of assets of the Debtors and of the Debtors' non-debtor subsidiaries, when such dispositions are allegedly nothing more than part of the regular day-to-day operations of the Debtors.  The JPLs express concern that the "time, cost and delay in having to seek Court approval for every potential

11

transaction is a huge burden on (i) the Debtors and their creditors in terms of cost of preparing the separate motions and the risk that sales may fall through because of the delay in obtaining approval, and (ii) the Court, in terms of the burden of holding scores of hearings to approve such transactions that, outside of bankruptcy, would occur in the ordinary course of the Debtors' business." Sale Motion at ¶ 13.

29.    Importantly, in the Sale Motion, the JPLs acknowledge that all of the assets which they seek to sell, transfer or otherwise dispose of "in the ordinary course of the Debtors' businesses" *are located within the territorial jurisdiction of the United States* and that under the existing Bermuda Orders appointing the JPLs, they do not need to seek any further order of the Bermuda Court to sell, transfer or otherwise dispose of assets of the Debtors and of the Debtors' non-debtor subsidiaries.  As such, the JPLs are requesting that this Court, pursuant to 11 U.S.C. § 1507, grant the proposed relief in order to "provide additional assistance to [the JPLs] under [the Bankruptcy Code]." Sale Motion at ¶ 14.

**D.    Applicability of Section 363 in Chapter 15 Cases**

30.    Generally, in a cross border case, there are several ways to obtain relief, including by:  (i) obtaining relief from the foreign court in the main or non-main proceeding and then obtaining the same relief from the court in the United States, with each court applying its own standard of review, or (ii) obtaining relief from the foreign court and then seeking recognition by the United States bankruptcy court of the foreign ruling on the basis of comity, without the U.S. bankruptcy court applying its own standard of review.  These processes are used to ensure the enforceability of the order at issue in the foreign country and in the United States—including orders governed by section 363 of the Bankruptcy Code.

12

31.     In the instant case, however, despite well-established principles of comity, the JPLs must obtain authority from this Court to ensure that any proposed 363 sale outside the ordinary course of business constitutes a sound exercise of the Debtors' business judgment.  *In re Fairfield Sentry Ltd.*, 768 F.3d 239, 244-46 (2d Cir. 2014) (bankruptcy court cannot defer reviewing a 363 sale motion under principles of comity); *see also In re Elpida Memory, Inc.*, 2012 Bankr.  LEXIS 5367, at 26-28 (Bankr. D. Del. Nov. 16, 2012) (comity should be considered by a bankruptcy court, but a bankruptcy court should not "defer completely" to a foreign court to the extent a previous foreign order approved a sale of the debtor's assets).

32.     The NC Insurance Companies do not dispute that a foreign representative may exercise the rights and powers of a debtor to the extent permitted under section 363 of the Bankruptcy Code for assets located within the United States.  *See* 11 U.S.C. § 1520(a)(2); *In re Markus*, 610 B.R. 64, 75 (Bankr. S.D.N.Y. 2019) (under section 1520 of the Bankruptcy Code, a foreign representative is allowed to operate a debtor's business by exercising the rights and powers of the debtor under section 363).  Indeed, section 363 is automatically applicable in a Chapter 15 case when the foreign proceeding is a foreign main proceeding.  *See* 11 U.S.C. § 1520(a)(2).  The key issue presented in the Sale Motion, however, is determining what rights and powers the JPLs of a Chapter 15 debtor have under section 363 of the Bankruptcy Code.

33.     Generally, "[t]he purpose behind the ordinary course of business rule in § 363 is to allow a business to continue its daily operations without incurring the burden of obtaining court approval or notifying creditors for minor transactions, while at the same time protecting secured creditors and others from the dissipation of the estate's assets."  *In re Selgar Realty Corp.*, 85 B.R. 235, 240 (Bankr. E.D.N.Y. 1988) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 181-82 (1977)).

13

34.     As the JPLs correctly note, section 363(c)(1) of the Bankruptcy Code authorizes a trustee to enter into transactions—including the sale or lease of property of the estate—in the ordinary course of business, without the necessity of first seeking court approval.  11 U.S.C. § 363(c)(1) (emphasis added).  However, section 363(b)(1) of the Bankruptcy Code requires that a trustee may, only "*after notice and a hearing* . . . use, sell, or lease, *other than in the ordinary course of business*, property of the estate."  11 U.S.C. § 363(b)(1) (emphasis added).

35.     It bears noting at the outset that through the Sale Motion, the JPLs are seeking authority to *liquidate* estate assets, which a Second Circuit bankruptcy court in *In re Fairfield Sentry Ltd.*, 539 B.R. 658, 674-76 (Bankr. S.D.N.Y. 2015) deemed to be outside of the ordinary course of business in the chapter 15 context.  *See Id.*  (because the former debtor's "normal, daily business" did not involve liquidation, the transaction was outside of the ordinary course of business and required prior bankruptcy court approval); Proposed Order at ¶ 2.  The JPLs are likely aware of this fact, which may be why they are also requesting authority to conduct sales that "are not in the ordinary course of the Debtors' businesses . . . without further order of this Court."  Proposed Order at ¶ 3.  Thus, while a chapter 15 debtor may utilize section 363 (pursuant to section 1520 of the Bankruptcy Code) to continue conducting *daily operations that are within industry norms*, in all other circumstances, such as liquidations, court approval must be obtained before engaging in any non-ordinary transactions.  *See generally In re Selgar Realty Corp.*, 85 B.R. at 240.  For the reasons stated below, the Sale Motion should be denied regardless of whether the Proposed Transactions are deemed ordinary or not.

14

## **ARGUMENT**

A.    **The JPLs Fail to Clearly Define What Constitutes a "Proposed Transaction," Preventing this Court from Determining What Transactions are Actually in the Ordinary Course of the Debtors' Businesses.**

36.     In the Sale Motion, the JPLs discuss at length the law addressing whether a transaction is within the ordinary course of a companies' business—namely by using the vertical and horizontal analyses.  Sale Motion at ¶¶ 18-24.  The JPLs are correct that a bankruptcy court will conduct a two-part test to determine whether a transaction is in the ordinary course of business and does not require prior bankruptcy court authority:  (i) the vertical test views the disputed transaction from the vantage point of a hypothetical lien creditor to determine if the economic risks of the transactions are the same as those that occurred prepetition, and (ii) the horizontal test compares the debtor to similar businesses to determine if it is a transaction that similar businesses would engage in as ordinary business.  *See In re Winimo Realty Corp.*, 2004 U.S. Dist. LEXIS 17260, at *14 (S.D.N.Y. Aug. 27, 2004); *In re Enron Corp.*, 2003 Bankr. LEXIS 2111 (Bankr. S.D.N.Y. Mar. 21, 2003); *In re Lavigne*, 114 F.3d 379, 385 (2d Cir. 1997).

37.     To conduct this two-part test, a bankruptcy court must first be provided with substantial evidence regarding the proposed sales, including, but not limited to, the amount, type, and proportion of estate assets being sold, the value of the assets being sold, the debtor's experience regarding previous sales, a business plan describing the proposed sales, and the distribution channels being used to conduct the sales.  *In re G.S. Distrib.*, 331 B.R. 552, 558-59 (Bankr. S.D.N.Y. 2005) (the debtor's proposed sales program was not authorized under section 363(c) of the Bankruptcy Code because the debtor did not provide the following evidence necessary to conduct the vertical and horizontal tests); *see also In re Fairfield Sentry Ltd.*, 539 B.R. 658, 674-76 (Bankr. S.D.N.Y. 2015) (rejecting the argument that a sale of a $10 billion claim held by the

estate and being administered by a foreign representative and liquidator was a transaction in the ordinary course of business under section 363(c)(1) because (i) the debtor's prepetition "normal, daily business" was as an investment fund, not as a liquidator, and (ii) any liquidation of valuable estate assets must first be approved by the court under section 363(b)); 3 Collier on Bankruptcy ¶ 363.02, at 363-10 (16th ed. 2009).

38.     For example, in *In re Lott*, 2008 Bankr. LEXIS 4813, (Bankr. W.D. Ark. Sept. 23, 2008), a year after filing for chapter 11 bankruptcy protection, the debtor conducted a "yard sale" of its equipment and materials without prior court authorization. *Id.* at *29.  The "yard sale" resulted in the debtor improperly selling thousands of dollars of estate material and equipment to third-parties.  *Id.*  The bankruptcy court held that, as a former steel fabricator, the debtor should have only sold the assets after a notice and a hearing before the bankruptcy court under section 363(b). *Id.* at *31.  In support of its holding, the bankruptcy court concluded that section 363(c)(1) was inapplicable based on evidence related to the debtor's prepetition business transactions, the value of the assets, the purchase price of the assets, how the proceeds were used, and the prepetition purpose of the debtor. *Id.* at *29-31.

39.     Here, the Sale Motion is devoid of any crucial data and evidence.  The JPLs have not provided any of the evidence outlined by the *In re G.S. Distrib.*, *In re Fairfield Sentry Ltd.*, or the *In re Lott* courts to support their position that the Proposed Transactions are ordinary course. The JPLs have asserted that the Debtors hold over 100 investments in the United States consisting of loans and equity interests and that the Debtors "regularly sell, assign or otherwise dispose of such investments."  Sale Motion at ¶ 12.  However, the JPLs have failed specifically to describe the Proposed Transactions to determine whether the vertical or horizontal ordinary course of business analysis has been satisfied.  The Sale Motion also fails to include any relevant evidence

16

necessary for this Court to determine whether the proposed transactions are actually ordinary, most importantly, the value of the assets and how such value will be maximized for the benefit of the Debtors' estates and their creditors. As a result, this Court has no basis to find that the Proposed Transactions may be executed by the JPLs without court-authority pursuant to section 363(c)(1) of the Bankruptcy Code.

40.     Incredibly though, this lengthy discussion by the JPLs in the Sale Motion is utterly irrelevant, since they also seek *blanket authorization to conduct non-ordinary course business transactions*, purportedly pursuant to section 363(b)(1) of the Bankruptcy Code. *See* Proposed Order at ¶ 3 ("to the extent any of the Proposed Transactions are not in the ordinary course of the Debtors' businesses, the JPLs are hereby authorized to consummate the Proposed Transactions without further order of this Court."). In other words, even if this Court was provided with evidence (which it has not) and determined that one or more of the Proposed Transactions was not in the ordinary course of business, the JPLs seek to eliminate the bankruptcy code requirement that they must demonstrate to this Court that they have exercised their sound business judgment.

**B.      The JPLs Fail to Satisfy the Business Judgment Standard Imposed by Section 363(b)(1) of the Bankruptcy Code for Transactions Outside the Ordinary Course of Business**

41.     The Second Circuit Court of Appeals in *In re Fairfield Sentry Ltd.*, 768 F.3d 239, 244-46 (2d Cir. 2014) held that a transfer of a debtors' assets under section 363 in a chapter 15 case is subject to the bankruptcy court's review and *is not subject to comity*. The Court of Appeals explained its ruling by noting that a bankruptcy court's "principal responsibility . . . is to secure for the benefit of creditors the best possible bid," with respect to postpetition sales of estate assets located in the United States. *Id.* at 246-47 (internal citation omitted); 11 U.S.C. § 1502(8) (assets are located "within the territorial jurisdiction of the United States" when the assets are located

within that territory, which includes property subject to attachment or garnishment that may be seized by an action in a United States court).[8]

42.     Rather than blindly defer to a foreign court on the basis of comity, United States courts are required to review such sales under the standards for asset sales set forth in section 363, which standard is the business judgement rule.  *Fairfield Sentry Ltd.*, 768 F.3d at 246-47; *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d. Cir. 1983) (bankruptcy court must review all salient 363 sale factors, including "the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value"); *see also In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'") (internal citation omitted).

43.     Assuming that the Court finds that the Proposed Transactions are outside of the ordinary course of the Debtors' businesses, the Sale Motion is devoid of any evidence to support the 363(b) factors outlined by the *Lionel Corp.* court to determine whether the Proposed Transactions satisfy the business judgment standard.  The four categories of Proposed Transactions include "(i) the investing and reinvesting of policyholders' and investors' premiums, (ii) the funding and rebalancing of trust accounts, (iii) investing reinsurance proceeds, and (iv) selling

---

[8] Here, the JPLs have acknowledged that all of the assets which would be considered the subject of a Proposed Transaction involve assets located within the territorial jurisdiction of the United States.  Sale Motion at ¶ 14.

and/or liquidating certain assets of both the Debtors and the Debtors' non-debtor subsidiaries to reduce the risk of investment portfolios held for the benefit of policyholders and investors." Sale Motion at ¶ 11. However, the Sale Motion does not explain: (i) the proportionate value of the premiums, trust accounts, reinsurance proceeds, or certain other assets compared to the other estate assets; (ii) the current value of the assets; (iii) the effect on the estates from the proposed investing, reinvesting, funding, rebalancing, selling, and liquidating of the assets; (iv) the expected proceeds from the sales; (v) any alternatives to conducting the sales, including the result to the estates of not conducting the sales; or (vi) the value to the estates after conducting the sales.

44.     In addition to the lack of evidence to demonstrate whether the Proposed Transactions will be in the ordinary course of business or satisfy the business judgment standard for non-ordinary course of business sales, the Sale.  For example, it is remarkable that the Sale Motion does not limit the Proposed Transactions based on the dollar amount of the sales, require the JPLs to provide notice of the proposed sales or file monthly (or even quarterly) sale reports. *See, e.g.*, *In re Borders Group, Inc.*, 453 B.R. 477, 481-82 (Bankr. S.D.N.Y. 2011) (broad authorization to conduct sales outside of the ordinary course of business may be appropriate when such sales are limited by a dollar amount and proper notice is given to parties-in-interest); *In re Partsearch Tech.*, Case No. 11-10282 (MG) (Bankr. S.D.N.Y. Apr. 21, 2011) (entering *de minimis* asset sale order under section 363 when (a) all of the assets did not exceed $75,000, (b) no one asset was valued at more than $5,000, and (c) three days prior written notice was provided to interested third-parties who could block the asset sale until the debtor received express bankruptcy court authority).

45.     Furthermore, the Sale Motion even requests authority to sell and/or liquidate *non-debtor* assets, which is clearly not appropriate and should be rejected by this Court outright.  Sale

Motion at ¶¶ 11-12.  The case law is clear that these non-debtor assets cannot be sold by the JPLs.

*See, e.g.*, *In re Billingsley*, 338 B.R. 372, 376 (Bankr. C.D. Ill. 2006) (section 363 does not provide

authority for a debtor "to reach the assets of a non-debtor corporation"); *In re Normandin*, 106

B.R. 14 (Bankr. D. Mass. 1989) (debtor could not sell assets held jointly with non-debtor partners).

### C.   Approval of the Sale Motion Should be Denied as it May Be Used by the JPLs to Negate the Contractual Rights of Other Parties

46.    PBLA is a participating lender on dozens of loans subject to assignment to

NHC (the "PBLA Participation Loans") and as noted above, PBLA serves as administrative

agent on four of those loans (the "PBLA Agented Loans").  NEC and one of the NC

Insurance Companies serve as agent for the rest of the PBLA Participation Loans.

47.    Due to the complexity of this structure, through many layers of loan syndication,

PBLA and the NC Insurance Companies are lenders to a number of the same Affiliated Entities.

In fact, not only are the NC Insurance Companies and PBLA invested in the same entities, but

PBLA has investments in the NC Insurance Companies' parent company and vice versa—the NC

Insurance Companies and other Global Growth entities are lenders to PBLA's parent company.

48.    The loan agreements for the PBLA Participation Loans allow the borrower to

assign their debt obligations to another entity with the prior written consent of the agent.

Thus, pursuant to the PBLA Participation Loans, the appointed agent's consent (here, either

NEC or one of the NC Insurance Companies) is required for the borrower's assignment of

the loans to NHC; no such consent is required of PBLA.  This is because PBLA, as lender,

ceded to the agents its authority to exercise any rights and remedies it may have as lender.

PBLA's rights with respect to the loans were essentially stripped by the terms of the loan

agreements themselves.  Because PBLA ceded approval authority for the assignments of

these loans to the loan agents, the PBLA Participation Loans cannot be assigned by PBLA

to another party.  *See, e.g., In re Nemko, Inc.,* 143 B.R. 980, (Bankr. E.D.N.Y. 1992 (A debtor's contractual rights "do not expand when the debtor files a petition in bankruptcy").

49.    Similarly, the PBLA-agented loans provide that the borrower may assign its debt obligations to another entity without the prior consent of the agent.  Accordingly, it is the borrowers—and not PBLA—who may assign the PBLA-agented loans to a third party (such as NHC).

50.    Because of the lack of specificity regarding the Proposed Transactions, the NC Insurance Companies are concerned that, as fully discussed herein, the broad and opaque relief sought by the Sale Motion may potentially be used impermissibly by the JPLs to sell or assign rights which they either do not have or have already relinquished to others.  With no transparency with respect to the JPLs' intentions, it is impossible for the NC Insurance Companies—and of course, for this Court—to consider the implications of granting such relief, even if it were appropriate under applicable law.

51.    Accordingly, the NC Insurance Companies object to granting PBLA *carte blanche* to engage in transactions related to PBLA's loans to the Affiliated Entities.  PBLA has no authority to engage in those transactions based on the terms of the relevant loan agreements.  Moreover, it would be imprudent to allow PBLA to engage in transactions involving the loans without oversight to confirm that any Proposed Transaction does not present collateral harm to other creditors, or to PBLA itself.  For these reasons as well, the Sale Motion should be denied.

## CONCLUSION

52.    The relief sought in the Sale Motion—as clearly reflected in the Proposed Order—would give authority to the JPLs to sell any assets—in or out of the ordinary course of business—without notice to this Court or the Debtors' creditors, for whatever amount, without caps, without

010-9297-4423/12/AMERICAS

this Court's supervision or control, without creditors' input, without regard to who owned the asset, and without any reporting obligations.

53.     Such a result would be wholly inconsistent with the role of this Court, which must be able to (i) determine what asset sales may be considered in the ordinary course of business, and (ii) supervise sales outside of the ordinary course of business.  If such relief was granted, it would unfairly advantage the JPLs and result in a potential detriment to the Debtors' creditors and other parties-in-interest in these cases, including the NC Insurance Companies.

54.     With so many questions remaining unanswered with respect to ordinary course sales and the unprecedented, overly-broad request for authorization to consummate non-ordinary asset sales without court supervision or appropriate limitations, it is respectfully submitted that this Court has no choice but to deny the Sale Motion.

010-9297-4423/12/AMERICAS

**WHEREFORE**, the NC Insurance Companies respectfully request that the Court deny the Sale Motion and grant such other and further relief as is just and proper.

Dated:  November 30, 2021

Squire Patton Boggs (US) LLP

By: */s/ Norman N. Kinel*

Norman N. Kinel
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
Email: norman.kinel@squirepb.com

Williams Mullen

By: */s/ Wes J. Camden*

Wes J. Camden
301 Fayetteville Street, Suite 1700
P.O. Box 1000 (27602)
Raleigh, NC 27601
Telephone: (929) 981-4064
Facsimile: (919) 981-4300
Email: wcamden@williamsmullen.com

*Co-Counsel for Colorado Bankers Life
Insurance Company, Bankers Life
Insurance Company, Southland National
Insurance Corporation and Southland
National Reinsurance Corporation*