**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PB LIFE AND ANNUITY CO., LTD., *et al.*,[1] | Case No. 20-12791 (LGB) |
| Debtors in Foreign Proceedings. | (Jointly Administered) |

| | |
|---|---|
| JOHN JOHNSTON and RACHELLE FRISBY, as Joint Provisional Liquidators on behalf of PB LIFE AND ANNUITY CO., LTD., NORTHSTAR FINANCIAL SERVICES (BERMUDA) LTD., OMNIA LTD., and PB INVESTMENT HOLDINGS LTD., and PB LIFE AND ANNUITY CO., LTD., NORTHSTAR FINANCIAL SERVICES (BERMUDA) LTD., OMNIA LTD., and PB INVESTMENT HOLDINGS LTD., | Adv. Proc. No. 23-_____(LGB) |
| Plaintiffs, | |
| v. | |
| GREGREY EVAN LINDBERG A/K/A GREG EVAN LINDBERG, CHRISTA M. MILLER, CHRISTOPHER E. HERWIG, DEVIN E. SOLOW, ERIC D. BOSTIC, BANKERS LIFE INSURANCE COMPANY, COLORADO BANKERS LIFE INSURANCE COMPANY, SOUTHLAND NATIONAL INSURANCE CORPORATION, SOUTHLAND NATIONAL REINSURANCE CORPORATION, 286 SPRING PH HOLDINGS CORP., | |

---

[1] PB Life and Annuity Co., Ltd., Northstar Financial Services (Bermuda) Ltd., Omnia Ltd. and PB Investment Holdings Ltd., foreign Debtors, are Bermuda limited companies which each have a registered address in Bermuda c/o Deloitte Ltd., Corner House, 20 Parliament Street, Hamilton HM 12, Bermuda, and are Jointly Administered for procedural purposes, by Order of this Court entered on April 2, 2021, Main Case, ECF No. 42.

2B4A SARL,
2MEDIA GMBH,
3BL HOLDINGS, LLC,
3BL MEDIA, LLC,
4839 N. ELSTON, LLC,
5 STAR TECHNICAL SERVICES, LLC,
A.C.J COMPUTER SERVICES
LIMITED,
A/R ALLEGIANCE GROUP, LLC,
AAH LOAN-BACKED FUNDING, LLC,
AAM HOLDINGS I, LLC,
AAM HOLDINGS, LLC,
AAPC HOLDINGS, LLC,
AAPC INDIA, LLP,
AAPC INVESTMENTS, LLC,
AAPC VOTING TRUST,
AAPC, LLC,
ACADEMY FINANCIAL ASSETS, LLC,
ACADEMY FINANCIAL HOLDINGS,
LLC,
ACE FOUNDATION, INC.,
ACQUIRED DEVELOPMENT, LLC,
ADDICTION RECOVERY HELPLINE
LLC,
ADVANCED BENEFIT CONNECTIONS
LLC,
ADVANTAGE CAPITAL
INVESTMENTS LLC,
ADVISORY CONSULTANTS, LLC,
AFFGLO HOLDINGS, INC.,
AFP, LLC,
AGENCE DE RECOUVREMENT
GLOBAL, INC.,
AGERA ENERGY, LLC,
AGERA HOLDINGS, LLC,
AGH PARENT, LLC,
AGT MEDIA LTD.,
AGX HOLDINGS, LLC,
AHOSKIE, LLC,
ALCOHOL & DATA HOLDINGS, LLC,
ALLIANCE MEDIA GROUP LLC,
ALPHARETTA, LLC,
ALPINE CAPITAL, LLC,
ALSTEAD, LLC,
ALTA BILLING HOLDINGS, LLC,
ALTA BILLING, LLC,

AMERICA FREE PRESS, LLC,
AMERICAN ACADEMY HOLDINGS
LTD.,
AMERICAN ACADEMY HOLDINGS,
LLC (D/B/A AAPC),
AMERICAN ACADEMY OF
PROFESSIONAL CODERS CHAPTER
ASSOCIATION,
AMERICAN FUNERAL AND
CREMATION PLANS, LLC,
AMERICAN HEALTHCARE
ALLIANCE LIMITED,
AMERICAN YACHT CHARTERS, LLC,
AMHERST, LLC,
ANACONDA, LLC,
ANALYTICAL MEDICAL INSIGHT
LIMITED,
ANDOVER ASSET MANAGEMENT,
LLC,
APAC HOLDCO, LLC,
APACHE JUNCTION, LLC,
APEX INTERNATIONAL, LLC,
APIO LOCAL, LLC,
APP THIS, INC.,
AQUA BLUE HOLDINGS, LLC,
AR MANAGEMENT (ARREVIO)
TRUST,
AR MANAGEMENT (GGH) TRUST,
AR PURCHASING SOLUTIONS 2, LLC,
AR PURCHASING SOLUTIONS, LLC,
ARA GROUP HOLDINGS, LLC,
ARCANE TINMEN APS T/A AT
PRIVATE LABELS APS,
ARREVIO HOLDINGS, LLC,
ARREVIO, LLC,
ASCENDENT D4K HOLDINGS, LLC,
ASCENDENT DENTAL GROUP
(FIELET & LEE), P.C.,
ASCENDENT DENTAL
MANAGEMENT D4K, LLC,
ASHEBORO, LLC,
ASIM CE, LLC,
ASIM HOLDINGS, LLC,
ASIM, LLC,
ASL HOLDINGS, LLC,
ASL NEW HOLDINGS, LLC,

ASSET MANAGEMENT, INC.,
ASSISTIVE PARTNER INVESTMENTS
LIMITED,
AT DENMARK INVESTMENTS APS,
ATHENS, LLC,
ATKINSON, LLC,
ATLANTA BIDCO LIMITED,
ATLANTA MIDCO LIMITED,
ATLANTA TOPCO LIMITED,
ATLAS GLOBAL HOLDINGS, LLC,
ATLAS GLOBAL, LLC,
ATLAS GROUP, LLC,
AUDIOEDUCATOR, LLC,
AUDIOSOLUTIONZ, LLC,
AUDIT SERVICES GROUP, LLC,
AUGUSTA ASSET MANAGEMENT,
LLC,
AUGUSTA, LLC,
AUTOMOTIVE FLEET INVESTMENTS
LIMITED,
AUTONOMY HEALTHCARE
MANAGEMENT, LLC,
AUTONOMY HOLDINGS, LLC,
AUTONOMY INVESTMENTS, LLC,
AYC CREW, LLC,
AYC HOLDINGS LIMITED,
AYC HOLDINGS,  LLC,
AYC HOLDINGS, LTD.,
BALDWIN ASSET MANAGEMENT,
LLC,
BAM HOLDINGS I, LLC,
BANKERS INSURANCE HOLDINGS
S.A.,
BANKERS REINSURANCE COMPANY
LTD.,
BARNSTEAD, LLC,
BARRINGTON, LLC,
BBLN-AGERA CORP,
BCC HOLDINGS, LLC,
BCC JUNIOR LOAN-BACKED
FUNDING, LLC F/K/A BCC JUNIOR
LOAN BACK SECURITY FUNDING,
LLC,
BCC RESEARCH, LLC F/K/A
BANKERS MINUTE, LLC,
BCC SENIOR LOAN-BACKED

FUNDING, LLC F/K/A BCC SENIOR
LOAN BACK SECURITY FUNDING,
LLC,
BEAUFORT HOLDINGS, S.A.,
BECKETT AUCTION HOLDINGS, LLC,
BECKETT AUCTIONS, LLC,
BECKETT AUTHENTICATION
SERVICES, LLC,
BECKETT BUSINESS SOLUTIONS,
LLC,
BECKETT COIN & ROCK, LLC,
BECKETT COLLECTIBLES
HOLDINGS, LLC,
BECKETT COLLECTIBLES, LLC,
BECKETT CONFERENCES, LLC,
BECKETT MEDIA, LLC,
BEGONIA EIGHT, LLC,
BENSON, LLC,
BERKELEY LAKE, LLC,
BERLIN, LLC,
BHLN-286 SPRING CORP.,
BHLN-AGERA CORP.,
BIDWORLD PRIVATE LIMITED,
BISBEE, LLC,
BKT LOAN-BACKED FUNDING, LLC
F/K/A BKT LOAN BACK SECURITY
FUNDING, LLC,
BKX HOLDINGS, LLC,
BLACKFIN FINANZEN SAS,
BLACK ROSE, LLC,
BLH CAPITAL, LLC,
BLI HOLDINGS, INC.,
BLUE DAFFODIL, LLC,
BLUE IRIS, LLC,
BLUE MARIGOLD, LLC,
BLUE SKIES ADDICTION CENTRE
LTD.,
BLUE VIOLET, LLC,
BLUESPIER INTERNATIONAL
LIMITED,
BMX BERMUDA HOLDINGS, LTD.,
BMX HOLDINGS, LLC,
BOLN-286 SPRING CORP.,
BOLN-AGERA CORP.,
BOSTON LASER EYE CARE
MANAGEMENT, LLC,

BOSTON LASER HOLDINGS, LLC,
BOSTON LASER-EYE & LASIK
SPECIALISTS HOLDINGS, LLC,
BOW, LLC,
BRC CAPITAL, LLC,
BRC HOLDING, LLC,
BRC HOLDINGS, INC.,
BRCB (BARBADOS) CAPITAL, LTD.,
BRCB (BARBADOS) HOLDINGS, LTD.,
BRITISH ORIENT INFOTEL PRIVATE
LIMITED,
BULLHEAD CITY, LLC,
CAF HOLDINGS, LLC,
CAF II HOLDINGS, LLC,
CAF III HOLDINGS, LLC,
CAF IV HOLDINGS, LLC,
CAF V HOLDINGS, LLC,
CAM HOLDINGS I, LLC,
CAMP VERDE, LLC,
CANAAN, LLC,
CANDESCENT EYE HEALTH
SURGICENTER, LLC,
CANDESCENT EYE SURGICENTER,
LLC,
CANDOR GLOBAL SERVICES, LLC,
CANTA HEALTH, LLC,
CAPITAL ASSET FUND I, LLC,
CAPITAL ASSET FUND II, LLC,
CAPITAL ASSET FUND III, LLC,
CAPITAL ASSET FUND IV, LLC,
CAPITAL ASSET FUND V, LLC,
CAPITAL ASSET MANAGEMENT II,
LLC,
CAPITAL ASSET MANAGEMENT III,
LLC,
CAPITAL LENDING PARTNERS, INC.,
CAPLOC HOLDINGS, LLC,
CAPLOC, LLC,
CAPSTONE PRENEED FUNERAL AND
BURIAL ASSOCIATION,
CARE REFERRALS LIMITED,
CAREER HEALTH, LLC,
CARNATION THREE, LLC,
CAROLINA EYE CENTER, LLC N/K/A
CAROLINA EYE CENTER, P.A.,
CAROLINA LONGEVITY INSTITUTE,

LLC N/K/A THE DAILY NEWS
CORPORATION, LLC,
CARTERSVILLE, LLC,
CASAR, LLC,
CASTLE & COOKE MORTGAGE LLC,
CATO HOLDINGS, INC.,
CAVE CREEK, LLC,
CBCS HOLDINGS, LLC,
CBCS OPERATIONS, LLC,
CBS GROUP HOLDINGS, LLC,
CBS GROUP SERVICES, LLC,
CBV COLLECTION SERVICES LTD.,
CBV COLLECTIONS LIMITED,
CC MORTGAGE TRUST,
CCM HOLDINGS, LLC,
CCM INVESTMENTS, LLC,
CEIC CAPITAL, LLC,
CEIC HOLDINGS, INC.,
CELANDINE EIGHT, LLC,
CENTURY VENTURE GLOBAL, LLC,
CENTURY VISION GLOBAL, LLC,
CERTIFICATION FOR LONG-TERM
CARE, LLC,
CERTITREK GROUP, LLC,
CFH HOLDINGS, LLC,
CHATSWORTH ASSET
MANAGEMENT, LLC,
CHRYSANTHEMUM TWO, LLC,
CLAIMSURE SLÁINTE (IRELAND)
LIMITED,
CLANWILLIAM AUSTRALIA
INVESTMENTS PTY LIMITED,
CLANWILLIAM GROUP,
CLANWILLIAM HEADQUARTERS
LIMITED,
CLANWILLIAM HEALTH (DGL)
LIMITED,
CLANWILLIAM HEALTH (RX WEB)
LIMITED,
CLANWILLIAM HEALTH (SOCRATES)
LIMITED,
CLANWILLIAM HEALTH LIMITED,
CLANWILLIAM INVESTMENTS (UK)
LIMITED,
CLANWILLIAM INVESTMENTS
IRELAND LIMITED,

CLANWILLIAM NZ LIMITED,
CLANWILLIAM SOFTWARE LIMITED,
CLANWILLIAM VENTURES LIMITED,
CLAREMONT, LLC,
CLARIS VISION HOLDINGS, LLC,
CLARIS VISION LLC,
CLAXTON, LLC,
CLAYTON PLAZA, LLC,
CLAYTON, LLC,
CLIENT SERVICES CSICR, SRL A/K/A
CLIENT SERVICES CSICR SR LTDA,
CLIENT SERVICES HOLDINGS, LLC,
CLIENT SERVICES, INC.,
CLOVER CONCEPTS, LLC,
CLTC HOLDINGS, LLC,
CLTC JUNIOR LOAN-BACKED
FUNDING, LLC F/K/A CLTC JUNIOR
LOAN BACK SECURITY FUNDING,
LLC,
CLTC SENIOR LOAN-BACKED
FUNDING, LLC F/K/A CLTC SENIOR
LOAN BACK SECURITY FUNDING,
LLC,
CMC HOLDING COMPANY, LLC,
CMC LOAN-BACKED FUNDING, LLC
F/K/A CMC LOAN BACK SECURITY
FUNDING, LLC,
COACH D TENNIS, LLC,
COBRA, LLC,
CODING INSTITUTE, LLC,
COLLECTION MANAGEMENT
COMPANY,
COLLECTIONS MANAGEMENT
HOLDINGS, LLC,
COLUMBUS, LLC,
COMPLIANCE SERVICES LTD.,
COMPLIANCE SERVICES, LLC,
COMPLYSMART HOLDINGS, LLC,
COMPLYSMART, LLC,
CONCEPT CREATIONS CORP.,
CONNECT2 CME LIMITED N/K/A
ALCHEMIE MEDICAL EDUCATION
LIMITED,
CONNECT2 MEDICAL
COMMUNICATIONS LIMITED,
CONSERVATRIX LEVEN, NV,

CONWAY, LLC,
COWPER, LLC,
CREATIVE COLLECTIBLE COMPANY,
LLC,
CRESTON, LLC,
CRI HOLDINGS, LLC,
CSI INTERCO, LLC,
CV EQUIPMENT LEASING, LLC,
CV HOLDINGS, LLC,
CV INVESTMENTS, LLC,
CVE HOLDINGS, LLC,
CWNP, LLC,
DAFFODIL SIX, LLC,
DAHLIA TEN, LLC,
DAISY SEVEN, LLC,
DAM HOLDINGS I, LLC,
DAMASCUS ASSET MANAGEMENT,
LLC,
DAMOCO BIDCO LIMITED (UK),
DAMOCO HOLDCO LIMITED (UK),
DAMOCO MIDCO LIMITED (UK),
DAMOVA POLSKA SP. ZO.O,
DAMOVO BELGIUM NV/SA,
DAMOVO COSTA RICA SRL,
DAMOVO DEUTSCHLAND GMBH &
CO. KG,
DAMOVO DEUTSCHLAND TOPCO
GMBH,
DAMOVO DEUTSCHLAND
VERWALTUNGS GMBH,
DAMOVO GLOBAL SERVICES (UK)
LIMITED,
DAMOVO HOLDINGS
DEUTSCHLAND GMBH,
DAMOVO IRELAND LIMITED,
DAMOVO LTD (ATLANTA TOPCO
LIMITED),
DAMOVO LUXEMBOURG S.A.R.L.,
DAMOVO ÖSTERREICH GMBH,
DAMOVO SCHWEIZ AG,
DAMOVO SVERIGE.AB,
DAMOVO USA, INC.,
DANIELSVILLE, LLC,
DEERING, LLC,
DELMAR CENTER HOLDINGS, LLC,
DELMAR SURGICAL CENTER, LLC,

DEMAND SIDE MEDIA, LTD.,
DENTAL MANAGEMENT HOLDINGS,
LLC,
DENTAL MANAGEMENT
OPERATIONS, LLC,
DERRY, LLC,
DGX HOLDINGS, LLC,
DICTATE IT LIMITED,
DIVERSIFIED TERRA HOLDINGS,
LTD.,
DJRTC, LLC,
DREAM MARKETS, INC.,
DRUMMOND GROUP, LLC,
DSE HOLDINGS, LLC,
DTH HOLDINGS, LTD,
DUNBARTON, LLC,
DUNHILL HOLDINGS, LLC,
DUNSTANS PUBLISHING LIMITED,
DURHAM, LLC,
EAM HOLDINGS I, LLC,
EAST HILL HOLDINGS, LLC,
EASTERN ENTERPRISES, LLC,
EATONTON, LLC,
ECL GROUP, LLC,
ECL HOLDINGS, LLC,
ECLL PRIVATE LTD,
EDWARDS MILL ASSET
MANAGEMENT, LLC,
EFFINGHAM, LLC,
E-FINITY LEADS LTD. N/K/A CANDID
INSURANCE SERVICES LTD,
EG MEDIA HOLDINGS, LLC,
EG MEDIA INVESTMENTS, LLC,
EGX HOLDINGS, LLC,
EIFFEL HOLDINGS, LLC,
ELBERTON, LLC,
ELEMENTS COMMUNICATIONS
LIMITED,
ELEVATE HEALTHCARE, INC.,
ELEVATE PORTFOLIO, LLC,
ELI ARREVIO LIMITED N/K/A
GLOBAL GROWTH ARREVIO
PRIVATE LIMITED,
ELI BPO INDIA PRIVATE LTD,
ELI BUSINESS SOLUTIONS PRIVATE
LTD,

ELI DENMARK INVESTMENTS, LLC,
ELI DEUTSCHLAND GMBH,
ELI EQUITY, LLC,
ELI GERMANY HOLDINGS, LLC,
ELI GLOBAL ASIA PACIFIC LIMITED,
ELI GLOBAL PHILIPPINES
RESOURCES OPERATIONS CENTER,
INC.,
ELI GLOBAL, LLC,
ELI HEALTH SOLUTIONS PVT. LTD.,
ELI KNOWLEDGE SERVICES (INDIA)
PRIVATE LIMITED,
ELI NEW MEDIA, LLC,
ELI PUBLICATIONS, INC.,
ELI RESEARCH INDIA PRIVATE
LIMITED,
ELI RESEARCH, LLC,
ELI REVENUE CYCLE SOLUTIONS
PRIVATE LIMITED,
ELI SHARED SERVICES PRIVATE
LIMITED,
ELI VENTURES, LLC,
ELLAVILLE, LLC,
ELP HOLDINGS, LLC,
ELT GROUPE,
ENG HOLDINGS, LLC,
ENGAGED MEDIA HOLDINGS, LLC,
ENGAGED MEDIA, LLC,
ENGAGEMENT GROUP, LLC,
ENGLERT HOLDINGS, LLC,
ENTERPRISES SERVICES, LLC,
ENTRUST GLOBAL GROUP, LLC,
ENX, LLC,
EPHESUS ASSET MANAGEMENT,
LLC,
EPIC CARE HOME TECHNOLOGIES
LIMITED,
EPIC SOLUTIONS LIMITED,
EPPING, LLC,
ERADIMAGING, LLC,
ERIE PROPERTIES, LLC,
ERX HOLDINGS, LLC,
EYE & LASIK EYE CARE
MANAGEMENT, LLC,
EYE & LASIK HOLDINGS, LLC,
EYE & LASIK OPTICAL, LLC,

EYE CARE LEADERS HOLDINGS, LLC,
EYE CARE LEADERS PORTFOLIO HOLDINGS, LLC,
EYE REACH PATIENTS, LLC,
F1RSTMARK, LLC,
FAFNIR DISTRIBUTION APS,
FAISON, LLC,
FARGO, LLC,
FARMINGTON, LLC,
FARRINGTON MILL HOLDINGS, LLC,
FAYETTEVILLE, LLC,
FIA HOLDINGS, LLC,
FIASCO FINE WINE, LLC,
FINANCIAL INSTITUTE ADVISORS, LLC,
FINANZEN FRANCE SAS,
FINANZEN HOLDINGS, LLC,
FINANZEN.DE MAKLERSERVICE GMBH,
FINANZEN.DE VERMITTLUNGSGESELLSCAFT TOR VERBRAUCHERVERTR,
FIRST INTERNATIONAL FINANCIAL, INC.,
FLAGSHIP HOLDINGS, LLC,
FLEET ASSIST INTERCO LIMITED,
FLEET ASSIST LIMITED,
FLEMINGTON, LLC,
FLOVILLA, LLC,
FLOWERY BRANCH, LLC,
FMC MORTGAGE CORPORATION,
FIRSTMARK, LLC,
FMX HOLDINGS, LLC,
FOLKSTON, LLC,
FOREST PARK ASSET MANAGEMENT, LLC,
FORSYTH, LLC,
FORTREX HOLDINGS, LLC,
FORTREX TECHNOLOGIES HOLDINGS, LLC,
FORTREX, LLC,
FOXFORD INVESTMENTS LIMITED,
FPAM HOLDINGS I, LLC,
FRANCONIA, LLC,
FS WINDUP, LLC,

FTGU HOLDINGS, LLC,
FTGU MEDICAL BILLING, LLC,
FUNSTON, LLC,
FUTURESOURCE CONSULTING
LIMITED,
FUTURESOURCE HOLDINGS
LIMITED,
GAM HOLDINGS I, LLC,
GAM HOLDINGS, LLC,
GAMESPRO GLOBAL GROUP APS,
GARDENIA ONE, LLC,
GARFIELD, LLC,
GB CAPITAL, LLC,
GB LIFE LUXEMBOURG S.A.,
GB UK INVESTMENTS, LLC,
GB VENTURE FUND, LLC,
GBC ADVISORS, LLC,
GBC HOLDINGS, LLC,
GBI GROUP, LLC,
GBIG BUSINESS SOLUTIONS
PRIVATE LIMITED,
GBIG CAPITAL, LLC,
GBIG HOLDINGS, INC. (AKA GBIG
HOLDINGS & REINSURANCE
COMPANY INC.),
GBIG PORTUGAL, S.A.,
GBVF HOLDINGS, LLC,
GC HOLDINGS, LLC,
GCC HOLDINGS US, LLC,
GCC HOLDINGS, LLC,
GCC INTERCO, LLC,
GERANIUM TWO, LLC,
GHTG INVESTMENT, LLC,
GILFORD ASSET MANAGEMENT,
LLC,
GILFORD, LLC,
GILLSVILLE, LLC,
GIX HOLDINGS, LLC,
GLOBAL A&D HOLDINGS, LLC,
GLOBAL BANKERS INSURANCE
GROUP, LLC N/K/A ASPIDA
FINANCIAL SERVICES, LLC,
GLOBAL CREDIT & COLLECTION
(INDIANA) CORPORATION,
GLOBAL CREDIT & COLLECTION
CORPORATION,

GLOBAL CREDIT AND
COLLECTIONS, INC.,
GLOBAL DATA INSIGHTS LIMITED,
GLOBAL ETC, LLC,
GLOBAL GROWTH, LLC,
GLOBAL GROWTH HOLDINGS, INC.
F/K/A ACADEMY ASSOCIATION,
INC.,
GLOBAL HEALTH TECHNOLOGY
GROUP, LLC,
GLOBAL MORTGAGE CAPITAL
HOLDINGS, LLC,
GLOBAL MORTGAGE CAPITAL, INC.,
GLOBAL OPERATIONS SERVICES,
LLC,
GLOBAL TIC CE, LLC,
GLOBAL VISION GROWTH, LLC,
GMK PEPPER HOLDINGS LIMITED,
GOFFSTOWN, LLC,
GOLDEN ENERGY GROUP, LLC,
GOPRIME MORTGAGE, INC.,
GOSHEN, LLC,
GP MANAGEMENT, LLC,
GRANDE LLC,
GREEN LILAC, LLC,
GREEN SOLUTIONS, LLC,
GREENFIELD CAPITAL, LLC,
GREENVILLE, LLC,
GSRE 27, LLC,
GSRE 29, LLC,
GTIC HOLDINGS, LLC,
GTIC&A, LLC,
HA WIND UP 1, LLC F/K/A HANSEN
AEROSPACE HOLDINGS, LLC,
HAM HOLDINGS I, LLC,
HAMPSTEAD, LLC,
HAMPTON ASSET MANAGEMENT,
LLC,
HANSEN AEROSPACE HOLDINGS,
LLC N/K/A HA WINDUP 1, LLC,
HANSEN AEROSPACE, LLC,
HARVARD COLLECT, LLC,
HARVARD COLLECTION SERVICES,
LLC,
HEALTH AUDIO, LLC,
HEALTH IRELAND PARTNERS

LIMITED,
HEALTH THROUGH INFORMATION,
HEALTHCARE JOBS, LLC,
HEALTHICITY, LLC,
HEALTHLINK GROUP INVESTMENTS
LIMITED,
HEALTHLINK GROUP LIMITED,
HEALTHLINK GROUP PTY LIMITED,
HEALTHLINK HOLDINGS, LLC,
HEALTHLINK INVESTMENTS, LLC,
HEALTHLINK RESEARCH LIMITED,
HELIX HEALTH GROUP LIMITED,
HELIX HEALTH SOFTWARE
LIMITED,
HEMOPHILIA PREFERRED CARE OF
MEMPHIS, INC.,
HEMOPHILIA PREFERRED CARE OF
MISSISSIPPI, INC.,
HEMOPHILIA PREFERRED CARE OF
OKLAHOMA, INC.,
HENNIKER, LLC,
HH SPIRAL HOLDINGS LIMITED,
HIBISCUS THREE, LLC,
HOLT, LLC,
HOME MEDICAL EQUIPMENT
SPECIALISTS, LLC (D/B/A HME
SPECIALISTS LLC),
HOOKSETT, LLC,
HOPKINTON, LLC,
HORIZON HOLDINGS I, LLC,
HPC BIOLOGICALS, INC.,
HPC SPECIALTY RX OF KANSAS,
INC.,
HPC SPECIALTY RX REED, INC.,
HPC SPECIALTY RX WEST VIRGINIA,
INC.,
HPC, LLC,
HPCNC, INC.,
HPCSP HOLDINGS, LLC,
HPCSP INVESTMENTS, LLC,
HRWEB HOLDINGS, LLC,
HRWEB SOFTWARE, LLC,
HYBRID TREATMENT SOLUTIONS,
LLC,
HYACINTH FOUR, LLC,
HYDRANGEA FOUR, LLC,

I SBA-INTERNATIONAL SOCIETY OF
BUSINESS APPRAISERS, LLC,
IBC MANAGEMENT, LLC,
ICAM HOLDINGS I, LLC,
IFA SYSTEMS AG,
IMEDICWARE, INC.,
IMW EMR, LLC,
IMW HOLDINGS, LLC,
IN THE ARENA, LLC,
INDEPENDENT CONTRACTOR
SERVICES, LLC,
INDEPENDENT CONTRACTOR, LLC,
INFORMATICA INVESTMENTS
LIMITED,
INFORMATICA SYSTEMS LIMITED,
INHEALTHCARE, LLC,
INKOP, LLC,
INSIGHT SOFTWARE, LLC,
INTEGRITY EMR HOLDINGS, LLC,
INTEGRITY EMR, LLC,
INTRALAN (UK) LIMITED,
INTRALAN GROUP LIMITED,
INTRALAN INVESTMENTS LIMITED,
INTRALAN TELECOM LIMITED,
IO PRACTICEWARE, INC.,
IOPW HOLDINGS, LLC,
IREDELL, LLC,
IRIS FOUR, LLC,
IRON CITY ASSET MANAGEMENT,
LLC,
ISBA-INTERNATIONAL SOCIETY OF
BUSINESS APPRAISERS, LLC,
ITECH FUNDING, LLC,
JACKSON ASSET MANAGEMENT,
LLC,
JACKSONVILLE, LLC,
JAFFREY, LLC,
JAM HOLDINGS I, LLC,
JASMINE FIVE, LLC,
K2B SÀRL,
KENLY, LLC,
KEYMED HOLDINGS, LLC,
KEYMED, LLC,
KITE ASSET MANAGEMENT, LLC,
KITE HOLDINGS I, LLC,
KONNECT NET HOLDINGS, LLC,

KONNECT NET INVESTMENTS
LIMITED,
KONNECT NET LIMITED,
LACONIA, LLC,
LAM HOLDINGS I, LLC,
LAM HOLDINGS, INC.,
LARES HOLDINGS, LLC,
LARES, LLC,
LAVENDER SIX, LLC,
LENS ON DEMAND, LLC,
LIBERTY HOLDINGS LLC,
LIBERTY HOUSE CLINIC LIMITED,
LILAC SIX, LLC,
LILLY ASSET MANAGEMENT, LLC,
LILY TWO, LLC,
LIMITLESS RESEARCH, INC.,
LITTLETON, LLC,
LMG HOLDINGS, LLC,
LMG MANAGEMENT HOLDINGS,
LLC,
LMG MANAGEMENT, LLC,
LONDONDERRY, LLC,
LOTUS SEVEN, LLC,
LOUDON, LLC,
LOUISBURG, LLC,
M HOLDING COMPANY, LLC,
M INVESTMENTS, LLC,
MACON, LLC,
MADBURY, LLC,
MAGNOLIA EIGHT, LLC,
MAM HOLDINGS I, LLC,
MARIGOLD NINE, LLC,
MARKET TECH MEDIA
CORPORATION,
MARS CARS, LLC,
MARSHALL ASSET MANAGEMENT,
LLC,
MARVAL GROUP LIMITED,
MARVAL INVESTMENTS LIMITED,
MARVAL SOFTWARE LIMITED,
MARVAL TRAINING AND
CONSULTANCY LIMITED,
MARVEL INVESTMENTS LIMITED,
MASTER PROCURE, LLC,
MAXWELL STANLEY CONSULTING
INVESTMENTS LIMITED,

MAXWELL STANLEY CONSULTING
LIMITED F/K/A ONE STEP AHEAD
CONSULTANCY LTD,
MBS INVESTMENTS PTY. LTD. N/K/A
CLANWILLIAM AUSTRALIA PTY
LIMITED,
MBW HOLDCO, LLC,
MBW INTERCO, LLC,
MCCARTHY, BURGESS & WOLFF,
INC.,
MCKINLEY VENTURES GROUP, LLC,
MD OFFICE, LLC,
MDO GROUP HOLDINGS, LLC,
MDX, LLC,
MED CLAIMS INTERNATIONAL, LLC,
MEDATTEND, LLC N/K/A USA MASK
COMPANY, LLC,
MEDCLAIMS HOLDINGS, LLC,
MEDFLOW HOLDINGS, LLC,
MEDFLOW, INC.,
MEDIA PRODUCT SERVICES, LLC,
MEDICAL BUSINESS SYSTEMS PTY
LTD.,
MEDICAL PHYSICS, LLC,
MEDICOM MEDICAL COMPUTER
SOLUTIONS LIMITED,
MERCATO LEADMANAGEMENT
INVESTMENTS HOLDINGS GMBH,
MEREDITH, LLC,
MERRIMACK, LLC,
METRONOME FINANCIAL, LLC,
METRONOME HOLDINGS, LLC,
MIRACARD, LLC,
MM HOLDINGS I, LLC,
MM HOLDINGS, LLC,
MM LOGISTICS, LLC,
MNI HOLDINGS, LLC,
MORNING MOUNTAIN HOLDINGS,
LLC,
MORRESVILLE, LLC,
MOUNTAIN WEST INNOVATIONS
INC.,
MRX HOLDINGS, LLC F/K/A MPLUS
HOLDINGS, LLC,
MVE HOLDING, LLC N/K/A MNI
HOLDINGS, LLC,

MY VISION EXPRESS, INC.,
NAM HOLDINGS I, INC.,
NASHUA, LLC,
NATIONWIDE RECOVERY
HOLDINGS, LLC,
NATIONWIDE RECOVERY SYSTEMS,
LTD.,
NEBB HOLDINGS, LLC,
NEBB INSTITUTE, LLC,
NEC HOLDINGS, LLC,
NEI HOLDINGS, LLC,
NEI INVESTMENTS, LLC,
NEI MANAGEMENT, LLC,
NETFARMERS GMBH,
NETHERLANDS INSURANCE
HOLDINGS, INC.,
NETHERLANDS INSURANCE
HOLDINGS, LLC,
NEW ENGLAND CAPITAL, LLC,
NEW HILL ASSET MANAGEMENT,
LLC,
NEW HILL, LLC,
NEW IPSWICH, LLC,
NEXT LEVEL PURCHASING, INC.,
NEXT LEVEL PURCHASING, LLC,
NHA HOLDINGS, LLC,
NHC HOLDINGS, LLC,
NICE ASSET MANAGEMENT, INC.,
NIH CAPITAL, LLC,
NLC HOLDINGS, LLC,
NLC INVESTMENTS, LLC
NLP HOLDINGS, LLC,
NN LIFE LUXEMBOURG S.A.,
NOM GB 2018 I, LLC,
NON SPORT UPDATE HOLDINGS,
LLC,
NON SPORT UPDATE, LLC,
NORLINA, LLC F/K/A HIGHLIGHT,
LLC,
NORTHEAST INSURANCE
HOLDINGS, INC.,
NORTHEAST LMG HOLDINGS, LLC,
NORTHERN AIR, LLC,
NORTHSTAR FINANCIAL
INSURANCE SERVICES, LLC,
NOTOCHORD LIMITED,

NOTTINGHAM, LLC,
NPC NATIONAL PHYSICS
CONSULTANTS, LLC,
NS BEAUFORT INVESTMENTS, LLC,
NS EBR, LLP,
NSES 13, LLC,
NSES B, INC.,
NSES C, INC.,
NSES D, INC.,
NSES E, INC.,
NSES F, INC.,
NSES FUNDING 10, LLC,
NSES G, INC.,
NSES H, INC.,
NSX WILMINGTON LIMITED,
NW EYE CARE MANAGEMENT, LLC,
NW EYE SURGEONS HOLDINGS, LLC,
NWES HOLDINGS, LLC,
OAM HOLDINGS I, INC.,
OATMAN ASSET MANAGEMENT,
INC.,
OBSIDIAN HEALTHCARE GROUP
LIMITED,
OCEAN OPHTHALMOLOGY
MANAGEMENT HOLDINGS, LLC,
OCEAN OPHTHALMOLOGY
MANAGEMENT, LLC,
OCIM AUGUSTA, LLC,
OCIM BALDWIN, LLC,
OCIM CHATSWORTH, LLC,
OCIM DAMASCUS, LLC,
OCIM EPHESUS, LLC,
OCIM FOREST PARK, LLC,
OCIM GILFORD, LLC,
OCIM HAMPTON, LLC,
OCIM IRON CITY, LLC,
OCIM JACKSON, LLC,
OCIM KITE, LLC,
OCIM MARSHALL, LLC,
OCIM PARADISE, LLC,
OCIM ROCKDAL, LLC,
OCIM SUMMERVILLE, LLC,
OCIM TYBEE ISLAND, LLC,
OGX HOLDINGS, LLC,
OMPC, LLC F/K/A OMPC THERAPY,
LLC,

ONLINE REPUTATIONS MANAGER,
LLC,
ORANGE GARDENIA, LLC,
ORANGE PETUNIA, LLC,
ORANGE POPPY, LLC,
ORCHID FIVE, LLC,
P A S HOLDING LIMITED,
P WINDUP1 LIMITED,
P WINDUP2 LIMITED,
PAM HOLDINGS I, INC.,
PAM HOLDINGS I, LLC,
PARADIGM PARK HOLDINGS, LLC,
PARADISE ASSET MANAGEMENT,
LLC,
PARALLEL CAPITAL ASSETS, LLC,
PATENT REVIEW SCORE, INC. A/K/A
PATIENT REVIEW SCORE, INC.,
PATRIOT GROUP HOLDINGS, LLC,
PAVONIA LIFE INSURANCE
COMPANY OF MICHIGAN ("PLIC
MI"),
PB INVESTMENT COMPANY LTD.,
PBO HOLDINGS, INC.,
PBX BERMUDA HOLDINGS, LTD.,
PBX HOLDINGS LTD,
PBX HOLDINGS, LLC,
PCF HOLDINGS, LLC,
PCF, LLC F/K/A LITIGATION
FUNDING, LLC,
PELTON GROUP, LLC,
PELTON HOLDINGS, LLC,
PENN MEDICAL INFORMATICS
SYSTEMS, LLC,
PEONY FIVE, LLC,
PERIWINKLE SEVEN, LLC,
PETUNIA TEN, LLC,
PHARMA DATABASE, LLC N/K/A
SIXSAILS, LLC,
PHARMA HOLDINGS, LLC,
PHARMASYS INVESTMENTS
LIMITED,
PHARMASYS LIMITED,
PHENNA HOLDINGS, LLC,
PI SOFTWARE HOLDINGS, LLC,
PI SOFTWARE, LLC,
PIERRE MENDES, LLC,

PINK ORCHID, LLC,
PINK TULIP, LLC,
PLAISTOW, LLC,
PMMS INVESTMENTS LIMITED,
PMX, LLC,
POINT OF NO RETURN, INC.,
POPPY NINE, LLC,
PPF OFF 151 NORTH FRANKLIN
STREET, LLC,
PPH HOLDINGS, LLC,
PRACTICE BUILDERS, LLC,
PRAIRIE E&L HOLDINGS, LLC,
PRAIRIE E&L MANAGEMENT, LLC,
PREFERRED FINANCIAL
CORPORATION, LLC,
PRIME CASE FUNDING, LLC,
PRIME MORTGAGE LENDING, INC.,
PRIME TRUST,
PROACTIVE SOFTWARE HOLDINGS,
LLC,
PROACTIVE SOFTWARE LIMITED,
PROEDTECH, LLC,
PROFESSIONAL MEDICAL
MANAGEMENT SERVICES LIMITED,
PROLIMIATE SOLUTIONS HOLDINGS,
LLC,
PROLIMIATE SOLUTIONS, LLC,
PROSPECT RIDGE ENERGY, LLC,
PULSE IT COMMUNICATIONS PTY
LTD.,
QAM HOLDINGS I, INC.,
QUEENSTOWN ASSET
MANAGEMENT, INC.,
R&A EYE HOLDINGS, LLC,
R&A EYE MANAGEMENT, LLC,
RAYMOND, LLC,
RECOVERY WEB SOLUTIONS
LIMITED,
RED BEGONIA, LLC,
RED DAHLIA, LLC,
RED DAISY, LLC,
RED EAGLE ENTERPRISES, LLC,
RED JASMINE, LLC,
RED RIVER DEVELOPMENTS, LLC,
RESEARCH TRIANGLE CLINICAL
DEVELOPMENT,

RESOLUTE FREE PRESS, LLC,
REVENUE HEALTH SOLUTIONS, LLC,
REYNOLDS & ANLIKER HOLDINGS,
LLC,
RHS HOLDINGS, LLC,
RINDGE, LLC,
ROCK HOLDINGS I, LLC F/K/A ROCK
HOLDINGS I, INC.,
ROCKDALE ASSET MANAGEMENT,
LLC,
ROSE FOUR, LLC,
RPI RADIOLOGICAL PHYSICS, LLC,
RUMNEY, LLC,
SAF HOLDINGS I, LLC,
SAF HOLDINGS II, LLC,
SAF HOLDINGS III, LLC,
SAF HOLDINGS IV, LLC,
SAM HOLDINGS I, LLC,
SANCTUARY BANBURY LIMITED,
SANDOWN, LLC,
SATORI WATERS, LLC,
SCMA, LLC,
SECURED LOAN-BACKED FUNDING
I, LLC,
SECURED LOAN-BACKED FUNDING
II, LLC,
SECURED LOAN-BACKED FUNDING
III, LLC,
SECURED LOAN-BACKED FUNDING
IV, LLC,
SECURED LOAN-BACKED FUNDING
IX, LLC,
SECURED LOAN-BACKED FUNDING
V, LLC,
SECURED LOAN-BACKED FUNDING
VI, LLC,
SECURED LOAN-BACKED FUNDING
VII, LLC,
SECURED LOAN-BACKED FUNDING
VIII, LLC,
SECURED LOAN-BACKED FUNDING
X, LLC,
SECURED LOAN-BACKED FUNDING
XI, LLC,
SECURED LOAN-BACKED FUNDING
XII, LLC,

SECURED LOAN-BACKED FUNDING
XIII, LLC,
SECURED LOAN-BACKED FUNDING
XIV, LLC,
SECURED LOAN-BACKED FUNDING
XV, LLC,
SECURED LOAN-BACKED FUNDING
XVI, LLC,
SECURED LOAN-BACKED FUNDING
XVII, LLC,
SEDWICK, LLC,
SFM LOAN-BACKED FUNDING, LLC,
SHIRT, LLC,
SHOP LOC HOLDINGS, LLC,
SHOPPER LOCAL, LLC,
SIC US HOLDINGS, LLC,
SIRIUS CAPITAL HOLDINGS
LIMITED,
SKYWORLD CORPORATION,
SN GROUP DEVELOPMENT, LLC,
SN MALTA SERVICES LIMITED,
SNA CAPITAL, LLC N/K/A GBIG
CAPITAL, LLC,
SNA FUNDING, LLC,
SNH ACQUISITION, LLC,
SOCRATES HEALTHCARE, INC.,
SOMERSWORTH, LLC,
SOUTH HILL HOLDINGS, LLC,
SOUTHEAST INSURANCE CAPITAL,
LLC,
SOUTHERN HOBBY DISTRIBUTION,
LLC,
SOUTHERN HOBBY HOLDINGS, LLC,
SP HOLDCO, LLC,
SPEEDY SERVICES, LLC,
SSH CAPITAL, LLC,
STANDARD ADVISORY SERVICES
LIMITED,
STANDARD ASSETS FUND I, LLC,
STANDARD ASSETS FUND II, LLC,
STANDARD ASSETS FUND III, LLC,
STANDARD ASSETS FUND IV, LLC,
STANDARD FINANCIAL LIMITED,
STANDARD HOLDINGS LIMITED,
STANDARD INSURANCE HOLDINGS,
INC.,

STANDARD INVESTMENT CAPITAL,
LTD.,
STANDARD INVESTMENT HOLDINGS
LTD.,
STANDARD LC CAPITAL, LLC,
STANDARD LC HOLDINGS, LLC,
STANDARD LIFE HOLDINGS
LIMITED,
STANDARD LIFE LIMITED,
STANDARD MALTA HOLDINGS
LIMITED,
STANDARD MALTA LIMITED,
STANDARD PACIFIC INVESTMENTS
PTY LTD,
STODDARD, LLC,
STRATFORD HOLDCO, LLC N/K/A
STRATCO HOLDINGS, LLC,
STRATFORD PHARMACEUTICALS,
LLC,
STRATHAM, LLC,
STUNNER PRODUCTIONS, LLC,
SUMMERVILLE ASSET
MANAGEMENT, LLC,
SW HOLDINGS, LLC,
SUNBIZ RESOURCES, LLC,
SUNFLOWER SIX, LLC,
SWANZEY, LLC,
SWEET CONSULTANTS, LLC,
TAC HOLDINGS, LLC,
TAC HOME MORTGAGE, LLC,
TAC INVESTMENTS, LLC,
TALARIA GLOBAL HEALTH, LLC,
TALENT ACQUISITION INNOVATION
HOLDINGS, LLC,
TALENT ACQUISITION INNOVATION,
LLC,
TARGETED METRICS, LLC,
TCC JUNIOR LOAN-BACKED
FUNDING, LLC,
TCC SENIOR LOAN-BACKED
FUNDING, LLC,
TCI LOAN-BACKED FUNDING, LLC
F/K/A TCI LOAN BACK SECURITY
FUNDING, LLC,
TECHDATE CORP.,
TESLA MANAGEMENT, INC.,

THE AMERICAN COUNCIL ON
ENGLISH LANGUAGE PROGRAM
CERTIFICATION, INC.,
THE AMERICAN COUNCIL, INC.,
THE CORPORATE RESPONSIBILITY
BOARD, LLC,
THE FINANCIAL ASSOCIATION
CORP.,
THE HOEHNE GROUP - SOFTWARE
DIVISION, LLC F/K/A THE HOEHNE
GROUP – SOFTWARE DIVISION, INC.,
THE HOME MEDICAL EQUIPMENT
TRUST,
THE ONLINE REHAB LIMITED,
THE RECOVERY HOUSE LIMITED,
THE RIVER SOURCE SOLUTION
HOLDINGS COMPANY, LLC,
THE RIVER SOURCE SOLUTIONS,
LLC,
THE RIVER SOURCE TREATMENT
CENTRE-CASA GRANDE, LLC,
TIAM HOLDINGS I, LLC,
TIER 1 LENDING HOLDINGS, LLC,
TIER 1 LENDING, LLC F/K/A TIER
ONE FUNDING, LLC,
TOCONNECT GMBH,
TONIQ LIMITED,
TORNADO, LLC,
TRANS-CONTINENTAL CREDIT &
COLLECTION CORP,
TRANSCONTINENTAL HOLDINGS,
LLC,
TRANSGLOBAL UK LIMITED,
TREATMENT DIRECT LIMITED,
TRIER HOLDING B.V.,
TRITON FINANCIAL LIMITED,
TUX HOLDINGS, LLC,
TV FANFARE CANADA LTD / TV
FANFARE CANADA LTÉE,
TYBEE ISLAND ASSET
MANAGEMENT, LLC F/K/A TYBEE
ISLAND ASSET MANAGEMENT, INC.,
UAM HOLDINGS I, INC.,
UK ADDICTION TREATMENT GROUP
LIMITED,
UK ADDICTION TREATMENT

LIMITED,
UK ASSET FUND HOLDINGS, LLC,
UK ATLANTA HOLDINGS, LLC,
UK FINTECH HOLDINGS, LLC,
UK AUTOMOTIVE HOLDINGS, LLC,
UK INFORMATICA INVESTMENTS,
LLC,
UK INTRALAN INVESTMENTS, LLC,
UK INVESTMENT HOLDINGS, LLC,
UK MARVAL INVESTMENTS, LLC,
UKAT HOLDINGS, LLC,
UKAT INTERCO LIMITED,
UKAT INVESTMENTS LIMITED,
ULTIMATE ADVISORS, LLC,
UNDERSTAND.COM, LLC,
UNDERSTAND.COM HOLDING, LLC,
UNIFY COMMUNICATIONS N.V.
N/K/A DAMOVO TECHNOLOGY
SERVICES NV/SA,
UNIT 77, LLC,
UNITED STAFFING SOLUTIONS, LLC,
UTOPIA ASSET MANAGEMENT, INC.,
VALDOSTA, LLC,
VAM HOLDINGS I, INC.,
VAN RU CREDIT CORPORATION,
VAN RU INTERNATIONAL, INC.,
VENTURA ASSET MANAGEMENT,
INC.,
VIOLET ONE, LLC,
VIP HUB SERVICES, LLC,
VISION CARE ALLIANCE, LLC,
VISION CARE SERVICES HOLDINGS,
LLC,
VISION CARE SERVICES, LLC,
VISTA LIFE & CASUALTY
REINSURANCE COMPANY,
VOICE & DATA NETWORK AG,
VR COLLECTIONS, LLC,
VR ENTERPRISES, LLC,
VRC HOLDINGS, LLC,
WACO ASSET MANAGEMENT, INC.,
WACO HOLDINGS I, INC.,
WC HOLDINGS, LLC,
WCS RESOURCES, LLC,
WEARE, LLC,
WEB COURSEWORKS, LLC,

WESTERN BANCORP, INC.,
WESTERNB HOLDINGS, LLC,
WESTERNB INVESTMENTS, LLC,
WHITAKER MILL, LLC F/K/A
TRIVIAL, LLC,
WHITE LILY, LLC,
WILLIAM STREET ASSET
MANAGEMENT LIMITED,
WILLIAMSON, LLC,
WILMINGTON HOLDINGS LIMITED,
WINN OVER ENTERPRISES, LLC,
WOLFEBORO, LLC,
WPP CAPITAL, LLC,
WPSC HOLDCO, LLC,
WPSC INVESTMENTS, LLC,
WSAM HOLDINGS LIMITED,
WW STAFFING, LLC,
WWS HOLDINGS, LLC,
WYO TECH INVESTMENTS LLC,
YARAS GROUP, LLC,
YARROW THREE, LLC,
YELLOW CARNATION, LLC,
YELLOW LOTUS, LLC,
YELLOW MAGNOLIA, LLC,
YELLOW SUNFLOWER, LLC,
ZAM HOLDINGS I, INC.,
ZAPIT MEDICAL PHYSICS, LLC,
ZEN SERVICES, INC.,
ZION ASSET MANAGEMENT, INC.,
and JOHN DOE #1 THROUGH JOHN
DOE #50, THE LAST FIFTY NAMES
BEING FICTITIOUS AND UNKNOWN
TO PLAINTIFFS; THE PERSONS OR
PARTIES INTENDED BEING
ASSIGNEES, SUCCESSORS, AND/OR
TRANSFEREES

                    Defendants.

28

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

**<u>PRELIMINARY STATEMENT</u>**………………………………………………………..1

   I.  **First Set of Improper Transactions – Malfeasance Claims**…………………………...1

   II. **Government Allegations Support the JPLs' Fraud Theories**…………………………8

   III.**Second Set of Improper Transactions – Voiding the IALA and MOU**……………...11

   IV.**Claims Related to the Debtor Investment Counterparties**…………………………...14

**<u>PROCEDURAL HISTORY</u>**………………………………………………………………15

**<u>PARTIES</u>**………………………………………………………………………………...17

**<u>FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION</u>**……………...163

   I.  **Lindberg and his Entrance into the Insurance Industry**…………………………163

   II. **Global Growth's Organizational Structure**……………………………………......172

   III.**Lindberg and Other Senior Decision Makers Failed to Respect Corporate Separateness and Abide by Corporate Formalities**…………………………….174

   IV.**Lindberg, Personal Expense Companies, and the Diversion of Debtors' Assets for Non-Debtor Personal Purposes**……………………………………………...183

   V.  **Lindberg's and Senior Decision Makers' Regular Business in Bermuda**………...187

   VI. **Representative Transactions Causing Harm to Northstar**………………………...189

        **Triton Transactions**………………………………………………………...194

        **UKAT Transactions**………………………………………………..…………199

        **ATL Transactions**……………….…...………………………………………204

        **Beaufort Transactions**…………………………………………...………… 210

        **Northstar's Insolvency**……………………………………………………...218

   VII. **Representative Transactions Causing Harm to PBLA**………………….............220

        **Repurchase Agreements**……………………………………………………220

          ***December 2017 Repo Agreements***……………………………………222

SNA Capital Promissory Note…………………………………………………229

PBLA ULICO Arbitration………………………………………………...233

Satori Waters Transactions………………………………………………238

AFA Transactions………………………………………………………244

PBLA's Insolvency………………………………………………………248

VIII. Representative Transactions Causing Harm to PBIHL…………………………..250

Agera/Yarrow Three Transactions………………………………………....251

Flagship Transactions…………………………………………………….......261

PBIHL's Insolvency……………………………………………………265

IX. Representative Transactions Causing Harm to Omnia………………………........267

MBW Transaction………………………………………………………267

Omnia's Insolvency……………………………………………………........272

X.    Memorandum    of    Understanding    and    Interim    Amendments    to    Loan
Agreement………………………………………………………………274

Rehabilitation of NCIC……………………………………………………274

Use of Debtors' Assets to Address NCIC's Liquidity Needs…………………279

Negotiation and Execution of the MOU and IALA…………………………..281

The MOU's Intended Operation, Beginning with the IALA…………………287

Adverse Effect of the MOU and IALA on the Debtors' Assets………………292

The MOU and IALA are Void or Voidable as to the Debtors………………295

*Lack of Authority of Lindberg and Herwig to Execute the MOU and
IALA........................................................................................................295*

*Breach of Fiduciary Duty by Herwig……………………………………300*

*Breach of Fiduciary Duty by Lindberg……………………………………303*

*Breach of Fiduciary Duty by CBL and SNIC…………………………304*

*Insufficiency of Consideration…………………………………………...306*

*CBL and SNIC Continue to Breach Their Fiduciary Duties*…………………………………………………………...………**306**

**CAUSES OF ACTION**……………………………………………………………………………..**310**

**PRAYERS FOR RELIEF**…………………………………………………………………………**368**

## COMPLAINT

Plaintiffs Rachelle Frisby and John Johnston of Deloitte Ltd., in their capacities as the Joint Provisional Liquidators and authorized foreign representatives ("JPLs") for PB Life and Annuity Co., Ltd. (in provisional liquidation) ("PBLA"), Northstar Financial Services (Bermuda) Ltd. (in liquidation) ("Northstar"), Omnia Ltd. (in liquidation) ("Omnia") and PB Investment Holdings Ltd. (in liquidation) ("PBIHL," together with PBLA, Northstar and Omnia, the "Debtors"), in proceedings currently pending before the Supreme Court of Bermuda (the "Bermuda Court"), Companies (Winding Up) Commercial Court, 2020: No. 306, 304 and 305, and 441 respectively (the "Bermuda Proceedings") as well as PBLA, Northstar, Omnia and PBIHL (the JPLs, PBLA, Northstar, Omnia, and PBIHL, collectively the "Plaintiffs") bring this Complaint and allege as follows:

## PRELIMINARY STATEMENT

1. The Debtors were subjected to two separate sets of misconduct orchestrated by Global Growth Holdings, Inc. (d/b/a Global Growth), f/k/a Academy Association, Inc. (d/b/a Eli Global) ("Global Growth"), Gregrey Evan Lindberg a/k/a Greg Evan Lindberg ("Lindberg") and his affiliates and co-conspirators, including Christopher E. Herwig ("Herwig"), Devin E. Solow ("Solow"), Christa M. Miller ("Miller"), and Eric D. Bostic ("Bostic") (collectively, the "Senior Decision Makers").

### I.  First Set of Improper Transactions – Malfeasance Claims

2. Between 2017 and 2019, Lindberg engineered, and he and his co-conspirator Senior Decision Makers implemented, a vast and intricate fraudulent scheme to drain over $700 million of liquid assets from the Debtors (over $1.1 billion including the PBLA ULICO 2017 Reinsurance Trust and Comfort Trust, hereinafter the "PBLA ULICO Trusts") and caused

1

these liquid assets to be transferred to a convoluted and opaque network of hundreds of Lindberg affiliates (collectively, "Lindberg Affiliates").[2]

3.  These transfers were disguised as legitimate loans and equity investments, but in fact most of them were sham transactions used by Lindberg and his co-conspirators to siphon over $700 million of liquid assets directly from the Debtors for the benefit of Lindberg and the Lindberg Affiliates. For instance, in late 2018, when Global Growth was facing regulatory pressure to make a significant capital contribution to the North Carolina insurance companies that Lindberg formerly controlled by year-end, the Senior Decision Makers caused Northstar to make three "investments" aggregating approximately $83.7 million in three Lindberg Affiliates, so that the proceeds could be used to capitalize the NCIC.[3] There was no independent basis for these so-called investments, which were clearly of no material benefit to Northstar, and among other harms, drained it of the liquidity it required to satisfy policyholder claims. Instead, in an attempt to salvage the equity he had in the NCIC, Lindberg improperly diverted Northstar's assets to capitalize the NCIC solely because Northstar still had available liquid assets at that time.

4.  Moreover, Lindberg diverted more than $12 million of the Debtors' cash to Lindberg Affiliates used to pay Lindberg's personal expenses (the "Personal Expense Companies").[4] Upon information and belief based on the incomplete books and records available

---

[2]  "Lindberg Affiliates" means all the entities named as defendants, excluding Lindberg, Miller, Herwig, Solow, Bostic and the NCIC (defined below).

[3]  The "NCIC" means and refers to Colorado Bankers Life Insurance Company ("CBL"), Bankers Life Insurance Company ("BLIC"), Southland National Insurance Corporation ("SNIC") and Southland National Reinsurance Corporation ("SNRC").

[4]  Non-exhaustive examples of Lindberg's Personal Expense Companies include: Acquired Development, LLC ("Acquired Development"); American Yacht Charters, LLC ("American Yacht"); Apex International, LLC ("Apex"); AYC Holdings Limited ("AYC Holdings"); Dunhill Holdings, LLC ("Dunhill"); East Hill Holdings, LLC ("East Hill"); First International Financial, Inc. ("First International"); Horizon Holdings I, LLC ("Horizon"); New

2

to the JPLs, Lindberg diverted substantially more than $12 million of the Debtors' cash. Lindberg's personal expenses paid by the Personal Expense Companies or other Lindberg Affiliates with cash taken from the Debtors appear to have included, but are not limited to, payments of Lindberg's personal American Express cards; salary payments to Lindberg's Personal Expense Company staff; operating expense and lease payments related to Lindberg's personal jets, lavish parties in Las Vegas and Miami, among other destinations; maintenance and operating expenses related to Lindberg's yacht, the "Double Down"; mortgage and/or operating expenses for properties Lindberg appears to have acquired and diverted for personal use; and substantial payments and gifts to multiple women who provided Lindberg with their eggs for fertility purposes, with some payments in excess of ███████ in a single year.

5.    Lindberg and his co-conspirators engaged in many other self-dealing transactions. For instance, they engaged in round-tripping transactions whereby funds originating from Lindberg Affiliates in the United States, were moved through various other Lindberg Affiliates in Malta, Barbados, at times through the Debtors in Bermuda, and then back to the Lindberg Affiliates in the United States within a few days, with each transfer being disguised as a legitimate investment including sale and repurchase agreements ("Repo Agreements"). Also, Lindberg and the Senior Decision Makers utilized loan to shareholder ("LTS") transactions, each of which was simply a façade when company assets or money were used to pay Lindberg's personal expenses – these often went unpaid and Lindberg received all the benefit with no repayment to the company that extended the LTS. Essentially, a LTS with a Lindberg Affiliate was a pretextual transaction used by Lindberg and the Senior Decision Makers to move money around between the Lindberg Affiliates. Sandi White ("White")—Global Growth's VP of

---

Hill Asset Management, LLC ("New Hill"); Skyworld Corporation ("Skyworld"); South Hill Holdings, LLC ("South Hill"); and Unit 77, LLC ("Unit 77").

3

Corporate Treasury until 2020—testified, moreover, that no LTSs had been repaid by Lindberg in more than a decade, all LTSs have been forgiven, amended or ignored.

6.   These sham transactions enabled Lindberg and the Senior Decision Makers to siphon off millions of dollars from the Debtors to fund: (1) operating expenses of Global Growth and its subsidiaries; (2) Lindberg's personal expenses; and/or (3) lucrative but unjustified "transaction" fees and bonuses, before the funds were returned to the Debtors disguised as new "investments."

7.   There are also instances where Lindberg and the Senior Decision Makers intentionally foisted assets onto the Debtors, that they knew to be in default, bankrupt or otherwise impaired at par for the benefit of other Lindberg Affiliates. For instance, on December 14, 2017, to alleviate regulatory issues at CBL, Lindberg and the Senior Decision Makers caused CBL to sell a $3.7 million participation interest at par to PBLA in a defaulted loan issued by a company called Satori Waters, LLC ("Satori Waters"). Similarly, when Global Growth acquired Omnia and PBIHL in June 2017 from Beechwood, LLC ("Beechwood"), Lindberg and the Senior Decision Makers knew the positions that Omnia and PBIHL held in a company called Agera Holdings, LLC ("Agera") were overvalued and inflated, and that Agera's financial condition was impaired, but chose to keep Agera on the books at an improper overstated value to deceive the Bermuda regulators.[5] Thereafter, in January 2018, the Senior Decision Makers caused: (a) PBIHL to make a $3,000,000 investment in worthless Agera preferred equity at par; and (b) PBLA, Omnia and PBIHL to spend $7,587,918 to acquire from CBL its worthless interests in Yarrow Three, whose only asset was a loan to another Lindberg Affiliate which only held Agera preferred equity.

---

[5]  Agera later filed for Chapter 11 and the Debtors' equity was wiped out.

4

8.   Even where investment proceeds were not used for Lindberg's personal purposes, these so-called investments, in substance, were wholly inappropriate for insurance and reinsurance companies such as the Debtors because: (i) the investments were illiquid, opaque, not marketable, and non-negotiable; and (ii) the Debtors were left with insufficient liquid assets to adequately protect policyholders from the risk caused by the investment in illiquid assets. Among other problems, the investment of virtually all funds in illiquid assets beginning in 2019 and less than two years after the acquisition of Northstar, Omnia and PBIHL left them without sufficient readily available cash to pay policyholder claims and surrenders of other financial products. In fact, most of these so-called investments were loans to shell companies, where loan proceeds to a counterparty were immediately transferred through multiple layers of other Lindberg Affiliates. Through multiple orders directing turnover of the Debtors' books and records, as well as documents received from insiders, non-insiders and the NCIC pursuant to multiple orders under Fed R. Bankr. P. 2004, the JPLs have been able to substantiate many instances of improper use of the Debtors' funds, aggregating hundreds of millions of dollars.

9.   The JPLs still do not have complete transparency as to where all the Debtors' funds ultimately wound up in the Lindberg empire, the nature of all those indirect investments that are multiple layers removed from the Debtors' direct counterparties, or the financial condition of all these multiple direct and indirect counterparties.

10.   Even in instances where the Debtors' funds were ultimately invested in profitable operating companies, the Debtors were harmed because in most instances they have no direct investment in a company with real assets and operations. Instead, for the most part, Lindberg and the Senior Decision Makers left the Debtors with promissory notes or preferred equity issued by inoperable, opaque and sometimes shell companies.  As a result, the Debtors are not in a position

5

to monetize these so-called investments at par, and have received little or no cash flow therefrom, resulting in significant harm.

11.  These so-called investments created an immediate liquidity mismatch between the Debtors' obligations to their policyholders, and in the case of PBLA, the Trust established for the benefit of Universal Life Insurance Company of Puerto Rico ("ULICO"). Moreover, by causing the Debtors to invest virtually all their assets in Lindberg Affiliates and the diversion of cash to Lindberg's Personal Expense Companies, Lindberg and the Senior Decision Makers violated contractual and legal obligations limiting investments in affiliates, as well as standards of prudent investing applicable to insurance companies, reinsurance companies and reinsurance trusts, both in Bermuda and in the United States.

12.  These investments also generated excessive and improper success fees, origination fees, management fees, and other improper and unacceptably disproportionate payments to Lindberg, the Senior Decision Makers and the Lindberg Affiliates including but not limited to Standard Advisory Services, Ltd. ("SASL"), Standard Financial Limited ("SFL") and Standard Investment Capital Ltd. ("SICL").

13.  The transfers from the Debtors to Lindberg Affiliates were made at an overvalue, not for reasonably equivalent value, or were made at a time when the Debtors were already distressed and/or experiencing cash flow problems. There is material evidence suggesting that the Debtors began experiencing cash flow problems at least as early as autumn of 2018.

14.  By orchestrating and implementing the foregoing putative "investments" that benefited Lindberg personally and his non-Debtor affiliates at the Debtors' expense, the Debtors' officers and directors breached the fiduciary duties that they owed to the Debtors.

6

15.  Lindberg did not respect the separateness of the Debtors or the Lindberg Affiliates in his dealings with the Debtors and the Lindberg Affiliates, including the Debtor Investment Counterparties. In fact, he commingled assets and shuttled money between entities freely whenever the need for funds arose (including without limitation the examples cited above), while failing to adhere to corporate formalities and appropriate governance procedures, including the lack of basic internal controls and accurate recordkeeping, the failure to properly perform due diligence before making investments, the failure to monitor investments or comply with loan covenants, the failure to obtain required corporate and regulatory consents, and the failure to maintain adequate capitalization.

16.  The effect, purpose and result of these actions was to create a complex web of companies behind the Debtor Investment Counterparties into which the Debtors' funds disappeared and were concealed from the purview of creditors and regulators, thereby making it extremely difficult if not impossible for the Debtors to ever be repaid on loans or equity investments, to sell such investments, or otherwise realize value therefrom. As a result, this Court should pierce the corporate veils of the Lindberg Affiliates to allow the Debtors, as creditors of and investors in the Debtor Investment Counterparties, all of which are merely shell companies, to reach the assets of all of the Lindberg Affiliates. In the alternative, this Court should substantively consolidate the Lindberg Affiliates with the Debtors. In the alternative, this Court should impose a constructive trust for the benefit of the Debtors over the assets of the Lindberg Affiliates to prevent unjust enrichment.

7

## II. Government Allegations Support the JPLs' Fraud Theories

17. Lindberg and his associates have been credibly accused by governmental entities of fraud and dishonesty, consistent with the foregoing allegations by the JPLs that the Debtors' so-called investments were nothing more than sham transactions.

*SEC Complaint*

18. On August 30, 2022, the United States Securities and Exchange Commission ("SEC") filed a complaint against Lindberg, Herwig, and a Malta-based Lindberg Affiliate, SASL alleging violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).[6]

19. Lindberg caused SASL to be formed in 2016, ostensibly to render investment advisory services to his affiliated entities which included PBLA after its formation in 2017.

20. SASL was registered with the SEC as an investment adviser from December 2016 to October 2019. It also possessed a license to provide investment advice from the Malta Financial Services Authority.

21. The SEC alleged, *inter alia*, that Lindberg, Herwig, and SASL, while acting as investment advisers, and in breach of their fiduciary duties, directly or indirectly, knowingly, willfully, or recklessly: (1) employed devices, schemes, and/or artifices to defraud PBLA and the NCIC; and (2) engaged in transactions, practices, and/or courses of business which operated as a fraud or deceit upon PBLA and the NCIC.

22. With regard to PBLA specifically, the SEC alleged that Lindberg, Herwig, and SASL devised a scheme to extract millions of dollars in cash or other highly liquid assets from the PBLA ULICO Trusts to finance the growth of Lindberg's other businesses.

---

[6] *See SEC v. Lindberg, et al.*, Case No. 22-cv-715 (M.D.N.C.) [ECF No. 1].

8

23. SASL was "Investment Manager" of the PBLA ULICO Trust, which when initially constituted, held more than $530 million in assets.

24. The SEC alleged that Lindberg, Herwig, and SASL advised PBLA to invest in ways that violated the Bank of New York Mellon ("BNY") and Wilmington Trust agreements governing the PBLA ULICO Trusts, PBLA's investment guidelines, and Puerto Rico insurance law. Importantly, the SEC further alleged that Lindberg, Herwig and SASL filled PBLA's balance sheet with Repo Agreements to dishonestly inflate the asset position, which is also supported by the Debtors' books and records.

25. For over two (2) years beginning in 2017, Lindberg and the other Senior Decision Makers caused PBLA to participate in the SASL scheme. Lindberg was a director of SASL and Chairman of PBLA in 2017, and Herwig was appointed as a director of SASL in May 2018 after Lindberg resigned from his seat.

26. In addition, SASL served as an "Investment Advisor" to PBLA. For services rendered from Q1 of 2018 through Q2 of 2019, the Debtors' incomplete books and records, made available by the Lindberg Affiliates, show that SASL charged PBLA nearly $11 million in advisory fees.

27. Lindberg additionally used SASL—one of a web of Malta entities ultimately owned by him—to compensate himself, and at least Herwig and Solow, among the Senior Decision Makers.

*Lindberg Indictment*

28. Separately, on March 18, 2019, Lindberg was indicted by a federal grand jury empaneled within the United States District Court for the Western District of North Carolina.

9

29. The charges included: (1) conspiracy to commit honest-services wire fraud (18 U.S.C. §§ 1343, 1346); and (2) committing and aiding and abetting federal-funds bribery (18 U.S.C. §§ 666(a)(2)).

30. The indictment, in generalized terms, resulted from Lindberg's interactions between November 2017 and August 2018 with Mike Causey ("Causey"), the Commissioner of the North Carolina Department of Insurance ("NCDOI"), a public official.

31. Lindberg was tried in February 2020 and on March 5, 2020, a federal jury convicted Lindberg of conspiracy to commit honest services wire fraud and bribery concerning a program that received federal funds.

32. His conviction was recently reversed based on a faulty jury instruction, and his request for release from prison granted.

33. Lindberg is scheduled to be retried for bribery in March 2023, and presently confined by judicial order to the Middle District of Florida.

*Herwig Guilty Plea*

34. On December 19, 2022, prosecutors in the Western District of North Carolina and Fraud Section of the Department of Justice's Criminal Division, charged Herwig with conspiracy to deceive and defraud the NCDOI, various ratings agencies, life insurance companies, and insurance policyholders; evade regulatory requirements meant to protect policyholders; conceal the true financial condition of the Lindberg Affiliates; and conceal the true use of insurance company funds for his benefit.

35. Prosecutors alleged, *inter alia*, as part of the manner and means of the conspiracy, that Herwig and Solow engaged in circular transactions among Lindberg's web of entities using insurance company funds, and made, and caused to be made, various false and fraudulent

10

representations, concealed material facts, and told deceptive half-truths to the NCDOI and other third parties regarding these transactions.

36.  For example, as part of the conspiracy and in furtherance of its purposes, the Bill of Information alleged, *inter alia*, that Herwig and Solow: (a) engaged in a series of "sham" Repo Agreements "totaling nearly $96 million . . . to, among other things, artificially inflate the capital position of" the insurance companies; (b) "fraudulently extracted nearly $200 million" from the insurance companies to amass "show money" in connection with Lindberg's planned acquisition of another insurance company; (c) caused the insurance companies to enter into "advisory service agreements" used to "extract millions of dollars . . . in the form of investment advisory fees"; and (d) "used loans to extract money from the insurance companies for [Lindberg's] personal benefit indirectly, including through transfers . . . documented as "loans to shareholder."

37.  On December 22, 2022, Herwig pleaded guilty to one count of conspiracy to defraud the United States government.

38.  Lindberg, Herwig, Bostic, and Solow, when questioned under oath pursuant to Bankruptcy Rule 2004 subpoenas issued by this Court, all invoked their Fifth Amendment rights against self-incrimination in response to substantive questions concerning the Debtors and the matters alleged herein. As such and among other things, adverse inferences are appropriate.

**III. Second Set of Improper Transactions – Voiding the IALA and MOU**

39.  After having already impaired the assets and capital of the Debtors by implementing the illiquid and improper investments in Lindberg Affiliates, Lindberg, the Senior Decision Makers and the NCIC then entered into two related contracts, both dated June 27, 2019,

SL1 1812077v17 114825.00001

that further impaired these investments: (1) the Interim Amendment to Loan Agreements (the "IALA"); and (2) the Memorandum of Understanding (the "MOU").

40.    Under the IALA, the NCIC, Lindberg, and certain of the Senior Decision Makers adversely modified the economic terms of over $700 million of debt and preferred equity held by the Debtors by imposing lengthy maturity extensions of up to nine years, interest rate deferrals and reductions, and other waivers, for absolutely no consideration. If the MOU is ever implemented, the NCIC would take control of 511 Lindberg Affiliates, the book value of which is believed to exceed $2 billion, including companies in which the Debtors invested over $700 million.  The investments of the Debtors and NCIC are intertwined and in some instances the parties are agents for each other on loan agreements.

41.    The NCIC traded concessions to Lindberg and his companies under the IALA in exchange for a host of benefits they hoped to receive from Lindberg and his companies under the MOU. However, the Debtors were also forced to make significant concessions under the IALA, currently estimated to be in excess of $117.8 million (and increasing by approximately $85,250[7] with each passing day), for absolutely no consideration. At the time, CBL and SNIC were acting as agents for the Debtors in their capacities as lenders under at least twenty-nine (29) loans to Lindberg Affiliates. CBL and SNIC breached their fiduciary duties owed to the Debtors and breached the implied covenant of good faith and fair dealing by adversely modifying loan terms for their own benefit, and to the Debtors' detriment. Since execution of the IALA and MOU, CBL and SNIC have continued to breach their fiduciary duties owed to the Debtors as agents by improperly executing transactions for CBL's and SNIC's own benefit, tortiously interfering with

---

[7] Both the $117.8 million aggregate damages figure and the *per diem* damages were calculated using the non-default rates of interest under the original loan documents before such rates were reduced under the IALA. If default rates are used, the damages incurred thus far would be approximately $179.5 million and the *per diem* damages would be

12

the Debtors' contract rights under loan agreements, failing to remit interest due to the Debtors, and charging excessive fees.

42. Importantly, the JPLs dispute that the IALA and MOU are valid, binding, effective, and enforceable as to the Debtors because, *inter alia*: (1) the investment modifications purportedly instituted thereunder expressly required prior written approval from the Bermuda Monetary Authority (the "BMA"), which was never obtained [*see* Affidavit of Graham Lamb, Assistant Director of the BMA, Concerning The JPLs' Applications for Orders Authorizing Issuance of Subpoenas Directing Production of Documents and Attendance for Deposition Testimony [ECF No. 250] (the "Lamb Aff."), ¶¶ 8-9 ("The BMA believes that the parties to the MOU and IALA knew or should have known that the BMA's prior written approval was required for modification of the Debtor investments;" and "The BMA never gave such prior written approval. . .")], thus the IALA is *ultra vires*; (2) the only consideration received for the MOU were the loan concessions under the IALA, so if the IALA is *ultra vires*, then the MOU is also invalid for failure of consideration; (3) the IALA adversely modified the economic terms of over $1 billion of debt and preferred equity held by the Debtors and the PBLA ULICO Trusts by imposing lengthy maturity extensions of up to nine years, interest rate deferrals and reductions, and other waivers, for absolutely no consideration; (4) the modifications purportedly made pursuant to the IALA and MOU represent avoidable fraudulent transactions on the basis that they were made at a time when the Debtors were insolvent (or in the alternative, rendered the Debtors insolvent), for no consideration; (5) there is insufficient evidence that PBLA was duly authorized to enter into these agreements, in that the JPLs have not been provided with any corporate resolutions or evidence of another formal corporate act sufficiently authorizing the same, putting

---

approximately $130,700. It appears these investments have been in default for many years. The JPLs reserve all rights to calculate damages based on applicable default rates.

aside, *arguendo*, the absence of the necessary BMA approval; (6) there is insufficient evidence as to Northstar, Omnia, PBIHL, and the Trustee of the Trusts agreeing to be bound in an enforceable manner, and none of which even executed the agreements and for none of which the JPLs have been provided corporate resolutions or evidence of another formal corporate act sufficiently authorizing the MOU or IALA; (7) the only law firms which may have been engaged for any Debtor in connection with the negotiation and execution of the IALA and MOU— Cadwalader, Wickersham & Taft LLP ("Cadwalader") and Moore & Van Allen PLLC ("MVA")—have repeatedly disclaimed any engagement by or for a Debtor, including with MVA as recently as the May 12, 2022 hearing in the Chapter 15 Proceeding, leaving the Debtors without any representation in the entry of the MOU and IALA;[8] and (8) with respect to assets held in the reinsurance trusts established for the benefit of ULICO, the Trustee (then Bank of New York Mellon, now TMI Trust Company) was not a party to the IALA or MOU, so the purported modifications cannot possibly be binding on assets held in the Trusts.

43.  The concessions that the Debtors were improperly forced to make under the IALA and MOU were made at little to no value, nor for reasonably equivalent value, and were made at a time that the Debtors were insolvent, or such transactions rendered the Debtors insolvent.

44.  By implementing the foregoing transactions under the IALA and MOU that benefited Lindberg personally, his non-Debtor affiliates, and the NCIC at the Debtors' expense, the Debtors' officers and directors breached the fiduciary duties that they owed to the Debtors.

## IV. Claims Related to the Debtor Investment Counterparties

45.  The Debtors can sue as creditors of the Debtor Investment Counterparties to avoid the fraudulent transfers they made to other Lindberg Affiliates under United States law. The

---

[8] When asked directly by the NC MOU Court whether PBLA was represented by MVA, Lindberg responded, "that's a good question. I'm not sure." Lindberg NC MOU Action Trial Testimony [Volume 6] Tr., at 73:1-4.

Debtors also have standing to sue subsequent transferees of the initial transferees under United States fraudulent transfer law. In the alternative, the Debtor Investment Counterparties are in default of payment and non-payment obligations under the relevant documents memorializing such loan and equity investments. The Debtors hereby accelerate all promissory notes issued by the Debtor Investment Counterparties. As a result, the Debtors are entitled to a judgment against the Debtor Investment Counterparties[9] in the amounts specified in Exhibit A, plus continuing interest or dividends (at the pre-IALA rates), late charges, and attorneys' fees.

## PROCEDURAL HISTORY

46. The JPLs since their appointment in September 2020 have invested more than 46,000 person-hours in the pursuit of their duties as appointed officers of the Supreme Court of Bermuda in connection with the Debtors.

47. The JPLs, among other things, have gathered, attempted to organize with varying degrees of success, and analyzed and assessed more than three million pages of books and records of the Debtors possessed by a number of custodians and other holders of the same, documents and ESI produced in response to Rule 2004 subpoenas authorized by this Court, and records of and relating to the Debtors from other sources.

48. Material portions of the Debtors' books and records remain incomplete, fragmented, missing, within the possession of custodians and persons outside the jurisdiction of the Courts of Bermuda and the United States, or otherwise unavailable presently to the JPLs and the Debtors.

49. There have not been since the JPLs' appointment in September 2020 any directors, officers, or employees of any Debtor within the control of the JPLs to contribute

---

[9] Debtor Investment Counterparties are the defendants identified in <u>Exhibit A</u>.

15

materially to the work of the JPLs, including the work leading to the development and pursuit of this Complaint and the claims asserted in this Complaint.

50.  On December 3, 2020, in their capacities as the JPLs of Northstar, the Plaintiffs presented a petition to the Bermuda Court to, *inter alia,* wind up PBIHL and to appoint Rachelle Frisby and John Johnston as the JPLs of PBIHL.  By Order dated January 8, 2021, the Plaintiffs were appointed as the JPLs and duly authorized foreign representatives of PBIHL.

51.  On December 3, 2020, the JPLs filed separate voluntary petitions with this Court under Chapter 15 on behalf of PBLA, Northstar and Omnia, seeking recognition of the Bermuda Proceedings as foreign main proceedings (or, in the alternative, as foreign nonmain proceedings) [ECF Nos. 1 and 2],[10] and related relief under Bankruptcy Code sections 1520 and 1521 (the "Recognition Motion") and included a motion for the joint administration of PBLA, Northstar and Omnia. [ECF No. 8]

52.  On December 4, 2020, the Court granted PBLA, Northstar and Omnia's motion for joint administration and, after a hearing held on January 5, 2021, the Court entered an order granting recognition of the PBLA, Northstar and Omnia Bermuda Proceedings as foreign main proceedings. [ECF Nos. 11 and 33]

53.  On April 2, 2021, the JPLs filed a voluntary petition under Chapter 15 on behalf of PBIHL seeking recognition of the PBIHL Bermuda Proceeding as a foreign main proceeding (or, in the alternative, as a foreign nonmain proceeding) and related relief under Bankruptcy Code sections 1520 and 1521.[11] The JPLs also filed a motion seeking joint administration of PBIHL with PBLA, Northstar and Omnia. [*In re PBIHL*, ECF No. 7]

---

[10] *See also In re Northstar Financial Services (Bermuda) Ltd.*, Case No. 20-12792 (LGB) [ECF Nos. 1 and 2] and *In re Omnia Ltd.*, Case No. 20-12793 (LGB) [ECF Nos. 1 and 2].

[11] *In re PB Investment Holdings, Ltd.,* Case No. 21-10623 (LGB) [ECF Nos. 1 and 2].

16

54. On April 2, 2021, the Court entered an order granting the joint administration of PBIHL with PBLA, Northstar and Omnia and, on May 4, 2021, the Court entered an order granting recognition of the PBIHL Bermuda Proceeding as a foreign main proceeding (together with the order granting recognition of the Bermuda Proceedings of PBLA, Northstar and Omnia, the "Recognition Orders"). [ECF Nos. 42 and 50]

55. The Recognition Orders expressly provide, "[a]ll provisions of section 1520 of the Bankruptcy Code apply in these Chapter 15 Cases, including, without limitation, the stay under section 362 of the Bankruptcy Code throughout the duration of these Chapter 15 Cases or until otherwise ordered by this Court." PBLA, Northstar and Omnia Recognition Order, pg. 5, ¶ 3 and PBIHL Recognition Order, pg. 4, ¶ 3.

56. The Recognition Order further provides that all entities are enjoined from "transferring, relinquishing, or disposing of any property of the Debtors to any entity (as that term is defined in section 101(15) of the Bankruptcy Code) other than the JPLs." Recognition Order at pg. 6, ¶ 7(d).

## **PARTIES**

57. PB Life and Annuity Co., Ltd. f/k/a Private Bankers Life and Annuity Co., Ltd. ("PBLA") is a Bermuda-based life and annuity reinsurance company incorporated on April 17, 2017 by Global Bankers Insurance Group, LLC n/k/a Aspida Financial Services, LLC ("GBIG") which, at the time, was ultimately owned by Lindberg. PBLA was registered as a Class E insurer under The Insurance Act 1978 of Bermuda on the basis that it would issue life and annuity products in the international offshore market and also provide reinsurance to small and middle market life insurance entities writing annuities, long-term disability insurance and life insurance products. PBLA is owned by PBX Bermuda Holdings, Ltd. ("PBX Bermuda"). Upon

17

information and belief based on the books and records currently available to the JPLs, the following persons and entities were Directors and Officers of PBLA according to its available corporate documents:

a)  Greg Lindberg (Chairman, May 2017– November 2018);

b)  Scott Boug (President, August 2017 – May 2021; Director, November 2018 – present; and Chief Executive Officer, November 2018 – May 2021);

c)  Brian Stewart (Chief Financial Officer, August 2018 – November 2018);

d)  Christopher Herwig (Director, November 2018 – present);

e)  Kenneth Goertzen (Director, August 2019 – March 2020);

f)  Joseph Machado (Chief Operations Officer, November 2017 - June 2021; Money Laundering Reporting Officer and Compliance Officer, April 2019 – June 2021);

g)  Paul Brown (Director, May 2017 – November 2018);

h)  Sarah Demerling (Director, August 2017 – November 2018);

i)  George Luecke (Director, May 2017 – November 2018);

j)  Allison Dryer-Fagundo (Director, November 2018 – July 2019);

k)  Krishnan Harihara (Director, November 2018 – June 2019);

l)  James Damian Resnik (Director, March 2020 – May 2020);

m) Estera Services (Bermuda) Limited n/k/a Ocorian Services (Bermuda) Limited (Secretary, May 2017 – September 2020);

n)  Tamre Edwards (Chief Legal Officer and Assistant Secretary, August 2018 – November 2018); and

o)  Aon Insurance Managers (Bermuda) Ltd. (Principal Representative and Insurance Manager, May 2017 – June 2019).

18

58. PBLA is currently in provisional liquidation, with matters pending before the Bermuda Court.

59. Northstar is an insurance company formed under the laws of Bermuda and acquired by Lindberg on July 3, 2018. Northstar was registered as a long-term Class C insurer under The Insurance Act 1978 of Bermuda and as a segregated accounts company under the Segregated Accounts Act 2000. Northstar administered a block of insurance and annuity products, including individual variable contracts, fixed-rate contracts, variable universal life insurance and universal life insurance policies. Northstar is owned by BMX Bermuda Holdings, Ltd. ("BMX Bermuda"). Upon information and belief based on the books and records currently available to the JPLs, the following persons and entities were Directors and Officers of Northstar according to its available corporate documents:

a) Scott Boug (Principal Representative and President, August 2018 – March 2021; Director, November 2018 – present, and Chief Executive Officer, November 2018 – May 2021);

b) Greg Lindberg (Director, August 2018 – August 2018);

c) Christopher Herwig (Director, November 2018 – present);

d) Paul Brown (Director, August 2018 – November 2018);

e) Tamre Edwards (Director, Chief Legal Officer and Assistant Secretary, August 2018 – November 2018);

f) Brian Stewart (Chief Financial Officer, August 2018 – November 2018);

g) George Luecke (Director, August 2018 – November 2018);

h) Kenneth Goertzen (Director, August 2019 – March 2020);

19

i)  Joseph Machado (Chief Operations Officer and Compliance Officer, November 2018 – March 2021);

j)  James Damian Resnik (Director March, 2020 – May 2020);

k)  Henry Komansky (Money Laundering Reporting Officer, November 2018 – November 2020);

l)  Allison Dryer-Fagundo (Director, November 2018 – June 2019);

m)  Krishnan Harihara (Director, November 2018 – July 2019);

n)  Lynn Superina (Chief Financial Officer, November 2018 – August 2019; Secretary and Segregated Account Representative, 2017 – August 2018; Money Laundering Reporting Officer, 2014 – November 2018);

o)  Anthony Patrick Donaghy (Deputy Anti-Money Laundering Officer, 2017 – November 2018); and

p)  Estera Services (Bermuda) Limited n/k/a Ocorian Services (Bermuda) Limited (Secretary, July 2018 – September 2020).

60.  Northstar is currently in liquidation, with matters pending before the Bermuda Court.

61.  Omnia is an insurance company formed under the laws of Bermuda and acquired by Lindberg on June 30, 2017. Omnia was a long-term Class E insurer under The Insurance Act 1978 of Bermuda, and historically sold variable annuity unit linked contracts, fixed annuity and deferred annuity discretionary contracts with participating features. Effective March 2009, Omnia went into run off and discontinued writing new business. Omnia is owned by PBX Bermuda. Upon information and belief based on the books and records currently available to the

20

JPLs, the following persons and entities were Directors and Officers of Omnia according to its available corporate documents:

a)  Scott Boug (Compliance Officer and Money Laundering, June 2017 to March 2019; Principal Representative, November 2017 – March 2021; Director, November 2018 to present;  and Chief Executive Officer, November 2018 – May 2021);

b)  Christopher Herwig (Director, November 2018 – present);

c)  Paul Brown (Director, June 2017 – November 2018);

d)  George Luecke (Director, June 2017 – November 2018);

e)  Brian Stewart (Chief Financial Officer, August 2018 – November 2018);

f)  Tamre Edwards (Chief Legal Officer and Assistant Secretary, August 2018 – November 2018);

g)  Sarah Demerling (Director, June 2017 – November 2018);

h)  Kenneth Goertzen (Director, August 2019 – March 2020);

i)  Allison Dyer- Fagundo (Director, November 2018 – July 2019);

j)  Krishnan Harihara (Director, November 2018 – June 2019);

k)  James Damian Resnik (Director, March 2020 – May 2020);

l)  Aon Insurance Managers (Bermuda) Ltd. (Insurance Manager, August 2018 – May 2019);

m) Joseph Machado (Chief Operations Officer, November 2017 – June 2021; Compliance Officer and Money Laundering Reporting Officer, April 2019 – March 2021); and

n)  Estera Services (Bermuda) Limited n/k/a Ocorian Services (Bermuda) Limited (Secretary, June 2017 – September 2020).

62. Omnia is currently in liquidation, with matters pending before the Bermuda Court.

63. PBIHL is an investment company formed under the laws of Bermuda and acquired by Lindberg on June 30, 2017. Historically, PBIHL sold fixed and variable investment products to non-US/non-Bermuda citizens. PBIHL was placed into receivership in late 2016, and has been in run off since its acquisition by Lindberg. PBIHL is owned by BMX Bermuda. Upon information and belief based on the books and records currently available to the JPLs, the following persons and entities were Directors and Officers of PBIHL according to its available corporate documents:

a) Scott Boug (President, November 2017 – April 2021; Director and Chief Executive Officer, November 2019 2018 – present; and Chief Executive Officer, November 2018 – May 2021);

b) Christopher Herwig (Director, November 2018 – present);

c) Paul Brown (Director, June 2017 – November 2018);

d) George Luecke (Director, June 2017 – November 2018);

e) Brian Stewart (Chief Financial Officer, August 2018 – November 2018);

f) Tamre Edwards (Chief Legal Officer and Assistant Secretary, August 2018 – November 2018);

g) Sarah Demerling (Director, July 2017 – November 2018);

h) Krishnan Harihara (Director, November 2018 – June 2019);

i) Allison Dyer- Fagundo (Director, November 2018 – July 2019);

j) Kenneth Goertzen (Director, August 2019 – March 2020);

k) James Damian Resnik (Director, March 2020 – May 2020);

l)   Joseph Machado (Chief Operations Officer and Compliance Officer, November 2017 –
June 2021); and

m)  Estera Services (Bermuda) Limited n/k/a Ocorian Services (Bermuda) Limited
(Secretary, 2017 – January 2021).

64. PBIHL is currently in liquidation, with matters pending before the Bermuda
Court.

65. Rachelle Frisby and John Johnston are the JPLs appointed by the Bermuda Court
on a provisional basis to administer the Debtors' affairs. Bermuda Order, at ¶ 4. As JPLs of the
Debtors, their responsibilities include, but are not limited to, the following: (i) to conduct such
investigations and obtain such information so far as it is necessary to locate, protect, secure, take
possession of, collect and get in the assets, and determine the liabilities, of the [Debtor],
including but not limited to securing the shares in and controlling the subsidiaries of the
[Debtor]; (ii) to investigate the assets and affairs of the [Debtor] and the circumstances which
gave rise to its insolvency; (iii) to consider any legal or arbitration proceedings (including
winding up proceedings) wherever situate in which the [Debtor] is a party and to give all
instructions in connection therewith and take such action as may be thought necessary to
continue to prosecute or defend such proceedings or to apply for a stay of such proceedings; and
(iv) to consider and if thought advisable to commence such actions as may be necessary in
Bermuda or elsewhere to protect, recover or obtain assets or money belonging to the [Debtor].
*Id.*, at ¶¶ 4.8, 4.9, 4.15 and 4.16.

66. Upon information and belief, Defendant Gregrey Evan Lindberg a/k/a Greg Evan
Lindberg is necessary party and a United States citizen located in Florida.

23

67. Upon information and belief, Defendant Christa M. Miller is necessary party and a United States citizen located in North Carolina.

68. Upon information and belief, Defendant Christopher E. Herwig is necessary party and a United States citizen located in North Carolina.

69. Upon information and belief, Defendant Devin E. Solow is necessary party and a United States citizen located in North Carolina.

70. Upon information and belief, Defendant Eric D. Bostic is necessary party and a United States citizen located in North Carolina.

71. Upon information and belief, Defendant Bankers Life Insurance Company is necessary party and an insurance company formed by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

72. Upon information and belief, Defendant Colorado Bankers Life Insurance Company is necessary party and an insurance company formed by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

73. Upon information and belief, Defendant Southland National Insurance Corporation is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

74. Upon information and belief, Defendant Southland National Reinsurance Corporation is necessary party and an insurance company formed by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

75. Upon information and belief, Defendant 286 Spring PH Holdings Corp. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

24

76. Upon information and belief, Defendant 2B4A Sàrl is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of Switzerland.

77. Upon information and belief, Defendant 2media GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Switzerland.

78. Upon information and belief, Defendant 3BL Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Oregon.

79. Upon information and belief, Defendant 3BL Media, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

80. Upon information and belief, Defendant 4839 N. Elston, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Illinois.

81. Upon information and belief, Defendant 5 Star Technical Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Michigan.

82. Upon information and belief, Defendant A.C.J Computer Services Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

83. Upon information and belief, Defendant A/R Allegiance Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Kansas.

84. Upon information and belief, Defendant AAH Loan-Backed Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

85. Upon information and belief, Defendant AAM Holdings I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

86. Upon information and belief, Defendant AAM Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Illinois.

87. Upon information and belief, Defendant AAPC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

88. Upon information and belief, Defendant AAPC India, LLP is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

89. Upon information and belief, Defendant AAPC Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

26

90.  Upon information and belief, Defendant AAPC Voting Trust is a necessary party and trust created and governed by the laws of the State of North Carolina. Ankura Trust Company acts as the Trustee for Defendant AAPC Voting Trust.

91.  Upon information and belief, Defendant AAPC, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

92.  Upon information and belief, Defendant Academy Financial Assets, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

93.  Upon information and belief, Defendant Academy Financial Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

94.  Upon information and belief, Defendant ACE Foundation, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of New York.

95.  Upon information and belief, Defendant Acquired Development, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

96.  Upon information and belief, Defendant Addiction Recovery Helpline LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of California.

27

97.  Upon information and belief, Defendant Advanced Benefit Connections LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

98.  Upon information and belief, Defendant Advantage Capital Investments LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Michigan.

99.  Upon information and belief, Defendant Advisory Consultants, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wisconsin.

100.  Upon information and belief, Defendant AFFGLO Holdings, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Canada.

101.  Upon information and belief, Defendant AFP, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

102.  Upon information and belief, Defendant Agence de Recouvrement Global, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Canada.

103.  Upon information and belief, Defendant Agera Energy, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

28

104. Upon information and belief, Defendant Agera Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

105. Upon information and belief, Defendant AGH Parent, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

106. Upon information and belief, Defendant AGT Media Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

107. Upon information and belief, Defendant AGX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

108. Upon information and belief, Defendant Ahoskie, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

109. Upon information and belief, Defendant Alcohol & Data Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

110. Upon information and belief, Defendant Alliance Media Group LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

SL1 1812077v17 114825.00001

111.  Upon information and belief, Defendant Alpharetta, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

112.  Upon information and belief, Defendant Alpine Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

113.  Upon information and belief, Defendant Alstead, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

114.  Upon information and belief, Defendant Alta Billing Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

115.  Upon information and belief, Defendant Alta Billing, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

116.  Upon information and belief, Defendant America Free Press, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

117.  Upon information and belief, Defendant American Academy Holdings Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Bermuda.

SL1 1812077v17 114825.00001

118. Upon information and belief, Defendant American Academy Holdings, LLC (d/b/a AAPC) is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

119. Upon information and belief, Defendant American Academy of Professional Coders Chapter Association  is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

120. Upon information and belief, Defendant American Funeral and Cremation Plans, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Alabama.

121. Upon information and belief, Defendant American Healthcare Alliance Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Kansas.

122. Upon information and belief, Defendant American Yacht Charters, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

123. Upon information and belief, Defendant Amherst, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

124. Upon information and belief, Defendant Anaconda, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

31

125.  Upon information and belief, Defendant Analytical Medical Insight Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

126.  Upon information and belief, Defendant Andover Asset Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

127.  Upon information and belief, Defendant APAC Holdco, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

128.  Upon information and belief, Defendant Apache Junction, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

129.  Upon information and belief, Defendant Apex International, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

130.  Upon information and belief, Defendant Apio Local, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

131.  Upon information and belief, Defendant App This, Inc.  is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Arizona.

SL1 1812077v17 114825.00001

132.  Upon information and belief, Defendant Aqua Blue Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Florida.

133.  Upon information and belief, Defendant AR Management (Arrevio) Trust is a necessary party and trust created and governed by the laws of the State of North Carolina. Hugh Steven Wilson and Walter L. Tippett, Jr. act as co-trustee of Defendant AR Management (Arrevio) Trust.

134.  Upon information and belief, Defendant AR Management (GGH) Trust is a necessary party and trust created and governed by the laws of the State of North Carolina. Hugh Steven Wilson and Walter L. Tippett, Jr. act as co-trustee of Defendant AR Management (Arrevio) Trust.

135.  Upon information and belief, Defendant AR Purchasing Solutions 2, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

136.  Upon information and belief, Defendant AR Purchasing Solutions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

137.  Upon information and belief, Defendant ARA Group Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

138.  Upon information and belief, Defendant Arcane Tinmen ApS t/a AT Private Labels APS is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Denmark.

33

139. Upon information and belief, Defendant Arrevio Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

140. Upon information and belief, Defendant Arrevio, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

141. Upon information and belief, Defendant Ascendent D4K Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

142. Upon information and belief, Defendant Ascendent Dental Group (Fielet & Lee), P.C. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of California.

143. Upon information and belief, Defendant Ascendent Dental Management D4K, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

144. Upon information and belief, Defendant Asheboro, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

145. Upon information and belief, Defendant ASiM CE, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

146.    Upon information and belief, Defendant ASIM Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

147.    Upon information and belief, Defendant ASIM, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

148.    Upon information and belief, Defendant ASL Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

149.    Upon information and belief, Defendant ASL New Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

150.    Upon information and belief, Defendant Asset Management, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

151.    Upon information and belief, Defendant Assistive Partner Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

152.    Upon information and belief, Defendant AT Denmark Investments ApS is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Denmark.

35

153. Upon information and belief, Defendant Athens, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

154. Upon information and belief, Defendant Atkinson, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

155. Upon information and belief, Defendant Atlanta BidCo Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

156. Upon information and belief, Defendant Atlanta MidCo Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

157. Upon information and belief, Defendant Atlanta TopCo Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

158. Upon information and belief, Defendant Atlas Global Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

159. Upon information and belief, Defendant Atlas Global, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

36

SL1 1812077v17 114825.00001

160. Upon information and belief, Defendant Atlas Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

161. Upon information and belief, Defendant AudioEducator, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

162. Upon information and belief, Defendant AudioSolutionz, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

163. Upon information and belief, Defendant Audit Services Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

164. Upon information and belief, Defendant Augusta Asset Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

165. Upon information and belief, Defendant Augusta, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

166. Upon information and belief, Defendant Automotive Fleet Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

37

167. Upon information and belief, Defendant Autonomy Healthcare Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

168. Upon information and belief, Defendant Autonomy Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

169. Upon information and belief, Defendant Autonomy Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

170. Upon information and belief, Defendant AYC Crew, LLC, is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

171. Upon information and belief, Defendant AYC HOLDINGS LIMITED is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

172. Upon information and belief, Defendant AYC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Delaware

173. Upon information and belief, Defendant AYC Holdings, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the Cayman Islands.

SL1 1812077v17 114825.00001

174. Upon information and belief, Defendant Baldwin Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

175. Upon information and belief, Defendant BAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

176. Upon information and belief, Defendant Bankers Insurance Holdings S.A. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Luxembourg.

177. Upon information and belief, Defendant Bankers Reinsurance Company Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Barbados.

178. Upon information and belief, Defendant Barnstead, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

179. Upon information and belief, Defendant Barrington, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

180. Upon information and belief, Defendant BBLN-Agera Corp. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

SL1 1812077v17 114825.00001

181.  Upon information and belief, Defendant BCC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

182.  Upon information and belief, Defendant BCC Junior Loan-Backed Funding, LLC f/k/a BCC Junior Loan Back Security Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

183.  Upon information and belief, Defendant BCC Research, LLC f/k/a Bankers Minute, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

184.  Upon information and belief, Defendant BCC Senior Loan-Backed Funding, LLC f/k/a BCC Senior Loan Back Security Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

185.  Upon information and belief, Defendant Beaufort Holdings, S.A. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Luxembourg.

186.  Upon information and belief, Defendant Beckett Auction Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

187.  Upon information and belief, Defendant Beckett Auctions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

40

188.  Upon information and belief, Defendant Beckett Authentication Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

189.  Upon information and belief, Defendant Beckett Business Solutions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

190. Upon information and belief, Defendant Beckett Coin & Rock, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

191.  Upon information and belief, Defendant Beckett Collectibles Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

192.  Upon information and belief, Defendant Beckett Collectibles, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

193.  Upon information and belief, Defendant Beckett Conferences, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

194.  Upon information and belief, Defendant Beckett Media, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

41

195.  Upon information and belief, Defendant Begonia Eight, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

196.  Upon information and belief, Defendant Benson, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

197.  Upon information and belief, Defendant Berkeley Lake, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

198.  Upon information and belief, Defendant Berlin, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

199.  Upon information and belief, Defendant BHLN-286 Spring Corp. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

200.  Upon information and belief, Defendant BHLN-Agera Corp. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

201.  Upon information and belief, Defendant Bidworld Private Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India

42

202.  Upon information and belief, Defendant Bisbee, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

203.  Upon information and belief, Defendant BKT Loan-Backed Funding, LLC f/k/a BKT Loan Back Security Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

204.  Upon information and belief, Defendant BKX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

205.  Upon information and belief, Defendant BlackFin Finanzen SAS is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of France.

206.  Upon information and belief, Defendant Black Rose, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

207.  Upon information and belief, Defendant BLH Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

208.  Upon information and belief, Defendant BLI Holdings, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

43

209.  Upon information and belief, Defendant Blue Daffodil, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

210.  Upon information and belief, Defendant Blue Iris, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

211.  Upon information and belief, Defendant Blue Marigold, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

212.  Upon information and belief, Defendant Blue Skies Addiction Centre Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

213.  Upon information and belief, Defendant Blue Violet, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

214.  Upon information and belief, Defendant Bluespier International Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

215.  Upon information and belief, Defendant BMX Bermuda Holdings, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Bermuda. .

44

216.  Upon information and belief, Defendant BMX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

217.  Upon information and belief, Defendant BOLN-286 Spring Corp. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

218.  Upon information and belief, Defendant BOLN-Agera Corp. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

219.  Upon information and belief, Defendant Boston Laser Eye Care Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

220.  Upon information and belief, Defendant Boston Laser Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

221.  Upon information and belief, Defendant Boston Laser-Eye & Lasik Specialists Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

222.  Upon information and belief, Defendant Bow, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

45

223. Upon information and belief, Defendant BRC Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

224. Upon information and belief, Defendant BRC Holding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

225. Upon information and belief, Defendant BRC Holdings, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Nebraska.

226. Upon information and belief, Defendant BRCB (Barbados) Capital, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Barbados.

227. Upon information and belief, Defendant BRCB (Barbados) Holdings, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Barbados.

228. Upon information and belief, Defendant British Orient Infotel Private Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of India.

229. Upon information and belief, Defendant Bullhead City, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

46

230. Upon information and belief, Defendant CAF Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

231. Upon information and belief, Defendant CAF II Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

232. Upon information and belief, Defendant CAF III Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

233. Upon information and belief, Defendant CAF IV Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

234. Upon information and belief, Defendant CAF V Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

235. Upon information and belief, Defendant CAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

236. Upon information and belief, Defendant Camp Verde, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

47

237.  Upon information and belief, Defendant Canaan, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

238.  Upon information and belief, Defendant Candescent Eye Health Surgicenter, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

239. Upon information and belief, Defendant Candescent Eye Surgicenter, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

240.  Upon information and belief, Defendant Candor Global Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Ukraine.

241.  Upon information and belief, Defendant Canta Health, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

242.  Upon information and belief, Defendant Capital Asset Fund I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

243. Upon information and belief, Defendant Capital Asset Fund II, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

48

244.    Upon information and belief, Defendant Capital Asset Fund III, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

245.    Upon information and belief, Defendant Capital Asset Fund IV, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

246.    Upon information and belief, Defendant Capital Asset Fund V, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

247.    Upon information and belief, Defendant Capital Asset Management II, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

248.    Upon information and belief, Defendant Capital Asset Management III, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

249.    Upon information and belief, Defendant Capital Lending Partners, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

250.    Upon information and belief, Defendant CapLOC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

49

251. Upon information and belief, Defendant CAPLOC, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

252. Upon information and belief, Defendant Capstone Preneed Funeral and Burial Association is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Virginia.

253. Upon information and belief, Defendant Care Referrals Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

254. Upon information and belief, Defendant Career Health, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

255. Upon information and belief, Defendant Carnation Three, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

256. Upon information and belief, Defendant Carolina Eye Center, LLC n/k/a Carolina Eye Center, P.A. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of South Carolina.

257. Upon information and belief, Defendant Carolina Longevity Institute, LLC n/k/a The Daily News Corporation, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

258.  Upon information and belief, Defendant Cartersville, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

259.  Upon information and belief, Defendant Casar, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

260.  Upon information and belief, Defendant Castle & Cooke Mortgage LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

261.  Upon information and belief, Defendant Cato Holdings, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

262.  Upon information and belief, Defendant Cave Creek, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

263.  Upon information and belief, Defendant CBCS Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

264.  Upon information and belief, Defendant CBCS Operations, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

51

SL1 1812077v17 114825.00001

265. Upon information and belief, Defendant CBS Group Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

266. Upon information and belief, Defendant CBS Group Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

267. Upon information and belief, Defendant CBV Collection Services Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Canada.

268. Upon information and belief, Defendant CBV Collections Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Canada.

269. Upon information and belief, Defendant CC Mortgage Trust is a necessary party and trust created and governed by the laws of the State of Delaware. Robert Majka and Bryn Mawr Trust Company act as co-trustees for Defendant CC Mortgage Trust.

270. Upon information and belief, Defendant CCM Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

271. Upon information and belief, Defendant CCM Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

52

272.  Upon information and belief, Defendant CEIC Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

273.  Upon information and belief, Defendant CEIC Holdings, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

274.  Upon information and belief, Defendant Celandine Eight, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

275.  Upon information and belief, Defendant Century Venture Global, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

276.  Upon information and belief, Defendant Century Vision Global, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

277.  Upon information and belief, Defendant Certification for Long-Term Care, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

278.  Upon information and belief, Defendant Certitrek Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

279.  Upon information and belief, Defendant CFH Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

280.  Upon information and belief, Defendant Chatsworth Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

281.  Upon information and belief, Defendant Chrysanthemum Two, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

282.  Upon information and belief, Defendant Claimsure Sláinte (Ireland) Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

283.  Upon information and belief, Defendant Clanwilliam Australia Investments PTY Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Australia.

284.  Upon information and belief, Defendant Clanwilliam Group is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Nevada

285.  Upon information and belief, Defendant Clanwilliam Headquarters Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

SL1 1812077v17 114825.00001

286.   Upon information and belief, Defendant Clanwilliam Health (DGL) Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

287.   Upon information and belief, Defendant Clanwilliam Health (RX Web) Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

288.   Upon information and belief, Defendant Clanwilliam Health (Socrates) Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland

289.   Upon information and belief, Defendant Clanwilliam Health Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

290.   Upon information and belief, Defendant Clanwilliam Investments (UK) Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

291.   Upon information and belief, Defendant Clanwilliam Investments Ireland Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

292.   Upon information and belief, Defendant Clanwilliam NZ Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of New Zealand

SL1 1812077v17 114825.00001

293. Upon information and belief, Defendant Clanwilliam Software Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

294. Upon information and belief, Defendant Clanwilliam Ventures Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

295. Upon information and belief, Defendant Claremont, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

296. Upon information and belief, Defendant Claris Vision Holdings, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

297. Upon information and belief, Defendant Claris Vision LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

298. Upon information and belief, Defendant Claxton, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

299. Upon information and belief, Defendant Clayton Plaza, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

300.  Upon information and belief, Defendant Clayton, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

301.  Upon information and belief, Defendant Client Services CSICR, SRL a/k/a Client Services CSICR SR LTDA is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Costa Rica.

302.  Upon information and belief, Defendant Client Services Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

303.  Upon information and belief, Defendant Client Services, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Montana

304.  Upon information and belief, Defendant Clover Concepts, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Arizona.

305.  Upon information and belief, Defendant CLTC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

306.  Upon information and belief, Defendant CLTC Junior Loan-Backed Funding, LLC f/k/a CLTC Junior Loan Back Security Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

307. Upon information and belief, Defendant CLTC Senior Loan-Backed Funding, LLC f/k/a CLTC Senior Loan Back Security Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

308. Upon information and belief, Defendant CMC Holding Company, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

309. Upon information and belief, Defendant CMC Loan-Backed Funding, LLC f/k/a CMC Loan Back Security Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

310. Upon information and belief, Defendant Coach D Tennis, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

311. Upon information and belief, Defendant Cobra, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

312. Upon information and belief, Defendant Coding Institute, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

313. Upon information and belief, Defendant Collection Management Company is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Pennsylvania.

58

314.  Upon information and belief, Defendant Collections Management Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

315.  Upon information and belief, Defendant Columbus, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

316.  Upon information and belief, Defendant Compliance Services Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Bermuda.

317.  Upon information and belief, Defendant Compliance Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

318.  Upon information and belief, Defendant ComplySmart Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

319.  Upon information and belief, Defendant ComplySmart, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

320.  Upon information and belief, Defendant Concept Creations Corp.  is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

SL1 1812077v17 114825.00001

321. Upon information and belief, Defendant Connect2 CME Limited n/k/a Alchemie Medical Education Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

322. Upon information and belief, Defendant Connect2 Medical Communications Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

323. Upon information and belief, Defendant Conservatrix Leven, NV is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the Netherlands.

324. Upon information and belief, Defendant Conway, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

325. Upon information and belief, Defendant Cowper, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

326. Upon information and belief, Defendant Creative Collectible Company, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

327. Upon information and belief, Defendant Creston, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

60

328.   Upon information and belief, Defendant CRI Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

329.   Upon information and belief, Defendant CSI Interco, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

330.   Upon information and belief, Defendant CV Equipment Leasing, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

331.   Upon information and belief, Defendant CV Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

332.   Upon information and belief, Defendant CV Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

333.   Upon information and belief, Defendant CVE Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

334.   Upon information and belief, Defendant CWNP, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

61

335.  Upon information and belief, Defendant Daffodil Six, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

336.  Upon information and belief, Defendant Dahlia Ten, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

337.  Upon information and belief, Defendant Daisy Seven, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

338.  Upon information and belief, Defendant DAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

339.  Upon information and belief, Defendant Damascus Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

340. Upon information and belief, Defendant Damoco Bidco Limited (UK) is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

341. Upon information and belief, Defendant Damoco Holdco Limited (UK) is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

SL1 1812077v17 114825.00001

342. Upon information and belief, Defendant Damoco Midco Limited (UK) is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

343. Upon information and belief, Defendant Damova Polska sp. Zo.o is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Poland

344. Upon information and belief, Defendant Damovo Belgium NV/SA is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Belgium.

345. Upon information and belief, Defendant Damovo Costa Rica SRL is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Costa Rica.

346. Upon information and belief, Defendant Damovo Deutschland GmbH & Co. KG is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

347. Upon information and belief, Defendant Damovo Deutschland TopCo GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

348. Upon information and belief, Defendant Damovo Deutschland Verwaltungs GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

63

349.  Upon information and belief, Defendant Damovo Global Services (UK) Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

350.  Upon information and belief, Defendant Damovo Holdings Deutschland GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

351.  Upon information and belief, Defendant Damovo Ireland Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

352.  Upon information and belief, Defendant Damovo Ltd (Atlanta TopCo Limited) is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

353.  Upon information and belief, Defendant Damovo Luxembourg S.a.r.l. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Luxembourg.

354.  Upon information and belief, Defendant Damovo Österreich GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Austria.

355.  Upon information and belief, Defendant Damovo Schweiz AG is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Switzerland.

64

356.   Upon information and belief, Defendant Damovo Sverige.AB is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Sweden.

357.   Upon information and belief, Defendant Damovo USA, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Ohio.

358.   Upon information and belief, Defendant Danielsville, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

359.   Upon information and belief, Defendant Deering, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

360.   Upon information and belief, Defendant Delmar Center Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

361.   Upon information and belief, Defendant Delmar Surgical Center, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Maryland.

362.   Upon information and belief, Defendant Demand Side Media, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

65

363.  Upon information and belief, Defendant Dental Management Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

364.  Upon information and belief, Defendant Dental Management Operations, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

365.  Upon information and belief, Defendant Derry, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

366.  Upon information and belief, Defendant DGX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

367.  Upon information and belief, Defendant Dictate IT Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

368.  Upon information and belief, Defendant Diversified Terra Holdings, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the Cayman Islands.

369.  Upon information and belief, Defendant DJRTC, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

370.  Upon information and belief, Defendant Dream Markets, Inc.  is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Iowa.

371.  Upon information and belief, Defendant Drummond Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

372.  Upon information and belief, Defendant DSE Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina

373.  Upon information and belief, Defendant DTH Holdings, Ltd is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the Cayman Islands.

374.  Upon information and belief, Defendant Dunbarton, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

375.  Upon information and belief, Defendant Dunhill Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

376.  Upon information and belief, Defendant Dunstans Publishing Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

67

377.  Upon information and belief, Defendant Durham, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

378.  Upon information and belief, Defendant EAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

379.  Upon information and belief, Defendant East Hill Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

380.  Upon information and belief, Defendant Eastern Enterprises, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

381.  Upon information and belief, Defendant Eatonton, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

382.  Upon information and belief, Defendant ECL Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

383.  Upon information and belief, Defendant ECL Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

68

384.  Upon information and belief, Defendant ECLL Private Ltd is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of India.

385.  Upon information and belief, Defendant Edwards Mill Asset Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

386.  Upon information and belief, Defendant Effingham, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

387.  Upon information and belief, Defendant E-finity Leads Ltd. n/k/a CANDID INSURANCE SERVICES LTD is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

388.  Upon information and belief, Defendant EG Media Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

389.  Upon information and belief, Defendant EG Media Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

390.  Upon information and belief, Defendant EGX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

69

391.  Upon information and belief, Defendant Eiffel Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

392.  Upon information and belief, Defendant Elberton, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

393.  Upon information and belief, Defendant Elements Communications Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

394.  Upon information and belief, Defendant Elevate Healthcare, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

395.  Upon information and belief, Defendant Elevate Portfolio, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

396.  Upon information and belief, Defendant Eli Arrevio Limited n/k/a Global Growth Arrevio Private Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

397.  Upon information and belief, Defendant Eli BPO India Private Ltd is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

SL1 1812077v17 114825.00001

398.   Upon information and belief, Defendant Eli Business Solutions Private Ltd is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

399.   Upon information and belief, Defendant Eli Denmark Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

400.   Upon information and belief, Defendant Eli Deutschland GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

401.   Upon information and belief, Defendant Eli Equity, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Florida.

402.   Upon information and belief, Defendant Eli Germany Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

403.   Upon information and belief, Defendant Eli Global Asia Pacific Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Hong Kong.

404.   Upon information and belief, Defendant Eli Global Philippines Resources Operations Center, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Philippines.

71

405.   Upon information and belief, Defendant Eli Global, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

406.   Upon information and belief, Defendant Eli Health Solutions Pvt. Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

407.   Upon information and belief, Defendant Eli Knowledge Services (India) Private Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

408.   Upon information and belief, Defendant Eli New Media, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

409.   Upon information and belief, Defendant Eli Publications, Inc.  is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Connecticut.

410.   Upon information and belief, Defendant Eli Research India Private Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

411.   Upon information and belief, Defendant Eli Research, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

412.  Upon information and belief, Defendant Eli Revenue Cycle Solutions Private Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

413.  Upon information and belief, Defendant Eli Shared Services Private Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

414.  Upon information and belief, Defendant Eli Ventures, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

415.  Upon information and belief, Defendant Ellaville, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

416.  Upon information and belief, Defendant ELP Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

417.  Upon information and belief, Defendant ELT Groupe is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of France.

418.  Upon information and belief, Defendant ENG Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

73

SL1 1812077v17 114825.00001

419. Upon information and belief, Defendant Engaged Media Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

420. Upon information and belief, Defendant Engaged Media, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

421. Upon information and belief, Defendant Engagement Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

422. Upon information and belief, Defendant Englert Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

423. Upon information and belief, Defendant Enterprises Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

424. Upon information and belief, Defendant Entrust Global Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

425. Upon information and belief, Defendant ENX, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

74

426. Upon information and belief, Defendant Ephesus Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

427. Upon information and belief, Defendant Epic Care Home Technologies Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

428. Upon information and belief, Defendant Epic Solutions Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

429. Upon information and belief, Defendant Epping, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

430. Upon information and belief, Defendant eRADIMAGING, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

431. Upon information and belief, Defendant Erie Properties, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

432. Upon information and belief, Defendant ERX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

433. Upon information and belief, Defendant Eye & LASIK Eye Care Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

434. Upon information and belief, Defendant Eye & LASIK Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

435. Upon information and belief, Defendant Eye & LASIK Optical, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

436. Upon information and belief, Defendant Eye Care Leaders Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

437. Upon information and belief, Defendant Eye Care Leaders Portfolio Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

438. Upon information and belief, Defendant Eye Reach Patients, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

439. Upon information and belief, Defendant F1rstmark, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

76

440.   Upon information and belief, Defendant Fafnir Distribution ApS is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Denmark.

441.   Upon information and belief, Defendant Faison, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

442.   Upon information and belief, Defendant Fargo, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

443.   Upon information and belief, Defendant Farmington, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

444.   Upon information and belief, Defendant Farrington Mill Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

445.   Upon information and belief, Defendant Fayetteville, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

446.   Upon information and belief, Defendant FIA Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

447. Upon information and belief, Defendant Fiasco Fine Wine, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

448. Upon information and belief, Defendant Financial Institute Advisors, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

449. Upon information and belief, Defendant Finanzen France SAS is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of France.

450. Upon information and belief, Defendant Finanzen Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

451. Upon information and belief, Defendant Finanzen.de Maklerservice GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

452. Upon information and belief, Defendant finanzen.de Vermittlungsgesellscaft t0r Verbrauchervertr is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

453. Upon information and belief, Defendant First International Financial, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

78

454. Upon information and belief, Defendant Flagship Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

455. Upon information and belief, Defendant Fleet Assist Interco Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

456. Upon information and belief, Defendant Fleet Assist Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

457. Upon information and belief, Defendant Flemington, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

458. Upon information and belief, Defendant Flovilla, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

459. Upon information and belief, Defendant Flowery Branch, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

460. Upon information and belief, Defendant FMC Mortgage Corporation is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

461.   Upon information and belief, Defendant Firstmark, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of Mississippi.

462.   Upon information and belief, Defendant FMX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

463.   Upon information and belief, Defendant Folkston, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

464.   Upon information and belief, Defendant Forest Park Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

465.   Upon information and belief, Defendant Forsyth, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

466.   Upon information and belief, Defendant Fortrex Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

467.   Upon information and belief, Defendant Fortrex Technologies Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

468.   Upon information and belief, Defendant Fortrex, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

469.   Upon information and belief, Defendant Foxford Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

470.   Upon information and belief, Defendant FPAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

471.   Upon information and belief, Defendant Franconia, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

472.   Upon information and belief, Defendant FS Windup, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

473.   Upon information and belief, Defendant FTGU Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

474.   Upon information and belief, Defendant FTGU Medical Billing, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

81

475.  Upon information and belief, Defendant Funston, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

476.  Upon information and belief, Defendant Futuresource Consulting Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

477.  Upon information and belief, Defendant Futuresource Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

478.  Upon information and belief, Defendant GAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

479.  Upon information and belief, Defendant GAM Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

480.  Upon information and belief, Defendant GamesPro Global Group ApS is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Denmark.

481.  Upon information and belief, Defendant Gardenia One, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

482.   Upon information and belief, Defendant Garfield, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

483.   Upon information and belief, Defendant GB Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

484.   Upon information and belief, Defendant GB Life Luxembourg S.A. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Luxembourg.

485.   Upon information and belief, Defendant GB UK Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

486.   Upon information and belief, Defendant GB Venture Fund, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

487.   Upon information and belief, Defendant GBC Advisors, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

488.   Upon information and belief, Defendant GBC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

489.  Upon information and belief, Defendant GBI Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

490.  Upon information and belief, Defendant GBIG Business Solutions Private Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of India.

491.  Upon information and belief, Defendant GBIG Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

492.  Upon information and belief, Defendant GBIG Holdings, Inc. (aka GBIG Holdings & Reinsurance Company Inc.) is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

493.  Upon information and belief, Defendant GBIG Portugal, S.A. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Portugal.

494.  Upon information and belief, Defendant GBVF Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

495.  Upon information and belief, Defendant GC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

84

496.  Upon information and belief, Defendant GCC Holdings US, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

497.  Upon information and belief, Defendant GCC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

498.  Upon information and belief, Defendant GCC Interco, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

499.  Upon information and belief, Defendant Geranium Two, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

500.  Upon information and belief, Defendant GHTG Investment, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

501.  Upon information and belief, Defendant Gilford Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

502.  Upon information and belief, Defendant Gilford, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

85

503.  Upon information and belief, Defendant Gillsville, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

504.  Upon information and belief, Defendant GIX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

505.  Upon information and belief, Defendant Global A&D Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

506.  Upon information and belief, Defendant Global Bankers Insurance Group, LLC n/k/a Aspida Financial Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

507.  Upon information and belief, Defendant Global Credit & Collection (Indiana) Corporation is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

508.  Upon information and belief, Defendant Global Credit & Collection Corporation is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

509.  Upon information and belief, Defendant Global Credit and Collections, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Canada.

SL1 1812077v17 114825.00001

510. Upon information and belief, Defendant Global Data Insights Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

511. Upon information and belief, Defendant Global ETC, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

512. Upon information and belief, Defendant Global Growth, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

513. Upon information and belief, Defendant Global Growth Holdings, Inc. f/k/a Academy Association, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

514. Upon information and belief, Defendant Global Health Technology Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

515. Upon information and belief, Defendant Global Mortgage Capital Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

516. Upon information and belief, Defendant Global Mortgage Capital, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

517. Upon information and belief, Defendant Global Operations Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

518. Upon information and belief, Defendant Global TIC CE, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

519. Upon information and belief, Defendant Global Vision Growth, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

520. Upon information and belief, Defendant GMK Pepper Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

521. Upon information and belief, Defendant Goffstown, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

522. Upon information and belief, Defendant Golden Energy Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

523. Upon information and belief, Defendant GoPrime Mortgage, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

88

524. Upon information and belief, Defendant Goshen, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

525. Upon information and belief, Defendant GP Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

526. Upon information and belief, Defendant Grande LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Arizona.

527. Upon information and belief, Defendant Green Lilac, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

528. Upon information and belief, Defendant Green Solutions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Idaho.

529. Upon information and belief, Defendant Greenfield Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

530. Upon information and belief, Defendant Greenville, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

89

531.  Upon information and belief, Defendant GSRE 27, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

532.  Upon information and belief, Defendant GSRE 29, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

533.  Upon information and belief, Defendant GTIC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

534.  Upon information and belief, Defendant GTIC&A, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

535.  Upon information and belief, Defendant HA Wind Up 1, LLC f/k/a Hansen Aerospace Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

536.  Upon information and belief, Defendant HAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

537.  Upon information and belief, Defendant Hampstead, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

90

538. Upon information and belief, Defendant Hampton Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

539. Upon information and belief, Defendant Hansen Aerospace Holdings, LLC n/k/a HA Windup 1, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

540. Upon information and belief, Defendant Hansen Aerospace, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

541. Upon information and belief, Defendant Harvard Collect, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

542. Upon information and belief, Defendant Harvard Collection Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Illinois.

543. Upon information and belief, Defendant Health Audio, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

544. Upon information and belief, Defendant Health Ireland Partners Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

91

545.   Upon information and belief, Defendant Health Through Information is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

546.   Upon information and belief, Defendant Healthcare Jobs, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

547.   Upon information and belief, Defendant Healthicity, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

548.   Upon information and belief, Defendant HealthLink Group Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of New Zealand.

549.   Upon information and belief, Defendant HealthLink Group Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of New Zealand.

550.   Upon information and belief, Defendant HealthLink Group PTY Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Australia.

551.   Upon information and belief, Defendant Healthlink Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

552. Upon information and belief, Defendant Healthlink Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

553. Upon information and belief, Defendant HealthLink Research Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of New Zealand.

554. Upon information and belief, Defendant Helix Health Group Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

555. Upon information and belief, Defendant Helix Health Software Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

556. Upon information and belief, Defendant Hemophilia Preferred Care of Memphis, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Alabama.

557. Upon information and belief, Defendant Hemophilia Preferred Care of Mississippi, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Mississippi.

558. Upon information and belief, Defendant Hemophilia Preferred Care of Oklahoma, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Oklahoma.

93

559.  Upon information and belief, Defendant Henniker, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

560.  Upon information and belief, Defendant HH Spiral Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

561.  Upon information and belief, Defendant Hibiscus Three, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

562.  Upon information and belief, Defendant Holt, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

563.  Upon information and belief, Defendant Home Medical Equipment Specialists, LLC (d/b/a HME Specialists LLC) is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of New Mexico.

564.  Upon information and belief, Defendant Hooksett, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

565.  Upon information and belief, Defendant Hopkinton, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

94

566. Upon information and belief, Defendant Horizon Holdings I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

567. Upon information and belief, Defendant HPC Biologicals, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Alabama.

568. Upon information and belief, Defendant HPC Specialty Rx of Kansas, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Oklahoma.

569. Upon information and belief, Defendant HPC Specialty Rx Reed, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of West Virginia.

570. Upon information and belief, Defendant HPC Specialty Rx West Virginia, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of West Virginia.

571. Upon information and belief, Defendant HPC, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Alabama.

572. Upon information and belief, Defendant HPCNC, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

95

573. Upon information and belief, Defendant HPCSP Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

574. Upon information and belief, Defendant HPCSP Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

575. Upon information and belief, Defendant HRWeb Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

576. Upon information and belief, Defendant HRWeb Software, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

577. Upon information and belief, Defendant Hybrid Treatment Solutions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

578. Upon information and belief, Defendant Hyacinth Four, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

579. Upon information and belief, Defendant Hydrangea Four, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

96

580.   Upon information and belief, Defendant I SBA-International Society of Business Appraisers, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

581.   Upon information and belief, Defendant IBC Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Florida.

582.   Upon information and belief, Defendant ICAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

583.   Upon information and belief, Defendant IFA Systems AG is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

584.   Upon information and belief, Defendant iMedicWare, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of New Jersey.

585.   Upon information and belief, Defendant IMW EMR, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

586.   Upon information and belief, Defendant IMW Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

97

587.   Upon information and belief, Defendant In the Arena, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

588.   Upon information and belief, Defendant Independent Contractor Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

589.   Upon information and belief, Defendant Independent Contractor, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Georgia.

590.   Upon information and belief, Defendant Informatica Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the United Kingdom.

591.   Upon information and belief, Defendant Informatica Systems Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

592.   Upon information and belief, Defendant Inhealthcare, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

593.   Upon information and belief, Defendant Inkop, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

SL1 1812077v17 114825.00001

594. Upon information and belief, Defendant Insight Software, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

595. Upon information and belief, Defendant Integrity EMR Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

596. Upon information and belief, Defendant Integrity EMR, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

597. Upon information and belief, Defendant Intralan (UK) Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

598. Upon information and belief, Defendant Intralan Group Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

599. Upon information and belief, Defendant Intralan Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

600. Upon information and belief, Defendant Intralan Telecom Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

601. Upon information and belief, Defendant IO Practiceware, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of New York.

602. Upon information and belief, Defendant IOPW Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

603. Upon information and belief, Defendant Iredell, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

604. Upon information and belief, Defendant Iris Four, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

605. Upon information and belief, Defendant Iron City Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

606. Upon information and belief, Defendant ISBA-International Society of Business Appraisers, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

607. Upon information and belief, Defendant iTech Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Arizona.

100

608.   Upon information and belief, Defendant Jackson Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

609.   Upon information and belief, Defendant Jacksonville, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

610.   Upon information and belief, Defendant Jaffrey, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

611.   Upon information and belief, Defendant JAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

612.   Upon information and belief, Defendant Jasmine Five, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

613.   Upon information and belief, Defendant K2B Sàrl is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of France.

614.   Upon information and belief, Defendant Kenly, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

101

615.  Upon information and belief, Defendant KeyMed Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

616.  Upon information and belief, Defendant KeyMed, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

617.  Upon information and belief, Defendant Kite Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

618.  Upon information and belief, Defendant KITE Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

619.  Upon information and belief, Defendant Konnect Net Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

620.  Upon information and belief, Defendant Konnect Net Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of New Zealand.

621.  Upon information and belief, Defendant Konnect Net Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of New Zealand.

102

622.  Upon information and belief, Defendant Laconia, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

623.  Upon information and belief, Defendant LAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

624.  Upon information and belief, Defendant LAM Holdings, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

625.  Upon information and belief, Defendant Lares Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

626.  Upon information and belief, Defendant Lares, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

627.  Upon information and belief, Defendant Lavender Six, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

628.  Upon information and belief, Defendant Lens on Demand, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

629. Upon information and belief, Defendant Liberty Holdings LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

630. Upon information and belief, Defendant Liberty House Clinic Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

631. Upon information and belief, Defendant Lilac Six, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

632. Upon information and belief, Defendant Lilly Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

633. Upon information and belief, Defendant Lily Two, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

634. Upon information and belief, Defendant Limitless Research, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Canada.

635. Upon information and belief, Defendant Littleton, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

SL1 1812077v17 114825.00001

636. Upon information and belief, Defendant LMG Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

637. Upon information and belief, Defendant LMG Management Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

638. Upon information and belief, Defendant LMG Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

639. Upon information and belief, Defendant Londonderry, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

640. Upon information and belief, Defendant Lotus Seven, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

641. Upon information and belief, Defendant Loudon, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

642. Upon information and belief, Defendant Louisburg, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

105

643.  Upon information and belief, Defendant M Holding Company, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

644.  Upon information and belief, Defendant M Investments, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

645.  Upon information and belief, Defendant Macon, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

646.  Upon information and belief, Defendant Madbury, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

647.  Upon information and belief, Defendant Magnolia Eight, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

648.  Upon information and belief, Defendant MAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

649.  Upon information and belief, Defendant Marigold Nine, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

106

650.   Upon information and belief, Defendant Market Tech Media Corporation is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

651.   Upon information and belief, Defendant Mars Cars, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

652.   Upon information and belief, Defendant Marshall Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

653.   Upon information and belief, Defendant Marval Group Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

654.   Upon information and belief, Defendant Marval Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

655.   Upon information and belief, Defendant Marval Software Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

656.   Upon information and belief, Defendant Marval Training and Consultancy Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

SL1 1812077v17 114825.00001

657. Upon information and belief, Defendant Marvel Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the United Kingdom.

658. Upon information and belief, Defendant Master Procure, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

659. Upon information and belief, Defendant Maxwell Stanley Consulting Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

660. Upon information and belief, Defendant Maxwell Stanley Consulting Limited f/k/a One Step Ahead Consultancy Ltd is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

661. Upon information and belief, Defendant MBS Investments PTY. LTD. n/k/a Clanwilliam Australia PTY Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Australia.

662. Upon information and belief, Defendant MBW Holdco, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

663. Upon information and belief, Defendant MBW Interco, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

664. Upon information and belief, Defendant McCarthy, Burgess & Wolff, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

665. Upon information and belief, Defendant McKinley Ventures Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Michigan

666. Upon information and belief, Defendant MD Office, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

667. Upon information and belief, Defendant MDO Group Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

668. Upon information and belief, Defendant MDX, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

669. Upon information and belief, Defendant Med Claims International, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

670. Upon information and belief, Defendant MedAttend, LLC n/k/a USA Mask Company, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

671. Upon information and belief, Defendant MedClaims Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

672. Upon information and belief, Defendant Medflow Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

673. Upon information and belief, Defendant Medflow, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

674. Upon information and belief, Defendant Media Product Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

675. Upon information and belief, Defendant Medical Business Systems PTY Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Australia.

676. Upon information and belief, Defendant Medical Physics, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

677. Upon information and belief, Defendant Medicom Medical Computer Solutions Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

678.  Upon information and belief, Defendant Mercato Leadmanagement Investments Holdings GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

679.  Upon information and belief, Defendant Meredith, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

680.  Upon information and belief, Defendant Merrimack, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

681.  Upon information and belief, Defendant Metronome Financial, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

682.  Upon information and belief, Defendant Metronome Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

683.  Upon information and belief, Defendant Miracard, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

684.  Upon information and belief, Defendant MM Holdings I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Missouri.

SL1 1812077v17 114825.00001

685.  Upon information and belief, Defendant MM Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

686.  Upon information and belief, Defendant MM Logistics, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

687.  Upon information and belief, Defendant MNI Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

688.  Upon information and belief, Defendant Morning Mountain Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

689.  Upon information and belief, Defendant Morresville, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

690.  Upon information and belief, Defendant Mountain West Innovations Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

691.  Upon information and belief, Defendant MRX Holdings, LLC f/k/a MPlus Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

112

692. Upon information and belief, Defendant MVE Holding, LLC n/k/a MNI Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

693. Upon information and belief, Defendant My Vision Express, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Georgia.

694. Upon information and belief, Defendant NAM Holdings I, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

695. Upon information and belief, Defendant Nashua, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

696. Upon information and belief, Defendant Nationwide Recovery Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

697. Upon information and belief, Defendant Nationwide Recovery Systems, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Texas.

698. Upon information and belief, Defendant NEBB Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

113

699.  Upon information and belief, Defendant NEBB Institute, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

700.  Upon information and belief, Defendant NEC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

701.  Upon information and belief, Defendant NEI Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

702.  Upon information and belief, Defendant NEI Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

703.  Upon information and belief, Defendant NEI Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

704.  Upon information and belief, Defendant Netfarmers GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Germany.

705.  Upon information and belief, Defendant Netherlands Insurance Holdings, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

114

706. Upon information and belief, Defendant Netherlands Insurance Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

707. Upon information and belief, Defendant New England Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

708. Upon information and belief, Defendant New Hill Asset Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

709. Upon information and belief, Defendant New Hill, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Oregon.

710. Upon information and belief, Defendant New Ipswich, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

711. Upon information and belief, Defendant Next Level Purchasing, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Pennsylvania.

712. Upon information and belief, Defendant Next Level Purchasing, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

115

713.  Upon information and belief, Defendant NHA Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

714.  Upon information and belief, Defendant NHC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

715.  Upon information and belief, Defendant Nice Asset Management, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

716.  Upon information and belief, Defendant NIH Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

717.  Upon information and belief, Defendant NLC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

718.  Upon information and belief, Defendant NLC Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

719.  Upon information and belief, Defendant NLP Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

116

720.   Upon information and belief, Defendant NN Life Luxembourg S.A. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Luxembourg.

721.   Upon information and belief, Defendant NOM GB 2018 I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

722.   Upon information and belief, Defendant Non Sport Update Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

723.   Upon information and belief, Defendant Non Sport Update, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

724.   Upon information and belief, Defendant Norlina, LLC f/k/a Highlight, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

725.   Upon information and belief, Defendant Northeast Insurance Holdings, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

726.   Upon information and belief, Defendant Northeast LMG Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

727.   Upon information and belief, Defendant Northern Air, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

728.   Upon information and belief, Defendant Northstar Financial Insurance Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

729.   Upon information and belief, Defendant Notochord Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

730.   Upon information and belief, Defendant Nottingham, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

731.   Upon information and belief, Defendant NPC National Physics Consultants, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

732.   Upon information and belief, Defendant NS Beaufort Investments, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

733.   Upon information and belief, Defendant NS EBR, LLP is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Texas.

118

734.   Upon information and belief, Defendant NSES 13, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

735.   Upon information and belief, Defendant NSES B, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

736.   Upon information and belief, Defendant NSES C, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

737.   Upon information and belief, Defendant NSES D, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

738.   Upon information and belief, Defendant NSES E, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

739.   Upon information and belief, Defendant NSES F, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

740.   Upon information and belief, Defendant NSES Funding 10, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

SL1 1812077v17 114825.00001

741.  Upon information and belief, Defendant NSES G, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

742.  Upon information and belief, Defendant NSES H, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

743.  Upon information and belief, Defendant NSX Wilmington Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

744.  Upon information and belief, Defendant NW Eye Care Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

745.  Upon information and belief, Defendant NW Eye Surgeons Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

746.  Upon information and belief, Defendant NWES Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

747.  Upon information and belief, Defendant OAM Holdings I, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

SL1 1812077v17 114825.00001

748. Upon information and belief, Defendant Oatman Asset Management, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

749. Upon information and belief, Defendant Obsidian Healthcare Group Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

750. Upon information and belief, Defendant Ocean Ophthalmology Management Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

751. Upon information and belief, Defendant Ocean Ophthalmology Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

752. Upon information and belief, Defendant OCIM Augusta, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

753. Upon information and belief, Defendant OCIM Baldwin, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

754. Upon information and belief, Defendant OCIM Chatsworth, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

121

755. Upon information and belief, Defendant OCIM Damascus, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

756. Upon information and belief, Defendant OCIM Ephesus, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

757. Upon information and belief, Defendant OCIM Forest Park, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

758. Upon information and belief, Defendant OCIM Gilford, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

759. Upon information and belief, Defendant OCIM Hampton, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

760. Upon information and belief, Defendant OCIM Iron City, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

761. Upon information and belief, Defendant OCIM Jackson, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

SL1 1812077v17 114825.00001

762.  Upon information and belief, Defendant OCIM Kite, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

763.  Upon information and belief, Defendant OCIM Marshall, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

764.  Upon information and belief, Defendant OCIM Paradise, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

765.  Upon information and belief, Defendant OCIM Rockdal, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

766.  Upon information and belief, Defendant OCIM Summerville, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

767.  Upon information and belief, Defendant OCIM Tybee Island, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

768.  Upon information and belief, Defendant OGX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

769.  Upon information and belief, Defendant OMPC, LLC f/k/a OMPC Therapy, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

770.  Upon information and belief, Defendant Online Reputations Manager, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

771.  Upon information and belief, Defendant Orange Gardenia, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

772.  Upon information and belief, Defendant Orange Petunia, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

773.  Upon information and belief, Defendant Orange Poppy, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

774.  Upon information and belief, Defendant Orchid Five, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

775.  Upon information and belief, Defendant P A S Holding Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of New Zealand

124

776.  Upon information and belief, Defendant P Windup1 Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

777.  Upon information and belief, Defendant P Windup2 Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

778.  Upon information and belief, Defendant PAM Holdings I, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

779.  Upon information and belief, Defendant PAM Holdings I, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

780.  Upon information and belief, Defendant Paradigm Park Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

781.  Upon information and belief, Defendant Paradise Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

782.  Upon information and belief, Defendant Parallel Capital Assets, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

783. Upon information and belief, Defendant Patent Review Score, Inc. a/k/a Patient Review Score, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

784. Upon information and belief, Defendant Patriot Group Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

785. Upon information and belief, Defendant Pavonia Life Insurance Company of Michigan ("PLIC MI") is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Missouri.

786. Upon information and belief, Defendant PB Investment Company Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Bermuda.

787. Upon information and belief, Defendant PBO Holdings, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

788. Upon information and belief, Defendant PBX Bermuda Holdings, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Bermuda.

789. Upon information and belief, Defendant PBX Holdings Ltd is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

126

790.  Upon information and belief, Defendant PBX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

791.  Upon information and belief, Defendant PCF Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

792.  Upon information and belief, Defendant PCF, LLC f/k/a Litigation Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

793.  Upon information and belief, Defendant Pelton Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

794.  Upon information and belief, Defendant Pelton Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

795.  Upon information and belief, Defendant Penn Medical Informatics Systems, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

796.  Upon information and belief, Defendant Peony Five, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

127

797. Upon information and belief, Defendant Periwinkle Seven, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

798. Upon information and belief, Defendant Petunia Ten, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

799. Upon information and belief, Defendant Pharma Database, LLC n/k/a SixSails, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

800. Upon information and belief, Defendant Pharma Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

801. Upon information and belief, Defendant PharmaSys Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

802. Upon information and belief, Defendant PharmaSys Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

803. Upon information and belief, Defendant Phenna Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

128

804. Upon information and belief, Defendant PI Software Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

805. Upon information and belief, Defendant PI Software, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

806. Upon information and belief, Defendant Pierre Mendes, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

807. Upon information and belief, Defendant Pink Orchid, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

808. Upon information and belief, Defendant Pink Tulip, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

809. Upon information and belief, Defendant Plaistow, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

810. Upon information and belief, Defendant PMMS Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

SL1 1812077v17 114825.00001

811. Upon information and belief, Defendant PMX, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

812. Upon information and belief, Defendant Point of No Return, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Arizona.

813. Upon information and belief, Defendant Poppy Nine, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

814. Upon information and belief, Defendant PPF OFF 151 North Franklin Street, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

815. Upon information and belief, Defendant PPH Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

816. Upon information and belief, Defendant Practice Builders, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

817. Upon information and belief, Defendant Prairie E&L Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

818. Upon information and belief, Defendant Prairie E&L Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

819. Upon information and belief, Defendant Preferred Financial Corporation, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

820. Upon information and belief, Defendant Prime Case Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of Delaware.

821. Upon information and belief, Defendant Prime Mortgage Lending, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

822. Upon information and belief, Defendant Prime Trust is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina. Border Credit Advisors LLC acts as Trustee for Defendant Prime Trust.

823. Upon information and belief, Defendant ProActive Software Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

824. Upon information and belief, Defendant ProActive Software Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of New Zealand.

131

825.   Upon information and belief, Defendant ProEdTech, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

826.   Upon information and belief, Defendant Professional Medical Management Services Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

827.   Upon information and belief, Defendant Prolimiate Solutions Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

828.   Upon information and belief, Defendant Prolimiate Solutions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

829.   Upon information and belief, Defendant Prospect Ridge Energy, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

830.   Upon information and belief, Defendant Pulse IT Communications PTY Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Australia.

831.   Upon information and belief, Defendant QAM Holdings I, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

SL1 1812077v17 114825.00001

832.  Upon information and belief, Defendant Queenstown Asset Management, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

833.  Upon information and belief, Defendant R&A Eye Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

834.  Upon information and belief, Defendant R&A Eye Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

835.  Upon information and belief, Defendant Raymond, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

836.  Upon information and belief, Defendant Recovery Web Solutions Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

837.  Upon information and belief, Defendant Red Begonia, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

838.  Upon information and belief, Defendant Red Dahlia, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

133

SL1 1812077v17 114825.00001

839.  Upon information and belief, Defendant Red Daisy, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

840.  Upon information and belief, Defendant Red Eagle Enterprises, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

841.  Upon information and belief, Defendant Red Jasmine, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

842.  Upon information and belief, Defendant Red River Developments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Michigan.

843.  Upon information and belief, Defendant Research Triangle Clinical Development is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

844.  Upon information and belief, Defendant Resolute Free Press, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

845.  Upon information and belief, Defendant Revenue Health Solutions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

134

846.   Upon information and belief, Defendant Reynolds & Anliker Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

847.   Upon information and belief, Defendant RHS Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

848.   Upon information and belief, Defendant Rindge, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

849.   Upon information and belief, Defendant Rock Holdings I, LLC f/k/a Rock Holdings I, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

850.   Upon information and belief, Defendant Rockdale Asset Management, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

851.   Upon information and belief, Defendant Rose Four, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

852.   Upon information and belief, Defendant RPI Radiological Physics, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

135

853. Upon information and belief, Defendant Rumney, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

854. Upon information and belief, Defendant SAF Holdings I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

855. Upon information and belief, Defendant SAF Holdings II, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

856. Upon information and belief, Defendant SAF Holdings III, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

857. Upon information and belief, Defendant SAF Holdings IV, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

858. Upon information and belief, Defendant SAM Holdings I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

859. Upon information and belief, Defendant Sanctuary Banbury Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

136

860.  Upon information and belief, Defendant Sandown, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

861.  Upon information and belief, Defendant Satori Waters, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Florida.

862.  Upon information and belief, Defendant SCMA, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

863.  Upon information and belief, Defendant Secured Loan-Backed Funding I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

864.  Upon information and belief, Defendant Secured Loan-Backed Funding II, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

865.  Upon information and belief, Defendant Secured Loan-Backed Funding III, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

866.  Upon information and belief, Defendant Secured Loan-Backed Funding IV, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

867.  Upon information and belief, Defendant Secured Loan-Backed Funding IX, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

868.  Upon information and belief, Defendant Secured Loan-Backed Funding V, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

869.  Upon information and belief, Defendant Secured Loan-Backed Funding VI, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

870.  Upon information and belief, Defendant Secured Loan-Backed Funding VII, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

871.  Upon information and belief, Defendant Secured Loan-Backed Funding VIII, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

872.  Upon information and belief, Defendant Secured Loan-Backed Funding X, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

873.  Upon information and belief, Defendant Secured Loan-Backed Funding XI, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

138

874.  Upon information and belief, Defendant Secured Loan-Backed Funding XII, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

875.  Upon information and belief, Defendant Secured Loan-Backed Funding XIII, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

876.  Upon information and belief, Defendant Secured Loan-Backed Funding XIV, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

877.  Upon information and belief, Defendant Secured Loan-Backed Funding XV, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

878.  Upon information and belief, Defendant Secured Loan-Backed Funding XVI, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

879.  Upon information and belief, Defendant Secured Loan-Backed Funding XVII, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

880.  Upon information and belief, Defendant Sedwick, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

139

881.   Upon information and belief, Defendant SFM Loan-Backed Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

882.   Upon information and belief, Defendant Shirt, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

883.   Upon information and belief, Defendant Shop Loc Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

884.   Upon information and belief, Defendant Shopper Local, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

885.   Upon information and belief, Defendant SIC US Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

886.   Upon information and belief, Defendant Sirius Capital Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

887.   Upon information and belief, Defendant Skyworld Corporation is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

140

888.   Upon information and belief, Defendant SN Group Development, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

889.   Upon information and belief, Defendant SN Malta Services Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

890.   Upon information and belief, Defendant SNA Capital, LLC n/k/a GBIG Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

891.   Upon information and belief, Defendant SNA Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

892.   Upon information and belief, Defendant SNH Acquisition, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

893.   Upon information and belief, Defendant Socrates Healthcare, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of New York.

894.   Upon information and belief, Defendant Somersworth, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

895. Upon information and belief, Defendant South Hill Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

896. Upon information and belief, Defendant Southeast Insurance Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

897. Upon information and belief, Defendant Southern Hobby Distribution, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

898. Upon information and belief, Defendant Southern Hobby Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

899. Upon information and belief, Defendant SP HoldCo, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

900. Upon information and belief, Defendant Speedy Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

901. Upon information and belief, Defendant SSH Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

142

902.  Upon information and belief, Defendant Standard Advisory Services Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

903.  Upon information and belief, Defendant Standard Assets Fund I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

904.  Upon information and belief, Defendant Standard Assets Fund II, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

905.  Upon information and belief, Defendant Standard Assets Fund III, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

906.  Upon information and belief, Defendant Standard Assets Fund IV, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

907.  Upon information and belief, Defendant Standard Financial Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

908.  Upon information and belief, Defendant Standard Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

143

909. Upon information and belief, Defendant Standard Insurance Holdings, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

910. Upon information and belief, Defendant Standard Investment Capital, Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

911. Upon information and belief, Defendant Standard Investment Holdings Ltd. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

912. Upon information and belief, Defendant Standard LC Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

913. Upon information and belief, Defendant Standard LC Holdings, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

914. Upon information and belief, Defendant Standard Life Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

915. Upon information and belief, Defendant Standard Life Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

144

916.  Upon information and belief, Defendant Standard Malta Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

917.  Upon information and belief, Defendant Standard Malta Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

918.  Upon information and belief, Defendant Standard Pacific Investments PTY LTD is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Australia.

919.  Upon information and belief, Defendant Stoddard, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

920.  Upon information and belief, Defendant Stratford HoldCo, LLC n/k/a Stratco Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

921.  Upon information and belief, Defendant Stratford Pharmaceuticals, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Florida.

922.  Upon information and belief, Defendant Stratham, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

145

923.  Upon information and belief, Defendant Stunner Productions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

924.  Upon information and belief, Defendant Summerville Asset Management, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

925.  Upon information and belief, Defendant SW Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

926.  Upon information and belief, Defendant SunBiz Resources, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Florida.

927.  Upon information and belief, Defendant Sunflower Six, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

928.  Upon information and belief, Defendant Swanzey, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

929.  Upon information and belief, Defendant Sweet Consultants, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

SL1 1812077v17 114825.00001

930.  Upon information and belief, Defendant TAC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

931.  Upon information and belief, Defendant TAC Home Mortgage, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

932.  Upon information and belief, Defendant TAC Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

933.  Upon information and belief, Defendant Talaria Global Health, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

934.  Upon information and belief, Defendant Talent Acquisition Innovation Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

935.  Upon information and belief, Defendant Talent Acquisition Innovation, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

936.  Upon information and belief, Defendant Targeted Metrics, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

937.   Upon information and belief, Defendant TCC Junior Loan-Backed Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

938.   Upon information and belief, Defendant TCC Senior Loan-Backed Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

939.   Upon information and belief, Defendant TCI Loan-Backed Funding, LLC f/k/a TCI Loan Back Security Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

940.   Upon information and belief, Defendant TechDate Corp. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

941.   Upon information and belief, Defendant Tesla Management, Inc.   is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Arizona.

942.   Upon information and belief, Defendant The American Council on English Language Program Certification, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

943.   Upon information and belief, Defendant The American Council, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

148

944.  Upon information and belief, Defendant The Corporate Responsibility Board, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

945.  Upon information and belief, Defendant THE FINANCIAL ASSOCIATION CORP. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

946. Upon information and belief, Defendant The HOEHNE Group - Software Division, LLC f/k/a The HOEHNE Group – Software Division, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Utah.

947.  Upon information and belief, Defendant The Home Medical Equipment Trust is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware. Hugh Steven Wilson acts as Trustee for Defendant The Home Medical Equipment Trust.

948.  Upon information and belief, Defendant The Online Rehab Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

949.  Upon information and belief, Defendant The Recovery House Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

950.  Upon information and belief, Defendant The River Source Solution Holdings Company, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

951.  Upon information and belief, Defendant The River Source Solutions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

952.  Upon information and belief, Defendant The River Source Treatment Centre-Casa Grande, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Arizona.

953.  Upon information and belief, Defendant TIAM Holdings I, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

954.  Upon information and belief, Defendant Tier 1 Lending Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

955.  Upon information and belief, Defendant Tier 1 Lending, LLC f/k/a Tier One Funding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

956.  Upon information and belief, Defendant toconnect GmbH is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Switzerland

957.  Upon information and belief, Defendant Toniq Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of New Zealand

150

958.  Upon information and belief, Defendant Tornado, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

959.  Upon information and belief, Defendant Trans-Continental Credit & Collection Corp is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of New York.

960.  Upon information and belief, Defendant Transcontinental Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

961.  Upon information and belief, Defendant Transglobal UK Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

962.  Upon information and belief, Defendant Treatment Direct Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

963.  Upon information and belief, Defendant Trier Holding B.V. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the Netherlands.

964.  Upon information and belief, Defendant Triton Financial Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Ireland.

SL1 1812077v17 114825.00001

965. Upon information and belief, Defendant TUX Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

966. Upon information and belief, Defendant TV Fanfare Canada Ltd / TV Fanfare Canada Ltée is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Canada.

967. Upon information and belief, Defendant Tybee Island Asset Management, LLC f/k/a Tybee Island Asset Management, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

968. Upon information and belief, Defendant UAM Holdings I, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

969. Upon information and belief, Defendant UK Addiction Treatment Group Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

970. Upon information and belief, Defendant UK Addiction Treatment Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

971. Upon information and belief, Defendant UK Asset Fund Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

152

972.   Upon information and belief, Defendant UK Atlanta Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

973.   Upon information and belief, Defendant UK Automotive Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

974.   Upon information and belief, Defendant UK Fintech Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

975.   Upon information and belief, Defendant UK Informatica Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

976.   Upon information and belief, Defendant UK Intralan Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

977.   Upon information and belief, Defendant UK Investment Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

978.   Upon information and belief, Defendant UK Marval Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

979.  Upon information and belief, Defendant UKAT Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

980.  Upon information and belief, Defendant UKAT Interco Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

981.  Upon information and belief, Defendant UKAT Investments Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

982.  Upon information and belief, Defendant Ultimate Advisors, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of South Dakota.

983.  Upon information and belief, Defendant Understand.com, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

984.  Upon information and belief, Defendant Understand.com Holding, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

985.  Upon information and belief, Defendant Unify Communications N.V. n/k/a Damovo Technology Services NV/SA is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Belgium.

986.  Upon information and belief, Defendant Unit 77, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

987.  Upon information and belief, Defendant United Staffing Solutions, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

988.  Upon information and belief, Defendant Utopia Asset Management, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

989.  Upon information and belief, Defendant Valdosta, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

990.  Upon information and belief, Defendant VAM Holdings I, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

991.  Upon information and belief, Defendant Van Ru Credit Corporation is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Illinois.

992.  Upon information and belief, Defendant Van Ru International, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

155

993.  Upon information and belief, Defendant Ventura Asset Management, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

994.  Upon information and belief, Defendant Violet One, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

995.  Upon information and belief, Defendant VIP Hub Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

996.  Upon information and belief, Defendant Vision Care Alliance, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

997.  Upon information and belief, Defendant Vision Care Services Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

998.  Upon information and belief, Defendant Vision Care Services, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

999.  Upon information and belief, Defendant Vista Life & Casualty Reinsurance Company is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Vermont.

SL1 1812077v17 114825.00001

1000. Upon information and belief, Defendant Voice & Data Network AG is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Switzerland

1001. Upon information and belief, Defendant VR Collections, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1002. Upon information and belief, Defendant VR Enterprises, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Arizona.

1003. Upon information and belief, Defendant VRC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1004. Upon information and belief, Defendant Waco Asset Management, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

1005. Upon information and belief, Defendant WACO Holdings I, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

1006. Upon information and belief, Defendant WC Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

SL1 1812077v17 114825.00001

1007.  Upon information and belief, Defendant WCS Resources, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Florida.

1008.  Upon information and belief, Defendant Weare, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

1009.  Upon information and belief, Defendant Web Courseworks, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1010.  Upon information and belief, Defendant Western Bancorp, Inc. is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

1011.  Upon information and belief, Defendant WesternB Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1012.  Upon information and belief, Defendant WesternB Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1013.  Upon information and belief, Defendant Whitaker Mill, LLC f/k/a Trivial, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1014.  Upon information and belief, Defendant White Lily, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1015.  Upon information and belief, Defendant William Street Asset Management Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

1016.  Upon information and belief, Defendant Williamson, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1017.  Upon information and belief, Defendant Wilmington Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of Malta.

1018.  Upon information and belief, Defendant Winn Over Enterprises, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Florida.

1019.  Upon information and belief, Defendant Wolfeboro, LLC is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

1020.  Upon information and belief, Defendant WPP Capital, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

159

1021.  Upon information and belief, Defendant WPSC HoldCo, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

1022.  Upon information and belief, Defendant WPSC Investments, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

1023.  Upon information and belief, Defendant Wsam Holdings Limited is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the United Kingdom.

1024.  Upon information and belief, Defendant WW Staffing, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1025.  Upon information and belief, Defendant WWS Holdings, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1026.  Upon information and belief, Defendant WYO Tech Investments LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Wyoming.

1027.  Upon information and belief, Defendant Yaras Group, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Lindberg organized and existing under the laws of the State of North Carolina.

160

1028.  Upon information and belief, Defendant Yarrow Three, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1029.  Upon information and belief, Defendant Yellow Carnation, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1030.  Upon information and belief, Defendant Yellow Lotus, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1031.  Upon information and belief, Defendant Yellow Magnolia, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1032.  Upon information and belief, Defendant Yellow Sunflower, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

1033.  Upon information and belief, Defendant ZAM Holdings I, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

1034.  Upon information and belief, Defendant ZapIT Medical Physics, LLC is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of North Carolina.

161

1035.  Upon information and belief, Defendant Zen Services, Inc.  is a necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Indiana.

1036.  Upon information and belief, Defendant Zion Asset Management, Inc. is necessary party and a company owned or controlled directly or indirectly by Greg Evan Lindberg organized and existing under the laws of the State of Delaware.

1037.  The Plaintiffs name John Doe # 1 through John Doe #50 each is an entity or a person whose name or identify presently is unknown to Plaintiffs, but whose wrongful or otherwise actionable acts and omissions as alleged herein was the actual or proximate cause of harm, loss, or compensable damage to one or more Plaintiff.  When discovered by a Plaintiff, the identity of the corresponding DOE defendant will be stated, and that person named as an individual defendant to this Complaint consistent with applicable laws and rules of procedure before this Court.

1038.  The MOU Affected Parties are all defendants who were not parties to the MOU but whose rights were affected thereunder, as identified in Schedule II, and therefore are necessary parties.

1039.  The IALA Affected Parties are all defendants who were not parties to the MOU but whose rights were affected thereunder, as identified in Schedule III, and therefore are necessary parties.

1040.  The Plaintiffs identify major non-party participants: (i) Mike Causey, the Commissioner of the North Carolina Department of Insurance; (ii) Michael Dinius, of Noble Consulting Services, Inc., the Special Deputy Rehabilitator for the NCIC; and (iii) Hutchison PLLC.

162

## JURISDICTION & VENUE

1041. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, sections 109 and 1501 of the Bankruptcy Code and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated as of January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

1042. This Court has expressly retained jurisdiction over the subject matter of this adversary proceeding pursuant to the Recognition Order.

1043. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1410.

1044. The statutory predicate for the Adversary Proceeding is 11 U.S.C. §§ 1520, 541, Bermuda law and North Carolina General Statutes.

1045. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(H) and (b)(2)(P), and the Court may enter a final order in respect of it under Article III of the United States Constitution.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### I. Lindberg and his Entrance into the Insurance Industry

1046. Lindberg is a self-proclaimed entrepreneur and leadership coach, and according to his website, https://www.greglindberg.com/bio/, "leads a character-driven life in which doing good takes an equal role to doing well."[12]

1047. In 1993, Lindberg graduated from Yale University, earning a degree in Economics.

---

[12] Lindberg has written a tell all book about the "SINGLE most advantageous experience of [his] life" detailing his time spent in an Alabama federal prison where he spent almost two years for, *inter alia*, attempting to bribe Mike Causey. *See* Greg Lindberg, *633 Days Inside: Lessons on Life and Leadership*, BOWKER IDENTIFIER SERVICES (September 21, 2022).

163

1048.  Lindberg's first business was one he started in 1991, a "home care compliance reimbursement newsletter" focused on "Medicare Part A for home health agencies." The newsletter is still presently active.

1049.  In 1991, Lindberg created Eli Research f/k/a Eli Global. To fund Global Growth, Lindberg borrowed money from various financial institutions and mezzanine funds. From the start, Lindberg described Global Growth's business strategy and philosophy as the "buy-and-hold strategy," because "success doesn't happen overnight." According to Lindberg, "we [Global Growth] think buy-and-hold is the right philosophy for capitalism."

1050.  In 2014, Lindberg caused Global Growth to enter the United States insurance industry. Using approximately $25 million of money that he swept[13] from other businesses he owned, Lindberg acquired his first United States based insurance company – SNIC. Lindberg NC MOU Action Trial Testimony [Volume 5] Tr., at 14:20-15:11.[14]

1051.  In late 2015, Lindberg acquired his second United States based insurance company – CBL. *Id.*, 15:14-16:1.

1052.  Lindberg re-domesticated both SNIC and CBL in North Carolina, and both remain domiciled in North Carolina. *Id.*

1053.  After the acquisition of SNIC and CBL, Lindberg acquired his third United States based insurance company – BLIC, in late 2016.

---

[13] "Swept" or "sweep" was a term often used by Lindberg and other Senior Decision Makers when they would search for available cash in various operating accounts of Lindberg Affiliates and use that money to pay for something else. White 2004 Examination Testimony, *infra*.

[14] "NC MOU Action" shall mean *Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company, in Rehabilitation, Colorado Bankers Life Insurance Company, in Rehabilitation, and Southland National Reinsurance Corporation, in Rehabilitation v. Greg Evan Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC and Private Bankers Life and Annuity Co., Ltd. a/k/a PB Life and Annuity Company, Ltd.*, Gen. Court of Justice, Superior Court Division (Wake County), No. 19 CVS 013093 (discussed in further detail, *infra*).

164

1054. SNIC, CBL, and BLIC were originally engaged in the business of selling including but not limited to, Medicare supplement insurance, long-term care insurance, supplemental health insurance (hospital indemnity insurance), annuities, life (term, whole, juvenile whole and universal), accident and critical condition insurance policies to consumers in North Carolina and other states.

1055. Lindberg also acquired a United States based reinsurance company – SNRC. SNRC was the reinsurer for CBL and SNIC.

1056. As a generally accepted rule in the insurance industry, insurance companies invest the cash premiums they receive from their policyholders in stable, liquid assets that will generate investment income to pay claims, surrenders, or redemptions, and be available for sale in circumstances requiring ready cash to satisfy claims and surrenders when due. For insurance companies, those investments are most typically in relatively safe investments such as treasury securities, investment-grade corporate bonds, and other high-quality instruments such as mortgage notes secured by investment-rated commercial real estate.[15]

1057. When policyholders choose insurance companies and reinsurance companies, they do so with the understanding that their money – the premiums – will be invested in a reasonably prudent manner.

1058. In 2018, however, the NCIC held too many investments on their books with and among affiliated parties, such as debt instruments and preferred equity in entities Lindberg also owned or controlled.

---

[15] *See* Robert McMenamin, *What do U.S. life insurers invest in?*, CHICAGO FED LETTER, Number 309 (April 2003), available at https://www.chicagofed.org/-/media/publications/chicago-fed-letter/2013/cflapril2013-309-pdf.pdf.

SL1 1812077v17 114825.00001

1059.  Lindberg's business model relied heavily on the acquisition of existing insurers, and the investment of policyholder premiums in affiliated insurers and affiliated non-insurance businesses owned by him.

1060.  Lindberg located his United States insurance businesses in North Carolina which, until 2019, did not limit insurance company affiliated investments.

1061.  By some estimates, Lindberg's affiliated investments through NCIC reached 80%, well beyond the standard practice in North Carolina.

1062.  According to Lindberg, when he entered the insurance industry in 2012, he approached the NCDOI, then led by commissioner Wayne Goodwin ("Goodwin"), and said "we [Global Growth] wanted to replicate the Warren Buffett model.  He created the most valuable insurance company on the planet with the model and we figured it was good for policyholders and good for everybody." Lindberg NC MOU Action Trial Testimony [Volume 5] Tr., at 22:2-14.

1063.  Ultimately after those discussions, Lindberg testified that he was given "permission to invest 40 percent in sub investment-grade variable-rate loans and we did that, noninsurance investments in these companies that we owned that I had 100 percent ownership interest in [sic]." *Id*.

1064.  Lindberg took advantage of this and exploited this informal agreement to the fullest extent possible, investing a significant amount of the NCIC cash into Lindberg's other businesses. At their peak, NCIC had more than sixty percent (60%) of their investments in affiliates, with some approaching or exceeding eighty percent (80%).

1065.  The NCDOI grew wary of Lindberg's affiliated investments because of how frequently a transaction occurred – "weekly basis" – and how poorly Global Growth tracked and

166

reported the transaction to the NCDOI. Brian Stewart NC MOU Action Trial Testimony [Volume 2] Tr., at 36:13-37:22.

1066.  Loan and investment tracking through into 2018 was on an Excel spreadsheet maintained by an assistant to Herwig.

1067.  Brian Stewart ("Stewart")—CFO of GBIG—testified that he, and the GBIG team, became "concerned" about Lindberg's affiliated investments. *Id*., at 37:23-38:21.

1068.  It became clear, after numerous questions from the NCDOI, that "a consolidated financial statement for all of Lindberg's companies, insurance and noninsurance…was such that the total group was it [sic] a negative equity position," which was a concern that the NCDOI pointed out in their original assessment "as the end of 2017." *Id*, at 38:3-12.

1069.  Stewart further testified that as they moved into 2018, what he "saw happening was [the PPN structure][16] was being used to increase the volume of affiliated investments instead of repackaging so the overall exposure was going up over time [sic]." *Id*., at 38:3-18.

1070.  In an attempt to change the optics of this affiliation issue, but not the fundamental fact of affiliation, and in conjunction with his counsel at Hutchison PLLC ("Hutchison"),[17] Lindberg created Edwards Mill Asset Management ("EMAM").

1071. EMAM was used to "disaffiliate" the NCIC investments, whereby EMAM created Limited Liability Company special purpose vehicles ("SPVs") to make "conduit loans" from one of the NCIC to an operating company owned by Lindberg. EMAM was the Class A Member of each SPV, holding one hundred percent (100%) voting interest in the SPV.

---

[16] An instrument selected by Lindberg and his Senior Decision Makers, a "PPN" is a principal protected note "where…a FinCo or other type of asset management investment" is packaged with "a bank-issued zero-coupon bond that would pay off the full principle of both investments at maturity, typically 30 or so years later [sic]." tewart NC MOU Action Trial Testimony [Volume 2] Tr., at 21:1-6.

SL1 1812077v17 114825.00001

1072.  The SPVs were platforms for single asset pass-through lending to act as an added layer between Lindberg and the loan. This created the appearance, for purposes of affiliation limits, that Lindberg's involvement with the SPVs was diluted because EMAM held a one hundred percent (100%) voting interest in the same SPV. Therefore, it appeared to satisfy the "affiliated investment" threshold limit imposed under North Carolina insurance law. Dinius NC MOU Action Deposition Tr., at 287-288; 297-298 and Wofford NC MOU Action Deposition Tr., at 131:11-132:7.

1073.  In practice, instead of the NCIC lending directly to an operating company owned by Lindberg, the NCIC loaned money to an SPV, which then immediately made a loan to an operating entity owned by Lindberg.

1074.  The SPVs were nothing more than vehicles used to make conduit loans from the NCIC to other Lindberg Affiliates, adding a protective layer between Lindberg and the loan, creating an artificial disaffiliation from Lindberg to comply with North Carolina law. As the Lindberg Affiliates used them, they were shams.

1075. Even with the SPV structure, the NCIC continued to accumulate affiliated investments that exceeded even the informal agreement with Goodwin of forty percent (40%). North Carolina voters elected a new insurance commissioner in November 2016.

1076.  In November 2016, Causey was elected as the North Carolina Commissioner of Insurance. He took office in January 2017 as the first Republican Commissioner in state history. Lindberg publicly supported Causey's opponent in the election, including with the sponsorship of advertising against Causey's candidacy.

---

[17] Lindberg has had an engagement with Hutchison since 1999. Hutchison represents Global Growth (then Eli Research).

SL1 1812077v17 114825.00001

1077.  Causey was a less tolerant regulator for Lindberg than Goodwin. Causey learned about Lindberg and his potentially troubled companies from the NCDOI's financial-analysis section, which had already been looking at Lindberg's companies as part of routine financial examination of regulated insurance companies. Beginning in spring 2015, NCDOI Chief Financial Analyst Jacqueline Obusek ("Obusek"), and her team had grown concerned about Lindberg's companies and the security of their investments. Regulators from other states had also expressed concerns to Obusek.

1078.  Shortly after taking office in January 2017, Causey replaced and reassigned several employees in leadership positions within the NCDOI, including persons with responsibility for oversight of Lindberg's businesses. Causey promoted Obusek from Chief Financial Analyst to Senior Deputy Commissioner of Insurance, replacing Ray Martinez, who many believed took a more relaxed approach toward Lindberg's companies than toward others. Notably, Martinez began working for Lindberg a few weeks after his reassignment.

1079.  Additionally, in late 2018, an informal agreement was entered between Lindberg and the NCDOI to reduce the percentage of affiliated investments to forty percent (40%), with an ultimate goal of ten percent (10%). The NCDOI had significant concerns and reservations about the number of affiliated investments because according to Causey, the question then became whether NCIC had sufficient long-term liquidity to meet outstanding obligations to policyholders as they came due. Causey NC MOU Action Deposition Tr., at 11:11-12:1.

1080.  Around this time, Lindberg retained John D. Gray ("Gray") to assist him with NCDOI relations. Lindberg and Gray engaged in a campaign between December 2017 and August 2018 to convince Causey to maintain a friendly regulatory environment in North Carolina for Lindberg's insurance companies. Specifically, they sought to persuade Causey to

169

allow Lindberg's companies to invest heavily in affiliated businesses, give positive reports to out-of-state regulators, and replace Senior Deputy Commissioner Obusek, whom Lindberg perceived as hostile to his interests.

1081.  The lobbying escalated quickly from $5,000 donations for Causey's yet-to-begin re-election campaign, to threats by Lindberg of lawsuits against the NCDOI, to attempted bribery. In the fall of 2017, Causey attended a compliance seminar offered by the United States Attorney's Office for the Western District of North Carolina. At its end, Causey spoke with an Assistant United States Attorney, expressing his concerns that the NCDOI's difficulties in regulating Lindberg's businesses and Lindberg's attempts to make contributions to Causey's campaign were connected. Causey met with Federal Bureau of Investigation ("FBI") agents in January 2018, and thereafter, agreed to cooperate with an investigation into Lindberg and his associates.

1082.  There were almost thirty (30) recordings of interactions between Causey and Lindberg or his associates in 2018. As examples from the interactions, the government contended that Lindberg sought assignment of a compliant investigator to replace Senior Deputy Commissioner Obusek, making and dangling before Causey upwards of a collective $2 million in campaign contributions.

1083.  In August 2018, the FBI searched Global Growth's Durham North Carolina Headquarters. From that point forward, Lindberg's businesses and reputation deteriorated quickly. Because of the "reputational risk," financial institutions refused to lend Lindberg Affiliates money and provide capital; Wells Fargo closed hundreds of the Lindberg Affiliates'

170

bank accounts, giving Lindberg ninety (90) days' notice to move hundreds of bank accounts to different banks – which proved very difficult.[18]

1084.  As the concern about affiliation levels grew, on October 18, 2018, Causey entered a consent order placing the NCIC into Administrative Supervision in an effort to reconcile NCIC's impending financial distress.

1085.  On February 28, 2019 the *Wall Street Journal* published a lengthy investigative feature concerning Lindberg and the Lindberg Affiliates. *See* Mark Maremont and Leslie Scism, *Financier Who Amassed Insurance Firms Diverted $2 Billion Into His Private Empire*, WALL ST. J. (February 28, 2019), available at https://www.wsj.com/articles/financier-who-amassed-insurance-firms-diverted-2-billion-into-his-private-empire-11551367856?mod=article_inline (the "First Wall Street Journal Article"). Its content portrayed Lindberg in a manner that raised immediate reputational concerns.

1086.  On March 18, 2019, Lindberg and Gray were indicted by a federal grand jury empaneled by the United States District Court for the Western District of North Carolina. The charges included: (1) conspiracy to commit honest-services wire fraud (18 U.S.C. §§ 1343, 1346); and (2) committing and aiding and abetting federal-funds bribery (18 U.S.C. §§ 666(a)(2)). The indictment, in generalized terms, resulted from Lindberg's interactions between November 2017 and August 2018 with Causey.

1087.  Lindberg was arrested on April 2, 2019, with the news rapidly spreading worldwide.

1088.  Less than two weeks later, the BMA imposed conditions to be added to the Certificates of Registration for PBLA, Omnia, and Northstar, including that the companies

---

[18] White 2004 Examination (defined below) Tr., at 49:12-50:14.

obtain prior written approval from the BMA before establishing bank accounts or moving assets, and restricting the companies from modifying the terms of their investments without prior written approval. At the same time, the Debtors saw an increase and acceleration of redemptions and surrenders by policyholders and customers approaching a run on the bank. Each Debtor, now exposed due to lack of reserves and liquidity, was irreversibly sentenced to insolvency.

1089. On June 27, 2019, the NCIC entered rehabilitation pursuant to Article 30 of Chapter 58 of the North Carolina General Statutes and Causey appointed Michael Dinius ("Dinius") and John Murphy (" Murphy") of Noble Consulting Services, Inc. ("Noble") as Special Deputy Rehabilitators for the NCIC.

1090. After Lindberg's arrest and the amendment to the Certificates of Registration, Lindberg's criminal prosecution proceeded to trial and conviction in less than a year. The criminal case was tried by a jury, the Honorable Max O. Cogburn Jr., presiding. On March 5, 2020, the jury convicted Lindberg and Gray on both counts. Lindberg was sentenced to an eighty-seven (87) month prison term, and Gray to a thirty (30) month prison term.

1091. On September 11, 2020, Lindberg appealed.

1092. On June 29, 2022, the United States Court of Appeals for the Fourth Circuit in *United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022), vacated Lindberg's and Gray's convictions, and remanded the matter for a new trial.

## II. Global Growth's Organizational Structure

1093. Global Growth's corporate organizational structure was and remains a very complicated and layered structure involving hundreds of corporate entities (e.g., operating companies, financing companies, SPVs, etc.), ultimately owned by Lindberg. Miller 2004 Examination (defined below) Tr., at 16:13-20 ("It was…a very complicated org structure.");

172

Miller NC MOU Action Trial [Volume 2] Tr., at 103:20-104:9 ("the structure was very complicated…"); Miller NC MOU Action Deposition Tr., at 27:4-16 (over 130 operating companies).

1094. Senior Decision Makers and other Global Growth employees reviewed the financial reports that the operating companies provided them because the operating companies did the accounting themselves. Miller testified that monthly reports were not always completely accurate; rather there were many inconsistencies in the financial reporting, a significant portion of the accounting was done in India or elsewhere internationally. Miller NC MOU Action Deposition Tr., at 30:5-35:15.

1095. Beginning in or around October 2017, Global Growth began converting investments in notes issued by SPVs into notes issued by finance or financing companies ("FinCos"), which were purportedly managed by non-affiliate third parties and backed by a pool of Lindberg-affiliated middle market loans.

1096. This was not true. Lindberg and his Senior Decision Makers controlled the FinCos, including how the proceeds were distributed and used. In fact, many of the loans underlying the FinCos were the same loans underlying the SPV structures.

1097. The mechanics of the SPV-to-FinCo conversions were, by design, complex and contrived to obscure their real purposes. Lindberg and Herwig concealed from the Debtors' Bermuda based directors the details of the SPV-to-FinCo conversions.

1098. In reality, these transactions served as a way to divert cash to Lindberg. Lindberg used the misappropriated funds: (a) for his personal use and benefit; (b) to acquire other businesses under the Global Growth umbrella; and (c) to support the cash needs of his affiliated businesses.

173

### III. Lindberg and Other Senior Decision Makers Failed to Respect Corporate Separateness and Abide by Corporate Formalities

1099.  Lindberg, by and through Global Growth, formed, acquired, and directly and indirectly controlled the Lindberg Affiliates as majority owner, as controlling shareholder, through power of appointment of a majority of board seats, as managing partner or member pursuant to a partnership or LLC management agreement, as managing member in a joint venture, or as an alter ego.

1100.  Each Lindberg Affiliate commonly was controlled, managed, and/or operated by Lindberg, the sole member, and by him as he directed or authorized the Senior Decision Makers. Under Lindberg's direction, the Senior Decision Makers and other Global Growth employees were integral to the management and operations, or lack thereof, of each Lindberg Affiliate and Global Growth overall.

1101.  Some important Global Growth employees that had awareness of many of these material facts and were also involved, aside from the Senior Decision Makers, included: Scott Boug ("Boug"), the President and CEO of each Debtor; Peter Nordberg ("Nordberg") who was part of Global Growth's in-house counsel team with Tamre Edwards ("Edwards"); and George Vandeman ("Vandeman"), the Chairman of the Board of Global Growth.

1102.  Lindberg and the Senior Decision Makers used the Debtors as funders of risky or otherwise non-conforming investments in the Debtor Investment Counterparties and other Lindberg Affiliates, as a capital source to attempt to bail-out insolvent Lindberg Affiliates, and for similar wrongful purposes. As a result, the Debtors' assets were improperly directed to these and similar ends.

1103.  Specifically, Lindberg and the Senior Decision Makers caused the Debtors to invest over $700 million in hundreds of Lindberg Affiliates, which Lindberg represented as

174

viable investment vehicles for the Debtors, but in fact, were illiquid and opaque, closely held entities.

1104.  The investments consisted of: (i) collateralized and uncollateralized loans (the "Loans"); (ii) Repo Agreements; and (iii) preferred equity instruments (the "Equity Interests") (collectively with the Loans and Repo Agreements, the "Investments," or singularly the "Investment"). The Debtor Investments reflect funds maintained for the benefit of approximately 2,500 participants of insurance policies, annuities, investment plans and other financial products held by persons and families across the United States and overseas. The Debtors' products were offered through various distributors, which included but were not limited to broker dealers and banks' wealth management units.

1105.  Lindberg and the Senior Decision Makers caused (i) PBLA to invest in over ten (10) Lindberg Affiliates; (ii) Northstar to invest in over fifty (50) Lindberg Affiliates; (iii) Omnia to invest in five (5) Lindberg Affiliates; and (iv) PBIHL to invest in three (3) Lindberg Affiliates.

1106.  These transactions were represented by Lindberg and the Senior Decision Makers to the Debtors and their regulators and stakeholders as viable investment vehicles to best secure the Debtors' promises and commitments to their policyholders and clients but were nothing of the sort.

1107.  Typically, these transactions resulted from the need for cash or liquidity in other parts of the organization, or because Lindberg needed cash for himself, and were initiated through an email from one or some of Herwig, Bostic, and Solow setting forth the basic terms of the transaction and seeking approval from North Carolina Global Growth employees, normally those in the Treasury department.

SL1 1812077v17 114825.00001

1108. Thereafter, written trade confirmations, or Commitment Transaction Advice ("CTA") documents were drafted and signed utilizing electronic signatures, then submitted to Debtors' respective banks. Conforming papers were drawn and signed before and sometimes after the fact. This entire process, from inception to wire confirmation, generally took as little as one to two days, and as the JPLs learned through their review of the limited books and records available to them, appears entirely deficient with regards to minimum due diligence, both financial and operational, and lacked corporate formalities such as the Debtors' Board minutes approving said transactions.

1109. Notwithstanding the absence of documentary evidence, Lindberg testified at the NC MOU Action that there existed a "very robust investment committee," which included a team made up of the "CEOs of the operating companies" and those who performed the due diligence, which included "the accounting team, the due diligence team and the M&A team." Lindberg NC MOU Action Testimony, Tr., at 393:6-13. According to Lindberg, the same process was done when it came to the insurance companies' decision to underwrite a loan or pursue other investments. *Id.*, at 395:3-15. In response to Herwig's guilty plea on December 22, 2022, Lindberg said the same things through a spokeswoman in an effort to distract and deflect blame from himself.

1110. The officers of the operating companies were often one of the Senior Decision Makers. This was also the case for the financing companies.

1111. Lindberg further testified that each transaction had a "huge" due diligence file, which included the basic memo for the transaction and all the underlying due diligence materials. *Id.*, at 393:17-23; 394:1-10. The JPLs, however, have been unable to locate any such files, or any single file inclusive of all the underlying due diligence and underwriting materials for Debtor

176

transactions. Rather, in some instances, the JPLs have only located the standard originating transactional document(s), the basic transaction memo, usually ranging from 5–10 pages, as well as the third-party "arm's length" opinion or rating agency memos conformed to a particular transaction's facts, usually from HR Ratings—a ratings agency based in Mexico.

1112. Lindberg's testimony is further contradicted by the deposition of Bostic, who testified that he did not know where due diligence materials were maintained for these types of transactions, nor was he aware whether Lindberg or Herwig actually conducted any such due diligence prior to investing. Bostic NC MOU Action Deposition Tr., at 24:1-18. In fact, Bostic testified that Global Growth's North Carolina office rarely had access to basic due diligence materials, like a clear and comprehensive financial record. *Id.*, at 21:24-22:2. The realization, later, of his personal exposure may explain why Bostic invoked his Fifth Amendment Privilege in response to every substantive question posed to him during his 2004 Examination on October 25, 2022, *infra*.

1113. The lack of due diligence is not the only instance of Lindberg and the Senior Decision Makers failing to adhere to the most basic internal controls and duties of care. They also failed to comply with applicable law and prudent investment standards.

1114. In addition to the fact that there was rarely ever comprehensive due diligence performed in connection with the Debtor Investments, there also were little to no internal policies or procedures put in place as it relates to the record keeping and bookkeeping practices of Global Growth.

1115. On December 8, 2022, White appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court (the "White 2004 Examination"). As it relates to the internal processes and procedures of Global Growth, White had the following to say:

177

> **Q:**    To your understanding, was there a policy or procedure followed internally by the Lindberg entities [Lindberg Affiliates] with respect to intercompany transfers, what was appropriate, what wasn't?
>
> **A:**    I don't believe we had any written policies regarding that.
>
> **Q:**    Did you have any written policies with respect to how intercompany transfers were justified?
>
> **A:**    No.
>
> **Q:**    Did you have any policies with respect to how intercompany transfers were supported or explained?
>
> **A:**    No.
>
> **Q:**    Were there any policies or even guidelines with respect to how intercompany transfers were to be evaluated or processed?
>
> **A:**    No.

White 2004 Examination Tr., at 196:6-197:16.

1116.  Herwig often departed from even the barest of corporate procedures which would be to obtain manager consent to consummate a transaction. He often evaded obtaining requisite consents before completing transactions. As one example, Herwig executed a sale of AAPC Holdings, Inc. ("AAPC") (a Lindberg Affiliate that the Debtors invested in) preferred stock without Miller's consent – Miller was the manager of AAPC at the time of the sale. In that instance, manager consent was required to execute such a transaction; Herwig ignored this and improperly executed the sale on his own.

1117.  The Senior Decision Makers were often the only signatories for all parties to a transaction. For example, the Chatsworth Asset Management, LLC ("CAM") loan (which later became a Northstar asset) dated November 10, 2017, lists Lindberg as the signatory for each of the Borrower (CAM), the Lenders (CBL and SNIC) and the Agent (CBL).

1118. After certain transactions closed, namely after the acquisition of an external portfolio (*e.g.*, the Damovo portfolio), Lindberg and the Senior Decision Makers then initiated a transfer of a substantial "origination fee" from Debtor accounts to other Lindberg Affiliates, of which Lindberg was the ultimate beneficial owner. Bostic NC MOU Action Deposition Tr., at 18:16-25.

1119. Lindberg and the other Senior Decision Makers searched all the operating accounts under the Global Growth umbrella to pay the debts of other Lindberg Affiliates – treating the entire conglomerate as one entity.

1120. This is further evidenced by White's 2004 Examination testimony.

1121. When a Lindberg Affiliate did not have enough money to pay a vendor or a debt, Global Growth paid for it after finding available cash through a sweep and according to White, at Lindberg's direction, it was accounted for in the following way, "We [Global Growth] transferred the money into that company's bank account so they could pay it out of their accounts, and it was recorded usually as an intercompany between Academy [Global Growth] and that entity." White's 2004 Examination Tr., at 72:17-73:16.

1122. On December 29, 2022 Lindberg appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court after he and an attorney appearing for him contested its issuance (the "Lindberg 2004 Examination"). Lindberg was represented by an attorney of his choosing throughout the oral examination. When asked, "Isn't it true that you commingled assets and shuttled money back and forth between these entities freely whenever the need for funds arose without regard to the interest of the company providing the funding," he invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 141:7-13.

179

1123.   Moreover, when asked "Isn't it true that you and your management team simply raided whatever company had available cash at the time," Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 51:12-15.

1124.   The Lindberg Affiliates' questionable business practices are further borne out by the interchangeability of the Lindberg Affiliates. It was often the case that if one Lindberg Affiliate ran out of cash to pay its obligations in a timely manner, Lindberg or other Senior Decision Makers routinely transferred money from one Lindberg Affiliate's operating account to another Lindberg Affiliate's operating account to fund the obligation.

1125.   In one instance, in an email dated October 1, 2018, Lio Drian ("Drian")—worked with White in Global Growth's Corporate Treasury department—notified Miller that AFA and Netherland Insurance Holdings ("NIH") did "not have enough cash to pay [AFA and NIH] P&I [principal and interest] today." To correct the problem, she forwarded this email to Lindberg and proposed "to move funds from [Southland National Holdings] to AAI [Academy Association, Inc. n/k/a Global Growth] to fund these P&I payments that are due today," and that she would be "going to go through all of the operating cash accounts and try to find any pockets of cash that we can take." This is just one instance of the "sweeping" that White referred to in her 2004 Examination.

1126.   On October 17, 2022, Miller appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court after she and an attorney appearing for her contested its issuance. Miller was represented by an attorney of her choosing throughout her oral examination ("Miller 2004 Examination"). Miller testified that in October 2018, $83 million of Northstar's funds was used to capitalize GBIG Holdings Inc. f/k/a Southland National Holdings, Inc.

180

("GBIG Holdings") in an effort to satisfy regulators with CBL's capitalization, instead of having that cash available to fund redemptions and surrenders from Northstar policyholders. Miller 2004 Examination Tr., at 187:2-190:12.

1127. Moreover, during the Lindberg 2004 Examination, when asked whether he instructed Miller to divert over $80 million from Northstar for the benefit of the NCIC in 2018, Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 98:5-9.

1128. On October 11, 2018, Miller, Stewart, Bostic, and Solow discussed an urgent need to get money to GBIG Holdings to fund CBL, in response, to which Miller requested that someone "devise a plan for how it [cash] moves from" Northstar as a capital contribution. Bostic ultimately lined up three separate transfers, disguised as investments, totaling over $83 million, from Northstar to AFA ($18,525,650.27), CAF V ($20,236,758.83) and CAF VI ($45,051,894.96). Those entities were then directed to transfer the funds to SNH [GBIG Holdings] to satisfy the regulators' capitalization requirements for CBL.

1129. Miller testified that the purpose of the transfers from Northstar to the three entities—AFA, CAF V and CAF VI—was to simply provide SNH [GBIG Holdings] the required capital so it [SNH] did not have regulatory issues. Miller 2004 Examination Tr., at 189:1-8. There is no evidence available to the JPLs that anyone involved with these events considered Northstar's obligations to its policyholders and owners of similar financial products.

1130. According to the current Debtor books and records available to the JPLs, there is no indication that GBIG Holdings or CBL ever repaid to Northstar the $83 million.

1131. In an email exchange dated November 27, 2018 between Bostic, Solow and Miller, Solow said, after identifying affiliates, "it ultimately is all the same cash."

SL1 1812077v17 114825.00001

1132.  In February 2019, Miller and White exchanged emails whereby Miller instructed White: "We need to fund $900K to Dunhill by end of week. We have $4m coming in from PBLA tomorrow. Just a heads up. Once the funds hit from PBLA, I will send instructions on that. We also need to fund yacht expenses by end of week –app. $400K."

1133.  Also, Lindberg emailed Miller on February 19, 2019 with the subject line, ███████████████████████████████████████████████ Miller responded, ███████████████████████████████ ███████████████████████████ This indicates that there was a plan that Miller created, along with the other Senior Decision Makers to liquidate the last of Northstar's governmental bonds to fund Lindberg's personal expenses. Moreover, during the Lindberg 2004 Examination, when asked whether this was a misuse of Northstar's funds, Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 136:17-138:7.

1134.  During his 2004 Examination, when asked whether it was true that he did not respect the separateness of the Debtors, Global Growth or the [Lindberg] Affiliates, Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 103:2-6.

1135.  This was a reflection of the corrupt culture, including one where all the money was Lindberg's. Lindberg and the Senior Decision Makers routinely shuttled money back and forth among Lindberg Affiliates including the Debtors based on the needs of the company receiving the cash, rather than the interests of the company transferring the cash. These transfers

182

were then dressed up as investments, although there was no thought given to whether there was any legitimate purpose for such an "investment" to be made.

1136. The knowledge of Lindberg and the Senior Decision Makers is attributable to each of the Lindberg Affiliates. Moreover, for the same reasons, and for the reasons pleaded in Count XIII, *infra*, Lindberg and the other Senior Decision Makers owed at all material times fiduciary duties to the Debtors and subsequently breached the same, egregiously.

## IV. Lindberg, Personal Expense Companies, and the Diversion of Debtors' Assets for Non-Debtor Personal Purposes

1137. Lindberg from 2017 and into at least 2020 directed, caused, allowed, and himself diverted the Debtors' assets for personal purposes having no rational connection to the Debtors' business and obligations to their insurance policyholders and owners of the financial products sold by the Debtors.

1138. The Lindberg Personal Expense Companies were funded with cash directed, transferred, swept, or taken from the Debtors and other Lindberg Affiliates.

1139. The Lindberg Personal Expense Companies used that cash to pay operating expenses, the salary or wages and benefits of their employees, taxes and similar assessments and fees, rents, and transportation costs throughout the United States and around the world. Payments were also made to at least one ghost writer for a book attributed to Lindberg's authorship, and lavish entertainment and personal expenses for Lindberg, members of his family, his friends, and a significant number of paramours – including for his personal reproductive purposes.

1140. Lindberg through the Lindberg Personal Expense Companies often charged more than a half-million dollars per month to one or more American Express cards, and the Lindberg Personal Expense Companies paid all charges without questioning their propriety or nature. A

183

significant percentage of Lindberg's personal expenses were paid through Dunhill, South Hill, First International, AYC Holdings, and Acquired Development.[19, 20] Dunhill was the most involved Lindberg Personal Expense Company in this regard, until reputational risk associated with Lindberg caused Wells Fargo to tell Dunhill and other Lindberg Affiliates to bank elsewhere and close its accounts.[21] Lindberg similarly caused the Lindberg Personal Expense Companies to pay or reimburse the acquisition and financing costs, pilot and crew fees, fuel and other operational and maintenance fees, associated airport and harbor fees, and decorating and comparable expenses for his planes and yacht (the "Double Down").

1141. Examples of the lavish entertainment and personal expenses that Lindberg caused the Lindberg Personal Expense Companies to pay for him included nearly ▮▮▮▮ on some nights in Las Vegas nightclubs for himself and his guests; and parties in Miami, Los Angeles, and on-board his yacht with models for Rock Star Energy drinks as hostesses, chocolate fountains, and similar indulgences.

1142. Between 2017 and 2020, Lindberg caused the Personal Expense Companies to expend ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[19] Miller's 2004 Examination Tr. at 138:5-14, 141:3-144:16, 145:6-15. ("[Dunhill was] one of the entities that Greg used...for personal stuff," "the funds moved from Eli to South Hill to Dunhill," "[New Hill] was similar to South Hill," "[American Yacht] was the company that owned the yacht," "[Acquired Development] was an alternative to Dunhill."); White 2004 Examination Tr., at 39:24-40:6. ("Apex…is Greg [Lindberg]'s security team.")

[20] In Lindberg's North Carolina divorce case, the Court quoted Mrs. Lindberg's Answer and her characterization of Dunhill and her putative role in the business as follows:  "while [Mr.]Lindberg purported to call [her] the CEO of [Dunhill] on occasion, [Dunhill] never employed her in any capacity and Dunhill was merely a vehicle through which [Greg] Lindberg funded the personal lifestyle of the parties and their family…" *Dunhill Holdings v. Tisha Lindberg et. al.*, No. COA18-1112, 17 CVS 3710, page 2 (N.C. App. Ct. 2019).

[21] Prior to the FBI search of headquarters in 2018 and the First Wall Street Journal Article, Global Growth had approximately "340 operating accounts" at Wells Fargo. Lindberg "had access to all of [the Wells Fargo accounts]," and personally and routinely accessed and "moved the money from various entities." White 2004 Examination Tr., at 45:5-14.

184

SL1 1812077v17 114825.00001

██, and similar charges to more than two dozen women with whom he had purported relationships and/or children, and/or were egg donors. Also, Lindberg caused the Personal Expense Companies and other Lindberg Affiliates to pay the salaries and other expenses for Apex[22]– the security service maintained by him for himself, his family, and occasionally Senior Decision Makers – who also keep surveillance of these women and reported their findings to Lindberg.[23]

1143. Lindberg looked for available cash sitting in Lindberg Affiliates' operating accounts and "swept" it up to fund whatever aforementioned expense he needed to pay at that time, according to White.

> **A:**        A lot of it was swept up from the operating companies.
>
> **Q:**        "Swept up" meaning what?
>
> **A:**        Greg [Lindberg] didn't like to leave a lot of cash in the operating company account, so we would routinely sweep it up to Academy [Global Growth].

White 2004 Examination Tr., at 71:22-72:11.

1144. After the sweep up to Global Growth, Lindberg then personally transferred the money directly to Dunhill or another Personal Expense Company when he needed money. *Id.*, at 44:10-15. After Wells Fargo closed all the accounts when Lindberg asked White asked to move money from a bank account, *e.g.*, an operating company, to another bank account, *e.g.*,

---

[22] Apex is a business Lindberg uses to run his personal security team. Lindberg also employed, through Apex, private investigators to investigate on potential paramours. *See* Mark Maremont and Leslie Scism, *'Active Interest': Insurance Tycoon Spied on Women Who Caught His Eye*, Wall St. J. (Oct. 3, 2019), available at https://www.wsj.com/articles/active-interest-insurance-tycoon-spied-on-women-who-caught-his-eye-11570117310 ("[Lindberg] paid for dozens of surveillance operatives to tail the women up to 24 hours a day, taking surreptitious photos and sometimes putting GPS trackers on their vehicles…").

[23] According to Lindberg's ██████████████ tax returns, Lindberg gifted ██████████████


another operating company, no questions were asked, and the transfers were simply done at Lindberg's or another Senior Decision Makers' direction. White 2004 Examination Tr., at 45:19-23. ("If I [White] was asked to move from A to B, since it was all within the Greg [Lindberg] world, I just did it because it was all his money. If it went from anywhere to Dunhill, Greg [Lindberg] did it.").

1145.  When asked whether he ever instructed Herwig, Solow, Bostic, Miller or White to use the Debtors' cash to fund Personal Expense Companies, such as Dunhill or Acquired Development, Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 97:16-99:17.

1146.  Moreover, when asked if he caused the Debtors to make investments in Lindberg Affiliates in order to get cash to Dunhill and other Personal Expense Companies, Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 52:12-17.

1147.  Further, when asked whether he or the Global Growth management team raided the Debtors' coffers to pay his personal expenses, Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 52:7-10.

1148.  The incomplete books and records obtained by the JPLs for the Debtors' business from 2017 through in or about 2020 and the documents produced by Lindberg and the Lindberg Affiliates pursuant to Rule 2004 subpoenas authorized by this Court and served on them do not tie a dollar of new business generated or existing business maintained or saved from the Lindberg Personal Expense Companies' expenditures.

186

SL1 1812077v17 114825.00001

1149.  Books and records and other evidence made available to the JPLs and identified by them to date, including as alleged elsewhere in this Complaint, shows that each Debtor's cash and/or liquid assets, usually through transactions originating and directed by Lindberg and the Senior Decision Makers in North Carolina, was directed, transferred, or otherwise diverted and made available to the Lindberg Personal Expense Companies for the personal purposes alleged herein.

1150.  The JPLs and Debtors are without evidence in the books, records, and other evidence available to them that their cash and/or liquid assets directed, transferred, or otherwise diverted and made available to the Lindberg Personal Expense Companies was segregated or otherwise kept separate from the funds used by them to pay Lindberg's personal expenses as alleged in this Complaint.

1151.  The funds from the Debtors and other Lindberg Affiliates that were directed, transferred, or otherwise diverted and made available to the Lindberg Personal Expense Companies for Lindberg's personal purposes alleged herein often were recorded after their aggregation at headquarters within a single Lindberg Affiliate, transferred, then booked as a LTS.

1152.  The JPLs and Debtors are without evidence in the books, records, and other evidence available to them that those LTSs were repaid, nor have the JPLs or Debtors been able to identify from them any evidence that any Debtor's cash originally directed to a Lindberg Personal Expenses Company has been repaid to the Debtor.

## V. Lindberg's and Senior Decision Makers' Regular Business in Bermuda

1153.  Lindberg, Herwig, and at least Miller from among the Senior Decision Makers traveled to Bermuda from 2017 through in or about 2020.

187

1154. The presence of each of them in Bermuda included as a principal purpose the conduct of business with and on behalf of the Lindberg Affiliates and the Debtors. Activities in which each engaged during a visit included meetings with directors and officers of the Debtors, meetings with employees of the Debtors, and meetings with others involved or connected with the business of the Debtors such as regulators, auditors and accountants, and lawyers.

1155. Lindberg, Herwig, and all of the Senior Decision Makers, together with other senior executives, acting from North Carolina offices or outside Bermuda, regularly and on a daily or multiple days per-week basis conducted business in the United States and internationally with directors, officers, employees of the Debtors and banks in Bermuda with which the Debtors maintained accounts from 2017 through in or about 2020 (the "Regular Business"). They less frequently, and regularly when necessary, did so from outside Bermuda with regulators, auditors and accountants, and lawyers. They similarly did so for and on behalf of the Debtors with counterparties and others, including acting in interstate commerce within the United States.

1156. Lindberg, Herwig, and all of the Senior Decision Makers when conducting the Regular Business used landline telephones, cellular telephones, electronic mail, text and direct messages, the internet, and other wired, cellular, and satellite communications networks and services to communicate and conduct that business throughout the United States, to and within Bermuda, and elsewhere around the world.

1157. Lindberg, Herwig, and all of the Senior Decision Makers when conducting the Regular Business knew, understood, and intended that their acts would affect the Debtors, their directors, officers, employees, banking relationships, and business with regulators, auditors and accountants, and lawyers.

188

1158.  Lindberg, Herwig, and all of the Senior Decision Makers when conducting the Regular Business and when acting otherwise for and on behalf of themselves, the Lindberg Affiliates, and the Debtors from outside Bermuda knowingly, intentionally, and purposefully availed themselves and the entities for which they acted of the benefits, privileges, and obligations of the laws of Bermuda in addition to those of the places outside Bermuda from and with which they acted in a particular circumstance.

1159.  Ultimately, Lindberg and the other Senior Decision Makers made all strategic, tactical and material financial and business decisions concerning the Debtors' Investments outside of the purview of the Debtors' Bermuda executives (e.g., Boug, Superina (defined herein), Hawkins (defined herein), etc.) as part of their Regular Business. Moreover, the Bermuda executives and employees had virtually no control over the Debtors' Investments or the Debtors' investment and bank accounts, which is discussed more thoroughly in the next Section of the Complaint.

## VI. Representative Transactions Causing Harm to Northstar

1160.  Northstar was acquired by Lindberg in 2018. Northstar is a wholly-owned subsidiary of BMX Bermuda Holdings, Ltd., which in turn is wholly-owned by BMX Holdings, LLC ("BMX Holdings"). Lindberg holds 100% ownership in BMX Holdings, and thus, these entities, each of which was formed and existed under Bermuda law during their ordinary operations.

1161.  Prior to Lindberg's acquisition of Northstar on July 3, 2018, Northstar was invested with, held and managed for the benefit of its policyholders – inclusive of owners of annuities and similar financial products – over $200 million in liquid securities issued by counterparties, all of which were unaffiliated with Northstar. Those liquid, blue-chip investments

were widely considered by insurers and their regulators as stable, liquid investments intended to maintain their basis and produce reasonable income at modest risk so that policyholders' claims and surrenders could be paid in the ordinary course, and even in extraordinary circumstances. BlackRock Asset Management (UK) Limited ("BlackRock") held over $200 million in liquid securities that the then Northstar executives managed for the benefit of policyholders.

1162. Within one year of acquiring Northstar, Lindberg and his US-based Global Growth investment team at GB Capital, which included Herwig, Bostic, Solow, and Greg Johnson ("Johnson") (an investment analyst at Global Growth), depleted Northstar's $200 million liquid reserve held in BlackRock and transferred the proceeds to a Northstar Segregated Custody Account at HSBC Bank (the "HSBC Account").

1163. Lindberg and his North Carolina Global Growth executives (then named as signatories on the HSBC Account) caused Northstar to purchase illiquid investments in Lindberg Affiliates – senior and junior loans and/or preferred equity, largely unsecured by real collateral, readily susceptible to manipulative amendments for the benefit of the Lindberg Affiliates and eventually Lindberg.

1164. This transformation of Northstar's assets – including in many cases, their liquidation in exchange for illiquid, sham, and readily manipulated investments in Lindberg Affiliates – left Northstar to fund its operations and policyholder redemptions with ordinary income, itself dwindling, and illiquid capital of uncertain value.

1165. During Lindberg's 2004 Examination he invoked his Fifth Amendment privilege against self-incrimination when asked whether it was true that he diverted over $200 million of Northstar's liquid assets for his personal purposes or to prop up other Lindberg affiliates. Lindberg 2004 Examination Tr., at 109:11-15.

1166.  By February 2019, Northstar's liquid reserves from BlackRock were gone.

1167.  Within a month of transferring Northstar's assets to the HSBC Account, Bostic relayed to Northstar's management team that there were plans to completely "invest" the "majority of the remaining available cash" in "private placement debt offerings" — principally, if not exclusively, loan transactions with Lindberg Affiliates. The improper allocation of assets was not lost on employees of Global Growth because Northstar's management team put Bostic on notice when Lynn Superina ("Superina")—Northstar's Senior Vice President, Financial Controller and Compliance Officer—acknowledged a "significant change in [our] investment portfolio will certainly be a focus for the auditors."

1168.  At Lindberg's direction, employees of Global Growth sold off all or almost all of Northstar's liquid investments, corporate bonds, and similar investments that conformed with insurance business investment standards and replaced them with non-conforming assets.

1169.  The proceeds from these transactions substantially were used to stanch the cash and liquidity failures of: (i) CBL, including in one instance, of many, on December 6, 2018, when Miller stated to Herwig that, "[we] need $31mm from Northstar just to meet December obligations and make the CBL equity infusion."; and (ii) other Lindberg Affiliates that were suffering from liquidity issues, including in one instance when Miller discussed with Lindberg moving money from Northstar to other Lindberg Affiliates in need of capital – whether to pay outstanding principal and interest that they could not pay, or to fund Lindberg's personal expenses.

1170. Global Growth executives acted without acknowledgment or attention to the adverse consequences to Northstar's reserves or the repeated concerns expressed by Northstar's executive finance team, including what, at a minimum, was the diminution of the quality of those

reserves for the benefit of non-Northstar insurers that had no obligation to Northstar or its policyholders and owners of similar financial products.

1171.  From the acquisition of Northstar on July 3, 2018, Global Growth executives quickly depleted the $200 million liquid reserve over the course of only seven months, turning that $200 million in liquid assets into illiquid, and difficult to value loans to private companies affiliated with Lindberg such as Triton Financial Limited ("Triton"); UKAT Interco Limited ("UKAT"); Atlanta TopCo Limited (UK) ("ATL"); and Beaufort Holdings, S.A. ("Beaufort"). The funds transferred from Northstar to other affiliates of Lindberg alleged herein, together with the specific sample transactions alleged herein, exemplify and substantiate the claims asserted by and on behalf of Northstar.

1172.  Within seven months after acquiring Northstar, Lindberg and Global Growth caused the majority of the liquid fixed income securities managed by BlackRock to be sold  and the proceeds to be invested in to other Lindberg Affiliates. Regarding "the cash needed for CBL equity infusion," Miller advised, "the additional Northstar sources that I show in the yellow highlighted area will come from Northstar investments purchased using proceeds from sale of their current bond investments." Superina consequently expressed liquidity concerns to Global Growth executives directly answerable to Lindberg, including Miller and Bostic:

> Given we have just invested the last of the bond portfolio amounting to $ 17 million of the Non- Trust Account I would like to have a call to discuss cash requirements of Northstar. Without these funds we currently have less to $ 2 [million] available to us for any fixed surrenders/withdrawals and opex [i.e. operating expenses]. Given the slow start to the year, the additional opex incurred and intercompany payments I am certain that we will need cash next week to make surrenders, withdrawal and opex requirements (in particular payroll which needs to go out next week). Considering we now have no bond portfolio to draw down on I would like to understand what the process is to obtain funds for the operations of Northstar [sic].

192

1173. In or about January 2019, Herwig, Bostic, Solow, Stewart and Johnson—an investment analyst at Global Growth—developed an "investment restructuring plan" to achieve better year-end ratings for the Lindberg-owned NCIC, each at the time in enhanced oversight with the involvement of Dinius of Noble on behalf of the NCDOI, whereby GBIG took Northstar's investment-grade holdings for the benefit of the NCIC, and replaced them with "lower rated US loans" held by the FinCos. Stated differently, the NCIC drained Northstar of its liquid assets to reduce their own affiliate/PPN exposure. One such transaction was the ATL Transaction, discussed *infra*, which was a "plan of trades to bring the 14 fincos[24] up to [investment grade]." To effect it, they proposed to "pull[] Damovo [ATL] pref[erred] out of Northstar and [Investment Grade] assets from [CAF]."

1174. Northstar's cash and liquid assets, all of which should have been held and made readily available to it to pay Northstar's policyholders and similar financial products owners when the corresponding obligations became due, was instead ransacked to stop the hemorrhaging of the other Lindberg Affiliates; to permit Lindberg Affiliates to skim transaction fees wrongly applied to these value-free deals for non-existent advisory services; to inflate asset values to create an illusion that the asset values with a Lindberg Affiliate that needed a boost was determined at arms-length, when the transactions in reality were between related parties; to inflate the company's balance sheet in an effort to mislead investors and regulators; to fund Lindberg's lavish lifestyle; to pay "advisory" fees to SASL and other Lindberg Affiliates; and to pay post-transaction bonuses to the Global Growth executives who answered to Lindberg.

---

[24] Chatsworth Asset Management, LLC; Damascus Asset Management, LLC; Ephesus Asset Management, LLC; Forest Park Asset Management, LLC; Gilford Asset Management, LLC; Iron City Asset Management, LLC; Jackson Asset Management, LLC; Kite Asset Management, LLC; Lilly Asset Management, LLC; Marshall Asset Management, LLC; Paradise Asset Management, LLC; Rockdale Asset Management, LLC; and Tybee Island Asset Management, LLC.

1175.  The following specific representative transactions substantiate the allegations in this Complaint, including as they concern Northstar.

**Triton Transactions**

1176.  On December 4, 2018, Bostic directed Northstar to transfer $5,728,000 to Global Growth in order for Northstar to purchase preferred equity in Triton – a Lindberg Affiliate that acts as the holding company for all GHTG foreign entities, comprised of various portfolios and companies that operate in the healthcare, finance, and technology industries ("Triton Preferred Equity"). This transaction was a loan papered as a preferred equity investment, and a way to move cash around among the Lindberg Affiliates, as Global Growth executives often did.

1177.  Although on paper Northstar invested in Triton Preferred Equity, Global Growth's North Carolina Treasury team immediately directed the cash to Global Growth.

1178.  Global Growth simultaneously repaid an intercompany loan it owed to GBIG Holdings, still another Lindberg Affiliate, and the ultimate holding entity for the NCIC.

1179.  Over the course of seven days—December 6, 10, 11 and 13, 2018—Johnson and a team at GBIG Holdings papered four separate transactions—$4,000,000, $1,000,000, $400,000, and $400,000, respectively—back to Global Growth. The $4,000,0000 transfer on December 6, 2018 was recorded as a LTS. This LTS was problematic because (i) Global Growth does not own GBIG Holdings so recording a transaction as a LTS is incorrect; and (ii) a LTS from GBIG Holdings to Global Growth was a self-interested transaction that ultimately went for the benefit of Lindberg, and was never repaid to the loaning entity.

1180.  After Global Growth received the $5,800,000 from GBIG Holdings, Bostic then orchestrated transfers to plug holes at other Lindberg Affiliates and pay bonus compensation for executives that had no connection to Northstar.

194

1181. First, among other things, the Senior Decision Makers, namely Lindberg and Miller, extended a short-term loan dated December 6, 2018 valued at $2,500,000 to Century Vision Global, LLC ("CV Global")—a Lindberg Affiliate—to fund an executive bonus, for the same amount, to Michael Gallup ("Gallup").[25] There was no legitimate transactional or other business nexus between Northstar and CV Global. Instead, Northstar, as an available cash cow, had its cash misappropriated. The JPLs' available books and records provide no record of the repayment or other disposition of this first transaction.

1182. Second, Miller directed Global Growth to settle an intercompany payment of $1,200,000 dated December 6, 2018 to SFL—another Lindberg Affiliate—used to fund payroll and other operational expenses of Lindberg's other affiliated corporate service entities, such as Eli Research India Private Limited ("ERP Ltd."). Again, there was no legitimate transactional or other business nexus between Northstar and SFL, nor between Northstar and ERP Ltd. The JPLs' available books and records provide no record of the repayment or other disposition of this second transaction.

1183. Third, Lindberg extended three different LTSs dated December 7, 2018, December 11, 2018 and December 13, 2018, valued at $400,000, $450,000 and $410,000, respectively to Dunhill – one of Lindberg's most used Personal Expense Companies. Its revenues in substantial part were used to pay Lindberg's personal expenses. There was no purpose consistent with Northstar's business – particularly its obligations to policyholders and owners of similar financial products – for its cash and liquid assets to be used to fund Dunhill. The only apparent reason for it was that there was a need for cash, and Northstar was an available source of liquidity perceived at headquarters to be ripe for raiding.

---

[25] Gallup was the Portfolio Manager and CEO of the CV Global Portfolio.

1184. Lastly, on December 10, 2018, the Senior Decision Makers extended cash to IMW EMR, LLC ("IMW EMR"),another Lindberg Affiliate to make a payment of $895,507 to provide IMW EMR with the requisite funds to settle the principal and interest payments that was owed to CBL on two unrelated loans.

1185. Without the $5.8 millionpaid to Global Growth by GBIG Holdings, there would not have been sufficient funds to make the four payments detailed above.

1186. The first Triton Preferred Equity transaction described, in summary economic terms, involved the following:



1187. Not satisfied with one sham preferred equity investment in Triton, at Bostic's direction, on January 15, 2019, Lindberg and the Senior Decision Makers caused Northstar to acquire $17,000,000 worth of Triton Preferred Equity from Triton.

196

1188.  On the same day that "deal" closed, Triton transferred $17,000,000 to CAF V, a Lindberg Affiliate.  CAF V then transferred on January 15, 2019 the same $17,000,000 amount to AFA, still another Lindberg Affiliate. On January 15, 2019, AFA then paid GBIG Holdings $11,300,000. AFA held the remaining $5,700,000 of that amount to pay its outstanding operating expenses, or fund one of Lindberg's AFA sweeps and divert the funds to him.

1189.  GBIG Holdings was just another shell, however, in the progression of Lindberg Affiliates through which Northstar's $17,000,000 passed as an "IC" (intercompany loan) on January 15, 2019 as part of the Triton "deal."   Of the $11,300,000 paid to GBIG Holdings, $10,825,000 then was transferred to Global Growth, and then subsequently allocated to Lindberg's Personal Expense Companies and other Lindberg Affiliates to fund payroll and various otherwise unspecified "funding needs." Notably, over $1,700,000 went to Dunhill, and $100,000 was transferred to Apex.

1190.  The remainder of the $10,825,000 went to fund other Lindberg Affiliates that needed capital, but could not raise it themselves. For example: (i) over $2,500,000 went to GB Capital, LLC, a Lindberg Affiliate, for payroll expenses and bonuses including to Herwig, Solow, and Bostic; (ii) over $1,100,000 to Eli Research, LLC, a Lindberg Affiliate, for unspecified "funding needs"; (iii) over $650,000 to Metronome Financial, LLC, a Lindberg Affiliate, for payroll expenses; (iv) over $600,000 to Carolina Longevity institute, LLC, a Lindberg Affiliate, for unspecified "funding needs"; and (v) over $700,000 to CV Global LLC a/k/a Century Vision Global, LLC, a Lindberg Affiliate, for payroll expenses and bonuses.

1191.  None of the transactions that Northstar funded with its $17,000,000 of reserves, on information and belief and after examination of Northstar's available books and records, were for the benefit of Northstar and its obligations to its policyholders or owners of similar financial

products. No interest, consideration, dividend or fixed rate fee was paid to Northstar for advancing funds to Lindberg Affiliates, or after they were sent to them.

1192. The second Triton Preferred Equity transaction described, in summary economic terms, involved the following:



1193. Northstar's liquid assets in this circumstance $17,000,000 existed because policyholders paid premiums and the reasonable equivalent for other financial products sold by Northstar, and trusted Northstar to use that money to remain in a position to honor its corresponding obligations. These obligations were violated by Lindberg and the executives in

North Carolina directly answering to him. Both Triton transactions were proximate causes of Northstar's damages.

### UKAT Transactions

The following representative transaction was contemplated in connection with the Senior Decision Makers' efforts to capitalize CBL with the $83 million dollars from Northstar described *supra*.

*Fraud*

1194.  On October 16, 2018, Bostic and Solow caused Northstar to wire $18,525,987.00 to AFA—a Lindberg Affiliate—for the purchase of its preferred equity interest in UKAT, another Lindberg Affiliate ("UKAT Preferred Equity"). Northstar was compelled to purchase the preferred equity interest at an inflated price, in a deal that was anything but the arms-length transaction as presented.

1195.  Lindberg, Herwig, Solow, Miller, Bostic and Stewart (Chief Financial Officer of GBIG) all materially participated in the structuring, negotiation and ultimate authorization of this transaction, despite the numerous concerns raised as to its propriety.

1196.  In a September 6, 2018 email, Stewart advised Bostic, Herwig, Solow, and Paul Brown, "[w]e have stopped all affiliate investments from the insurance companies at this time so we should not execute this [UKAT] transaction."

1197. On September 10, 2018, Stewart expressed further concerns about Northstar's liquidity, the use of a PIK [i.e., payment in kind] structure, and Northstar's ability to pay the same. Specifically, Stewart advised: (a) "[Northstar's] liquid assets have dropped significantly and if all the proposed investments are completed then we would be below 10% in liquid assets"; (b) "[t]he majority of the new investments are PIK (or have a PIK option) so this will further

199

pressure liquidity"; and (c) "[t]he Beaufort investment is preferred stock into the holding company for GB Life[26] so it will have no ability to pay interest for the foreseeable future."

1198.  Edwards, GBIG's Chief Legal Officer, echoed Stewart's concerns, and advised in a September 10, 2018 email, "[b]ased on these concerns," that they should not execute these transactions. Edwards reiterated his position in an October 5, 2018 email that it was "not Ok to proceed" with the UKAT transaction.

1199.  Despite the contrary advice and misgivings, Lindberg intervened and approved the proposed UKAT transaction, which Bostic conveyed in an October 15, 2018 email, "Upon Greg's approval, please send the below wires. . . . Wiring to [AFA] for purchase of [UKAT] preferred equity: $18,552,987.48."

*Subsequent Transferee(s)*

1200.  In an October 12, 2018 email to Miller, Bostic, and other Global Growth employees Clint Dobson ("Dobson") and Carson McGuffin ("McGuffin"), Solow explained the intent behind Northstar's purchase of UKAT preferred equity, which was to transfer funds to GBIG Holdings to close out intercompany debts.

1201.  In a follow up email to the same parties, Solow wrote "IF [sic] we can get cash in either AFA or GIC, then we can dividend up to [Global Growth] and partially close out the [Global Growth] to [GBIG Holdings] I/C."

1202.  On October 17, 2018, Miller directed the transfer of the "$18M received from AFA . . . to SNH [GBIG Holdings] as repayment of outstanding IC." The remaining $525,981 became part of a $1,500,000 transfer—at the direction of Lindberg, upon information and belief—from AFA to New Hill, a Personal Expense Company, and pass-through entity Lindberg

---

[26] "GB Life" refers to GB Life Luxembourg, S.A.

used to move funds from Global Growth to other Personal Expense Companies such as Dunhill or South Hill. In this instance, New Hill wired $1,505,000 to Dunhill on October 18, 2018.

1203.  Between October 23, 2018 and October 29, 2018, GBIG Holdings redistributed portions of the $18 million received from AFA as part of the following transactions:

- $13,400,000 to AFA for the purchase of preferred equity in AGH Parent, LLC ("AGH");

- $4,000,000 as a loan to Global Growth, Inc. for funding needs;

- $3,000,000 to Global Growth for additional funding needs; and

- ███████████████████████████████████

1204.  The $7,000,000.00 transferred to Global Growth was then distributed to several other Lindberg Affiliates, including Dunhill, through over twenty (20) transactions, executed between October 26, 2018 and October 29, 2018.

1205.  The UKAT Preferred Equity transaction described, in summary economic terms, involved the following:



SL1 1812077v17 114825.00001

1206.  Given the elaborate corporate structure whereby UKAT was positioned three (3) companies away from the operating (and therefore cash generating) companies, any potential dividends were dissipated well before they were able to be paid to Northstar.

**Organizational Chart**



UKAT Interco Limited

UKAT Investments Limited

UK Addiction Treatment Group Limited

OpCos

1207.  Lindberg and the Senior Decision Makers collected inflated management charges and fees at entities below UKAT, thus removing returns to Northstar.

1208.  On July 5, 2019, on the direction of Lindberg, UK Addiction Treatment Group Limited ("UKAT Group")—a company beneath UKAT, and therefore closer to the operating companies—wired the sum of £484,026 (GBP) to Acquired Development—a Lindberg Personal Expense Company. A further £4,200,000 (GBP) was wired by UKAT Group to Acquired Development and AYC Holdings—also a Personal Expense Company—between August 2019 and July 2020.

1209.  These further wires were expressly authorized by Lindberg as per UKAT Group Board Resolutions which he resolved and signed. To date, no dividends have been paid to Northstar, nor is there evidence of repayments from Lindberg's Personal Expense Companies or any of the UKAT group of companies.

202

1210. Effective December 13, 2021, the corporate structure of the UKAT group was amended to the detriment of Northstar's preferred equity. Prior to the restructure, UKAT was positioned three (3) companies away from the operating companies. Following the restructuring UKAT is positioned five (5) companies and one (1) trust away from the operating companies. This restructure further separated UKAT from the cash generating entities and has added layers in which cash and dividends can be dissipated, similar to the $606,000 transferred to Acquired Development, prior to any transfer to UKAT. Also, the Trust was also created to provide a separation between the UKAT group and Lindberg.

**Organizational Chart**
**(Effective December 13, 2021)**



UKAT Interco Limited

UKAT Parent, LLC

English Governed Trust
(US Trustee Steve Wilson)

UKAT Holdings, LLC

UKAT Investments Limited

UK Addiction Treatment Group Limited

OpCos

203

1211. Lindberg and the other Senior Decision Makers carefully crafted the organizational structure to further divert funds from Northstar to other Lindberg Affiliates. The UKAT transaction was a proximate cause of Northstar's damages.

**ATL Transactions**

1212. ATL was incorporated under the U.K. Companies Act 2006, on June 4, 2018, by Inhoco Formations Ltd., a commercial support services company. Thereafter, on June 26, 2018, Ashley K. Pittman, an attorney at Hutchison, filed articles of organization with the North Carolina Secretary of State on behalf of UK Atlanta Holdings, LLC ("UKAH"). UKAH is a wholly-owned subsidiary of Global Growth, which in turn is wholly-owned by Lindberg. On or about, July 9, 2018, UKAH acquired 100% of the ordinary shares in ATL. Thus, Lindberg was the ultimate beneficial owner of ATL. The Notice of Individual Person with Significant Control filed with the U.K. Companies House confirms this point.

1213. The purpose of ATL's formation was to be a vehicle to purchase shares in Damoco Holdco Limited's U.K. and European subsidiaries, as well as all European intellectual property relating to the Damovo name and branding. The acquisition was completed on August 23, 2018, at which point ATL became the ultimate parent company of the group of subsidiaries commonly referred to as the Damovo Group. To facilitate these transactions, Solow and Lindberg caused Northstar to purchase 5,308,411,615 preferred shares of ATL, for a subscription price of $0.01 per share, each with a nominal value of $0.01 for a total subscription price of $53,084,116.15 (the "ATL Purchase").

1214. Although Northstar received preferred equity in ATL, presented as a well-reasoned investment for Northstar, the evidence available to the JPLs shows that this transaction was engineered to provide liquidity which enabled Lindberg to acquire and achieve control of the

204

Damovo group of companies, not for the benefit of Northstar or its insureds. Indeed, insurers such as Northstar must maintain a portfolio of liquid assets to satisfy obligations held to their insureds – a fundamental element for an asset held by an insurer in respect of obligations to its policyholders and holders of similar financial products – not "equity" in a company with no ready market.

1215.  The following exchange on or about August 13, 2018, among Herwig, Solow and Harihara, an employee at GB Capital, underscores the point:

| | |
|---|---|
| **Herwig:** | Devin, how much do we need for Damovo and First Scottish. |
| **Solow:** | About 70mm total, so we should be good. It might be nice to throw something else in there such as Greenfield. |
| **Harihara:** | When do you want this done by? |
| **Herwig:** | We could buy it and just bank on the DOI [NCDOI] allowing us to do another PPN [i.e., Preferred Principal Note]. Could we close it by Friday if we pull the trigger Wednesday? |
| **Harihara:** | You mean the rated PPN? No way. . . . |
| **Herwig:** | Devin, is the 20th a hard date? Can live without the structure being rated but need the structure in place. |
| **Solow:** | We have to fund the UK deals on the 17th. Maybe we can convince Greg [Lindberg] to let us warehouse the loans at Northstar? |

1216.  Thereafter, Johnson prepared closing instructions and a "playbook" for the transaction. The closing instructions provided:

(1) Treasury to do a test wire to Addleshaw Goddard LLP [a law firm] Euro Client Acc ending ****8788.

(2) Eric to send signed SPA for Northstar to purchase Damovo Preferred shares.

(3) Steps 4-8 are on behalf of [UKAH].

(4) Upon Greg [Lindberg]'s approval, Lynn to wire $45,854,004.41 from Northstar to 53rd FX [foreign exchange] account ending ****9427.

SL1 1812077v17 114825.00001

(5) Devin to confirm FX at 53RD [financial institution].

(6) 53rd FX to wire EUR 39,873,047.31 to Addleshaw Goddard LLP Euro Client Acc ending ****8788.

(7) Lynn to wire $7,230,111.74 from Northstar to SICL Wells [Wells Fargo] account ending ****9188.

(8) Treasury to send $1,150.00 from [Global Growth] Wells to SICL Wells account ending ****9188. This is LTS and APIC to [UKAH] in order to pay fees.

1217. No more than two (2) months after the transaction closed, Burkhart Böttcher, CFO of Damovo Group, contacted Miller, indicating that its "current funds and cash flow plan" did not allow for a €950,000 payment that was then due to Ares (lender of Damovo), and requesting that funding "be provided from a different source, *e.g.*, our shareholder [Northstar]." At that time, Damovo was seeking a €5 million Revolving Credit Facility ("RCF"), and had asked that Global Growth provide a letter of support. Mr. Böttcher explained:

> The letter would have to be issue [sic] by one of the ELI companies where the creditworthiness can be checked by a bank (or we are able to deliver the evidence of such easily). We are assuming that - If the letter was issued by one of the ATLANTA or DAMOCO entities in UK (see attached corp org chart) - it will not be accepted by the bank as these companies have basically no substance.

1218. Miller separately forwarded Mr. Böttcher's correspondence to Solow, commenting: "They just keep coming. Another company that cannot make their debt payments. Looks like we need to add this to our list of urgent cash needs," to which Solow responded, "[c]an we get 1mm euro worth of pref out of NS [Northstar]?" Miller confirmed, it "[s]hould not be a problem."

1219. Reasonable diligence performed before the acquisition of $53 million in ATL preferred shares would have disclosed the acquired company's inability—only two months

later—to satisfy a payment representing a fraction of Northstar's investment. That especially is true, and nearly self-evident, because ATL, UKAH, Global Growth and Northstar all were Lindberg Affiliates.

1220. Nevertheless, on November 20, 2018, Northstar and Damovo Deutschland GMBH & Co. KG executed an Intra Group Loan Agreement, whereby Northstar loaned $1,200,000 to Damovo. Northstar's cash and liquid assets were entrusted to it by policyholders via premium payments and the equivalent for financial products to pay Northstar's policyholders when needed, not to satisfy the debts or fund the expenses of these Lindberg Affiliates.

1221. Additionally, as part of the ATL closing, Northstar paid to SICL—a Lindberg Affiliate—$7,230,111.74 in M&A Advisor Fees.[27] The JPLs have not identified any agreements between Northstar and SICL identifying what services, if any, were actually rendered to Northstar to warrant payment of these fees, which represent nearly fourteen percent (14%) of the purchase price.

1222. The following Global Growth employees also received bonuses in connection with the ATL Purchase: (a) Solow ███████; (b) Grant Powley ███████; (c) Bostic ███████; (d) Dónal O'Sullivan ███████; (e) Joseph Bennett ███████ and (f) Herwig ███████. Any additional bonuses paid to Solow, Bostic, or the others by SASL presently are unknown to the JPLs. The JPLs have not identified from the books and records made available to them or from extensive pre-complaint Rule 2004 examinations and document productions from the Lindberg Affiliates any objective rationale for the payment of these bonuses, other than to pay the complicit executives involved for their contributions to this scheme. The following discussion between Solow and Powley is illustrative of this point:

---

[27] Miller was a director and authorized signatory of SICL.

| | |
|---|---|
| **Solow:** | You have to tone these down. They are too high. Can you also clarify what you were doing on some of these vs Henry [Komansky]? |
| **Powley:** | Does this work? Can you make sure this on 9/7?<br><br>  - I took out Damavo and First Scottish because I mainly just reviewed Greg [Lindberg]'s final package<br><br>  - Trimmed down USAP by $1.25k |
| **Solow:** | This is still too high. Can you clarify what you did on UKAT and NPC vs Greg [Lindberg]? USAP bonus should be less. The final memos were not ready in time for the call with the regulators. Probably not going to make it on 9/7 at this point. |

1223.  When questioned under oath about the bonus paid to him in this or a similar circumstance, Solow answered with an invocation of his Fifth Amendment privilege against self-incrimination.

1224.  In or about January 2019, Stewart, Herwig and others developed an "investment restructuring plan," whereby GBIG swapped Northstar's investment-grade holdings with "lower rated US loans" held by the FinCos, to achieve better year-end ratings for the Lindberg-owned NCIC. On February 6, 2019, Johnson advised Solow and Dobson:

> "We are doing 60+ cashless trades today to diversify the fincos and raise their ratings. As part of this plan, Northstar will be trading $12.8M of SMHL [Standard Malta Holdings Limited][28] debt (Malta) and the equivalent of $50.5M of Damavo pref (UK). NS [Northstar] will receive US debt in exchange for these assets."

1225.  On February 7, 2019, Herwig and Miller caused Northstar to execute four (4) Assignment and Assumption Agreements with Jackson Asset Management ("JAM"), Lilly Asset

---

[28] SMHL is a wholly-owned subsidiary of Malta Insurance Holdings, LLC, which in turn, is wholly-owned by Lindberg. SASL is a wholly-owned subsidiary of SMHL.

Management ("LAM"), Marshall Asset Management ("MAM") and Tybee Island Asset

Management ("TIAM"), assigning its Preferred Interest in ATL.[29]

1226.  As explained by Stewart:

"Damovo would keep 3 more fincos from being non-IG [investment grade]. Damovo is BBB in this methodology and is being swapped in for ~50mm of B rated assets. B rated assets have ~10x the negative impact on the portfolio when compared to BBB."

1227.  Johnson similarly explained:

"[A]nything that moved out of CAFs/NS went to the fincos in exchange for the B rated assets. Northstar has more diversity in their BS [balance sheet] after but, they are lower rated US credits being swapped in."

1228.  The ATL transaction described, in summary economic terms, involved the

following:



---

[29] NFIS, a wholly-owned subsidiary of Northstar, was incorrectly listed as the assignor on the Assignment and Assumption Agreements. This error was ultimately discovered and resolved.

SL1 1812077v17 114825.00001

1229. Later that year, Grace Edy, a Northstar financial consultant, emailed Julia Hawkins ("Hawkins"), a financial controller for Northstar, and Bostic, identifying a $1,415,834.11 difference between the $53,084,116.15 opening balance of the ATL Purchase, and the $51,668,282.04 exchange of assets in February 2019. Edy advised, "[w]e have a missing trade (sale of assets) of $1,415,834.11 in addition to one trade (with TIAM) having a differing value than the $15,935,532.74 noted in the workbook (signed contract has $17,100,907.51)."

1230.  In July 2020, Bostic responded, in part, to Edy's concern by writing to Solow:

> "What do you think here? The finco rerate trades apparently traded away from Northstar amounts that didn't equate to the assets they got back. Specifically there were multiple AGH Parent/Agera assets that should have been assigned into Northstar that the legal docs don't show. Should Northstar book a receivable for this amount?"

1231. Bostic provided additional information to Solow later, enclosing an email from Surinder Jain, an accountant at Global Growth, that "no receivable [was] required."

1232.  The ATL transaction was a proximate cause of Northstar's damages.

**Beaufort Transactions**

1233.  In 2018, Lindberg and his Senior Decision Makers caused Northstar to expend $24 million in cash and cash equivalents to acquire preferred equity in Beaufort—a Luxembourg entity owned by and affiliated with Lindberg, and which serves as a holding company for GB Life, another insurance company owned by Lindberg. There was no legitimate economic purpose in the context of Northstar's business and its obligations to its policyholders to execute such a transaction.

1234.  The preferred equity in Beaufort was illiquid and incapable of a prompt and reliable valuation. It lacked any sort of meaningful exchange or market in which to trade, either to understand or to realize its actual value. That included the absence of a market to test the value

210

ascribed to it by Lindberg himself, businesses affiliated with him, or executives dependent upon him.

1235.  None of those failings caused anyone involved with the transaction to question its legitimacy, challenge it, or put a stop to it. Those persons specifically included Lindberg, Solow, Bostic, Miller and Herwig, and those who worked for them and with them, together with the entities that permitted them to hold offices and employed them.

1236.  On October 23 2017, Lindberg, through SFL, a Lindberg Affiliate, extended a loan in an aggregate principal amount of EUR 14,231,000 to Beaufort. As per the terms of the Loan Agreement dated October 23 2017, the accumulated interest was capitalized on an annual basis and payable on December 31st of each year until the maturity date of October 23, 2027.

1237.  Shortly after, Lindberg caused CBL, a North Carolina domiciled insurance company owned by Lindberg, to assume the loan to Beaufort from SFL. This affiliated investment, among others, caused the NCDOI to ultimately subject CBL to administrative supervision in October 2018. The administrative supervision itself was enhanced oversight and scrutiny from the NCDOI and Dinius (then acting as an appointed Supervisor) due to its poor financial condition.

1238.  Lindberg, Bostic, and Solow developed a plan in October 2018 whereby Northstar's liquid policyholder reserves were raided to purchase a portion of this illiquid loan agreement from CBL for $6,000,000. In addition to this, the Senior Decision Makers caused Northstar to purchase 14,519 shares of preferred equity issued by Beaufort, then owned by SFL for $18,032,178.25 to enable SFL to declare a $16,000,000 dividend to Global Growth.

1239.  Global Growth used this dividend to settle an intercompany debt owed to GBIG Holdings.

211

1240.  GBIG Holdings ultimately used this $16,000,000 to make a capital infusion to CBL on December 31, 2018.

1241.  The proceeds received from Northstar from these transactions were substantially used to ameliorate the cash flow and liquidity concerns of CBL. In one instance, on December 6, 2018, of many, Miller confirmed to Herwig that, "[we] need $31mm from Northstar just to meet December obligations and make the CBL equity infusion."; and (ii) other Lindberg Affiliates that were suffering from liquidity issues, including in one instance, of many, when Miller discussed with Lindberg moving money from Northstar to other Lindberg Affiliates in need of capital as an asset appropriate to secure CBL's obligations to its policyholders. Such transfers were ultimately done to stop the further hemorrhaging of the NCIC that were quickly entering distress.

1242.  Solow appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court after he and an attorney appearing for him contested its issuance. Solow was represented by an attorney of his choosing throughout the oral examination. In response to multiple questions concerning the Beaufort-CBL-Northstar transaction and his involvement with it and knowledge about it, his answer to each question was an invocation by him of the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Solow 2004 Examination Tr., at 87:24-90:3.

1243.  On November 21, 2022, Herwig appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court after he and an attorney appearing for him contested its issuance. Herwig was represented by an attorney of his choosing throughout his oral examination ("Herwig 2004 Examination"). In response to multiple questions concerning the Beaufort-CBL-Northstar transaction, his involvement with it and knowledge about it, his answer to each question was to deny specific involvement or knowledge.

212

1244. How the Beaufort-CBL-Northstar transaction worked in 2018 when executed is illustrated in succeeding paragraphs. This includes, for summary purposes, the resulting investigation initiated by the Luxembourg regulatory authority after it learned about one aspect of it; and how Lindberg and those involved or aware of the original Beaufort-CBL-Northstar transaction compounded its wrongfulness in 2019 after the opportunity to sell a Portuguese affiliate at a substantial profit to Lindberg presented itself, and the Luxembourg affiliate including Beaufort was sold at a loss to reduce Lindberg's tax liability from the Portugal profit. In addition to the $10 million loss imposed on Northstar in 2019, pretextual explanations were proffered by Global Growth employees to the Luxembourg and Bermuda regulatory authorities.

a. On November 13, 2018, Lindberg caused CBL and Northstar to execute an assignment agreement. In it, CBL assigned its loan agreement with Beaufort to Northstar.

b. On November 14, 2018, Northstar transferred $6 million to CBL.

c. On November 30, 2018, SFL sold to Northstar 14,519 shares of Beaufort preferred equity with a value stated to Northstar of EUR 15,845,499.34.

d. On the same day, Solow and Miller instructed Bostic to cause Northstar "to send $18,032,178.25 to SFL USD account for the purchase of Beaufort preferred equity."

e. As a consequence of this "transaction" in 2018, Northstar was burdened with CBL's illiquid Beaufort preferred equity and drained of $18.032 million in liquid assets. It eventually (as explained more fully below) suffered a loss of more than $10 million, with the loss allocable to the Beaufort preferred equity one that should have been CBL's to bear.

SL1 1812077v17 114825.00001



**2018**

**CBL**

Assignment and Assumption
Agreement (Beaufort)                     $6,000,000 **[11-14-2018]**

**NORTHSTAR**

**SFL**

14,519 Preferred Equity
Shares in Beaufort                        $18,032,178.25 **[11-14-2018]**

**NORTHSTAR**

1245.  For Northstar and its policyholders, there was no legitimate economic purpose for the Beaufort transaction. There is no material contrary indication from the books and records available to the JPLs and the Debtors or the documents produced by the Lindberg Affiliates in response to a subpoena served in 2022, nor is there any contemporaneous objective, reasonably thorough, meaningful analysis that assessed and attempted to justify the transaction.

1246.  As a consequence of the Beaufort transaction in 2018, Lindberg, Solow, Bostic, and the others involved, while the NCDOI and Dinius administratively supervised CBL, harmed Northstar and its policyholders for the benefit of CBL and its policyholders. They did so, among other reasons, to reduce and relieve the adverse regulatory oversight applied to CBL in 2018 by its regulators in North Carolina.

1247.  Beaufort's involvement in the Beaufort-CBL-Northstar transaction in 2018 also raised a flag with the regulator of its parent or holding company in Luxembourg in 2019. One reason that the Luxembourg regulator raised a flag, on information and belief, is that it understood that Lindberg Affiliates such as CBL were already subject to heightened scrutiny

214

from the NCDOI. Stewart testified that news such as this traveled immediately though these sources throughout the marketplace. Stewart NC MOU Action Deposition Tr., at 50:19-21.

1248. In an email dated January 15, 2019, Casey Smith, compliance counsel at GBIG, advised Herwig that Lindberg and GBIG were contacted by the Luxembourg regulators for failing to request or obtain prior approval for the transfer of Beaufort shares to Northstar:

> We have been contacted by the CAA [Luxembourg insurance regulator] in regards to a transfer of shares of Beaufort from SFL to NFSB. Unbeknownst to us, we were required to obtain their prior approval before the transfer could occur due to their status as parent company of GB Life Luxembourg [S.A.]. **Once they learned that the transfer had already occurred they requested, among other things, the CVs [curriculum vitae] and their equivalent of a criminal background check for each director of Northstar Financial Services (Bermuda) Ltd. This request is time sensitive as they are very displeased that they did not give the proper approval**. The Bermuda resident directors will be providing a police report from their end but we need to do a criminal background check for you and Krishnan Harihara to provide alongside your CVs.

1249. By letter dated, March 7, 2019, Pieter Coopmans of GB Life proffered a response that the motivation to change the shareholding structure of GB Life was to "streamline the ownership structure of the insurance group by moving ownership from a servicing company to an insurance company, and reducing their footprint in Malta."

1250. The response was a *post-hoc* pretext, one lacking any factual basis within the Northstar books and records available to the JPLs, or within the documents produced in 2022 by the Lindberg Affiliates in response to Fed. R. Bankr. P. 2004 subpoenas authorized by the Court.

1251. Lindberg, Senior Decision Makers, and other Global Growth employees were not content to let rest the initial liquidity reduction and immediate economic loss imposed on Northstar from the 2018 Beaufort-CBL-Northstar transaction. In 2019, an opportunity was presented to Lindberg to sell Global Bankers Insurance Group Portugal ("GB Portugal") at a

215

substantial gain to him personally. Lindberg and the Global Growth investment team contemporaneously identified GB Life Luxembourg S.A. ("GB Luxembourg"), Beaufort's parent, as a group to sell at a loss to offset income tax liability to Lindberg that arose from the GB Portugal gain.

1252. Lindberg and the Global Growth investment team, seeing the personal gains involved from the GB Portugal sale, seized on the GB Portugal and GB Luxembourg sales to benefit themselves, without regard to the additional losses that were imposed on Northstar and the reserves it held and was obligated to maintain for the benefit of its policyholders.

1253. By email on April 2019, Lindberg and Matteo Castelvetri, CEO of GBIG, were engaged in a sale of GB Life and GB Portugal.

| | |
|---|---|
| **Castelvetri:** | We are likely to receive offers on Lux + Portugal in 10 days, ie sell our Lux holdco with GBLife and the PT contract in it. . . . The capital structure of Lux is 8m of equity from you, 14m prefs from Northstar and 14 m of senior debt in between Northstar, CBL and a FinCo. |
| **Lindberg:** | [Y]es suggest we find another buyer ASAP for Portugal. . . and if they want Lux too, then great. |

1254. In an email dated April 27, 2019, Miller wrote to Lindberg, Herwig, and Nordberg noting that the GBIG Portugal sale would "generate significant tax liability" that would be "offset" "if they sell GB Life at a loss."

1255. Following these exchanges, Lindberg wrote, unsurprisingly, to those in charge of what had become the rehabilitation of his NCIC that it had become "necessary" for Northstar to sell its preferred equity in Beaufort at a loss. The pretext proffered was Northstar's "liquidity needs[.]" Lindberg then explained that "[Northstar] sell its interest in GB Life to CBL and then CBL will receive the cash proceeds. . . [Northstar] would receive approximately $12M in cash for its interest."

216

1256. On August 15, 2019, the loss on the proposed transaction was questioned by James McLaren from the BMA, including because Northstar at the time was required to obtain advance written approval from the BMA for asset transactions such as the one contemplated involving Beaufort:

**McLaren:**    Is this a resulting approximate $10m loss on sale or has some other restructuring occurred since the April 2019 asset valuation listing?

**Herwig:**    The loss is from the sale. Given the cash restraint at Northstar we think it makes sense to take the loss in exchange for the cash.

1257. Despite knowing that such a loss further burdened Northstar, knowing his own personal involvement with the Beaufort-CBL-Northstar transaction in 2018, and knowing that the true motivation for the 2019 GB Life sale including Beaufort was to generate a loss to offset his GB Portugal gain, Lindberg sat silent, accepted approval from the North Carolina rehabilitators, again sacrificed Northstar's interest, and took a tax benefit for himself. Northstar's losing sale of its preferred shares in Beaufort closed in December 2019. That cemented Northstar's more than $11 million loss.[30]

1258. On information and belief, Herwig was compensated directly by SASL with bonuses, or indirectly with an aggregate bonus, for his participation in this deal. Stewart NC MOU Action Trial Testimony [Volume 2] Tr., at 28:11-29:20 (Herwig and Solow both had salary arrangements with SASL). Herwig was a Northstar director at the time of the Beaufort-CBL-Northstar transaction.

1259. Lindberg engineered the Beaufort-CBL-Northstar transaction in 2018, a transaction among other things that lacked an economic purpose beneficial to Northstar. It was an apparent scheme to reduce and relieve scrutiny on CBL from its regulators in North Carolina

---

[30] Beaufort/GB Life had a book value of $24,761,692, but Northstar only received $11,294,365.

and to create a tax loss to offset the tax gain from a separate deal around the same period, which he was to gain personally from. Northstar's liquidity crisis in 2019 was created by Lindberg raiding its reserves to fund transactions such as Beaufort-CBL-Northstar or the fact that he caused Northstar to sell Beaufort at a substantial loss within less than a year. The Beaufort transaction was a proximate cause of Northstar's damages.

### Northstar's Insolvency

1260.  After Lindberg's 2018 acquisition of Northstar, Lindberg and the Senior Decision Makers used Northstar as Global Growth's cash cow. By the first quarter of 2019, not more than seven months after acquisition, Northstar was on the verge of insolvency as a result of the improper investments in Lindberg Affiliates discussed herein plus numerous other examples.

1261.  On February 20, 2019, Superina expressed several issues to the Senior Decision Makers about Northstar's liquidity and investment strategy. She told Miller, "we have policyholder obligations and operational invoices to pay. From a reputational perspective if there is any concern about the liquidity of Northstar and its ability to meet operational and policyholder obligations we have a huge issue with the distribution firms, our staff and clients."

1262.  She also expressed concerns about the investment strategy post the BlackRock liquidation and asked to invest Northstar's money into more liquid investments as opposed to the Lindberg Affiliates, "In the past when we had cash requirements we were able to redeem bonds in the Blackrock portfolio and make any necessary operational and policyholder payments as and when they were due. It would appear that the nature of our business may not be suitable with the investments that we currently hold. Would it be possible to reinvest some of the Northstar assets into more liquid investments to illuminate and cash flow concerns? [sic]"

1263.   Superina told Miller that Northstar was not writing enough business to fund the outflow of the business [Northstar] – paying operational expenses, etc. She even went as far as to put Miller on notice of the potential regulatory issues, "should the BMA be made aware of any liquidity concerns[?]"

1264.   These concerns were left unanswered and ignored.

1265.   On February 22, 2019, after being ignored, Superina—expressed her concerns to White, copying Miller, about Northstar's liquidity: "Northstar has been settling the operational expenses of the other Bermuda entities (BMX, Omnia, PBLA and PHIHL) [sic] for the last few months and as a result this is significantly impacting Northstar's cashflow and ability to meet our own cashflow requirements. [sic]"

1266.   Superina further expressed concern about Global Growth's failure to timely reimburse Northstar's expenses, suggesting Lindberg and the Senior Decision Makers in North Carolina, and her team in Bermuda, "develop a process that works for all entities as the current process can no longer be sustained by Northstar as [Northstar does] not have the funds to make these payments."

1267.   This never happened.

1268.   Miller then forwarded this email exchange among White and Superina to Boug on February 25, 2019, with the transmittal email reading, "This is getting a bit tense," to which Boug responded, "Northstar has simply run out of cash and we now face not paying vendors or clients."

1269.   Paying surrenders and operating expenses out of its own funds became next to impossible in 2019 because its formerly liquid assets had been drained by Lindberg and the other

219

Senior Decision Makers in 2018, and Northstar was forced to rely on Global Growth for its liquidity, which was noted by the BMA during its investigation in April of 2019 (*infra*).

1270.  On June 25, 2019, Boug told Bostic, Miller and Herwig that "Northstar has barely enough cash to get through August."

1271.  Northstar was also likely balance sheet insolvent by the first quarter of 2019, considering the illiquid affiliated investments which the Senior Decision Makers caused Northstar to enter into between July 2018 and March 2019.

## VII.  Representative Transactions Causing Harm to PBLA

1272.  PBLA was incorporated in 2017. PBLA is a wholly-owned subsidiary of PBX Bermuda Holdings, LLC. PBX Bermuda Holdings, LLC ("PBX Bermuda") is wholly-owned by PBX Holdings, LLC ("PBX Holdings"). Lindberg holds 100% ownership in PBX Holdings and thus, the sole beneficial owner of these entities, each of which was formed and existed under Bermuda law during their ordinary operations.

### Repurchase Agreements

1273.  In one scheme, Lindberg and Herwig—acting through SASL—advised PBLA to purchase $96 million in illiquid, sham Repo Agreements. Lindberg Affiliates issued the Repo Agreements (collectively, the "Repo Counterparties").

1274.  A Repo Agreement is a short-term agreement to sell securities in order to buy them back at a slightly higher price. The one selling the Repo Agreement is effectively borrowing and the party buying it is lending, since the lender is credited the implicit interest in the difference in prices from initiation to repurchase. In effect, a Repo Agreement functions like a short-term interest-bearing loan that has collateral-backing. While Repo Agreements are similar to collateral-backed loans, they are actual purchases. However, due to their short term and temporary ownership, they are treated as short term loans for tax and accounting purposes.

220

1275.  Under the December 2017 Repo Agreements (defined herein), PBLA directly sent or caused to be transferred $96 million to five (5) different affiliated companies as Repo Agreements between December 27 – 29, 2018. In exchange, PBLA purportedly received an interest in identifiable underlying assets owned or controlled by each of the Repo Counterparties.

1276. The Repo Counterparties on the other side of PBLA uniformly agreed to repurchase the underlying assets from PBLA at a higher price within a short term after the involved Repo Agreement was issued to PBLA in exchange for PBLA's liquid capital. The promises were false. Lindberg and Herwig fully understood that fact when the promises were made or allowed to be made, and nonetheless caused, authorized, and permitted the transactions to be performed and remain on the books of PBLA for years, ultimately causing PBLA to become insolvent.

1277. Lindberg and Herwig knew when they directed authorization of the Repo Agreements that the underlying assets held by each of the Repo Counterparties were not liquid, low risk, or short-term investments. Lindberg and Herwig in fact knew, or had every ability and reason to know, that the Repo Counterparties had no intention or ability to satisfy their repurchase obligations to PBLA. After all, each often was an owner (in the case of Lindberg), officer, or director on every side of the deal, *i.e.*, PBLA's side; the Repo Counterparty's side; and SASL's side.

1278.  When the Repo Agreements approached their maturity date, Lindberg and Herwig merely "rolled forward" the maturity date. In the end, PBLA was left holding $96 million in illiquid, sham Repo Agreements while Lindberg, Herwig and the Lindberg Affiliates received cash or the reasonable equivalent. SASL, in addition, collected millions of dollars in investment advisory fees from its defrauded advisory clients.

SL1 1812077v17 114825.00001

1279. Solow and Bostic were generally responsible for sending CTAs, wiring instructions, underlying assets and Repo Agreements to Wilmington Trust with instructions to wire PBLA's funds to the Repo Counterparties. Herwig and White typically arranged the bank transfers from the Repo Counterparties back to Global Growth, in what, from the records made available to the JPLs from the Lindberg Affiliates, appears to have been elaborate round-trip transactions.

1280. The Repo Agreements were characterized as cash or cash equivalents on PBLA's balance sheets to falsely paint the picture of a healthy balance sheet to regulators and external investors. This, like other falsities, came to light following Lindberg's arrest on April 2, 2019.

1281. In an April 12, 2019 email, Henry Komansky ("Komansky"), Northstar's Money Laundering Reporting Officer, advised Miller, Boug and Nordberg that "the BMA twice said today that it is a criminal offence to misstate matters to the Authority, as they believe was done in some of the information given to them, especially in stating Repos as Cash. And they just wanted to make us aware and made it clear they were not going to refer the matter to the police at this time."

1282. Within days, the BMA imposed conditions to be added to the Certificates of Registration for PBLA, Omnia, and Northstar, including that the companies obtain prior written approval from the BMA before establishing bank accounts or moving assets, and restricting the companies from modifying the terms of their investments without prior written approval.

### December 2017 Repo Agreements

1283. As another example of the Repo Agreements and how the transactions worked, on December 27, 2017, PBX, as borrower, and SFL and SASL, as lenders, executed a Junior Loan Agreement. SFL and SASL collectively agreed to loan $95,794,077 to PBX. Specifically, SFL

222

loaned $83,974,077 to PBX in three (3) installments of $26,637,430, $28,743,620 and

$28,413,027, and SASL loaned $12,000,000 to PBX in one installment.

1284. On the transaction, Solow advised the attorneys at Hutchison, counsel for

Lindberg and Global Growth:

> We are looking to capitalize PBLA's Main custody account [non-Trust assets] with subordinated debt to PBLA's immediate parent in Bermuda. This will happen through 3 series of transactions, which are described in the attached excel file. The sub debt described in the file should be pari passu and have similar terms to the already existing sub debt at PBLA's parent. The assets described in the various tabs have back up data in the zip file. Peter [Nordberg]'s team will provide documentation on the underlying assets that are being repurchased. The CAM assets still need some clarity, but Surinder's team is working on this. If there are any questions about the assets, please direct them to Surinder and me.
>
> The basic flow of funds are SFL to [PBX] as debt, [PBX] to PBLA Main as APIC [additional paid in capital], PBLA Main to asset management companies as repos, asset management companies to AAI [Global Growth] as repos and then AAI [Global Growth] to SFL to settle IC [intercompany].

1285. Jeremy Freifeld, an attorney at Hutchison, relatedly advised the attorneys at

Appleby (Bermuda) Ltd.:

> Capitalization of Private Bankers Life & Annuity Co Ltd ("PBLA"). In this transaction, [SFL] (an Eli Global Malta company) will make a $27M loan to [PBX]. [PBX] will then make an additional paid in capital contribution to its subsidiary, PBLA. PBLA will then use these funds to purchase assets (a mix of loans and equity) from certain Eli Global companies, pursuant to repurchase agreements.

1286. On December 27, 28 and 29, 2017, SFL made each respective installment

payment by transferring the funds from its Wells Fargo Bank Account to PBLA Main's

Wilmington Trust Bank Account. SASL made its payment on December 28, 2017. The funds

were recorded as subordinated debt to PBX, which were subsequently paid to PBLA as

223

additional paid in capital but were never transferred to PBX. The original source of the SFL funds were two payments of $26,637,429.00 and $40,743,620.00, respectively, received from Global Growth to SFL for "payment of services."

1287.  Promptly thereafter, Lindberg and Herwig drained PBLA's balance sheet of liquid assets, filling it with sham Repo Agreements. On December 27, 28, and 29, 2017, PBLA executed fifteen (15) Repo Agreements with the following Repo Counterparties: (a) AFA; (b) GIC; (c) AFI; (d) CAM II; and (e) CAF I (the "December 2017 Repo Agreements").[31] Lindberg typically signed for both PBLA and the Repo Counterparty.

1288.  Under the December 2017 Repo Agreements, PBLA agreed to send the millions of dollars of liquid capital it had just received for purposes of capitalization to the Repo Counterparties—which were Lindberg Affiliates—and, in exchange, purportedly received an interest in certain underlying assets held by each of the Repo Counterparties, on the condition that the involved Repo Counterparty repurchased the underlying assets from PBLA, no more than 364 days from the effective date of the agreement, for a price equal to 104.5% of the purchase price.

1289.  Lindberg and Herwig each knew that the Repo Counterparties had no intention or ability to repurchase these assets, because they directed and caused the Repo Counterparties to transfer PBLA's liquid capital to another Lindberg Affiliate as, once again, other Repo Agreements.

1290.  No sooner than the ink had dried on the December 2017 Repo Agreements, each of the above-listed Repo Counterparties executed their own Repo Agreements with Global Growth (the "Global Growth Repo Agreements"), whereby the Repo Counterparties exchanged

---

[31] PBLA executed five (5) Repo Agreements each on December 27, 28 and 29, 2017, respectively.

SL1 1812077v17 114825.00001

cash for underlying assets held by Global Growth, on the condition that Global Growth repurchase the underlying assets from the Repo Counterparties, once again no more than 364 days from the effective date of the agreement, for a price equal to 104.5% of the purchase price. Again, Lindberg typically signed for both parties.

1291. Lindberg further directed Solow to document a $7,000,000 "fee" from Global Growth to Dunhill for "business expense reimbursement," which Lindberg processed. Dunhill then promptly transferred $6,800,000 back to Global Growth to be recorded as repayment of LTS. Global Growth, a frequent intermediary in Lindberg's diversions of funds via Dunhill for his personal use, then made transfers of over $6,200,000, to pay the expenses of various Lindberg Affiliates who needed cash.

1292. When the Repo Agreements approached their maturity date, Lindberg and Herwig—knowing that the Repo Counterparties did not have sufficient capital to satisfy their repurchase obligations—merely "rolled forward" the maturity date. In December 2018, PBLA was compelled to amend the December 2017 Repo Agreements, extending the repurchase deadline an additional 364 days (*i.e.*, 728 days in total), in exchange for a "fully-earned and non-refundable amendment fee equal to one percent (1%) of the Purchase Price." This fee was never paid to PBLA.

1293. Then, in February 2019, PBLA was compelled to replace certain original assets underlying the December 2017 Repo Agreements with new underlying assets, as the original assets had "lost value, [were] eliminated, or otherwise became unrecoverable." Bostic asked the attorneys from Hutchison to prepare the agreements. The resulting exchanges and scrutiny, *inter alia*, is probative of Lindberg's and his involved Senior Decision Makers' intent as to PBLA:

|  |  |
|---|---|
| **Hutchison:** | One of the key questions I need to understand so we can document is what is happening with respect to interest that would have |

225

accrued on the asset during the time it was not held as per the repo agreement? Meaning, are you making up that amount in cash? Are you asking the counterparty to forego accrued interest during that period of time? Other?

While I understand that given the rollover no payment may have been due on the date of rollover, in order to make the other party whole we are swapping in different collateral, but what is the backstop on the interest that would have accrued during the time the asset was moved and should not have been moved?

**Bostic:**            Can you just focus on the principal amounts being replaced? Maybe put in some language agreeing to waive any accrued interest that would have been owed? The issue with these questions is that some of the assets were redeemed and weren't in existence for the past couple of months, so there would be no accruing to speak of.

**Hutchison:**        Thanks Eric. We can focus on the principal replacement but we have to have consideration for the party waiving the breach. Why would the party who has lost out on the accrued interest waive the breach in favor of the party who was supposed to hold the assets (including interest accrual) during the term of the agreement waive? We cannot draft documents that are not enforceable because of lack of consideration. We are trying to explain the issues with questions and come up with solutions so we can prepare documents.

**Bostic:**            So PBLA is waiving the breach?

**Hutchison:**        PBLA agreed in the repurchase agreement to "hold any interest, dividends, or other distributions received with respect to the Assets in trust" for the repo party (AFA/CAM/etc). On the repurchase date, the repo party was supposed to pay PBLA for the Asset (including any interest/dividends that had accrued or been received in trust by PBLA). So if PBLA hold such proceeds in trust, then it would have breached this obligation that it owed the repo party. As a result, it would be the repo party potentially waiving this breach.

When you say the Assets were "redeemed", how were they redeemed exactly? For example, did the underlying borrower fully pay off its loan but instead of sending the proceeds to PBLA to hold in trust, the underlying borrower sent the money to the repo party? Or are you using the term "redeemed" more broadly? Please be specific.

226

| | |
|---|---|
| **Bostic:** | The repo counterparties (not PBLA) are getting consideration with respect to PBLA agreeing to renew these repos and not call them in. That would be adequate business reason to waive. |
| **Hutchison:** | Aren't the repo parties getting the consideration set out in the agreement? |
| | . . . . |
| | I understand the asset itself may be fungible and is being swapped out but we are trying to solve the interest accrual owed. |
| | If you can clarify one transaction for us both in terms of what's happened and what you are proposing to do about it we can document and solve the legal technicalities by suggesting solutions. |
| **Bostic:** | Is it set out specifically in the agreements that PBLA pays back the interest collected? I wasn't sure on that point in our review. |
| **Hutchison:** | Yes. |
| **Bostic:** | When the repo is renewed, repo counterparties paid PBLA 4% of the face amount and the cycle starts over. If you're saying that PBLA needs to net this out against the accrued interest on the underlying assets, then that is fine – we can make that change from a cash flow standpoint. |
| **Hutchison:** | Eric – Thanks. I think I see where you're going. Jennifer and I discussed and we need further details of exactly what transpired. Using one transaction as a representative example, I've gone ahead and described what I think may have occurred. Please confirm the following details of what transpired and respond to the inline comments. . . . |
| **Bostic:** | The assets underlying these repos weren't all paid off. Most were eliminated by way of mergers or otherwise lost value due to mergers/shifts in business strategy. So we need to put in assets that have equal value to the initial transactions. Can we not just put in simple waiver language and get these drafted? |
| **Hutchison:** | We need to understand in detail what happened and it's still not clear. So if there were several different reasons why the assets were eliminated, we need to understand each of those reasons, step by step. |

227

| | |
|---|---|
| **Bostic:** | For all of the assets, they were deemed as no longer recoverable. This is not the case only with SMHL [Standard Malta Holdings Limited] preferred equity - this ran into a regulatory issue on the transfer of shares. Please let me know what else is needed. |
| **Hutchison:** | How about this – we'll take a pass at preparing amendments to each of repurchase agreements. We'll have some comments for you in connection with sharing our drafts (to fill in a few points in the drafting), but at least this approach gest (sic) the documentation drafting process going. |

1294.  Bostic understood that his pretexts did not pass the smell test. Dispensing with the pretense of attempting to explain himself to his internal peers, Bostic emailed Solow and Nordberg and candidly disclosed his frustration, in this case with outside counsel that was so comfortable with Lindberg that a decades-old engagement agreement governed their ordinarily accommodating relationship with the Lindberg Affiliates:

> Is there any way we can get comfortable doing these internally? It's literally just amending these repos to change the exhibits showing which assets are being repoed. Kristi [Gilbaugh] had previously said you wanted Hutch to do it since they drafted initially but I'm banging my head against a wall here with them…

1295.  Ultimately, Hutchison agreed to draft the transaction documents, and PBLA was harmed as a result.

1296.  Separately, Bostic emailed Solow asking, "Can you confirm what happened with [New Hill], Eli R[esearch], and Global Growth which has caused us to have to remove those as repo collateral?" Solow responded, "They were viewed as no longer recoverable or we didn't want to have to recover the loan to parent, in the case of Global Growth Holdings/[Malta Insurance Holdings]."

1297.  In reality, the Repo Counterparties simply forgave the debt owed, either by email or in a written agreement, by continuing to carry the obligation on the books without action, by

228

rolling it over, or with a later repetition or variation on the same scheme until regulators, insolvency, indictments and convictions, or similar developments intervened.

1298.  As one example, New Hill and CAF I executed a Loan Forgiveness Agreement, whereby CAF I forgave $23,006,363.07 in outstanding indebtedness owed by New Hill. New Hill was an affiliated pass-through entity which Lindberg used to move funds from CAF I to Dunhill or other Personal Expense Companies. Notably, $13,460,000 of this loan served as the underlying asset for the Repo Agreement between CAF I and PBLA.

1299.  The Repo Agreements were proximate causes of PBLA's damages.

**SNA Capital Promissory Note**

1300.  On or about January 25, 2018, Lindberg and his involved Senior Decision Makers—including Herwig, Solow, and Bostic—caused PBLA's parent, PBX Bermuda to borrow $99 million from BRCB (Barbados) Capital, Ltd. ("BRCB"), yet another Lindberg Affiliate. The $99 million loaned to PBX Bermuda was, on paper, acquired for purposes of capitalizing PBLA, and recorded as additional paid in capital ("APIC").

1301.  In reality, this $99 million loan was part of a more elaborate ruse intended to convince the Nebraska Department of Insurance that GBIG Holdings—a Lindberg affiliate—was adequately capitalized such that it should approve GBIG Holdings' acquisition of Lincoln Benefit Life Company ("LBL"), a Nebraska insurance company.

1302.  Several months earlier, on October 1, 2017, GBIG Holdings executed a Stock Purchase Agreement (the "SPA") with Resolution Life L.P., Resolution Life (Parallel) Partnership, and SNH Acquisition, LLC (collectively the "Sellers"). GBIG Holdings agreed to pay $585 million for all of the outstanding capital stock that the Sellers held in LBL HoldCo,

229

Inc. ("LBL HoldCo")—the owner through an affiliate of all the issued and outstanding capital stock of LBL.

1303.   To fund this acquisition as they pursued it, Lindberg and his involved Senior Decision Makers intended to pillage the Debtors, specifically PBLA in this circumstance.

1304.   On January 24, 2018, Lindberg directed Solow, Nordberg and White to "document and move" $325 million in cash to "show [the Nebraska Department of Insurance] the bank balance on Friday for closing the LBL [transaction]."

1305.   Solow summarized more of the details:

> Plan is to loan [$]99 [million] from BRC Barbados to PBX Bermuda. PBX Bermuda is doing [$]99 [million] of APIC [additional paid in capital] to PBLA. PLBA [sic] is loaning [$]99 [million] to SNA Capital. Terms will be 8%, 20 year PIK [payment-in-kind] unsecured. Actual wire will go straight from BRC Barbados to PBLA since PBX Bermuda doesn't have an account.

1306.   The closing instructions signed by Solow and Lindberg on January 25, 2018 confirm this plan:

> For Capitalizing SNH [GBIG Holdings] on January 25, 2018
>
> 1. Eric [Bostic] will circulate final TCD [teller cash dispenser].
>
> 2. Peter [Nordberg] will circulate final loan docs.
>
> 3. Grant [Powley] will send CTA [commitment transaction advice], wiring letter and PBL[A] to SNA Loan Agreement to Wilmington Trust with instructions to wire money to the SNA Wells account from PBLA.
>
> 4. Sandi [White] will wire $99,000,000 from BRC (Barbados) Holdings Limited to PBLA Main Custody account. This should be documented as a loan to PBX Bermuda Holdings and additional paid in capital into [PBLA].
>
> 5. Greg [Lindberg] to approve wires sent from PBLA Main Custody account for $99,000,000 to the SNA Wells account.

230

6. Sandi [White] will transfer $312,000,000 from SNA Capital Wells to Southland National Holdings Wells as additional paid in capital.

1307.   Immediately after PBLA received the $99 million APIC, the Senior Decision Makers caused PBLA to loan the entire sum received to SNA Capital, which in turn, contributed the balance to GBIG Holdings as APIC. This allowed Lindberg and the involved Senior Decision Makers to show a boosted balance to the Nebraska regulators for purposes of advancing SNH's [GBIG Holdings'] attempted acquisition of LBL.

1308.   On January 25, 2018, Lindberg and his involved Senior Decision Makers caused PBLA to execute a promissory note (the "Promissory Note") with SNA Capital. Under the Promissory Note, PBLA provided $99 million in "credit advances" to SNA Capital (the "Credit Extension"). In return, PBLA took back a payment-in-kind ("PIK") promissory note, usually issued by companies at a higher rate of return as they lack the cash to pay interest in the short term.

1309.   On its face, the Promissory Note promised to pay eight percent (8%) interest compounded annually on the principal—although, twenty (20) years hence, or in 2038 when the principal and interest all came due at once. The Promissory Note was subordinated to conventional debt and mezzanine debt, and not backed by a pledge of assets. Further, the compounding of interest annually artificially inflated PBLA's balance sheet every year even though no loan proceeds would be received by PBLA for two decades.

1310.   Lindberg described the transaction and told Herwig, Stewart, Bostic and Solow, among others: "We just put $ 99 [million] into PBLA as APIC [additional paid in capital] as excess surplus. This is now a loan from PBLA to SNA for LBL purchase price. Need to move the cash today."

231

1311. Despite Lindberg's pleas to have Causey intercede with his counterparts in Nebraska in support of the acquisition—which ultimately led to Lindberg's federal criminal conviction in March 2020—the LBL deal went bust in Fall 2018. GBIG wrote to LBL's Nebraska regulator, advising that the deal "was terminated, effective Oct. 1, 2018, without explaining why." *See* Ted Bunker, *Global Bankers dropped 2 deals as word emerged of federal criminal investigation*, S&P GLOBAL (January 30, 2019), available at https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/global-bankers-dropped-2-deals-as-word-emerged-of-federal-criminal-investigation-49420976 ("[O]ne state official familiar with the case told S&P Global Market Intelligence via email that news accounts concerning a grand jury probe into Lindberg and Global Bankers 'may shed light on the decision.'"). In subsequent litigation, Lindberg blamed Causey. *See*, *e.g.*, *Global Growth, LLC, et al. v. Causey*, 1:20-cv-00248 (M.D.N.C.).

1312. The $99 million loaned by PBLA never was returned to it—Lindberg and his involved Senior Decision Makers kept it in North Carolina to pay pending expenses of other Lindberg Affiliates, with at least a portion of it, according to Solow, "swept away" by Lindberg for his personal enrichment, consistent with his usual practice in that regard.

1313. In April 2019, following Lindberg's indictment, Global Growth engaged Duff & Phelps, LLC ("Duff & Phelps") to prepare an Estimation of the Fair Value of Certain Investments as of December 31, 2018.

1314. On May 31, 2019, Taft Husley—a Duff & Phelps employee—asked Bostic and Henry Capants (a Global Growth employee and direct report to Bostic), "What is the liquidity position of [SNA Capital]? . . . is this security performing? . . . is [SNA Capital] current on all debt payments to date?"

232

1315. Capants answered falsely—whether by ignorance or intentionally—that: "[SNA Capital is] the holdco to our US insurance companies which all have large cash reserves. . . . The security held by PBLA is performing, [it] will be [payment-in-kind] until maturity. . . . [and] [SNA Capital] is current on all debt payments to date."

1316. This scheme benefitted Lindberg and the Lindberg Affiliates to the detriment of PBLA. The Senior Decision Makers caused PBX Bermuda to borrow $99 million for purposes of capitalizing PBLA, yet in less than twenty-four (24) hours, that $99 million was sent at the behest of Lindberg and his involved Senior Decision Makers to SNA Capital for the stated purpose of purchasing LBL. When that acquisition failed to close, Lindberg instead used the $99 million borrowed from PBLA to meet other Lindberg Affiliates' financial needs, and to bolster the financial condition of the involved Lindberg Affiliates for purposes having nothing to do with PBLA or its obligations, principally to ULICO as its reinsured. PBLA, moreover, was left with an illiquid asset, in this circumstance a $99 million Promissory Note that by its terms would not pay income or return principal for twenty (20) years.

1317. The SNA Capital Promissory Note was a proximate cause of PBLA's damages.

**PBLA ULICO Arbitration**

1318. On or about June 30, 2017, PBLA and ULICO entered into a coinsurance reinsurance agreement (the "Reinsurance Agreement") whereby PBLA (as grantor) agreed to reinsure certain policies issued by ULICO (as beneficiary). Under the Reinsurance Agreement, ULICO agreed to cede to PBLA, and PBLA agreed to reinsure, between seventy-five percent (75%) and one hundred percent (100%) of ULICO's obligations under certain insurance policies or annuity contracts written by ULICO, with the percentage of reinsurance depending upon the particular type of policy sold.

233

1319. In addition, PBLA was to fund the newly created PBLA ULICO Trusts, as security for the insurance liabilities covered under the Reinsurance Agreement. ULICO deposited a total of $531,371,518.98 into the PBLA ULICO Trusts. Under the terms of the Trust Agreements[32] creating and governing the PBLA ULICO Trusts, PBLA was required—among other requirements—to maintain a minimum reserve in the PBLA ULICO Trusts, and in the event either account fell below the minimum reserve, PBLA was required to replenish the same.

1320. PBLA, however, through its then-controlling owner, Lindberg—either directly or through Global Growth—drained over $524 million in cash-equivalent assets from the PBLA ULICO Trusts, and replaced these assets with investments in the Lindberg Affiliates, which were represented as viable investment vehicles to reinsure ULICO and/or to increase the benefit of the policyholders.

1321. These transactions, coupled with the negotiation and execution of the IALA and MOU—which encumbered and modified the terms of over $1 billion of debt and preferred equity investments held by the Debtors, necessary to satisfy each Debtor's obligations to its policyholders and creditors—caused the principal balance of the PBLA ULICO Trusts to fall below the required reserves, resulting in a lack of liquidity.

1322. By the end of 2018, ULICO began expressing concerns regarding the viability of these assets placed in the PBLA ULICO Trusts by PBLA.

---

[32] "Trust Agreements" means the reinsurance trust agreement and comfort trust agreement executed or about June 30, 2017, by and between ULICO (as beneficiary), PBLA (as grantor) and Wilmington Trust, National Association ("Wilmington") (as trustee) (the "Wilmington Trust Agreements"), and the reinsurance trust agreement and comfort trust agreement executed on or about February 16, 2018, by and between ULICO (as beneficiary), PBLA (as grantor), and BNY (as trustee).

SL1 1812077v17 114825.00001

1323.  On November 12, 2018, ULICO provided written notice to PBLA, and directed to Herwig, that it had failed to meet "certain contractual obligations" under the Reinsurance Agreement—notably, the requirement to submit a "Quarterly Report."[33]

1324.  Upon receiving the requested report, ULICO expressed concerns about the large number of affiliated investments. In a December 12, 2018 letter to PBLA, and directed to Bostic, ULICO requested that PBLA "confirm the amount of assets held on account that are considered interests of Eli Global or affiliates. . . . [as] [m]ost of corporate debt and additional investment authority assets seems that fall under that category."

1325.  Herwig responded in a December 17, 2018 email, advising:

> None of the assets in the trust fit the definition of affiliate as noted in chapter 6 which defines affiliates as being under common control. The SPV structure has been analyzed by Rexach and approved as not meeting the definition. There are other investments in the reinsurance trust that, although not in the SPV structure, are investments in entities whose common stock and thus control is held by a trust for whom the trustee is unaffiliated with Eli/Greg Lindberg.

1326.  Despite these assurances, ULICO remained concerned about the viability of the assets in the PBLA ULICO Trusts.

1327.  In early March 2019, before Lindberg's indictment, a meeting was held in Puerto Rico where ULICO reiterated its concerns regarding the assets in the PBLA ULICO Trusts to Lindberg and Herwig, present on behalf of PBLA.

1328.  Shortly thereafter, Lindberg was indicted by a federal grand jury. As consequence of the indictment, Lindberg was arrested on April 2, 2019, with the news rapidly spreading worldwide.

---

[33] According to a May 8, 2019 letter from ULICO to PBLA, PBLA failed to deliver the "Quarterly Reports" for the next three (3) consecutive quarters.

235

1329.  On June 11, 2019, ULICO notified PBLA—in a letter directed to Boug—that it was exercising its right to terminate the Reinsurance Agreement, and recapture all of the business ceded by ULICO.

1330.  Boug replied by letter dated July 12, 2019, presenting "two recapture options" for the "estimated liability" of "$657,793,432 with unamortized upfront expenses of approximately $32,028,646 making the approximate amount due $625,764,786."

1331. ULICO "strongly disagree[d]" with PBLA's calculations, and advised in an August 5, 2019 letter that it would "prepare and deliver to PBLA the exact calculation of the Recapture Amount."

1332. Thereafter, Lindberg proposed creating a recapture trust to hold assets as collateral for the recapture of assets in the PBLA ULICO Trusts.

1333. On August 19, 2019, PBLA and ULICO executed a "Recapture Trust Term Sheet" to restructure Lindberg's affiliated companies' debt to ULICO through the creation of the recapture trust.

1334. However, as Lindberg advised in an October 20, 2019 email, "ULICO consent is required before entering the MOU. . . [a]nd Noble consent is required for the asset swaps contemplated in the ULICO recapture." Neither consent was obtained and on October 25, 2019, A.M. Best downgraded ULICO's credit ratings.

1335. On January 16, 2020, ULICO sent PBLA a written notice of breach alleging, *inter alia*, that assets contributed to the PBLA ULICO Trust by PBLA were non-compliant with the BNY Trust Agreements. In particular, ULICO claimed that over sixty-five percent (65%) of the assets held in the Trust were loan obligations of PBLA's affiliated entities, and in simplified

terms that the interrelationship between lenders and borrowers was in violation of Puerto Rico law.

1336.  PBLA denied any breach. On January 27, 2020, ULICO initiated arbitration under the Reinsurance Agreement by written demand.

1337.  On May 29, 2020, the arbitration panel held a two-hour hearing on ULICO's motion for interim relief. Both parties were provided with full opportunity to explain their positions, submit arguments and evidence including documentary exhibits, respond to the adversary's presentations, and answer questions posed by the panel. PBLA refrained from material participation in the arbitration, arguing that the dispute was not subject to arbitration, and instead, litigation was the parties' recourse.

1338.  On June 2, 2020, the arbitration panel issued a written, reasoned award granting ULICO's motion for preliminary relief. It required PBLA as part of its award to deposit $524,009,051.26 in a separate bank account, maintained strictly to secure PBLA's obligations under the Reinsurance Agreement, and if necessary, for ULICO's payment of any liabilities incurred pursuant to ULICO's obligations connected with business ceded pursuant to the Reinsurance Agreement. PBLA was required to deposit the funds within ten (10) business days, after which date interest would run at six percent (6%) per annum.

1339.  In reaching its determination, the arbitration panel found that ULICO "clearly and convincingly . . . raised material issues concerning the type and value of the subject assets since late 2018" and "that PBLA's responses were neither timely, consistent, nor accurate." Specifically, the panel found that PBLA presented "outdated information" that failed to clearly explain the "true nature and fair market value of these assets [i.e., investments in Lindberg Affiliates]," or support its claims and the requirement that these assets conform to regulations.

237

1340.  PBLA, as a direct result, became obligated to replenish the PBLA ULICO Trusts with additional funds, which it was unable to do, resulting in, among other direct damages, a $524 million civil money judgment entered on August 11, 2020 in favor of ULICO against PBLA in the United States District Court for the Southern District of New York (Hon. Lewis J. Liman).[34] The District Court concurred with the arbitration panel's findings.

1341.  The same disabilities of proof that led to PBLA's original loss persist today, although all now involved on behalf of PBLA diligently are attempting to rectify them or determine reliably that they are unresolvable. The JPLs, as a result, are now left with the consequences of $524 million civil money judgment.

1342.  Lindberg and Global Growth's wrongful conduct, consistent with related examples alleged in this Complaint, caused this loss and damage.

**Satori Waters Transactions**

1343.  CBL held a term loan and revolver in a company called Satori Waters, a drug treatment facility located in Florida. CBL inherited its participation in the loan from original lender Alpine Capital, LLC in November 2016.

1344.  In January 2017, Satori Waters defaulted on the loan made to it by Alpine. Alpine sued Satori Waters later in October 2017. Alpine was a Lindberg affiliate.

1345.  That default and Alpine's lawsuit were initiated by Satori Waters' failure to comply with loan covenants.

1346.  The Lindberg Affiliates, acting principally through Solow for those entities and Lindberg, then intervened to bail out CBL with PBLA cash.

---

[34] *See PB Life and Annuity Co. Ltd. f/k/a Private Bankers Life and Annuity Co., Ltd. v. Universal Life Insurance Company*, 1:20-cv-02284-LJL, District Court Opinion and Order dated July 30, 2020, granting ULICO's motion to confirm the arbitration award and denying PBLA's cross-motion to vacate the arbitration award (S.D.N.Y. ECF

238

1347. PBLA received a "participation interest" in CBL's exposure to Satori Waters. That in effect as of calendar year-end 2017 took CBL off the hook as to Satori Waters for $3.7 million in principal and put PBLA on it.

1348. Satori Waters' difficulties and Alpine's lawsuit were reported directly and in unmistakable terms to Lindberg. The Lindberg Affiliates within a month caused PBLA to fund the bail-out of Satori Waters with $3.723 million of liquid reserves held by PBLA for the benefit of its reinsured, ULICO, and ULICO's policyholders.

1349. Solow appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court after he and an attorney appearing for him contested its issuance. Solow was represented by an attorney of his choosing throughout the oral examination. In response to multiple questions concerning the CBL-Satori Waters-PBLA transaction and his involvement with it and knowledge about it, his answer to each question was an invocation by him of the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Solow 2004 Examination Tr., at 124:24-125:8.

1350. Herwig appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court after he and an attorney appearing for him contested its issuance. Herwig was represented by an attorney of his choosing throughout his oral examination. In response to multiple questions concerning the CBL-Satori Waters-PBLA transaction, his involvement with it and knowledge about it, his answer to each question was an invocation by him of the privilege against self-incrimination provided by the Fifth Amendment to the United States Constitution. Herwig 2004 Examination Tr., at 120:5-121:4.

---

No. 47) and Final Judgment entered in the United States District Court for the Southern District of New York (Hon. Lewis J. Liman) on August 11, 2020 (S.D.N.Y. ECF No. 52).

SL1 1812077v17 114825.00001

1351.  Lindberg and those who acted with and for him in the CBL-Satori Waters-PBLA transaction knew that Satori Waters was in default or should have known. They knew or should have known that the risk associated with an investment in a loan to a distressed drug treatment facility, itself sued by another lender, was higher than the usual risk a responsible insurer or reinsurer should accept for the benefit of its policyholder(s). In an email dated March 20, 2019, Solow admits that "the loan was in technical default when it was bought, but not payment default. It went into payment default shortly after it was bought." In fact, a loan covenant tracking file which was understood to be created by Eli Global, suggests the loan had also been in payment default since May 2017.

1352.  There was no economic benefit to PBLA from using its $3.723 million to bail-out Satori Waters, Alpine, and CBL.

1353.  There is no indication from the books and records available to the JPLs and Debtors or the documents produced by the Lindberg Affiliates in response to a subpoena served on them that any diligence, basis assessment, analysis, or other reasonably appropriate investigation or inquiry was performed on behalf of PBLA to ascertain the propriety for PBLA of committing the reserves ceded to it by ULICO to the CBL-Satori Waters-PBLA transaction. At the time, the driving purpose of the transaction was to remove a loan from CBL's balance sheet that Lindberg expected to default, move PBLA cash to CBL for the full principal amount of the loan, and leave PBLA on the hook for the anticipated default. In fact, although unsurprisingly, Satori Waters remained in default from the assignment of the obligation to PBLA in mid-December 2017 to date.

1354.  The events leading to the CBL-Satori Waters-PBLA transaction and PBLA's losses from it include the following material facts:

240

a.  Global Growth learned about the Alpine Loan and its lawsuit against Satori Waters relatively soon after it was commenced by Alpine in 2017.

b.  By email dated November 16, 2017, Surinder Jain of Global Growth reported directly to Lindberg that Satori Waters was an entity for which covenants "need to be monitored closely[.]" Jain noted in his report to Lindberg that "in case of Satori [Waters], per the last update available, a CRO [Chief Restructuring Officer] has been engaged by Satori [Waters]. On 10/17, Alpine filed a verified foreclosure complaint and motion to appoint a receiver with the US District Court to exit the loan. Post Filing, Satori [Waters] identified a party who would purchase the AR to repay the loan."

c.  On December 4, 2017, Solow emailed Alan Regdos and Mark Sullivan of Alpine asking whether they thought "Satori [Waters] debt will be paid off by yearend" and "[i]f not, we would like to participate it over to PBLA." Regdos replied that "[n]o, [i]t won't be paid off by year end. . . we can do a participation as you mentioned. Please send over details of PBLA and we'll have the participation drafted and make the transfer."

d.  When Sullivan asked Solow whether he would "need accrued interest numbers for [December] for the actual payoff of the participation" or to "just distribute accordingly between PBLA and [CBL] at the end of the month with the interest statement," Solow replied that "we will not transfer any accrued but will have a hard cutoff date for accrual to [CBL] that will then switch to PBLA."

e.  On December 14, 2017, CBL, PBLA and Alpine executed an Assignment and Assumption of Participation Agreement (signed by Boug for PBLA, Stewart for

241

CBL, and Alan G. Regdos II for Alpine Capital). The Agreement assigned the Satori Waters loan from CBL to PBLA. Once that agreement was executed, $3,723,293 was paid to CBL.



**2018**

**CBL**

Assignment and Assumption of Participation Agreement (Term Loan and Revolver in Satori Waters)

$3,723,293 **[12-14-2017]**

**PBLA**

1355. Soon after the assignment transaction, the Satori Waters loan went into payment default. PBLA took the losses despite Lindberg and the Global Growth investment team knowing, at the time that the loan was assigned, that the loan was in default, or certainly on the edge of it.

1356. Eighteen (18) months later, the NCDOI flagged the transaction. On February 28, 2019, Jeffrey A. Trendel, PIR Deputy Commissioner, Financial Analysis and Receivership Division N.C., emailed Dinius and asked about the following:

> Despite [Satori Waters'] failure to pay [Alpine], somehow came off the books of CBL in December 2017.
>
> Is it possible to determine how the revolver was paid off (source of money)?
>
> One of my concerns is how many of these defaults have occurred with the loans being "bought out" and perhaps buried in some other affiliate investment.

1357. The date of Trendel's email – February 28, 2019 – was the date on which the First Wall Street Journal Article was published.

242

1358.  Lindberg and the Senior Decision Makers scrambled to develop responses to the content of the First Wall Street Journal Article, in addition to a series of questions from the NCDOI and the BMA, particularly after Lindberg was indicted by a federal grand jury within a few weeks, and arrested in April 2019 as a consequence of the indictment.

1359.  As part of the internal scramble by Lindberg and the Senior Decision Makers to develop responses to the First Wall Street Journal Article published on February 28, 2019, Lindberg – consistent with his selective recall in other circumstances, including as to the Beaufort-CBL-Northstar transactions in 2018 and 2019 – concurred with a false writing dated March 5, 2019 pertaining to Satori Waters, and advanced its falsity.

1360.  Lindberg authorized others to tell the NCDOI that he intervened with respect to Satori Waters, using his own money (not PBLA's) "to protect the insurance company [CBL] balance sheet, even though [he] had no interest in Satori Waters."

1361.  Lindberg's rationalization with respect to Satori Waters is additional evidence that Lindberg and the Lindberg Affiliates knowingly manipulated entity balance sheets to suit a particular purpose, and that the veracity of any entry on any particular balance sheet or other financial record was something knowable only to Lindberg and the Senior Decision Makers, and even then, only in a particular moment. As Lindberg's CFO, Miller, wrote in 2018: "I wish my calculator did Greg [Lindberg] math."

1362.  Even as that rationalization was developed by Lindberg and advanced by him and on his behalf, headquarters executives investigated and confirmed the truth. Edwards, Chief Legal Officer of GBIG, wrote to Solow and Herwig on March 6, 2019. He asked whether "[Solow or Herwig had] any detail on the $20 million Greg [Lindberg] used to purchase the fraudulent mortgages and Satori Waters notes form the insurance companies[.]" Brian Smith of

243

GB Capital, LLC responded to Edwards after Solow's request that: "This is a complete wind down…The assets have been foreclosed on. . . A Receiver is currently in place to sell the assets. . . A $1mm D&O insurance claim is in process. . . We're less involved with this one on a day to day basis as there is no cash pay component, there is no longer a financial reporting/portfolio management component. . . ."

1363.  Even that truth was one that never was told to the NCDOI and Dinius in response to the questions from them that commenced on February 28, 2019. Instead, the following opaque and intentionally partial response was made by Paul Brown ("Brown") on behalf of the Lindberg Affiliates in an email to Dinius dated after March 26, 2019:

> Satori Waters
> - Revolver defaulted in October 2017, CBL's total $3.7m Satori Waters Revolver balance sold to PBLA on 12/14/2017
> - PLBA's direct exposure to Satori Waters moved/sold to Alpine (PBLA now has indirect exposure via Alpine)
> - PBLA holds $4.7 Alpine/Satori Waters exposure as of 12/31/18 and has posted a loss reserve of 1.4m (~30%)
> - A Receiver is currently in place working to wind down the company and sell the assets

1364.  In addition to the contradictions with Lindberg's statement on March 5, 2019, the truth as disclosed to Edwards on March 6, 2019, and among other things, the "posted loss reserve" ascribed to PBLA actually was the full amount of the $3.7 million exposure at the time of the March 26, 2019 response to Dinius.

1365.  The Satori Waters transactions were proximate causes of PBLA's damages.

**AFA Transactions**

1366.  Lindberg, Solow, and Bostic discussed ways to continue to use PBLA's assets for the benefit of other flailing Lindberg Affiliates. In a January 5, 2018 email, Bostic advised Lindberg that PBLA was "maxed out" on corporate debt, so Solow and Bostic will "brainstorm"

244

and "come up with something. Maybe SMHL, Triton, BRC [repurchase] the [preferred equity] to a shell and then shell the repos to PBLA."

1367.  One such way concocted by Lindberg, Solow, and Bostic was to manufacture a $34 million loan from PBLA to AFA, which remains outstanding.

1368.  Solow appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court after he and an attorney appearing for him contested its issuance. Solow was represented by an attorney of his choosing throughout the oral examination. In response to multiple questions concerning the PBLA-AFA loan and his involvement with it and knowledge about it, his answer to each question was an invocation by him of the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Solow 2004 Examination Tr., at 72:8-74:2.

1369. The events leading to the PBLA-AFA transaction and PBLA's losses from it include the following material facts:

   a. On January 24, 2018, PBLA executed a Repurchase and Sale Agreement with Hampton Asset Management ("HAM"), which was assigned to the PBLA ULICO Trusts on the same day, and which transferred to the PBLA ULICO Trusts HAM's interest in $17 million of stock in Triton. The PBLA ULICO Trusts wired $17 million to HAM the day after.

   b. On January 25, 2018, PBLA executed a Repurchase and Sale Agreement with Iron City Asset Management ("ICAM"), which was assigned to the PLBA ULICO Trusts on the same day (although not signed by Wilmington Trust), and which transferred to the PBLA ULICO Trusts ICAM's interest in $17 million of stock in BRC Holdings. The PBLA ULICO Trusts wired $17 million to ICAM the day after.

c. At the time each Repurchase and Sale Agreement was executed, neither HAM nor ICAM owned the shares they claimed to be selling. Instead, both HAM and ICAM purchased $17 million in shares of Triton and BRC, respectively, *after* receiving $34 million from the PBLA ULICO Trusts.

d. On February 1, 2018, Solow, Herwig and Lindberg caused Triton and BRC to loan $17 million each ($34 million in total) to PBLA, directly, booking the transfer as added capital.

e. By CTA dated February 1, 2018, PBLA loaned the $34 million to AFA.

f. The loan to AFA was wired to two AFA accounts: (i) $20 million to an AFA account held with Regions Bank; and (ii) $14 million to an AFA account held with Wells Fargo. As Solow explained in his February 7, 2018 email to Lindberg: "[w]e had 20mm go to AFA Regions to put some of the assets in the FinCos without creating [Interest Maintenance Reserve]. We had the other 14mm go into AFA Wells so that Sandi [White, then serving as Vice President of corporate treasury for Global Growth for the Lindberg Affiliates] could use those funds more immediately."

g. The $14 million in AFA's Wells Fargo account was then transferred to the following entities, in the following amounts, and on the noted dates: (i) $9 million to Global Growth [$4 million on February 7, 2018, and $5 million on February 14, 2018]; (ii) $1.8 million to New Hill [$800,000 on February 5, 2018, and $1 million on February 7, 2018]; and (iii) $778,585 [$624,857 and $153,727] to CBL for principal and interest settlements on behalf of various Lindberg affiliated

246

companies [PharmaSys Investments Ltd. and Marval Investments Ltd.] on February 2, 2018.

h.  New Hill transferred $1,805,000 to Dunhill [$810,000 on February 5, 2018 and $995,000 on February 7, 2018].



1370. AFA's transfers to New Hill were used to pay Lindberg's personal expenses (through transfers to Dunhill); various payments, such as loan payments, to other entities (Global Growth); principal and interest payments to other insurance companies; and deferred compensation and put option exercise fees (Pharma Sys Investments Ltd. and Medical Business Systems PTY Ltd.).

247

1371.  Upon information and belief, PBLA was not repaid the $34 million loan to AFA and did not receive any interest. The books and records currently available to the JPLs show that part of the reason for this is that the loan between AFA and New Hill was forgiven.

1372.  The AFA transactions were proximate causes of PBLA's damages.

**PBLA's Insolvency**

1373.  According to the books and records available to the JPLs, Lindberg and the Senior Decision Makers depleted PBLA's available cash and cash equivalents between July 2017 and September 2018.

1374.  In December 2017 alone, PBLA's available cash position decreased by eighty percent (80%), dropping from $15,145,244 to $2,993,947. The Senior Decision Makers caused PBLA to purchase sham investments and never received an interest payment or a dividend for those investments.

1375.  Between December 2017 and February 2018, PBLA was often involved in "round-trip transactions," receiving funds as APIC, then immediately transferring those funds in the form of investments in other Lindberg Affiliates located in the United States. PBLA's investments in the United States based Lindberg Affiliates were typically structured as illiquid, borrower friendly, long-term debt for which PBLA overpaid. All debt owing to PBLA from these "round-trip transactions" remains outstanding, with no interest payments or renewal fees having been received by PBLA.

1376.  By April 2018, PBLA was overcollateralized and experiencing liquidity issues that were readily apparent to Lindberg and the Senior Decision Makers by virtue of the fact that PBLA was unable to settle a $632,617 intercompany loan to GBIG because there was "no cash coming into the PBLA WT account."

248

1377. As of December 2018, PBLA's debt level was significantly greater than its equity capital, rendering PBLA cash flow insolvent by the end of 2018.

1378. During her 2004 Examination, Miller testified that by January 2019 PBLA was experiencing liquidity issues and having "surrender issues." Miller 2004 Examination Tr., at 202:23-203:2.

1379. Moreover, by February 2019, PBLA was unable to even pay its own operating expenses and relied on Northstar to fund such expenses with available cash on hand as low as $16,007.37. Superina expressed this operational concern to White in an email dated February 22, 2019, "Northstar has been settling the operational expenses of the other Bermuda entities (BMX, Omnia, PBLA and PHIHL) for the last few months [sic]."

1380. As a result of the illiquid and unmarketable nature of the Lindberg Affiliates assets held on the PBLA books, PBLA's solvency ratios demonstrate that PBLA was insolvent at the time the MOU and IALA were executed on June 27, 2019.

1381. Relatedly, as discussed *supra*, ULICO began expressing concerns by the end of 2018 regarding the book value of assets placed in the PBLA ULICO Trusts by PBLA. Lindberg and his Senior Decision Makers knew that some of the assets were worthless, like Agera (*infra*), and that assets in the PBLA ULICO Trusts were significantly impaired, overall, well before then.

1382. On March 31, 2017, Brown advised Lindberg, Boug, Hensley, and Luecke, "There is a good chance that ULICO does not know/believe that the existing portfolio has substantial losses in it. Our view is that the losses could be at least equal to our $30mm cede and maybe worse."

1383. Lindberg agreed, noting that they should "craft a way . . . to give ULICO downside protection on all trust assets and upside potential of still earning the $30M cede." Lindberg commented further, "[o]n valuation of trust assets, perhaps ULICO has accepted the [Duff & Phelps] recovery numbers, which seem very suspect to me... Like full recovery on a $15M all PIK sub debt note on a penny stock oil and gas exploration play that has massive losses and no cash [Agera]. We assumed this was worthless but D&P [Duff & Phelps] says it's somehow 60% LTV."

1384. Naturally, ULICO's concerns continued into 2019, and following PBLA's further repeated breach of its contractual obligations under the Reinsurance Agreement and Trust Agreements, ULICO exercised its right to terminate the Reinsurance Agreement, and recapture all of the business ceded by ULICO.

1385. ULICO's intended recapture ultimately did not occur, and on January 16, 2020, ULICO sent PBLA written notice of breach. PBLA, through its then-controlling owner, Lindberg, denied any breach, and on January 27, 2020, ULICO initiated arbitration under the Reinsurance Agreement.

1386. The arbitration concluded with a $524 million civil money judgment entered against PBLA. This looming judgment significantly affects PBLA's solvency position because the interest owed to ULICO is staggering and puts crippling pressure on PBLA's ability to pay operating expenses and surrenders.

## VIII. Representative Transactions Causing Harm to PBIHL

1387. PBIHL was acquired by Lindberg in 2017. PBIHL is a wholly-owned subsidiary of BMX Bermuda, which in turn is wholly-owned by BMX Holdings. Lindberg holds 100%

ownership in BMX Holdings, and thus, is the sole beneficiary. PBIHL formerly was owned by Beechwood, or one of its affiliates.

1388.   PBIHL, with Omnia, was acquired as it moved out of Beechwood, linked to the Platinum Partners ("Platinum") receivership. Among other things, PBIHL had $21.2 million in liquid capital on its books. Omnia had $6.2 million in liquid capital (cash and bonds) on its books at the time of acquisition.

**Agera/Yarrow Three Transactions**

1389.   Omnia and PBIHL suffered material reputational injury due to common connections between and among their leadership and businesses, and the leadership and business of Platinum. Beechwood was a part of Platinum. Platinum was a hedge fund that collapsed in 2017 while under federal investigation, including after federal criminal fraud allegations were asserted in connection with it. *See, e.g.*, Lawrence Delevigne, *Reinsurer Beechwood sold following hedge fund woes*, REUTERS (August 2, 2017), available at https://www.reuters.com/article/us-insurance-beechwood/exclusive-reinsurer-beechwood-sold-following-hedge-fund-woes-source-idUSKBN1AI2Y0. Multiple Platinum executives later were convicted of federal crimes connected with their involvement with Platinum.

1390.   Omnia and PBIHL, at the time of their acquisition by Lindberg, each owned assets acquired from insurance policyholder premium payments, and payments for financial services products such as annuities. The general purpose of those assets – held as reserves or deposits – was to pay policyholder or account holder claims and redemptions as and when necessary.

1391.   Lindberg paid the equivalent of $1.00 each for Omnia and PBIHL. Lindberg and the Lindberg Affiliates represented to outsiders – including to at least one insurance business

ratings firm – that his intention with the acquisition of PBIHL was to runoff, *i.e.*, resolve, its obligations and form a new entity to engage in the offering and distribution through banks and financial services institutions of fixed-income investment products directed to high-net-worth persons in markets outside the United States and Bermuda.

1392. According to Lindberg and the Lindberg Affiliates, if the runoff was concluded successfully, tangible liquid assets would have remained to use for other purposes. However, it is evident from the information made available to Lindberg and the Lindberg Affiliates that would not have been possible.

1393. The true intention of Lindberg and the Global Growth investment team as established by their actions with PBIHL and Omnia over the fifteen (15) months after the entities were acquired, was not materially different from their intentions with Northstar, including as evidenced by its similar treatment and fate after it was acquired in 2018.

1394. Three (3) months before they closed on PBIHL and Omnia, Lindberg and the Senior Decision Makers knew that the asset values stated on the books of each entity were inflated, other than cash and liquid assets. Lindberg along with Global Growth employees such as Brown, Hensley, George Luecke ("Luecke"), Herwig, Solow, and Bostic knew that the Agera[35] positions owned by PBIHL and Omnia were heavily overvalued and inflated. Lindberg even observed to Boug, Hensley, and Brown that Agera is a "penny stock oil and gas exploration play that has massive losses and no cash," and "the Duff & Phelps recovery numbers . . . seem very suspect to me . . . we assumed this [Agera Energy asset] was worthless by [Duff & Phelps] says it's somehow 60% LTV."

---

[35] "Agera" means AGH Parent, LLC ("AGH"), Agera Holdings, LLC ("Agera Holdings") and Agera Energy, LLC ("Agera Energy").

252

1395.  Additionally, Lindberg and the Senior Decision Makers were also aware of the depth of the connections that existed between Beechwood, Platinum, and Agera.

1396.  In particular, the connections and familial ties these entities had with Agera's executives and decision makers, such as Michael Nordlicht ("Nordlicht") and Kevin Cassidy ("Cassidy"), who had both been subject to multiple allegations and/or convictions of fraudulent business practices in which they may have been and/or were known to be involved. For example, Bostic, when confronted about the level of due diligence that was done in relation to Agera as part of the Omnia and PBIHL acquisitions, admitted in an email dated May 22, 2019, that "we were aware of Michael Nordlicht's familial ties to Platinum, but in our research never saw anything that seemed fraudulent."

1397.  Cassidy, who was a sales executive at Agera, had already served three sentences in prison for fraud and tax evasion[36] by the time the Omnia and PBIHL acquisitions took place. This also did not appear to raise any concerns with Lindberg or the Senior Decision Makers.

1398.  On October 21, 2022, Bostic appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court. Bostic was represented by an attorney of his choosing throughout the oral examination (the "Bostic 2004 Examination"). In response to multiple questions concerning the Agera-PBIHL and Agera-Omnia transactions, his involvement with it and knowledge about it, specifically whether the Agera assets on the Debtors books were impaired and whether Global Growth engaged Duff and Phelps to value the Debtors' positions in Agera, his answer to each question was an invocation of the privilege against self-incrimination

---

[36] *See* Press Release: *SEC Charges Banker and Brokerage Executives With Multi-Million Dollar Financial Fraud*, SEC (November 18, 2008), available at https://www.sec.gov/news/press/2008/2008-274.htm; Bill Singer, *Commodities CEO Gets 30 Months in Prison in Mark to Market Scheme*, FORBES (April 26, 2012), available at https://www.forbes.com/sites/billsinger/2012/04/26/commodities-ceo-gets-30-months-in-prison-in-mark-to-market-scheme/?sh=3757afa870c8; Lawrence Delevigne, *The top-performing hedge fund manager that's too hot for big*

253

provided in the Fifth Amendment to the United States Constitution. Bostic 2004 Examination Tr., at 133:6-137:15.

1399.  The value of the classes of PBIHL and Omnia shares as of June 30, 2017 stated on the books of each were as follows:

| [PBIHL] AGH Parent B1 Preferred | | |
|---|---|---|
| $ 38,180,383 | | |
| [Omnia] AGH Parent Class C | [Omnia] AGH Parent B1 Preferred | [Omnia] AGH Parent (Loan) |
| $ 17,193,067.77 | $ 8,084,488.13 | $ 17,405,364.96 |

1400.  Lindberg and the Senior Decision Makers also knew that the cash and liquid assets such as United States Treasury securities owned by each exceeded $27.4 million. PBIHL presented an even more attractive catch, because it owned more than $21.2 million in cash and liquid securities, and its business scope and customer base left it unregulated by the BMA, or any other regulatory authority.

1401.  The knowingly inflated assets of PBIHL and Omnia – principally equity stakes acquired in an overvalued energy speculator and exploratory oil drilling rights owner named Agera Energy and its parent or holding company – were left at the inflated values on PBIHL's and Omnia's books for more than fifteen (15) months post-acquisition.

1402.  In fact, Agera Energy and its parent or holding company functionally were affiliates of Lindberg in 2017.  That was because Lindberg and the Lindberg Affiliates in mid-2017 owned the majority of the issued and outstanding equity in those entities, and exercised their voting rights to take control of them in April 2018.

---

*money to handle*, Reuters (April 13, 2016), available at https://www.reuters.com/investigates/special-report/usa-hedgefunds-platinum/.

254

1403.  The Agera assets also were left on the PBIHL and Omnia books at inflated values, among other reasons, to appease the then auditors of Omnia, and to show to others to address any general concerns if inquiries were made about the viability of the businesses.

1404.  Lindberg even wrote, whether to comfort himself or the recipients of his email, that the "BMA seems to believe that all of the trusts [holding assets for PBIHL, Omnia, etc.] are whole if Agera is valued at par."

1405.  As at the end of December 2017, in the case of Omnia, 11,721 Preferred Equity Class B shares of its parent or holding company, AGH, were held on its books at a value of $11,806,537.48 and 171,930.68 Preferred Equity Class C Shares at a value of $17,193,067.77. There was a further loan note of $18,049,502.6719 from Omnia to AGH recorded in Omnia's records.

1406.  In the case of PBIHL, as at the end of December 2017, PBIHL held Preferred Equity Class B shares in AGH at a value of $ 61,041,875.58 on their books. Originally PBIHL held 50,600 Preferred Equity Class B shares in AGH were at a value of $50,968,800.63 on their books. However, in September 2017, PBIHL acquired 10,000 Preferred Equity Class B shares in AGH at a book value of $10,073,074.95.

1407.  Promptly after the cash and liquid assets were stripped by Lindberg and the Senior Decision Makers in PBIHL and Omnia (and after its auditor signed-off on its financial statements in the case of Omnia), in October 2018, the AGH Class B1 preferred equity shares were written-down by eighty-one and quarter percent (81.25%).

1408.  During the fifteen (15) month period post-acquisition beginning in July 2017, Lindberg and the Senior Decision Makers engaged in a series of transactions to strip cash and liquid assets from PBIHL and Omnia.

255

1409.  Among other things, this asset-stripping foreshadowed what they did with Northstar once its acquisition closed in 2018. The PBIHL and Omnia cash and equivalents stripped then was directed to other Lindberg Affiliates.

1410.  On March 13, 2019, in a meeting between Lindberg and ULICO, Lindberg stated that "they [Agera management] were selling contracts at a loss, just to get the sales in. Salespeople were wrongly incentivized."

1411.  Additionally, Miller stated in an email to Dinius, dated April 20, 2019, "the previous [Agera] management team made some really bad decisions and financial reporting seems to have been unreliable to say the least" further claiming that the Agera management, who included Nordlicht and Cassidy, had put "many less than ideal business practices" in place which had to be corrected. By October 2018, a $35 million misstatement was uncovered in the financials of Agera Energy, related to the recorded unbilled receivables.

1412.  In the same email dated April 20, 2019 to Dinius, Miller stated that the previous Agera management team had "entered into a lot of bad contracts" and that their previous sales commission plan was based on revenue and not gross margin," which likely encouraged the Agera management team to misstate the financials.

1413.  In addition to this, consistent with Lindberg's usual *modus operandi,* affiliated entities such as GBIG and SASL received fees from the sale, acquisition, and management of Omnia and PBIHL's assets.

1414.  Lindberg and the Senior Decision Makers wrongly stripped the value from Omnia and PBIHL which far exceeded the $1.00 price paid.

1415.  Solow appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court after he and an attorney appearing for him contested its issuance. Solow was

256

represented by an attorney of his choosing throughout the oral examination. In response to multiple questions concerning the Agera-PBIHL and Agera-Omnia transactions, his involvement with it and knowledge about it, specifically whether PBIHL was directed and used to prop up other entities, like Agera, his answer to each question was an invocation of the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Solow 2004 Examination Tr., at 94:22-99:23.

1416.  The Debtors' books and records of Omnia and PBIHL currently available to the JPLs and the business records produced by Lindberg and the Lindberg Affiliates in response to a Rule 2004 subpoena served on them, as one example of the abuse of Omnia and PBIHL, show that in 2018 more than $4,000,000, presumably in asset management fees, were allocated to GBIG from Omnia and PBIHL. The information available does not permit the JPLs to ascertain what other fees Lindberg and/or the Lindberg Affiliates collected from PBIHL or Omnia relating to the sale, acquisition, and management of assets.

1417.  In the case of PBIHL and Omnia, the liquid-asset stripping and progression of events under the leadership of Lindberg and the Senior Decision Makers included the following material transactions and omissions, for purposes of illustration:

*PBIHL Raided in September 2017 to Reduce Agera/AGH Overconcentration in the PBLA ULICO Trusts*

1418.  In 2017, the PBLA ULICO Trusts were too concentrated in its investments in AGH. Lindberg and the Senior Decision Makers, to reduce that overconcentration, caused PBIHL to transfer $10.073 million to PBLA ULICO Trusts.

1419.  In exchange, the PBLA ULICO Trusts transferred 10,000 preferred units of AGH to PBIHL.

SL1 1812077v17 114825.00001

1420.  The price that PBIHL paid for each unit (or share) was pegged to the already admittedly overstated value at which PBIHL held the AGH shares on its books.

1421.  In one swoop, most of PBIHL's liquidity—$10.073 million— was wiped-out and the PBLA ULICO Trusts were relieved of an overconcentration issue with Agera that Lindberg and the Senior Decision Makers knew that the BMA would flag if it were identified or disclosed to it.

1422.  The transaction itself, however, did nothing materially beneficial for any party to it.   Among other things, it was sleight-of-hand to wash a PBLA ULICO Trusts issue with liquidity taken from PBIHL.



*PBIHL Pays Agera Energy to Plug Immediate Cash Flow Needs*

1423.  Another representative transaction was closed on January 10, 2018.

1424.  It involved a transaction where PBIHL subscribed to 3,000 Preferred Units in Agera Holdings, LLC ("Agera Holdings") at $1,000 per share.

1425.  PBIHL transferred $3,000,000 directly to Agera Holdings' subsidiary, Agera Energy LLC ("Agera Energy"), where the money was needed. PBIHL was identified as a cash source for Agera Energy, along with CBL.

1426.  The transaction did nothing to materially benefit PBIHL. It instead reduced PBIHL's liquidity, and diminished PBIHL's ability to pay short term surrenders.

258



*CBL Pays Agera in a Deal to Reduce CBL's Exposure to Yarrow Three*

1427.  A week later, Herwig, Solow, and Bostic decided that CBL needed to liquidate an asset it held in Yarrow Three, LLC ("Yarrow Three")—a Lindberg Affiliate.

1428.  Yarrow Three, a special purpose vehicle or "SPV," held a loan to Red River Development, LLC, itself a shell used to hold AGH stock denominated as "Class B-1 Preferred Units."

1429.  CBL through this transaction on January 17, 2018 sold its Yarrow Three interest for $24 million to several Lindberg Affiliates, as well as to PBLA, PBIHL, and Omnia. PBLA paid $2.1 million; PBIHL paid almost all of its remaining liquidity, or $3.7 million; and Omnia paid $1.787 million to CBL.

1430.  CBL then directed the cash immediately to Agera Holdings.



259

1431. Each Debtor was expected to invest in stable, liquid assets with a readily ascertainable and realizable value; to limit investment concentration, particularly in affiliated or otherwise related businesses or other investment opportunities; and to conduct its business at all times consistent with their long-term obligations to policyholders and account holders.

1432. Also, as with the other Plaintiffs and other Lindberg Affiliates, PBIHL and Omnia within months of Lindberg's and the Global Growth investment team's exercise of their control in mid-2017 were left without liquidity to meet basic operating expense, eventually becoming dependent by mid-to-late 2018 on Northstar's available liquidity and Bermuda staff to fund and execute basic business operations.

1433. PBIHL and Omnia within months of Lindberg's and the Global Growth investment team's exercise of their control were left by their pillaging and related malfeasance to *ad hoc* fire drills and the raiding of others to satisfy policyholder redemptions and similar events.

1434. Examples pertaining to the fire drills and raiding of others to satisfy policyholder redemptions and similar events include the following:

- In March 2018, PBIHL had to sell its entire Yarrow Three interest to a different Lindberg Affiliate —Forest Park Asset Management ("FPAM")—to, according to Bostic, "free up a cash for the surrender of a PBIHL policy." Shortly after in May 2018, it had to sell another $3,000,000 for another surrender.

- Omnia's sole nonaffiliated assets were significantly depleted by March 2018. Omnia struggled to make future surrender payments and at first proceeded to sell liquid affiliated assets to cover surrender requests. From September 2018 Omnia could not pay surrenders in the in the normal course, and started to use company earned income to supplement payments of policyholder redemptions.

- On December 26, 2018, Lindberg and Herwig at Bostic's request authorized a transaction to cause PBLA to purchase $800,000 worth of Agera Class B-1 Preferred Units from PBIHL so that PBIHL had $800,000 to fund a pending surrender.

1435. With the implementation the Senior Decision Makers' raiding and pillaging of PBIHL and Omnia, as with the other Plaintiffs, Lindberg and the Senior Decision Makers by late 2018 eviscerated Omnia's and PBIHL's capacity to satisfy obligations to their policyholders and account holders. They left each unable to fund their operating expenses.

1436. Moreover, if the Agera positions owned by Omnia and the loan due to Omnia were valued prudently in its books for year-end 2018, the inconvenient truth would have rendered Omnia insolvent in the midst of BMA scrutiny of PBLA, Northstar, and Omnia in May 2019. It caused the same result for Northstar.

1437. It was noted by Global Growth in that regard that the Duff & Phelps report received in May 2019 had marked the Agera shares down by ninety-nine percent (99%) between December 2018 and March 2019.

1438. The Agera and Yarrow Three transactions were proximate causes of PBIHL's damages.

**Flagship Transactions**

1439. In an effort to plug the capital shortfalls from an anticipated write-down of Agera in October 2018, the Senior Decision Makers decided to infuse $41 million of preferred equity from Flagship Holdings, LLC ("Flagship") into Omnia, PBIHL and PBLA.[37]

1440. On November 21, 2018, Bostic advised Solow and Herwig, "we need [$]50-60 [million] of [preferred equity] to put into Omnia PBIHL by year-end," to which Herwig responded, "Can we use Flagship [preferred equity] then?" Bostic replied, "That should work for Omnia/PBIHL."

1441. On November 26, 2018, Bostic provided Solow with a "writedown for Yarrow Three and Bermuda AGH Parent assets," commenting that "[$84 million] of the total need could

261

be accomplished with any sort of assets while the [$30 million] for PBLA, which has been discussed previously, will take some mortgages/real estate/TVA bond, etc."

1442.  In a responsive email, Solow asked, "[a]re there any solid asset[s] to use here other than ASL Pref[erred] or SNA debt? Maybe Finazen Pref[erred]?" Herwig added, "Flagship pref[erred]? Stradford (sic) debt? CCM [CC Mortgage] debt?"

1443.  Solow advised that "Stratford and CCM are in [Principal Protected Notes]," but added, "I guess [F]lagship [preferred] would work, but it is mostly held in [Atlas Financial Investments, LLC] and that is pretty much all [Atlas Financial Investments, LLC] holds at this point."

1444.  Herwig—as of December 22, 2022, an admitted criminal fraudster—directed his subordinates to fire up the printer. He responded, "Create some more then. Should be plenty of equity at Flagship as far as I can tell."

1445.  Solow then asked Eli Global investment analyst Henry Capants, "how much cushion in the common Flagship do we have to issue pref[erred] based on your numbers for Ares/Apollo?" Capants replied, "[a]round $500 [million]."

1446.  On December 7, 2018, Dawn Mota ("Mota")—GBIG Offshore Controller—acting for Omnia, emailed Solow, Bostic and Boug advising, that "[t]he Omnia capital position is actually okay," and asking whether they "still plan on an additional contribution to both Omnia and PBLA even though they aren't below capital requirements?"

1447.  Bostic responded, "if [Omnia and PBIHL] are in an adequate capital position then no we would likely not contribute assets. I thought as of an earlier email you sent that they both could only stand a writedown of roughly [$5 million] or so before needing additional capital?"

1448.  Mota replied:

---

[37] Wilmington Trust never acknowledged the preferred equity contributed to Omnia and PBIHL.

SL1 1812077v17 114825.00001

> PBIHL needs capital to the tune of $40ish million. Current capital position for PBIHL is -$30 [million]. Still not clear with the BMA what the capital requirements will be since the entity is unlicensed. Omnia does not need capital. I was using a draft June 30 management accounts to estimate, adjusting only for the writedown (assuming no other movements in the financials), but once they updated for Q3, reserves decreased more than the assets, so we actually ended up ok capital wise. [sic]

1449.  Bostic then requested "a final number on how much we need to put into Omnia and PBIHL," and Mota advised:

> PBIHL has enough capital, but I thought you said you had to do an infusion to keep the 105%? So I will leave that up to you. We also have to run some sensitivities should the BMA not approve the change from [Edward Jones] to HR [Ratings] (shouldn't be an issue, but we should be prepared).
>
> For Omnia, the 9/30 capital position was $9 [million], so another $1 [million] to get us to $10 [million]. PBIHL also needs to be made whole again. Our capital position in the draft 9/30 management accounts is -$30 [million], with the loss on Agera at -$44 [million]. We don't have a required capital calculation right now (we are waiting for BMA to give us guidelines since the entity is unlicensed), but I think it's safe to say we need to fix the negative capital position. [sic]

1450.  Bostic replied, "Ok so $1 [million] at Omnia and $30 [million] at PBIHL will cover it?" Mota responded, "[$1 million] at [O]mnia. I think $30 [million] at PBIHL is going to only give equity of nil. So I'd plan on covering the whole loss to make the company whole again ($44 [million]). [sic]"

1451.  Bostic then emailed Solow asking, "So do we just do $31 [million] of Flagship [preferred] (plus the $10 [million] going to PBLA) for now?"

1452.  Solow responded, "I guess so. Did Chris [Herwig] mention where the Flagship [preferred] was coming from?"

1453.  Bostic replied, "We're just creating it right? Since there is room for [preferred]."

263

1454. Solow responded, "I guess so. It was going to be tight, but we might get Christa [Miller] comfortable with 30 [million] more."

1455. Portions of the aforementioned preferred equity was created and later sold (to Lindberg Affiliates) to fund the pending surrenders and redemptions on the rise at Omnia and PBIHL.

1456. As of December 31, 2018, AFA, having merged with Atlas Financial Investments, LLC ("AFI"), held 84% of the preferred membership interests in Flagship.

1457. On February 19, 2019, AFA executed a Membership Interest Contribution Agreement, whereby AFA contributed 100% of its interest in Flagship to AFA. Immediately thereafter, Flagship contributed 100% of its interest to Global Growth.

1458. This pattern continued as such:

    a.    Lindberg contributed 100% of his interest to PBX Holdings;

    b.    PBX Holdings then contributed 100% of its interest to PBX Bermuda;

    c.    PBX Bermuda then contributed 100% of its interest to PBLA; and

    d.    PBLA then contributed 100% of its interest to the PBLA ULICO Trusts.

1459. There was no consideration for this exchange. On April 5, 2019, an employee of AON—the Debtors' third-party actuary—emailed Bostic asking:

> The Flagship Holdings, as I could not trace any outflow in 2018 given that this was just entered into in 2019 with effective date of 2018 I could deduce that this was intended to be recognized as a liability in 2018 as counterpart for the investment entry. For subsequent to yearend procedure, can you please provide support for the cash outflow in respect of the $ 1 [million] interest contribution?
>
> Also, we would need the supporting third party valuation for the market values of MBW and Yarrow. Is this forthcoming?

264

1460. Bostic responded, "[t]he Flagship positions were contributed to PBLA, Omnia, and PBIHL in exchange for [preferred] equity in the entities' parent companies. So no cash outflow."

1461. Bostic expanded in a later email, "The shares were exchanged into PBX Holdings in exchange for preferred equity of PBX Holdings. The shares were then contributed down the chain to PBLA and also to the PBLA ULICO Trusts. This was to recapitalize these entities after the Agera writedown. There was no cash consideration."

1462. Herwig and Solow both appeared for 2004 Examinations in November 2022. When asked about the Flagship transaction, Solow invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution, and Herwig answered that he did not remember.

1463. The "capital injection" into Omnia failed to ameliorate its insolvency. Even after the "capital injection," Omnia was unable to pay its surrenders as they came due, evidenced by the fact that it needed to sell off the Flagship preferred equity that it received as a "capital injection" to other Lindberg affiliates to pay surrenders.

1464. The "capital injection" was a ruse to mislead the BMA, with the Flagship preferred equity used to artificially inflate the asset value of Omnia and PBIHL to keep both entities balance sheet solvent on paper, and to keep the entire Lindberg scheme afloat.

**PBIHL's Insolvency**

1465. Since as early as July 2017, PBIHL experienced liquidity issues due to the Agera overconcentration.

1466. Between July 2017 and December 2018, PBIHL's available cash positions held with Wilmington Trust decreased ninety-two percent (92%), dropping from $12,340,472 to

SL1 1812077v17 114825.00001

$1,029,603. During this time, Lindberg and the Senior Decision Makers liquidated PBIHL's United States. Treasury Bonds and other corporate bonds, reducing PBIHL's stable, liquid assets from $8,852,268 to $143,469.

1467.  As of April 2018, PBIHL was unable to pay its obligations as they became due, primarily consisting of surrenders by policyholders.

1468.  According to the current books and records available to the JPLs, as of December 2018, PBIHL was balance sheet insolvent, in that it had a debt-to-equity ratio of -3.76 – a clear indication of insolvency.

1469.  Although Lindberg and the Senior Decision Makers determined that PBIHL needed a capital injection of $44 million to make PBIHL "whole again," there is no evidence that any capital was contributed to PBIHL. As a result, PBIHL continued to fail to meet its obligations to policyholders as they became due.

1470.  In May 2019, PBIHL failed to pay a $1.2 million surrender that was due on May 16, 2019 because of the lack of liquidity.

1471.  In June 2019, Miller advised Lindberg and the Senior Decision Makers that PBIHL had a pending $2.9 million surrender that it was unable to pay.

1472.  On August 28, 2019, Miller advised Lindberg, "I just got off of a phone call with Bermuda. They have the following current funding requests related to surrenders – Northstar $3 million this week and $3 million within the next couple weeks; PBIHL $4 million; Omnia $4 million… We obviously do not have the necessary liquidity to meet these needs."

### IX.    Representative Transactions Causing Harm to Omnia.

1473.  Omnia was acquired by Lindberg in 2017, a wholly-owned subsidiary of PBX Bermuda, which in turn is wholly-owned by PBX Holdings. Lindberg held 100% ownership in PBX Holdings, and thus was the sole beneficiary.

1474.  Within the first four months of the acquisition, Lindberg, the Senior Decision Makers, and the Global Growth investment team liquidated the bonds of Omnia, and within nine months the remaining alienable assets were liquidated.

**MBW Transaction**

1475.  Within a couple of months after the acquisition of Omnia from Beechwood, Lindberg and the Senior Decision Makers seemingly realized that Omnia's policyholders were surrendering faster than they had forecast. By the end of March 2018 Omnia's liquid assets had declined significantly and the remaining assets were highly illiquid and/or worthless. The AGH Parent asset was impaired, under its Share Purchase Agreement with Beechwood, the Platinum Partners Value Arbitrage Fund Limited ("PPVA") asset then-held by Omnia would eventually be returned to Beechwood, and the Yarrow Three transaction in January 2018, in particular, wiped out a large portion of Omnia's remaining immediate liquidity. According to the books and records available to the JPLs, the PPVA asset was never returned.

1476.  As a result of the above and the capital requirements of the BMA, Omnia was in need of a "capital injection" to support its solvency position as early as January 2018.

1477.  Dean Fisher, Vice President of Corporate Finance, Mergers & Acquisitions at GBIG, estimated that a $7.3 million "capital injection" was needed to "top-up" Omnia's Bermuda Solvency Capital Requirement ("BSCR"), and proposed rounding the value up to $7.5 million.

267

1478.  Stewart, in response, suggested that $10 million would be "more prudent . . . in case the BMA takes a different position on the BSCR calc[ulation]."

1479.  Initially, the plan was to have GBIG Holdings loan $10 million to PBLA, which then issued a $10 million surplus note to Omnia.  However, Stewart suggested instead that GBIG Holdings send the $10 million in funding to Omnia directly, "and then get the documents done and backdated." As Fisher explained, "[i]t's just nice to start the [conversation] with the regulator with: 'the money is in there now, here's our structure…'" On January 31, 2018, Fisher emailed Lindberg explaining:

> We've learned that structuring the injection as a Tier 2 Subordinated Note and Tier 3 Subordinated Note will allow us to backdate to 12/31. The Tier rules that Brian [Stewart] mentioned below would allow us to count **$6.5m New Tier 2 and $3.0m New Tier 3 = $ 9.5m** new capital towards our solvency [calculation] as of 8/31/17….

1480.  Lindberg approved the transaction, and on February 2, 2018, White directed a wire transfer of $9.5 million from GBIG Holding's Wells Fargo bank account to Omnia's Wilmington Trust bank account.

1481.  The infusion was given less than a week to rest before it was moved.

1482.  Less than one week later, in effectuating the directives of the Senior Decision Makers, Grant Powley ("Powley"), directed that $4 million of the $9.5 million in capital received by Omnia be used to purchase preferred equity in MBW Interco, LLC ("MBW"), another Lindberg Affiliate.

1483.  The funds from Omnia, along with additional funding from HAM, JAM, and ICAM, were to be used to fund MBW's acquisition of McCarthy, Burgess & Wolff, Inc. ("McCarthy")—an Ohio-based collection agency.

268

1484. As explained in the underwriting for this transaction—prepared three weeks *after* the funds had already been transferred, and backdated to February 2, 2018:

> An additional $4,118,741 of preferred equity is being injected into the balance sheet via Omnia, Ltd, a Bermuda based insurance company under the Eli Global corporate umbrella. Omnia has excess capital on their balance sheet, resulting in the deployment of said capital into the MBW transaction. Omnia's preferred shares are restricted securities and cannot be sold, transferred or otherwise disposed of unless they are subsequently registered under the Securities Act or an exemption from the registration is available.

1485. However, the Closing Instructions for this transaction—dated February 9, 2018, and signed by Lindberg and Solow on behalf of MBW—tell a different story. As is relevant here, the Closing Instructions provide:

> 6. Greg [Lindberg] to approve [Wilmington Trust] to send $1,926,156 from Omnia Ltd. to [Steida Holdings, Inc.] for stock purchase.
>
> 7. Greg [Lindberg] to approve [Wilmington Trust] to send $1,731,108 to SICL for M&A Advisory Fees from Omnia, on behalf of MBW Interco.
>
> 8. Greg [Lindberg] to approve [Wilmington Trust] to send $461,476.88 to Hutchinson PNC Trust for ($153,825.63 each) origination fee from Omnia, on behalf of MBW Interco.

1486. Of the $4,118,741.88 in preferred equity Omnia was purportedly purchasing, more than half of the funds were being diverted to other sources. Moreover, available records do not establish a basis for the number of shares to be purchased.

1487. On February 12, 2018, Herwig directed the transfer of $4,118,740.88 in liquid capital from Omnia's Wilmington Trust bank account for the purchase. Of the funds transferred, only $1,926,156 was wired to Steida Holdings, Inc. ("Steida") for its preferred equity in MBW.

1488. As to the remaining funds, Omnia was required to pay to SICL $1,731,108 in M&A Advisor Fees. These fees far exceed any fee reasonably resulting from services

269

purportedly performed by SICL, especially for the purported benefit to Omnia, which is none because upon information and belief, SICL did not perform any services for Omnia. The JPLs have not identified any agreements between Omnia and SICL identifying what services, if any, were actually rendered to Omnia to warrant payment of these fees.

1489.  Omnia was also required to pay to Hutchison $461,476.88 in "origination fees," which were promptly redirected to HAM, JAM and ICAM in equal payments of $153,826, again with no clear benefit to Omnia.

1490.  Throughout 2018 and 2019, Omnia policyholders continued to submit contract surrenders, requiring liquidity which Omnia did not have, even after the February 2018 "capital injection."

1491.  Given the immediacy of the need to pay the surrenders, Omnia on several occasions had to resort to using earned income to fund surrenders, and ultimately resorted to selling portions of the newly acquired MBW preferred equity in and around September 2018, and in October 2019.

1492.  On August 29, 2018, Stacey Orndoff ("Orndoff")—Treasurer of GBIG—emailed Lindberg and Herwig requesting approval to execute an intercompany wire transfer "to fund policyholder disbursements." Herwig approved, and Bostic promptly responded, "FYI this pretty much clears out the cash we have there so will need to work on selling assets out of OMNIA."

1493.  Solow, also on the correspondence, asked "Are any of them foreign? If so, it may make sense to sell them to Northstar." Bostic advised that the assets were "Agera, MBW pref[erred], and Platinum hedge fund debt, [sic]" to which Solow responded, "Okay, so no good options…"

270

1494. On September 17, 2018, Orndoff again advised Bostic, "[w]e need to fund the Omnia disbursements account again – another $2 [million]." Bostic and Solow ultimately concluded that selling Omnia's preferred equity in MBW would be "the best move based on value going into the FinCo." Accordingly, on September 19, 2018, Omnia and Paradise Asset Management, LLC ("PAM") executed a Membership Interest Transfer Agreement, whereby Omnia transferred 46% of its preferred equity in MBW to PAM in exchange for $2,038,215.99.

1495. Omnia's liquidity woes continued throughout 2019.

1496. On July 17, 2019, Hawkins—a financial controller for Northstar—advised Miller, "[w]e now have eleven (11) surrenders that cannot go out until we receive funding, totaling $1,890,128.14." Bostic ultimately decided to sell Omnia's further preferred equity in MBW to AFA in exchange for $1,800,000.

1497. It is clear that the original $9.5 million "capital injection" into Omnia, veiled under the guise to cover its 2017 liquidity problem and assist with its inability to pay surrenders, was a ploy to artificially infuse cash into Omnia to purchase more investments held in Lindberg Affiliates.

1498. Even after the "capital injection," Omnia was still unable to pay its surrenders as they came due evidenced by the fact that it (i) resorted to using company earned income to fund these surrender payments and (ii) needed to sell off recently acquired preferred equity that it purchased with the "capital injection" – the MBW preferred equity.

1499. The "capital injection" was a ruse to mislead the Bermuda regulator and put more cash into Lindberg's pockets, because it was used to purchase and infuse thousands of dollars into Lindberg Affiliates.

271

1500. The MBW transaction, as well as the Yarrow three transaction reflected in VIII above, were proximate causes of Omnia's damages.

**Omnia's Insolvency**

1501. As of September 2017, Bostic and Solow were aware that Omnia had liquidity concerns because after Bostic attempted to "load up" Omnia with "nearly 100% AGH" but Solow questioned whether that was viable given Omnia's "liquidity concern."

1502. Several months later, on January 31, 2018, Matt Weeks—Director of Financial Planning and Analysis of GBIG—advised Bostic and Solow that "Omnia [was] rapidly declining."

1503. Neither Bostic nor Solow took any appropriate actions to resolve or report Omnia's liquidity issues.

1504. Omnia's solvency ratios demonstrate that Omnia held debt far in excess of its equity capital given the over inflated AGH assets. As a result, Omnia should have been rendered balance sheet insolvent as early as December 2017—had management been honest and trustworthy.

1505. In August, 2018, an ordinary surrender payment rendered Omnia cash flow insolvent. On August 28 2018, Bostic wrote to Herwig and Solow, advising "FYI this [the surrender payment] pretty much clears out the cash we [Omnia] have there so will need to work on selling assets out of OMNIA."

1506. On September 17, 2018, Stacey Orndoff—former Treasurer of GBIG—sent an email to Bostic that Omnia was experiencing cash flow issues: "We need to fund the Omnia disbursements account again – another $2M…," but Omnia was unable to pay this $2 million surrender because it lacked the cash to do so. Instead, Solow and Bostic devised a plan to sell

272

Omnia's preferred equity stake in MBW Interco to another Lindberg-affiliated finance company.

1507. As of September 2018, Omnia had $2,184,005 in cash assets held with Wilmington Trust. However, in October 2018, according to the current books and records available to the JPLs, there was a ninety-one percent (91%) decrease in cash held Omnia's cash position dropped from $2,184,005 to $187,920. Apart from the investments in Lindberg Affiliated assets, Omnia held no other liquid assets which would have been available to meet fixed policy holder surrenders linked to the US assets.

1508. As a result, Omnia lacked the liquidity to pay policyholders in the normal course of business as obligations arose. On November 27, 2018, Omnia lacked the liquidity to pay a $900,000 surrender by a policyholder, with Bostic emailing Miller, "We need to send $900k to Omnia to generate cash there for a policy redemption."

1509. Lindberg, the Senior Decision Makers, and other Global Growth employees were well aware that Omnia was experiencing liquidity issues and essentially rendered insolvent but failed to rectify the same in a reasonably prudent manner.

1510. Omnia's distress was exacerbated by the fact that the AGH Class B1 preferred equity shares were written down by eighty-one and quarter percent (81.25%) in October 2018. According to the books and records available to the JPLs, this was a write down in excess of $8,000,000.

1511. On December 6, 2018, Mota sent an email to Bostic and Boug. She requested direction to make Omnia's balance sheet "whole" after the Agera write off: "Do you have a few bullets on the strategy in Omnia and PBIHL to address the Agera shortfall? Maybe some more

273

detail as to where we are in the process, what assets (or at least $ $ amount) we will be contributing and where it will be coming from? [sic]"

1512. Bostic answered, "We'll be adding affiliated pref[erred] equity to make up for the shortfall. The amount for each entity will be the amount of the Agera writedown [sic]." That affiliated preferred equity was the Flagship transaction whereby Omnia received a $1,000,000 capital contribution of Flagship preferred equity, in a failed attempt to make up or disguise the shortfall left by the Agera write down.

1513. A further write down of the Agera asset was reflected in the valuation prepared by Duff and Phelps in March 2019, which marked the shares down by ninety-nine percent (99%) between December 2018 and March 2019.

1514. Omnia's liquidity and solvency issues persisted through 2019. In March 2019, Omnia's cash assets held at Wilmington Trust decreased by ninety-six percent (96%), dropping from $187,920 to $7,920, making it impossible for Omnia to pay obligations as they came due.

1515. In an effort to hide Omnia's insolvency, on May 9, 2019 Boug proposed to Lindberg a series of investments that would "(i) contribute illiquid affiliate assets to top up and capitalize the entities; (ii) use the Keep Well [proposal sent to ULICO] concept to provide cash as needed in exchange for return of the same amount of assets. This creates a solvent balance sheet and only contributing the cash as needed."

## X. Memorandum of Understanding and Interim Amendments to Loan Agreement Rehabilitation of NCIC

1516. In the fall of 2018, Causey expressed doubts about the long-term liquidity (and hence, the viability) of the NCIC.

1517. The NCIC's ultimate regulator was the NCDOI. The gravity of its expressed doubts with respect to the NCIC in 2018 cannot be understated.

274

1518. Rehabilitation – in effect, the intercession and subordination of existing management to the State of North Carolina in an attempt to save the interests of an insurance company's policyholders – would have displaced Lindberg's control over the NCIC.

1519. That displacement included control over what was left of each of the NCIC's reserves to pay policyholder claims.  Those reserves, in a manner comparable to the allegations throughout this Complaint with respect to the reserves of each Debtor, had been abused and dispersed, often untraceably among counterparties affiliated with Lindberg including the FinCos, and paid or diverted to Lindberg for his personal benefit, among other abuses contrary to promises made to policyholders and similar financial products owners.

1520. The enterprise risk raised by the NCDOI's concerns was that rehabilitation, itself a publicly disclosed status and exercise, exposed Lindberg and the Lindberg Affiliates as unsustainable.  As these inevitable events eventually unfolded beginning in the late winter and spring of 2019, they among other events caused the "runs on the bank" that befell the Debtors in 2019.

1521. Lindberg immediately understood these risks.

1522. So did the North Carolina Global Growth executives, to varying degrees.

1523. In an effort to dodge the NCDOI's bullet and avoid rehabilitation, Lindberg caused GBIG and the NCIC to propose a "Remediation Plan" intended to address Causey's concerns.

1524. The Remediation Plan ultimately failed in relatively short order.  It did so because it was filled with promises not unlike the PPNs, Flagship stock, and similar instruments that Lindberg and his Senior Decision Makers concocted and reduced to writing their raiding of the Debtors.  The promises in the Remediation Plan were ones that Lindberg never intended to keep

275

– and at that point in time could not keep – but they were enough to buy time to continue draining and secreting the Debtors' assets, among the assets of the other Lindberg Affiliates.

1525. As a simple example, the acquisition of Northstar closed and from July 3, 2018 through June 27, 2019, more than $180 million of its liquid assets were stripped by Lindberg and the Senior Decision Makers during the attempted execution of the Remediation Plan for the NCIC. Succeeding allegations, *infra*, concerning the MOU and IALA show how the Debtors' losses in that regard were compounded for the benefit of the NCIC in 2019, continuing through the present.

1526. Once the Remediation Plan itself was approved by Causey and Deputy Commissioner Jeffrey A. Trendel on May 2, 2018, GBIG engaged Dinius and Murphy of Noble to assist with effectuating the "Remediation Plan."

1527. By Consent Order dated October 18, 2018, the NCIC were placed into Administrative Rehabilitation (the "Consent Rehabilitation Order"). Thereafter, Noble and its team began to examine the NCIC's financial situation.

1528. They identified significant liquidity issues. For example, on December 6, 2018, Miller advised Herwig, "[w]e need $31 [million] from Northstar just to meet December obligations and make the [CBL] equity infusion. So really difficult for me to see how we can manage to use Northstar to fund Northwest Eye." Northwest Eye was another operating company that was hemorrhaging cash and the Senior Decision Makers planned to use Northstar's money for that purpose, and would have had no benefit to Northstar if it had been consummated.

1529. In or around January 2019, Herwig, Bostic, Solow, Stewart and Johnson developed an "investment restructuring plan," whereby GBIG swapped Northstar's investment-

grade holdings with "lower rated US loans" held by the FinCos, to achieve better year-end ratings.

1530. Stated differently, the NCIC drained Northstar of its liquid assets to reduce their own affiliate/PPN exposure.

1531. One such transaction was the ATL Transaction, discussed *supra*, which was a "plan of trades to bring the 14 fincos up to [investment grade]." To effect it, Johnson proposed to Herwig and Stewart to "pull[] Damovo [ATL] pref[erred] out of Northstar and [Investment Grade] assets from [CAF]."

1532. On January 17, 2019, Johnson relayed to Herwig and Solow a plan for various trades to bring the FinCos up to investment grade, suggesting that "anything that moved out of [CAF]/[Northstar] went to the fincos in exchange for the B rated assets. Northstar has more diversity in their [balance sheet] after but, they are lower rated US credits being swapped in."

1533. By February 6, 2019, the plan of trades had ballooned to "60+ cashless trades," whereby "Northstar will be trading $12.8 [million] of [Standard Malta Holdings Ltd.] debt (Malta) and the equivalent of $50.5 [million] of Damovo pref[erred] (UK). [Northstar] will receive US debt in exchange for these assets."

1534. Dinius was made aware of this "investment restructuring plan" in January 2019.

1535. Stewart explained in a January 23, 2019 email to Dinius that ███████████

███████████████████████████████████████████████████████

███████████████████████████████████

1536. Stewart included a PowerPoint in the explanations to Dinius. It detailed examples of "FinCo Rebalancing" transactions and "Segregate FinCo" transactions, identified as the "eliminat[ion] [of] non-GBIG exposure in FinCos where GBIG has exposure." On January 24,

2019, Stewart wrote to Herwig and Johnson, "Noble has not expressed any concerns so . . . okay to proceed."

1537.  Following a February 14, 2019 meeting among Dinius, Lindberg and the other Senior Decision Makers, Dinius noted progress, and as importantly noted the failures of Lindberg and his headquarters executives:



1538.  Thereafter, Lindberg and the Senior Decision Makers began to prepare an investment restructuring plan for the NCIC.

1539.  On March 6, 2019 Dinius wrote to Stewart stating,



1540.  Stewart responded, "Before these transactions, CBL had no exposure to Damovo, but after the transactions, CBL had a pro-rata share of the $51.3MM, which equates to the ~$35MM." Further clarifying on March 7, 2019, Stewart wrote, "The FinCo rebalancing was included in the investment restructuring file I sent you on January 23rd and was done for year-end ratings purposes based on initial feedback from HR [rating agency]."

1541. Meanwhile, Lindberg and his headquarters executives continued to engineer and execute disadvantageous trades on behalf of the Debtors, as illustrated through the multiple examples alleged in this Complaint.

1542. On April 11, 2019, Lou Hensley ("Hensley")—CEO and President of GBIG—forwarded Dinius an email he sent to Miller, hours earlier, expressing his frustration in this regard:

> You understand, we need to do this investment restructuring (remove layers/revise controls) on private instruments, in order to have transparency and control around the insurance companies investment portfolios. This [AFA/PBLA Trade] is another example of a trade where I have no insight, rational, financial impact to review or control. There is no way we can continue to operate under this current format, it does not work from an [enterprise risk management], compliance, etc. . . . standpoint. That is why we need to do [sic] agree to a new structure today, in addition, we have promised this to our regulators.

**Use of Debtors' Assets to Address NCIC's Liquidity Needs**

1543. To fund and effectuate the administrative rehabilitation, the NCIC required liquidity that they undeniably lacked themselves.

1544. By April 2019, it had become clear to all involved that liquidation of the NCIC's assets resulted in a considerable shortfall.

1545. Several weeks earlier, *The Wall Street Journal* had published an article under the title *Financier Who Amassed Insurance Firms Diverted $2 Billion into His Private Empire*, claiming that Lindberg had diverted $2 billion of insurance company funds for his personal benefit by causing the insurers to lend money to entities he owned. Shortly thereafter, Lindberg was indicted on charges of attempting to bribe the NCDOI Commissioner, a public official elected in a statewide election.

279

1546. On April 15, 2019, the BMA imposed conditions to be added to the Certificates of Registration for PBLA, Omnia, and Northstar, including that these three Debtors obtain prior written approval from the BMA before establishing bank accounts or moving assets. The BMA also restricted these Debtors from modifying the terms of their investments without prior written approval.

1547. In the spring of 2019, the NCDOI and Noble accelerated and shortened negotiations with Global Growth and its executives, including Lindberg, to restructure the debt of the NCIC.

1548. In an April 16, 2019 email from Stewart to Lindberg and the Senior Decision Makers, Stewart explained:



1549. Herwig replied,

1550. Herwig's words belie the callous and dismissive disregard of Lindberg and his headquarters executives of the Debtors' obligations to policyholders and owners of their financial products, and further establish their malign intent to attempt to save the NCIC and themselves at the Debtors' expense.

280

1551.  On April 18, 2019, Miller replied,



Stewart also warned,

**Negotiation and Execution of the MOU and IALA**

1552.  On May 13, 2019, Dinius authorized for the benefit of the NCIC the suspension until June 1, 2019 of all principal and interest payments for all affiliated loans made to the NCIC, including any payments then-past due or due and owing within the month. This did not resolve the NCIC liquidity crisis.

1553.  On May 15, 2019, Lindberg emailed Nordberg, Miller and Herwig with "Draft Talking Points" for Noble. The "Financial Model" included "NHC [new holding company] overhead, [Lindberg] salary, and Eli management fee," as well as "a 20 [Basis Points] fee to SASL for asset management, with no affiliate investments allowed beyond the NHC [new holding company] debt and [preferred equity]." The plan also contemplated "selling control of PBLA to ULICO and taking a dividend of $250 [million] of the $300 [million] of PBLA surplus. . . in the form of affiliated assets."

1554.  Lindberg's intentions with his "Draft Talking Points" were plain.  In the midst of an enterprise crisis, the answer was about how Lindberg could help Lindberg, and others could help Lindberg help Lindberg.

1555.  On the same day, Nordberg wrote to Lindberg, and questioned the plan:



281



1556.  As to the Debtors and the obligations to their policyholders and financial products owners, Hensley's response underscores the magnitude of illiquid and non-performing assets that Lindberg proposed to leave or dump there:

> This sheet really needs to reflect paydowns and how much will Bermuda/others will hold.  How much current cashflow will the remaining asset produce, versus net worth . . . What will Bermuda really live with, I hear mixed messages. . .  [C]an you [Herwig] give a breakdown of what you are expecting the Bermuda companies to hold back by legal entity, e. g. PBLA, OMNIA, [PBIHL] and NS after the sale of CBL. It might be stated below and in the [Excel spreadsheet], but the end balances are unclear to me. . . [B]ased on your numbers that would be $363 [million] staying in Bermuda. This is my high- level view based on Bermuda holding $363 [million] in affiliates. The question will be what are the cashflows on the remaining $363 [million] in assets left. [sic]

1557.  Even Herwig, Lindberg's effective second, close ally, and a director of each Debtor raised his hand:



1558.  Nordberg asked Lindberg to

1559.  Miller similarly expressed her frustrations on May 15, 2019 with Lindberg's plan:



282



1560. Lindberg agreed to remove the numbers from their presentation, and Miller added, ███████████████████████████████████ ██████████████████████████████ Lindberg replied, ████████████ ██████████████████████ Miller requested that Lindberg use a different version, and allow Global Growth ████████████

1561. Lindberg, again, declined, and ignoring Nordberg, Herwig, and Miller he explained that ██████████████████████████████████ ███████████████████████████

1562. Between June 3 and June 27, 2019, the NCDOI, Lindberg and the Senior Decision Makers, directly or through counsel, negotiated the terms and exchanged drafts of [what would become] the MOU, IALA and Consent Rehabilitation Order. Dinius led the negotiation and implementation of the MOU and IALA on behalf of the NCIC, going so far as to threaten to place the NCIC in liquidation if Lindberg did not sign the MOU. Dinius Examination 2004 Tr., at 79:21-80:4; 144:4-145:18.

1563. On June 7, 2019, Miller emailed Dinius. She sought "an advance of $6 million to cover off needs for this week and maintain a buffer of cash, [sic]" as the NCIC were "down to $2,012,512 in cash."

1564. On the same day, Dinius replied:



283

1565. To effectuate their shared goals and distinct interests, Dinius, Lindberg and the other Senior Decision Makers decided to move underperforming and otherwise struggling assets from the NCIC to the Debtors. The loan-to-value ratio of the assets moved was unambiguous—they were largely illiquid, sham, and readily manipulated investments in other Lindberg Affiliates.

1566. Dinius, Lindberg and the other Senior Decision Makers knowingly sacrificed the Debtors' continued viability and their capacity to honor their obligations to policyholders and financial product owners for the benefit of the NCIC. As Lindberg explained in his May 6, 2019 email, "[b]ottom line, after all payoffs [Debtors] are left with a low [loan-to-value] loan on the remaining assets for the run off period."

1567. On June 9, 2019, Dinius circulated drafts of the MOU and IALA, stating:



1568. In a subsequent email, Dinius clarified:



SL1 1812077v17 114825.00001

1569.  On June 12, 2019, Dinius emailed Stewart and Hensley, ███████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

1570.  Hensley replied, ███████████████████████

1571.  Stewart attempted to minimize the true state of affairs with respect to Northstar in response to Dinius's question, at the same time admitting the calamity that Lindberg, Senior Decision Makers and the Global Growth investment team made after pillaging Northstar's assets and excluding its legacy management since Lindberg took control of it in August 2018:



1572.  Dinius crystallized the intended pillaging of Northstar.

1573.  He wrote: ████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████

1574.  In other words, at the same time that negotiations leading to the MOU and IALA were underway, Dinius specifically admitted that the obligations to Northstar and its interests were sacrificed for the benefit of the New Holdco ("NHC"). NHC was the vehicle intended to save the NCIC.

1575.  Stewart answered: ███████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████

1576.  On June 27, 2019, as part of the agreement to enter into the MOU and on consent of the NCIC, Lindberg and Dinius, the Superior Court of North Carolina entered an order of rehabilitation pursuant to Article 30 of Chapter 58 of the North Carolina General Statutes and appointed Causey, in his official capacity on behalf of the State of North Carolina as Commissioner of Insurance, as Rehabilitator for the NCIC in the matter captioned *Causey v. Southland National Insurance Corporation, et al.*, 19-CV-8664 (Wake County Superior Court).

1577.  On June 27, 2019, Causey elevated Dinius and Murphy from their prior roles and appointed each as a Special Deputy Rehabilitator (Causey, Dinius and Murphy, collectively and individually, the "Rehabilitators").

1578.  On June 27, 2019, the following parties entered into the MOU: (i) the NCIC; (ii) Global Growth; (iii) all entities listed in Exhibit A to the MOU—the Specified Affiliated Companies ("SACs"); (iv) EMAM, as holder of all SPV common class A units; (v) CBL, SNIC, New England Capital ("NEC"), and PBLA as agents under the senior term loan agreement ("Agents"); and (vi) Lindberg, individually and as attorney-in-fact for the SACs[38] and Agents.[39]

---

[38] *See* list of SACs in Schedule I.

[39] *See* list of "MOU Affected Parties" in Schedule II.

SL1 1812077v17 114825.00001

1579. In addition to being an agent, PBLA provided credit facilities to affiliates of Global Growth, in the amounts and pursuant to the agreements set forth in Schedule 5 to the MOU ("PBLA Loan Agreements").

1580. The Agents serve as agents: (i) under the senior term loan agreements in which lenders, including one or more of the NCIC, have extended credit facilities to certain of the SACs in the amounts and pursuant to the agreement set forth in Schedule 1 to the MOU ("Senior Debt"); (ii) under the subordinated debt arrangements in which lenders, including one or more of the NCIC, have extended credit facilities to certain of the SACs in the amounts and pursuant to the agreement set forth in Schedule 2 to the MOU ("Junior Debt"); and (iii) under the preferred equity financing arrangements in which lenders, including one or more of the NCIC, have provided equity financing to certain of the SACs in the amounts and pursuant to the agreements set forth in Schedule 3 to the MOU ("Preferred Equity").

1581. Lindberg signed the MOU on behalf of the Agents, which included PBLA. The final content and execution of it was a fact kept from Boug and others in Bermuda, including the BMA, for more than two weeks. So, too, was the IALA.

**The MOU's Intended Operation, Beginning with the IALA**

1582. The MOU involved three steps. The first step was the execution of the IALA, whereby the terms of loans to, and preferred equity in, hundreds of Lindberg Affiliates were materially amended.

1583. The following parties executed the IALA: (i) CBL, SNIC, NEC and PBLA, as agents for senior term loan agreements and junior term loan agreements (the terms loans are listed in Exhibits A and B of the IALA); (ii) the borrowers listed in Exhibits A and B of the IALA; (iii) the preferred equity holders listed in Exhibit C of the IALA; (iv) AGH; (v) Global

287

Growth; (vi) EMAM, as holder of certain Class A units of SPVs (listed in Exhibit H of the IALA); and (vii) Lindberg, individually and as attorney-in-fact for the borrowers, preferred equity holders and preferred equity issuers.[40]

1584.   Herwig signed the IALA purportedly on behalf of PBLA.

1585.   Northstar, Omnia and PBIHL are not parties to the MOU or IALA, although all three are lenders and preferred equity holders whose respective interests were impaired under the IALA and MOU.

1586.   The following adverse modifications were imposed on the Debtors under the IALA:

a.  deferral of interest payments on approximately $509.5 million of scheduled Senior Debt, set forth on Exhibit A to the IALA, for six (6) months, reduction of any prepayment penalties under the Senior Debt to zero, resetting the interest rate to 5% per annum, and amendment of loan maturity dates to December 31, 2029;

b.  modification of the preferred return on approximately $104.8 million of preferred equity, set forth on Exhibit C to the IALA, to 6% per annum and mandatory redemption on the 10-year anniversary of the IALA effective date;

c.  on approximately $259.4 million of loans provided by PBLA to certain borrowers controlled by Global Growth and Lindberg set forth on Exhibit E to the IALA,[41] no interest would accrue or be paid or payable after the IALA effective date, waiver of all prepayment penalties, and amendment of loan maturity dates to June 30, 2029; no other party to the MOU or IALA suffered this "zero coupon" amendment;

d.  deferral of interest payments on approximately $26 million of loans and preferred equity financing to certain borrowers controlled by Global Growth and Lindberg, set forth on Exhibit F to the IALA, for forty-eight (48) months, reduction to zero of any prepayment penalties, resetting the interest rate to 5% per annum, and amendment of the loan maturity dates to June 30, 2024;

e.  modification of approximately $84.8 million of loans and preferred equity financing to certain affiliated insurance holding companies controlled by Global

---

[40] *See* list of "IALA Affected Parties" in Schedule III.

[41] Although the IALA describes this category of debt as the "PBLA Loans," PBLA made significant concessions in each of the other categories of debt as well.

288

Growth and Lindberg, set forth on Exhibit G to the IALA, amendment of the maturity date to June 30, 2026, no interest would accrue or be paid or payable from and after the IALA effective date, and waiver of prepayment penalties;

f.  on approximately $52.6 million of loans and preferred equity financing to AGH and its subsidiaries, no interest would accrue or be paid or payable after the IALA effective date, waiver of prepayment penalties for both the loans and preferred equity, and amendment of the maturity dates to June 30, 2029; and

g.  as to PBLA and Northstar specifically, an eighteen (18) month deferral of the interest payments on approximately $9.8 million of scheduled Junior Debt, set forth on Exhibit B to the IALA, waiver of prepayment penalties, resetting of the interest rate on all loans to 5.5% per annum, and amendment of the maturity date to June 30, 2029.

1587.  The IALA was given effect by the NCIC, Lindberg, and the Lindberg Affiliates immediately upon execution and purported to amend 119 investments, comprised of loans and preferred equity, held by the Debtors and the PBLA ULICO Trusts in Lindberg affiliates with total outstanding principal and interest of $1,047,183,778.00, as of June 27, 2019.

1588.  Specifically, the IALA purported to amend: (a) forty-six (46) investments of Northstar with outstanding principal and interest of $199,097,682.00; (b) seven (7) investments of Omnia with outstanding principal and interest of $43,216,897.00; (c) five (5) investments of PBIHL with outstanding principal and interest of $43,359,504.00; and (d) sixty-one (61) investments of PBLA and the PBLA ULICO Trusts with outstanding principal and interest of $761,509,665.00. *Id.* (numbers aggregated from Exhibits A-G thereto).

1589.  Since the execution of the IALA, more than three years of interest and/or dividends have accrued on each of the above-mentioned amended interests. In that time, the Debtors have received minimal payments of interest and/or dividends. The Debtors, as of December 31, 2022, reasonably believe the non-payment of interest and/or dividends due to them exceeds $117.8 million. As broken down by debtor: (i) Northstar is owed $29 million ($22,700 daily interest); (ii) PBLA is owed $68.7 million ($47,300 daily interest); (iii) Omnia is

289

owed $11.7 million ($9,250 interest daily); and (iv) PBIHL is owed $8.4 million ($5,900 interest

daily).[42] This is based on the base rates and current information available to the JPLs that has

been collected from the Debtors' books and records, and third parties.

1590. Second, the MOU called for a global restructuring of the SACs ("Global

Restructuring"), including the Debtors' and the PBLA ULICO Trusts' loan counterparties,

whereby:

    a. all SACs were to become subsidiaries of NHC, and NHC was to manage all its subsidiaries pursuant to management service agreements between NHC and each subsidiary as was deemed necessary;

    b. NHC would indemnify the NHC Board, and NHC directors and officers, and procure Directors & Officer insurance; and

    c. companies not subject to the Global Restructuring (listed on Exhibit C to the MOU) would remain under Lindberg's control and management. MOU, pgs. 4-8, Article II. Global Restructuring.

1591. Under the terms of the MOU, Moshin Meghji ("Meghji")[43] was to be named

Chief Restructuring Officer of NHC, "to assist NHC with the Global Restructuring plan set forth

[in the MOU], under such terms and conditions as may be determined by the NHC Board."

MOU, pg. 6, ¶ 3.iv.

1592. The "In The Arena" (ITA) entities – which included UKAT – were a group of

companies that were excluded from the control of the NHC. However, under the MOU, these

entities benefited from the reduction in the interest rate and extended maturity dates with respect

to the various loans to the Debtors. This allowed Lindberg to retain ultimate control to strip cash

---

[42] When using the default rate, the calculations change to the following: (i) Northstar is owed $50.4 million ($37,000 interest daily); (ii) PBLA is owed $106 million ($76,000 interest daily); (iii) Omnia is owed $14.3 million ($11,300 interest daily); and (iv) PBIHL is owed $8.7 million ($6,100 interest daily).

[43] Meghji and M-III Partners, LP ("M-III") were previously retained by Lindberg in April of 2019 as financial advisors to assist with trouble involving the Agera valuation issues.

290

out of these entities under the pretense of favorable lending terms. This negatively impacted the Debtors that had investments in these ITA entities.

1593. Third, the MOU contemplated a restructuring and modification of all loans ("Global Loan Amendments"), including loans made by the Debtors and Trusts, whereby in relevant part:

    a. all loans as amended by the IALA (with exceptions), would be assumed by and assigned to NHC as borrower;

    b. all loans, but not preferred equity, would be adequately collateralized, including granting first-priority liens on borrower's assets unless already encumbered by an unaffiliated third party – if assets were already encumbered, the SACs would offer their assets as security for said loan;

    c. all loans would be personally guaranteed by Lindberg;

    d. all subsidiaries would become co-borrowers, would jointly and severally guaranty NHC's obligations as borrower, and would provide collateral support as determined by NHC; and

    e. Lindberg and NHC would execute a Management Services Agreement, whereby Lindberg would receive a 1.5% success fee for all net principal reduction in Senior Debt, Junior Debt, Preferred Equity, Agera Debt and PBLA Loans, as defined in the MOU. MOU, pgs. 8-10, Article III, Global Loan Amendments.

1594. The success fee would be payable even if Lindberg were to be convicted of a felony; in that case, the fee would be paid to an irrevocable trust established exclusively for Lindberg's children. MOU, pg. 9, Article III, ¶ 3.

1595. On December 13, 2022, Dinius appeared for oral examination pursuant to a Rule 2004 subpoena issued by the Court (the "Dinius 2004 Examination"). Dinius testified that the success fee was used as an incentive for Lindberg "to get these loans paid" and that Dinius was unaware of any benefit that the Debtors received as a result of that success fee. Dinius 2004 Examination Tr., at 55:15-25-56:2.

291

1596.  In addition, upon information and belief, the NCIC and certain Lindberg Affiliates executed a Subordination Agreement on or about July 1, 2019, under which the Debtors' debt was subordinated in favor of the NCIC's debt to Aspida. In response to questioning during the drafting of the Agreement, Dinius advised that ███████████████ ███████████████████████████

### Adverse Effect of the MOU and IALA on the Debtors' Assets

1597.  Each Debtor was adversely affected by the terms and operation of the MOU and IALA.

1598.  At the time of execution of the agreements, PBLA, Northstar, Omnia and PBIHL were insolvent or were rendered insolvent as a result thereof. Northstar, for one, stopped paying surrender requests of its policyholders at or about the time the MOU and IALA were executed.

1599.  Through the terms and operation of the MOU and IALA, Lindberg and the NCIC adversely modified the economic terms of over $1 billion of debt and preferred equity held by the Debtors by imposing lengthy maturity extensions of up to nine years, interest rate deferrals and reductions, and other waivers.

1600.  These modifications had the effect of wrongly improving the position of: (a) the NCIC vis-à-vis their own policyholders and creditors, to which the Debtors had no obligation; and (b) the Lindberg Affiliates.

1601.  When the agreements were executed, CBL and SNIC acted as agents for the Debtors in their capacities as lenders under at twenty-nine (29) loans to Lindberg affiliates. CBL and SNIC breached their duties as agents to the Debtors.

1602.  PBLA is a party to the MOU and IALA as a lender and preferred equity holder in investments listed in the IALA and MOU, and also as an Agent for certain loans. Under the

292

IALA and MOU, PBLA suffered adverse modifications to approximately $259.4 million in non-Trust investments, for which, *inter alia*, the IALA deferred all interest payments until June 30, 2029.

1603. This has resulted in a loss of over $68.7 million of interest and preferred equity dividends, including $37.4 million in default penalties to December 31, 2022 which, absent the IALA, would otherwise have been due and payable to or on behalf of PBLA. Moreover, the interest deferral through to 2029 continues to significantly increase PBLA's losses.

1604. With respect to PBLA, Dinius testified that PBLA was "intentionally excluded" from receiving any loan paydowns and that Global Growth "never directed us to pay anything to PBLA." Dinius 2004 Examination Tr., at 75:15-25.

1605. Under the IALA and MOU, Northstar, as a lender and preferred equity holder, had approximately $95.6 million in loan principal and interest as well as $103.4 million of preferred equity and dividends adversely modified without receiving any economic benefit and without being a party to either agreement. IALA, Exhibits A-G and MOU, Schedules 1-7. The JPLs conservatively estimate that the impairment of assets under the IALA and MOU has damaged Northstar alone in an amount of at least $29 million of interest and preferred equity dividends, including $21.4 million in default penalties which, absent the IALA, would have been due and payable to or on behalf of Northstar.

1606. Omnia and PBIHL have each also suffered similar damages as a direct result of the modification of the terms of their investments pursuant to the IALA, in an amount subject to proof at trial but reasonably estimated to exceed $20.1 million.

1607. The cash flow, liquidity and marketability of the Debtors' investments were severely impaired, impeding each Debtor's ability to satisfy its obligations to its policyholders

293

and creditors. Resulting liquidity and regulatory non-compliance issues, caused in substantial part by the terms of the IALA, which in turn, caused the BMA to file petitions to wind up PBLA, Northstar and Omnia, and appoint the JPLs and the subsequent petition by the JPLs to wind up PBIHL.

1608. In addition, as a result of Lindberg's failure to perform timely certain obligations identified in the MOU, the NCIC commenced the NC MOU Action on October 1, 2019, seeking, *inter alia*, specific performance of the MOU, compounding the adverse effects of the IALA on the Debtors. Lindberg, Global Growth, EMAM, NEC, and PBLA were named as defendants.

1609. By virtue of the Recognition Order and the commensurate stay of any litigation against PBLA (and the other Debtors), the North Carolina Court severed PBLA from the NC MOU Action.

1610. On May 18, 2022, the initial Judgment and Order was entered in the NC MOU Action, ordering specific performance of the MOU.

1611. On May 26, 2022, an Amended Judgment and Order was entered in the NC MOU Action.

1612. The NC Judgment has no *res judicata* or collateral estoppel effect as to PBLA or the other Debtors.

1613. The Amended Judgment and Order required Lindberg, Global Growth and NEC to execute and deliver documents to NHC to effectuate the transfer of the SACs to NHC pursuant to the MOU. *See* Amended Judgment and Order at 43, ¶ 5.

1614. Pursuant to the Amended Judgment and Order, the SACs are to be transferred to NHC. As a result, the Rehabilitators will have control over the SACs via NHC through the seven-person NHC Board, which includes Dinius and two other persons designated by Dinius.

SL1 1812077v17 114825.00001

There will also be two independent directors who will be elected by a majority of the NHC Board and because the Rehabilitators would control the majority of non-independent NHC Board seats, they will control who the independent directors will be and thus will control the NHC Board.

1615. The result of the MOU would effectively improperly cede, to the NCIC and Rehabilitators, control of over 500 entities affecting at least seventy (70) Debtor Investments. This would allow them to control the Debtors Investments aggregating more than $510 million in face value ███████████████ in accrued and unpaid interest, as well as dividends on those assets since June 27, 2019 and an additional $59.7 million in default penalities. These 500 plus entities are either Debtor Investment Counterparties or Lindberg Affiliates to which the proceeds of the Debtors' so-called investments were subsequently fraudulently transferred for the benefit of Lindberg and the Lindberg Affiliates, and to the Debtors' detriment.

1616. The result is that the fate of the Debtors' Investments would be in the hands of the NCIC, whose interests are not aligned with the interests of the Debtors, their policyholders and creditors. The JPLs will have no control over the Debtors' assets, rightfully should control them, and at present and since their appointment have been unable to effectively monitor and monetize the Debtor Investments for the benefit of the Debtors' respective policyholders and creditors.

**The MOU and IALA are Void or Voidable as to the Debtors**

***Lack of Authority of Lindberg and Herwig to Execute the MOU and IALA***

1617. The MOU and IALA are void as to the Debtors, or voidable by this Court, as ultra vires.

1618. Lindberg and Herwig signed the MOU and IALA on behalf of PBLA. Each at the time knew that he lacked authority to bind PBLA, or to affect adversely in any way the economic

295

interests of PBLA, Northstar, or Omnia because they did not obtain prior written approval from the BMA to modify the Debtors' Investments.

1619. PBLA, Northstar and Omnia, when operating, were regulated by the BMA, the government authority responsible, among other things, for supervising, regulating and inspecting financial institutions operating in Bermuda, including insurance, reinsurance and investment businesses operating as did the Debtors. *See* About Us, BERMUDA MONETARY AUTHORITY, available at https://www.bma.bm/about-us. Any (or any purported) representation made on behalf of any of the Debtors that it consented to the MOU and IALA, or entry of the Rehabilitation Order, was made without then-required prior written approval from the BMA and should have been known by any representee to have been made without authority.

1620. On April 15, 2019, the BMA implemented conditions to be added to the Certificates of Registration for PBLA, Omnia, and Northstar, including that the companies "shall not without prior written approval from the [BMA] establish vary or change the structure of bank or investment accounts," nor "without prior written approval from the [BMA] vary, sell, withdraw, transfer or make any reduction or vary the structure of all bonds, debentures, equities, loans and or any other form of investments, presently held in any bank, trust or investment account, with any financial institution or affiliate or corporate structure or by the Company in Bermuda or overseas" (the "Conditions"). *See* Lamb Aff., ¶¶ 1, 3 [ECF No. 250].

1621. Boug as President of each Debtor accepted the conditions, and advised, among others, Lindberg, Herwig, Miller, and Bostic. The conditions to the Certificates of Registration became effective midnight April 16, 2019.

1622. On April 17, 2019, the BMA on a telephone conference call with NCDOI, the Pennsylvania Insurance Department, and Dinius explained the Conditions that were added to the

296

PBLA, Omnia, and Northstar's Certificates of Registration, including the requirement for prior written approval from the BMA for any variation of the assets of the companies. Lamb Aff., ¶¶ 4, 6.

1623. According to Dinius, "[t]he IALA, the MOU, and the revolver were all one transaction, so they were all intertwined and dependent on each other. . . along with Lindberg's consent to place the North Carolina companies into rehabilitation." Dinius 2004 Examination Tr., at 36:4-18. It is clear from Dinius' testimony that Lindberg would not have signed the MOU without the IALA memorialized and in place. The IALA was nothing more than a quid pro quo for Lindberg, and there was no consideration received by the Debtors.

1624. On May 21, 2019, it became clear that Northstar needed $5.5 million to fund immediate surrenders that were due within the week. To prepare, Herwig devised and shared the following plan to fund those surrenders to Dinius:

> We have $4 mm of OMPC/Medical Physics, which is currently under LOI and marching towards close in the next 30 days. We also have $1 mm of Practice Insight, which is currently awaiting HSR approval but should close shortly. Would you [Dinius] be open to having one of the US insurers either buy these assets from Northstar or enter into repurchase agreements with Northstar where these have to be bought back in some agreed upon time frame if for some reason they don't sell? The MBO has been well received from what we understand and should be executed in the next one to two weeks. We believe that will greatly reduce the surrenders and allow for new production.

1625. In response to Herwig's proposed method described above, Dinius advised Herwig, Stewart, Miller, Solow, and Bostic, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

1626.   In response to a question about whether he knew that the BMA's written approval was required to modify the Debtors' investments, Herwig invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Herwig 2004 Examination Tr., at 81:20-23.

1627.   Lindberg conceded that BMA approval was required during the NC MOU Action. When asked why Farrell was being contacted during the MOU negotiations, Lindberg explained:

> Well, because I had an interest in Bermuda insurance companies and he's the regulator for those insurance companies. . . . [T]he reviewed insurance companies have significant pieces of investments in the what later became the specified affiliated companies in they were key counterparties and if they're not board, if the key counterparties are not board the deal is not going to work, and as we later found out, they are not on board. Bermuda is a key constituent [sic].

Lindberg NC MOU Action Trial Testimony [Volume 5] Tr., at 36:14-22.

1628.   The negotiation and execution of the IALA and MOU—which adversely modified the Debtors' investments in a manner that expressly required the BMA's prior written approval—occurred after the BMA's conditions went into effect.

1629.   The required prior written approval never was obtained.

1630.   The NCIC failed to disclose to Judge Shirley in the NC MOU Action that the IALA required the prior written approval of the BMA, and that such approval had never been obtained. If Judge Shirley had known that the IALA, which was the only consideration for the MOU, was *ultra vires*, then he may not have issued his ruling finding that the MOU was a valid and enforceable agreement.

1631.   Dinius went forward and attempted to bind PBLA, Northstar, and Omnia knowing that the requisite BMA approval was absent. In a June 11, 2019 email, Miller advised

298

Lindberg, ███████████████████████████████████████████

██████████████████████

1632.  Dinius denied knowing anything about such a requirement in his Rule 2004 examination, testifying that as he was "not [a] regulator of the BMA companies, he would not have that information" and that "the [D]ebtors had to get approval from the BMA, not – myself would not have required that approval. [sic]" Dinius Examination 2004 Tr., at 32:12-15; 133-134. He further testified that he did not recall seeing a prior written approval from the BMA. *Id.*, at 40:22-24. Dinius testified that while he did not recall a conversation where Farrell ever questioned Lindberg's authority to sign the MOU and IALA on behalf of the Debtors, Dinius acknowledged he sent an email on August 31, 2019 that Farrell is "not sure that Greg [Lindberg] had the authority to sign on behalf of BMA entities" and "wanted to have a conversation about it." *Id.*, at 128.

1633.  Dinius, the NCIC and the Lindberg Affiliates ultimately elected to move ahead, knowing that authority for PBLA, Northstar and Omnia to execute was absent. All involved executed the MOU and IALA without prior written approval from the BMA.

1634.  Given the restrictions placed in each of PBLA, Northstar, and Omnia's Certificate of Registration, the Board of Directors for those companies could not have authorized anyone to execute the MOU or IALA without prior written approval from the BMA. No one possessed actual or apparent authority to bind any of the Debtors to the MOU and IALA. The acts therefore were ultra vires and void (alternatively voidable), and the MOU and IALA do not bind the Debtors.

1635.  On or around September 12, 2019, Lindberg, Herwig, Miller, Meghji, and Dinius participated in a call with Farrell and Boug. They were provided with "clear notice from the

Bermuda insurers that they are not on board with the MOU. . . [and] they consider the MOU a
'tangent'."

1636.   In a September 17, 2019 email directed to Dinius (and others), copying Lindberg
(and others involved in the MOU), Vandeman made plain the wrong visited on the affected
Debtors, and the rejection of the attempted imposition of the MOU and IALA on them:

> It was our understanding when the MOU was signed that Bermuda
> and any other regulatory bodies with an interest had approved what
> was contemplated by the MOU. Unfortunately, this was not the
> case with respect to the Bermuda Insurance Commissioner. . . [and
> he] has made it clear that he will not participate in the MOU, and
> will not approve participation in the MOU by the Bermuda OpCos,
> which are the debtors of his insurance companies. Had the truth
> been known, the MOU would never have been signed.

1637.   The NCIC nonetheless imposed the terms of the IALA on the affected Debtors
and continue to do so.

1638.   The NCIC sued PBLA to seek specific performance of the IALA and MOU. The
NCIC have continued to apply the terms against the affected Debtors' assets. That has included
the unilateral or conspiratorial (with the Lindberg Affiliates) disproportionate and adverse
allocation of interest and dividends paid to NCIC away from the Debtors.

### Breach of Fiduciary Duty by Herwig

1639.   In his execution of the IALA, Herwig held himself out as a Director of PBLA.

1640.   As a Director of PBLA, Northstar, Omnia and PBIHL, Herwig had a duty to
discharge his duties honestly, conscientiously, fairly and with undivided loyalty to PBLA,
Northstar, Omnia and PBIHL.

1641.   In addition to his other wrongful acts, Herwig executed the IALA with actual
knowledge that he was precluded by PBLA's Amended Certificate of Registration from signing
the IALA on behalf of PBLA and was not authorized to do so. At Herwig's 2004 Examination,

300

in response to questions about whether he was authorized to execute the IALA on behalf of PBLA and who authorized him to execute the IALA on behalf of PBLA, Herwig invoked the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Herwig 2004 Examination Tr., at 71:9-14.

1642. Herwig executed the IALA with actual knowledge that the IALA would harm PBLA by substantially reducing payments to PBLA (in fact PBLA has received no payments under the IALA). At Herwig's 2004 Examination, in response to a question about whether a reasonably prudent director would have allowed PBLA to sign the IALA, Herwig invoked the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Herwig 2004 Examination Tr., at 35:17-24. Similarly, when asked whether Herwig failed to adequately discharge his fiduciary duties that he owed to the Debtors by entering into the MOU and the IALA on behalf of the Debtors, Lindberg invoked the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 67:20-68:3.

1643. Herwig signed the IALA for his own personal benefit—to remain employed and continue to earn his ███████████ annual compensation (██████ a year salary plus bonuses)—and for the benefit of Lindberg with disregard to the rights of PBLA, Northstar, Omnia, and PBIHL. When asked whether he paid the Debtors' directors to breach their fiduciary duties to the Debtors, Lindberg invoked the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 138:13-16.

1644. Herwig failed to exercise the reasonable skill or care expected of a director or act in a manner that he reasonably believed could have authorized or in the best interests of PBLA,

301

Northstar, Omnia and PBIHL. At Herwig's 2004 Examination, in response to a question about whether the IALA and the amendments therein were in the best interest of the Debtors, specifically PBLA, Herwig invoked the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Herwig 2004 Examination Tr., at 37:19-22.

1645.  The value of the loans and preferred equity held by PBLA, Northstar, Omnia and PBIHL have been substantially impaired as a direct and proximate result of Herwig's wrongful action.

1646.  In executing the IALA when he lacked authority to do so, Herwig breached his fiduciary duties owed to PBLA, Northstar, Omnia and PBIHL.

1647.  Relatedly, records available to the Debtors indicate that in mid-2020, Herwig and Lindberg began to negotiate monetary and ongoing litigation cooperation terms concerning Herwig's exit from one or more of his employment and director and officer positions with Lindberg and the Lindberg Affiliates.  While Herwig's relationship and performance of duties for one or more of the Lindberg Affiliates continued alongside the negotiations, the negotiations between Lindberg and Herwig eventually resulted in a written agreement made effective in the spring of 2021.

1648. Moreover, the records available to the Debtors show that the material terms negotiated beginning in mid-2020 and the terms eventually agreed to include the following:  (a) a monthly payment of ███████ (i) for consulting services inclusive of advice, services, and management and (ii) cooperation and consultation on litigation and similar disputes, with selection of counsel by Herwig and payment of all legal fees in addition to the monthly payment; (b) business expense reimbursement; (c) full indemnification, inclusive of attorneys' fees, connected with services rendered during the consultancy, excepting fraud and criminal and

302

similarly wrongful acts; and (d) incentive compensation opportunities based on the closure of transactions in which Herwig was involved during the engagement, which based on specifics exchanged during negotiations leading to the eventual agreement may have neared or exceeded ███████████

1649.   Consequently, on December 22, 2022, Herwig pleaded guilty to a federal crime directly related to his involvement with the PBLA transactions alleged in *SEC v. Lindberg, et al.*, Case No. 22-cv-715 (M.D.N.C.) [ECF No. 1]. The crime was conspiracy to defraud the United States. His criminal act(s) breached his fiduciary duties to PBLA, Northstar, Omnia and PBIHL.

### Breach of Fiduciary Duty by Lindberg

1650.   In executing the MOU, Lindberg held himself out as attorney-in-fact for, among others, the SACs and PBLA, as an agent under the senior term loan agreements. Although, Northstar, Omnia and PBIHL are not parties to the MOU or IALA, they are lenders and preferred equity holders whose respective interests were impaired under the IALA and MOU.

1651.   As such, Lindberg had a duty to discharge his duties honestly, conscientiously, fairly and with undivided loyalty to the Debtors.

1652.   Lindberg executed the MOU with actual knowledge that he was precluded by PBLA, Northstar and Omnia's respective Amended Certificates of Registration from signing the MOU on their behalf.

1653.   Lindberg executed the MOU with actual knowledge that the MOU would harm the Debtors by substantially reducing payments to the Debtors. Lindberg also had actual knowledge that the MOU would result in no benefit to the Debtors.  He did so for his own personal benefit, in disregard of the rights of the Debtors and their obligations to policyholders, financial product owners, and similar stakeholders.

1654. At Lindberg's 2004 Examination, in response to a question about whether entering into the MOU and the IALA was in the best interest of the Debtors and the policyholders, he invoked the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 67:3-10.

1655. Lindberg failed to act in a manner that he reasonably believed to be in the best interests of the Debtors.

1656. The value of the loans and preferred equity held by the Debtors have been substantially impaired as a direct and proximate result of Lindberg's wrongful action.

1657. In executing the MOU when he lacked authority to do so, Lindberg breached his fiduciary duties owed to PBLA and the other Debtors, among the other wrongs alleged in this Complaint.

### Breach of Fiduciary Duty by CBL and SNIC

1658. CBL and SNIC were the agents of the Debtors with respect to one or more of the Debtors' Investments (loans and preferred equity).

1659. Under North Carolina law, the relationship of agent and principal gives rise to a fiduciary duty.

1660. CBL and SNIC did not act for the benefit of the Debtors. Rather, they knowingly harmed the Debtors' financial interests and improved their financial interests in breach of their fiduciary duties. As one example, CBL and SNIC traded loan modifications under the IALA in order to induce Lindberg to sign the MOU in that they could gain complete control over the 511 SACs.

304

1661.   The SACs are comprised of Global Growth operating companies as well as the pass-through vehicles, through which the NCIC admit the Debtors' Investments flowed. *See* MOU, Exhibit A [Specified Affiliated Companies].

1662.   As a result, if the SACs are transferred to NHC, then the NCIC will not only be able to unilaterally modify multiple Debtor loans, but they will also be in control of the companies through which over $700 million of the Debtors' assets disappeared (not counting assets emanating from the PBLA ULICO Trusts).

1663.   Court appointed fiduciaries, such as the JPLs, may not be compelled to be compromised or subordinated to another, particularly parties such as the NCIC and Dinius, each of which has previously agreed to adversely modify the Debtor Investments, and through NHC, would have total control over the Debtor Investment Counterparties and subsequent transferees of the Debtors' so-called "investments."

1664.   Such self-dealing constitutes a breach of a fiduciary duty under North Carolina law.  Moreover, these breaches were readily apparent to and known by Dinius and the NCDOI.

1665.   CBL and SNIC executed the MOU and IALA with actual knowledge that the MOU and IALA would substantially harm the Debtors by materially reducing payments to the Debtors.  CBL and SNIC also had actual knowledge that the MOU and IALA would result in no benefit to the Debtors.  They did so for their own benefit in disregard of the Debtors' rights.  They have continued to do so, as one example by keeping for themselves interest and principal payments due to the Debtors.

1666.   CBL and SNIC failed to act in a manner that they reasonably believed to be in the best interests of the Debtors and their obligations to their policyholders, financial product owners, and similar stakeholders.

305

1667.  The value of the loans and preferred equity held by each of the Debtors have been substantially impaired as a direct and proximate result of the wrongful actions of CBL and SNIC.

### *Insufficiency of Consideration*

1668.  Under the terms of the MOU and IALA, the Debtors were forced to forego receipt of hundreds of millions of dollars in principal and interest payments, the primary purpose of which was to fund the rehabilitation of CBL and SNIC.

1669.  The Debtors received no consideration in exchange for the significant concessions they were forced to make under the IALA and MOU.

1670.  At Herwig's 2004 Examination, when asked to confirm that the Debtors received no consideration for the loan modifications under the IALA, Herwig invoked the privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Herwig 2004 Examination Tr., at 73:3-6.

1671.  To the extent the Debtors received any consideration from the NCIC for entry into or application of the IALA and MOU, any such consideration is grossly inadequate and is disproportionate to the value of the significant concessions the Debtors were forced to make under the MOU and IALA.

### *CBL and SNIC Continue to Breach Their Fiduciary Duties*

1672.  All the loan agreements whereby CBL or SNIC acted as agents to the Plaintiffs provide in relevant part that "Borrower shall have no right to specify the order or the accounts to which Agent shall allocate or apply any payments required to be made by Borrower to Agent on behalf of Lenders or otherwise received by Agent on behalf of Lenders under this Agreement when any such allocation or application is not specified elsewhere in this Agreement."

1673. CBL and SNIC, as agents for the Debtors on at least twenty-nine (29) loan agreements, have breached this provision of the loan agreement, and will continue to breach this provision.

1674. Dinius further testified that CBL and SNIC were instructed by Global Growth to not pay PBLA its proportional share of any partial paydown, saying Global Growth "intentionally excluded PBLA from … everything." Dinius 2004 Examination Tr., at 75:12-75:25; Tr., at 77:7-77:17 ("Q. But the exclusion is coming solely from the Global Growth side; is that -- is that your testimony? A. That's my understanding. Q. And so where PBLA is the lender, Global Growth has insisted that the money not go to PBLA and go, instead, to the other lenders; is that your testimony? A. Well, I -- my testimony is that they've never directed us to pay – they've never directed us to pay anything to PBLA."). Similarly, when asked whether he knew how partial loan repayments are supposed to be allocated among the lenders and whether it was supposed to be proportionally. Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 29:20-25.

1675. Moreover, when asked whether (i) he ever told Dinius not to remit loan payments to PBLA and (ii) whether he or anyone at Global Growth ever told Dinius how to allocate loan repayments under loans where one or more of the Debtors was a lender, Lindberg invoked his privilege against self-incrimination provided in the Fifth Amendment to the United States Constitution. Lindberg 2004 Examination Tr., at 32:9-25.

1676. Dinius went so far as to say that if Global Growth or the Lindberg Affiliate directed CBL or SNIC to pay the entire paydown to CBL and none to PBLA, that CBL and SNIC would comply with the directive. Dinius 2004 Examination Tr., at 75:1-75:8 ("Q. So if the

307

borrower, i.e., the Lindberg Global Growth affiliate, said 'Pay all of the money to CBL and none to PBLA,' you would pay it all to CBL -- CBL and none to PBLA; is that your testimony? A. If that was how it was determined, yes.").

1677. When asked how CBL and SNIC would allocate payments to lenders where a loan was partially paid down, Dinius testified that CBL and SNIC would allocate the payments based on information received from the borrowers – i.e Global Growth and the Lindberg Affiliates. Dinius 2004 Examination Tr., at 74:74:15-74:25; Tr., at 77:21-77:24 ("Q. Have you always applied the paydowns in the manner specified by Global Growth or its affiliates? A. Yes.").

1678. In a July 1, 2019 email to Dinius, Stewart attached a flow of funds chart concerning the paydown of a loan to GBIG Holdings, advising that Northstar and PBLA were to receive small paydowns. Dinius responded that more needed to go to CBL, ██████████ ████████████████████████ and further pressured Stewart ████████████████ ████████████ Stewart ultimately obliged. Moreover, Dinius testified that he believed "there [was] no obligation to pay [loan proceeds] proportionally," and "[they] need[ed] more to go to CBL," instead of the Debtors such as Northstar and PBLA. Dinius Examination 2004 Tr., at 97:20-99:5. As agents for the Debtors under at least twenty-nine (29) loan agreements, CBL and SNIC are obligated to treat the Debtors at least as well as they treat themselves, if not put the Debtors' interests above their own. Yet, on multiple occasions, CBL and SNIC have put their own interests above the interests of their principals, thereby causing harm to the Debtors, and undoubtedly will continue to do so.

308

1679.  Furthermore, CBL and SNIC, as agents for the Debtors on twenty-nine (29) loan agreements, have received three separate interest payments on said loan agreements in 2022, and have failed to remit said payments to the Debtors.

1680.  At his Rule 2004 Examination, Dinius admitted that CBL and SNIC received three interest payments in May 2022, August 2022, and November 2022, and that the Plaintiffs have not received any remittances from those three payments. *Id.*, at 99:17-99:24.

1681.  When asked why CBL and SNIC failed to remit the interest payments to the Debtors and other lenders, Dinius testified:

> We do not have sufficient information to allocate those payments and counsel has been working with Global Growth's counsel over many months to get that information. And we still do not have sufficient information to fully reconcile how much money the agents received. Q. How much money the agents received or how it should be allocated among the lenders? A. Well, we know how much we received, but we don't know how -- how that should be allocated.

*Id.*, at 99:24-100:12.

1682.  Dinius further testified that none of the three interest payments has been disbursed to any lenders, as CBL and SNIC await a reconciliation from Global Growth describing which interest payments attached to which loan. *Id.*, at 102:14-102:23. There does not appear to be any legitimate justification for CBL and SNIC to have failed to rectify these issues over the last eight months and distribute past due interest payments to the Debtors. Failure to have done so on a timely basis is a breach of CBL's and SNIC's duties as the Debtors' agents, and compounded the Debtors' ongoing loss and damage, among other things adversely affecting its policyholders and owners of similar financial products.

1683.  Based on the NCIC's past conduct, Plaintiffs reasonably believe that the NCIC may continue to pay themselves and other lenders other than proportionally – and not pay the

Debtors any loan proceeds - in violation of the Plaintiffs' rights respecting the subject of this action, which would tend to render any Judgment and Order ineffectual, or if such actions are committed or continued during the pendency of this action, would produce injury to the Plaintiffs.

## <u>COUNT I</u>
### <u>Fraudulent Trading Pursuant to Bermuda Companies Act 1981, § 246</u>

**(Lindberg; Herwig; Lindberg Affiliates; Senior Decision Makers)**

1684.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1685.  Lindberg and the Senior Decision Makers were each knowingly parties to the carrying on of the Debtors' businesses and/or were directors of the Debtors.

1686.  Lindberg and the Senior Decision Makers knowingly caused or allowed Northstar, Omnia, and PBIHL to carry on their respective businesses, with the knowledge that Northstar, Omnia, and PBIHL were insolvent or near insolvent.

1687.  The respective businesses of Northstar, Omnia, and PBIHL were carried on by Lindberg and the Senior Decision Makers with the intent to defraud creditors of these companies or creditors of any person or for any other fraudulent purpose in each case as pleaded *supra* and with the knowledge that there was no reasonable prospect of the creditors ever receiving payment of those debts.

1688.  Lindberg and the Senior Decision Makers were knowingly parties to the carrying on of the businesses in the manner aforesaid.

310

## COUNT II
### Fraud Pursuant to North Carolina Law

**(Lindberg; Lindberg Affiliates; Senior Decision Makers)**

1689.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1690.  Each of the Lindberg Affiliates, Lindberg, Herwig, Solow, Miller, and Bostic, individually and collectively, concealed material facts from each of the Debtors concerning the use of the Debtors' assets to improperly fund the operations of the Lindberg Affiliates.

1691.  Each of the Lindberg Affiliates, Lindberg, Herwig, Solow, Miller, and Bostic, individually and collectively, concealed these material facts to deceive the Debtors, their respective creditors and their respective policyholders.

1692.  Each of the Lindberg Affiliates, Lindberg, Herwig, Solow, Miller, and Bostic, individually and collectively, knowingly took such actions with the intent to deceive the Debtors, their respective creditors and their respective policyholders.

1693.  The actions by each of the Lindberg Affiliates, Lindberg, Herwig, Solow, Miller, and Bostic, individually and collectively, did in fact deceive the Debtors, their respective creditors and their respective policyholders.

1694.  As a result, each of the Debtors suffered economic injury and damages.

## COUNT III
### Constructive Fraud Pursuant to North Carolina Law

**(Lindberg; Senior Decision Makers)**

1695.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1696.  Herwig was a director of PBLA, Northstar, Omnia, and PBIHL from November 2018 through 2021. By virtue of that role, he owed the Debtors fiduciary duties, including but

311

not limited to the duty of loyalty and the implied covenant of good faith and fair dealing, as well as the duties of honesty and care.

1697.  Lindberg was a director of PBLA in 2017 only (and owed PBLA fiduciary duties, including but not limited to the duty of loyalty and the implied covenant of good faith and fair dealing, as well as the duties of honesty and care for this period by virtue of this office), and was never a de jure Director of Northstar, Omnia, or PBIHL.

1698. The other Senior Decision Makers were never de jure Directors of PBLA, Northstar, Omnia, or PBIHL.

1699.  Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) were each knowingly parties to the carrying on of the Debtors' businesses, and voluntarily assumed fiduciary duties to each of the Debtors, as well as a duty to exercise care, skill, and diligence, by undertaking to perform the following functions for, or having assumed a responsibility to, each of the Debtors as would thereby reasonably entitle the Debtors to expect that Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) would act in the Debtors' interest to the exclusion of their own or a third party's interest:

(a)     Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) held unfettered discretion to transfer cash and other assets in and out of the Debtors.

(b)     Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) held all authority over the daily business operations and other affairs of the Debtors.

(c)     The extent of delegation of decision-making power to Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director), in that corporate formalities were rarely if ever observed and the administrative steps of all

transactions concerning the Debtors were ceded to Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) or their agents.

(d)   The extent of the power that, through that delegation and influence, Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) had to affect the commercial interests of the Debtors (including by entering all financial transactions on Debtors' behalf; including but not limited to the MOU and IALA).

1700. To that extent, the Debtors were at the mercy of Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) and reliant upon them to act in their interests. This relationship meant that Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) owed the Debtors the fiduciary duties set out herein.

1701. Each of Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director), by virtue of their respective positions at Global Growth and the Debtors, was in a relation of trust and confidence vis-à-vis the Debtors, and was required to act in good faith and with due regard for each of the Debtors' respective interest.

1702. Each of Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) undertook the transactions described herein with the intent to benefit themselves and each other, taking advantage of their position of trust to the detriment of the Debtors.

1703. The actions taken by each of Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) proximately caused each of the Debtors to suffer economic injury and damages.

## <u>COUNT IV</u>

**Avoidance and Recovery of Actual Fraudulent Transfers Pursuant to North Carolina Law <u>Under North Carolina Uniform Voidable Transactions Act § 39-23.4(a)(1)</u>**

**(Lindberg; Debtor Investment Counterparties; Lindberg Affiliates (as Transferees and Subsequent Transferees)**

1704.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1705.  The Debtor Investment Counterparties intentionally transferred assets received from the Debtors to Lindberg and the Lindberg Affiliates.

1706.  Plaintiffs seek to avoid the overarching transfers from (i) the Debtor Investment Counterparties to the Lindberg Affiliates, and (ii) the Debtor Investment Counterparties to Lindberg.

1707.  Plaintiffs do not seek to avoid the component transactions by which the overarching transfers from the Debtor Investment Counterparties to either the Lindberg Affiliates or Lindberg were executed.

1708.  The transfers were made with knowledge that the Debtor Investment Counterparties would be unable to pay the claims of their creditors as a result of said transfers.

1709.  The Debtor Investment Counterparties, Lindberg, and the Lindberg Affiliates used the assets for their sole benefit, or intentionally transferred the assets to another Lindberg Affiliate.

1710.  The Debtor Investment Counterparties, Lindberg, and the Lindberg Affiliates knew that the transfers would enrich Lindberg and/or the Lindberg Affiliates to the detriment of the Debtors.

1711.  The Debtor Investment Counterparties, Lindberg, and the Lindberg Affiliates knew the Debtors would receive no consideration or equivalent value as a result of the Debtor

314

Investment Counterparties' transfers to Lindberg and/or the Lindberg Affiliates, and any subsequent transfer thereafter to another Lindberg Affiliate.

1712.  The Debtor Investment Counterparties, Lindberg, and the Lindberg Affiliates knew that at the time of the transfers, the Debtors were insolvent or would be rendered insolvent by the transfers.

1713.  The Debtor Investment Counterparties, Lindberg, and the Lindberg Affiliates intended the consequences of their actions.

1714.  The Debtors, as creditors of the Debtor Investment Counterparties, have standing to avoid the fraudulent transfers made by the Debtor Investment Counterparties to Lindberg and/or the Lindberg Affiliates.

1715.  The Debtors also have standing to sue those Lindberg Affiliates that were subsequent transferees of said transfers.

1716.  Plaintiffs, as the Debtors' foreign representatives, have the rights and powers to bring such claims on behalf of the Debtors.

1717.  The transfers were made with actual intent to hinder, delay or defraud the Debtors and enrich and benefit the Debtor Investment Counterparties, Lindberg, the Lindberg Affiliates and any and all subsequent transferees.

1718.  Lindberg, as initial transferee and subsequent transferee, did not take the transfers in good faith or for value.

1719.  The Lindberg Affiliates, as initial transferees and subsequent transferees, did not take the transfers in good faith or for value.

1720.  The Plaintiffs are entitled to avoid the transfers and obligations incurred herein as against Lindberg and/or the Lindberg Affiliates: (i) as the first transferee of the asset for whose benefit the transfer was made; or (ii) an immediate or mediate transferee of the first transferee.

### COUNT V
**Avoidance and Recovery of Constructive Fraudulent Transfers Pursuant to North Carolina Law**
**Under North Carolina Uniform Voidable Transactions Act §39-23.4(a)(2)**

**(Lindberg; Debtor Investment Counterparties; Lindberg Affiliates (as Transferees and Subsequent Transferees)**

1721.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1722.  The Debtors made the transfers and incurred the obligations to the Debtor Investment Counterparties, the Lindberg Affiliates, and/or Lindberg without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the Debtors (i) were engaged or were about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' ability to pay as they became due.

1723.  Plaintiffs seek to avoid the overarching transfers from (i) the Debtor Investment Counterparties to the Lindberg Affiliates, and (ii) the Debtor Investment Counterparties to Lindberg.

1724.  Plaintiffs do not seek to avoid the component transactions by which the overarching transfers from the Debtor Investment Counterparties to either the Lindberg Affiliates or Lindberg were executed.

1725. None of the Debtor Investment Counterparties, the Lindberg Affiliates, or Lindberg is a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

1726. None of the transfers constitute a margin payment or settlement payment made by, or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

1727. None of the transfers were made by, or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, commodity contract, or forward contract, that is made before the commencement of these Chapter 15 cases.

1728. Any financial institutions or securities clearing agencies that either received or disbursed the transfers from the Debtor Investment Counterparties to the Lindberg Affiliates and/or Lindberg were either mere conduits or intermediaries, and not transferees.

1729. No commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency acted as an actual or implied agent for any of the Debtors, the Debtor Investment Counterparties, the Lindberg Affiliates, or Lindberg.

1730. The Debtors, as creditors of the Debtor Investment Counterparties, have standing to avoid the fraudulent transfers made by the Debtor Investment Counterparties to the Lindberg Affiliates and/or Lindberg.

1731. The Debtors have standing to sue Lindberg and/or those Lindberg Affiliates that were subsequent transferees of said transfers.

317

1732.  Plaintiffs, as the Debtors' foreign representatives, have the rights and powers to bring such claims on behalf of the Debtors.

1733.  By reason of the foregoing, the transfers and subsequent transfers are constructively fraudulent as to the Debtors.

### COUNT VI
### Avoidance and Recovery of Constructive Fraudulent Transfers Pursuant to North Carolina Law
### Under North Carolina Uniform Voidable Transactions Act §39-23.5

**(Lindberg; Debtor Investment Counterparties; Lindberg Affiliates (as Transferees and Subsequent Transferees)**

1734.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1735.  The Debtors made the transfers and incurred the obligations to the Debtor Investment Counterparties without receiving a reasonably equivalent value in exchange for the transfers or obligations, and the Debtors were insolvent at that time or the Debtors became insolvent as a result of the transfers or obligations.

1736.  Plaintiffs seek to avoid the overarching transfers from (i) the Debtor Investment Counterparties to the Lindberg Affiliates, and (ii) the Debtor Investment Counterparties to Lindberg.

1737.  Plaintiffs do not seek to avoid the component transactions by which the overarching transfers from the Debtor Investment Counterparties to the Lindberg Affiliates and/or Lindberg were executed.

1738.  None of the Debtor Investment Counterparties, the Lindberg Affiliates or Lindberg is a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

318

1739.  None of the transfers constitute a margin payment or settlement payment made by, or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

1740.  None of the transfers were made by, or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, commodity contract, or forward contract, that is made before the commencement of these Chapter 15 cases.

1741.  Any financial institutions or securities clearing agencies that either received or disbursed the transfers from the Debtor Investment Counterparties to the Lindberg Affiliates and/or Lindberg were either mere conduits or intermediaries, and not transferees.

1742.  No commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency acted as an actual or implied agent for any of the Debtors, the Debtor Investment Counterparties, the Lindberg Affiliates, or Lindberg.

1743.  The Debtors, as creditors of the Debtor Investment Counterparties, have standing to avoid the fraudulent transfers made by the Debtor Investment Counterparties to the Lindberg Affiliates and/or Lindberg.

1744.  The Debtors have standing to sue Lindberg and/or those Lindberg Affiliates that were subsequent transferees of said transfers.

1745.  Plaintiffs, as the Debtors' foreign representatives, have the rights and powers to bring such claims on behalf of the Debtors.

1746.  By reason of the foregoing, the transfers and subsequent transfers are constructively fraudulent as to the Debtors.

## COUNT VII
**Avoidance of Fraudulently Incurred Indebtedness and Recovery of Actual Fraudulent Transfers Pursuant to North Carolina Law**
**Under North Carolina Uniform Voidable Transactions Act § 39-23.4(a)(1)**

### (NCIC)

1747.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1748.  By virtue of the MOU and IALA, the Lindberg Affiliates and the Debtor Investment Counterparties fraudulently incurred indebtedness and/or intentionally transferred assets received from the Debtors to NCIC.

1749.  Plaintiffs seek to avoid the overarching transfers from (i) the Debtor Investment Counterparties to the Lindberg Affiliates, and (ii) the Debtor Investment Counterparties to Lindberg.

1750.  Plaintiffs do not seek to avoid the component transactions by which the overarching transfers from the Debtor Investment Counterparties to either the Lindberg Affiliates or Lindberg were executed.

1751.  NCIC used the assets for their sole benefit.

1752.  The Debtor Investment Counterparties and the Lindberg Affiliates knew that the transfers would enrich NCIC to the detriment of the Debtors.

1753.  The Debtor Investment Counterparties and the Lindberg Affiliates knew the Debtors would receive no consideration or equivalent value as a result of the transfers to NCIC.

1754.  The Debtor Investment Counterparties, the Lindberg Affiliates, and NCIC knew that at the time of the transfers, the Debtors were insolvent or would be rendered insolvent by the transfers.

320

1755.  The Debtor Investment Counterparties, the Lindberg Affiliates, and NCIC intended the consequences of their actions.

1756.  The Debtors, as creditors of the Debtor Investment Counterparties, have standing to avoid the fraudulent transfers made by the Debtor Investment Counterparties to NCIC.

1757.  Plaintiffs, as the Debtors' foreign representatives, have the rights and powers to bring such claims on behalf of the Debtors.

1758.  The transfers were made with actual intent to hinder, delay or defraud the Debtors and enrich and benefit NCIC and any and all subsequent transferees.

1759.  NCIC, as initial transferees and subsequent transferees, knowingly did not take the transfers in good faith or for value.

1760.  The Plaintiffs are entitled to avoid the transfers and obligations incurred herein as against NCIC: (i) as the first transferee of the asset for whose benefit the transfer was made; or (ii) an immediate or mediate transferee of the first transferee.

## COUNT VIII
### Avoidance of Fraudulently Incurred Indebtedness and Recovery of Constructive Fraudulent Transfers Pursuant to North Carolina Law
### Under North Carolina Uniform Voidable Transactions Act §39-23.4(a)(2)

### (NCIC)

1761.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1762.  By virtue of the MOU and IALA, the Debtors made the transfers and fraudulently incurred the obligations to NCIC without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the Debtors (i) were engaged or were about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably

321

should have believed that the Debtors would incur, debts beyond the Debtors' ability to pay as they became due.

1763.  Plaintiffs seek to avoid the overarching transfers from the Debtors to NCIC.

1764.  Plaintiffs do not seek to avoid the component transactions by which the overarching transfers from the Debtors to NCIC were executed.

1765.  None of the NCIC is a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

1766.  None of the transfers or incurrences of indebtedness constitute a margin payment or settlement payment made by, or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

1767.  None of the transfers or incurrences of indebtedness were made by, or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, commodity contract, or forward contract, that is made before the commencement of these Chapter 15 cases.

1768.  Any financial institutions or securities clearing agencies that either received or disbursed the transfers from the Debtors to NCIC were either mere conduits or intermediaries, and not transferees.

1769.  No commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency acted as an actual or implied agent for any of the Debtors or NCIC.

1770.  Plaintiffs, as the Debtors' foreign representatives, have the rights and powers to bring such claims on behalf of the Debtors.

322

1771. By reason of the foregoing, the transfers and subsequent transfers are constructively fraudulent as to the Debtors.

### COUNT IX
**Avoidance of Fraudulently Incurred Indebtedness and Recovery of Constructive Fraudulent Transfers Pursuant to North Carolina Law Under North Carolina Uniform Voidable Transactions Act §39-23.5**

### (NCIC)

1772. Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1773. By virtue of the MOU and IALA, the Debtors made the transfers and fraudulently incurred the obligations to NCIC without receiving a reasonably equivalent value in exchange for the transfers or obligations, and the Debtors were insolvent at that time or the Debtors became insolvent as a result of the transfers or obligations.

1774. Plaintiffs seek to avoid the overarching transfers from the Debtors to NCIC.

1775. Plaintiffs do not seek to avoid the component transactions by which the overarching transfers from the Debtors to NCIC were executed.

1776. None of the Debtors or NCIC is a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

1777. None of the transfers or incurrences of indebtedness constitute a margin payment or settlement payment made by, or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

1778. None of the transfers or incurrences of indebtedness were made by, or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract,

commodity contract, or forward contract, that is made before the commencement of these Chapter 15 cases.

1779. Any financial institutions or securities clearing agencies that either received or disbursed the transfers from the Debtors to NCIC were either mere conduits or intermediaries, and not transferees.

1780. No commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency acted as an actual or implied agent for any of the Debtors or NCIC.

1781. Plaintiffs, as the Debtors' foreign representatives, have the rights and powers to bring such claims on behalf of the Debtors.

1782. By reason of the foregoing, the transfers and subsequent transfers are constructively fraudulent as to the Debtors.

## COUNT X

### Avoidance and Recovery of Fraudulent Transfer of Assets Pursuant to Part IV A of the Bermuda Conveyancing Act 1983

### (Debtor Investment Counterparties)

1783. Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1784. The Debtors directly or indirectly (i) made a disposition of their property or any interest in property, or (ii) caused such a disposition of their property or any interest in property to be made to the Debtor Investment Counterparties.

1785. The Debtors' disposition of their property to the Debtor Investment Counterparties was made for no or substantially undervalued consideration and therefore was at an undervalue.

SL1 1812077v17 114825.00001

1786. Alternatively, the value of the consideration given was, in money or money's worth, significantly less than the value, in money or money's worth, of the property disposed of and therefore was at an undervalue.

1787. The Senior Decision Makers, in breach of their fiduciary duties to the Debtors, directly or indirectly made or caused the Debtors to make a disposition of their property or any interest in property to the Debtor Investment Counterparties. As a result, the Senior Decision Makers are "transferors" of the Debtors' property pursuant to Bermuda statute.

1788. The Senior Decision Makers' dominant purpose in causing the Debtors' transfers to the Debtor Investment Counterparties was to deprive the Debtors of assets and to insulate the Senior Decision Makers from claims that might be made against them by doing so.

1789. The Senior Decision Makers' breach of fiduciary duties, and subsequent actions in causing the Debtors to make a disposition of their property to the Debtor Investment Counterparties, results in the Debtors being eligible creditors that can assert a claim for fraudulent transfer within the meaning of Part IV A of the Fraudulent Conveyancing Act 1983 of Bermuda.

1790. Plaintiffs, as the Debtors' foreign representatives, have the rights and powers to bring such claims on behalf of the Debtors.

## COUNT XI

**Avoidance and Recovery of Fraudulent Transfer of Assets Pursuant to
Part IV A of the Bermuda Conveyancing Act 1983**

**(Lindberg; Lindberg Affiliates (as Transferees and Subsequent Transferees); NCIC)**

1791. Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

325

1792. The Debtors directly or indirectly (i) made a disposition of their property or any interest in property, or (ii) caused such a disposition of their property or any interest in property to be made to the Debtor Investment Counterparties.

1793. The Debtors' disposition of their property to the Debtor Investment Counterparties was made for no or substantially undervalued consideration and therefore was at an undervalue.

1794. Alternatively, the value of the consideration given was, in money or money's worth, significantly less than the value, in money or money's worth, of the property disposed of and therefore was at an undervalue.

1795. The Debtor Investment Counterparties and other entities in the transactional "chain" of transactions pleaded herein between the Debtors and the ultimate recipients (the "**Transferors**") made relevant dispositions of property (i.e. the onward transfer of assets directly or indirectly received from the Debtors).

1796. The Transferors owed obligations to the Debtors (whether in debt under the contracts by which they acquired the relevant assets from the Debtors or by reason of other wrongdoing alleged herein) at the time of the relevant dispositions, or came to owe such obligations on or within two years of the relevant dispositions, and the relevant Debtors were reasonably foreseeable as creditors of the Transferors, so that they are "*transferors*" within the meaning of the statute, and the Debtors are "*eligible creditors*".

1797. The Transferors did so with the dominant purpose of putting the assets beyond the reach of the Debtors and defeating any claim that the Debtors might have against them (not least by depleting their own assets, so that there would be little or no assets against which the Debtors could enforce their claims).

326

1798.  The Plaintiffs, as foreign representatives of the Debtors, are therefore entitled to avoid them and are specifically entitled to orders (i) avoiding and setting aside all transfers made from each of the Debtors to (ultimately) the NCIC, the Lindberg Affiliates, Lindberg and other ultimate recipients; and (ii) directing the ultimate recipients to turn over the property transferred or the value thereof to the Plaintiffs.

### COUNT XII
### Declaratory Judgment Voiding the IALA and MOU Pursuant to Bermuda Law

**(Lindberg; Herwig; Lindberg Affiliates; Debtor Investment Counterparties; NCIC; SACs; EMAM; NEC; MOU Affected Parties; IALA Affected Parties)**

1799.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1800.  The investment modifications purportedly instituted under the MOU and IALA expressly required prior written approval from the BMA, which was never obtained.

1801.  As set forth in the Lamb Affidavit filed with this Court on May 5, 2022, Lindberg, Herwig, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC knew they needed the prior approval of the BMA to impair the Debtors' assets, yet they failed to obtain the required prior approval prior to executing the MOU and IALA.

1802.  The NCIC and their agents and representatives knew, as a result of the BMA's not having approved the MOU and IALA, that the MOU and IALA could not be in the interests of the Debtors.

1803.  The MOU and IALA adversely modified the economic terms of over $700 million of debt and preferred equity held by the Debtors by imposing lengthy maturity extensions of up to nine years, interest rate deferrals and reductions, and other waivers, for absolutely no consideration.

327

1804. There is insufficient evidence that PBLA was duly authorized to execute the MOU or IALA, and the JPLs have not been provided any corporate resolutions or other corporate formalities authorizing same.

1805. There is insufficient evidence that any of Northstar, Omnia, and PBIHL was duly authorized to be bound by the MOU or IALA, since none executed the MOU or IALA, and the JPLs have not been provided any corporate resolutions or other corporate formalities authorizing same.

1806. The entry into the MOU and IALA on behalf of Debtors was an ultra vires act in that it was undertaken without either actual or apparent authority, and for that reason incapable of binding the Debtors.

1807. The only consideration the Lindberg Affiliates, Debtor Investment Counterparties, and NCIC received for the MOU were the loan concessions under the IALA. The IALA is ultra vires, in that there was no actual or apparent authority to enter into a transaction for no consideration on behalf of the Debtors, and for that reason is incapable of binding the Debtors. As a result, the MOU is also invalid for failure of consideration and/or by virtue of an absence of authority which is attributable to a failure of consideration.

1808. The only law firms which may have been engaged for any Debtor in connection with the negotiation and execution of the IALA and MOU—Cadwalader, Wickersham & Taft LLP ("Cadwalader") and Moore & Van Allen PLLC ("MVA")—have repeatedly disclaimed any engagement by or for a Debtor, including with MVA as recently as the May 12, 2022 hearing in the Chapter 15 Proceeding, leaving the Debtors without any representation in the entry of the MOU and IALA. In properly authorized negotiations of this scale and significance, corporate entities such as the Debtors would have been represented by counsel whose role would be to

328

ensure their interests were adequately protected. When questioned under oath by the Court in the MOU trial, Lindberg could not testify that any Debtor was so represented, terming it "a good question." The Debtors' lack of counsel in the negotiation and execution of the MOU and IALA, and the knowledge of all parties to the MOU and IALA that the Debtors were not represented by counsel, demonstrates the MOU and IALA were not properly authorized by the Debtors.

1809.    With respect to assets held in the Trusts established for the benefit of ULICO, the Trustee (then Bank of New York Mellon, now TMI Trust Company) was not a party to the IALA or MOU, so the purported modifications cannot possibly be binding on assets held in the Trusts.

1810.    The modifications purportedly made pursuant to the IALA and MOU represent avoidable transactions on the basis that they were made when the Debtors were insolvent (or rendered insolvent) for no consideration such that, for the reasons given elsewhere:

> (i) no valid consideration was given for the contractual obligations allegedly modified;
>
> (ii) the MOU and IALA were executed for a substantial improper purpose, in breach of the duty of Lindberg, the Senior Decision Makers, CBL (as agent) and SNIC (as agent) to exercise their powers only for the purposes for which they are conferred;
>
> (iii) the modifications were conducted without the actual or apparent authority of the Debtors; and
>
> (iv)   any purported gratuitous disposition of the Debtors' property amounted to an unlawful disguised distribution of capital and/or an unlawful gratuitous corporate gift.

<u>Improper Purpose Transaction</u>

1811.    Lindberg and the Senior Decision Makers, by causing the Debtors' assets to be included in the MOU and IALA, exercised a fiduciary power for a substantial purpose outside the purposes for which that power had been conferred – namely, alleviating regulatory pressures

329

on the NCIC at the Debtors' expense – constituting a breach of the "proper purpose" fiduciary duty under Bermuda law.

1812.  This transaction was in breach of the proper purpose duty and/or as a result of that breach, such that the MOU and IALA are void or, alternatively, voidable, and the Plaintiffs have elected to avoid the MOU and IALA in commencing the present proceedings.

### COUNT XIII
### Declaratory Judgment Voiding the IALA and MOU Pursuant to North Carolina Law

**(Lindberg; Herwig; Lindberg Affiliates; Debtor Investment Counterparties; NCIC; SACs; EMAM; NEC; MOU Affected Parties; IALA Affected Parties)**

1813.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1814.  A real controversy exists between the Plaintiffs; Lindberg; Herwig; the Lindberg Affiliates; Debtor Investment Counterparties; NCIC; SACs; EMAM; NEC; MOU Affected Parties; and IALA Affected Parties in that: (i) the investment modifications purportedly instituted under the MOU and IALA expressly required prior written approval from the BMA, which was never obtained, and (ii) the failure of consideration given to the Debtors in exchange for having their interests adversely affected by the MOU and IALA.

1815.  As set forth in the Lamb Affidavit filed with this Court on May 5, 2022, Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC knew they needed the prior approval of the BMA to impair the Debtors' assets, yet they failed to obtain the required prior approval prior to executing the MOU and IALA.

1816.  Consideration is a necessary element for the formation of an enforceable contract.

1817.  The MOU and IALA adversely modified the economic terms of over $700 million of debt and preferred equity held by the Debtors by imposing lengthy maturity extensions of up

330

to nine years, interest rate deferrals and reductions, and other waivers, for absolutely no consideration.

1818. There is insufficient evidence that PBLA was duly authorized to execute the MOU or IALA, and the JPLs have not been provided any corporate resolutions or other corporate formalities authorizing same.

1819. There is insufficient evidence that any of Northstar, Omnia, and PBIHL was duly authorized to be bound by the MOU or IALA, since none executed the MOU or IALA, and the JPLs have not been provided any corporate resolutions or other corporate formalities authorizing same. The entry into the MOU and IALA on behalf of Debtors was an ultra vires act.

1820. The only law firms which may have been engaged for any Debtor in connection with the negotiation and execution of the IALA and MOU—Cadwalader and MVA—have repeatedly disclaimed any engagement by or for a Debtor, including with MVA as recently as the May 12, 2022 hearing in the Chapter 15 Proceeding, leaving the Debtors without any representation in the entry of the MOU and IALA. In properly authorized negotiations of this scale and significance, corporate entities such as the Debtors would have been represented by counsel whose role would be to ensure their interests were adequately protected and that when questioned under oath by the Court in the MOU trial, Lindberg could not testify that any Debtor was so represented, terming it "a good question." The Debtors' lack of counsel in the negotiation and execution of the MOU and IALA, and the knowledge of all parties to the MOU and IALA that the Debtors were not represented by counsel, demonstrates the MOU and IALA were not properly authorized by the Debtors.

1821.  With respect to assets held in the Trusts established for the benefit of ULICO, the Trustee (then Bank of New York Mellon, now TMI Trust Company) was not a party to the IALA or MOU, so the purported modifications cannot possibly be binding on assets held in the Trusts.

1822.  The Plaintiffs and the defendants hold opposing views as to the validity of the MOU and IALA.

1823.  The Plaintiffs and defendants herein have or may have legal rights, or are or may be under legal liabilities concerning the MOU and IALA, and on the facts admitted in the pleadings or established at the trial, this Court may render judgment, declaring the rights and liabilities of the respective parties, as between or among themselves, and affording the relief to which the parties are entitled under the judgment.

## COUNT XIV
### Breach of Fiduciary Duty Pursuant to Bermuda Law

### (Lindberg; Herwig; Senior Decision Makers)

1824.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1825.  Herwig was a director of PBLA, Northstar, Omnia, and PBIHL from 2017 through 2020. By virtue of that role, he owed the Debtors fiduciary duties, including but not limited to the duties set out more particularly below.

1826.  Herwig was under a fiduciary duty to exercise powers conferred upon him only for a proper purpose. As alleged *supra*, Herwig breached this fiduciary duty by causing the Debtors to engage in the various fraudulent transactions with the various substantial improper purposes detailed herein, and by causing the Debtors' assets to be included in the MOU and IALA. Herwig's exercise of these powers was not delegated to him by any of the Debtors, served no substantial purpose for any of the Debtors' businesses, and the purpose was improper.

332

1827. Herwig also breached his duty to each of the Debtors to have regard to the interests of their respective creditors. As alleged *supra*, Herwig breached this duty by causing the Debtors (without any or any proper or sufficient regard to the interests of their creditors) to engage in the various fraudulent transactions detailed herein, and by causing the Debtors' assets to be included in the MOU and IALA, in circumstances in which the Debtors were insolvent or bordering insolvency, or where an insolvent liquidation was more probable than not, and Herwig knew, or ought to have known, that each of the Debtors were insolvent or bordering on insolvency, or that an insolvent liquidation was probable.

1828. On December 22, 2022, Herwig pleaded guilty to one count of conspiracy to defraud the United States government.

1829. Lindberg was a director of PBLA in 2017 only (and owed the fiduciary duties set out below for this period by virtue of this office), and was never a de jure Director of Northstar, Omnia, or PBIHL.

1830. The other Senior Decision Makers were never de jure Directors of PBLA, Northstar, Omnia, or PBIHL.

1831. Lindberg and the other Senior Decision Makers (other than Herwig by virtue of his status as a director) voluntarily assumed fiduciary duties to each of the Debtors, as well as a duty to exercise care, skill, and diligence, by undertaking to perform the following functions for, or by assuming a responsibility to, each of the Debtors as would thereby reasonably entitle the Debtors to expect that Lindberg and the other Senior Decision Makers would act in the Debtors' interest to the exclusion of their own or a third party's interest:

(a)    The fact that Lindberg and the Senior Decision Makers held unfettered discretion to transfer cash and other assets in and out of the Debtors.

333

(b)     The fact that Lindberg and the Senior Decision Makers held all authority over the daily business operations and other affairs of the Debtors.

(c)     The extent of delegation of decision-making power to Lindberg and the Senior Decision Makers, in that corporate formalities were rarely if ever observed and the administrative steps of all transactions concerning the Debtors were ceded to Lindberg and the Senior Decision Makers or their agents.

(d)     The extent of the power that, through that delegation and influence, Lindberg and the Senior Decision Makers had to affect the commercial interests of the Debtors (including by entering all financial transactions on Debtors' behalf; including but not limited to the MOU and IALA).

To that extent, the Debtors were at the mercy of Lindberg and the Senior Decision Makers and reliant upon them to act in their interests. This relationship meant that Lindberg and the Senior Decision Makers owed the Debtors the duties set out below.

1832.  Lindberg and the Senior Decision Makers owed each of the Debtors a duty to act honestly and in good faith with a view to the Debtors' best interests. As alleged *supra*, Lindberg and the Senior Decision Makers breached this duty by causing the Debtors to engage in the various fraudulent transactions detailed herein, through and with the involvement and use of SASL, SICL, SFL, and similar entities to enrich themselves, among other things, and by causing the Debtors' assets to be included in the MOU and IALA.

1833. Lindberg and the Senior Decision Makers each owed a duty to exercise their powers only for the purposes for which they were conferred. As alleged *supra*, Lindberg and the Senior Decision Makers breached this duty by causing the Debtors to engage in the various fraudulent transactions (with the substantial improper purposes) detailed herein, and by causing the Debtors' assets to be included in the MOU and IALA.

334

1834.  Lindberg and the Senior Decision Makers each owed a duty to avoid a situation in which their duties to the Debtors conflicted, or possibly might conflict, with their duties to any other person or with their own interests. As alleged *supra*, Lindberg and the Senior Decision Makers breached this duty by causing the Debtors to engage in the various fraudulent transactions detailed herein, and by causing the Debtors' assets to be included in the MOU and IALA.

1835.  Lindberg and the Senior Decision Makers each owed a duty not to accept profits or remuneration that were not disclosed to the Debtors or were otherwise unauthorized. As alleged *supra*, Lindberg and the Senior Decision Makers breached this duty by causing the Debtors to engage in the various fraudulent transactions detailed herein. To the extent Lindberg and the Senior Decision Makers have accepted any profits or other remuneration, they have a duty to account to the Debtors for any such profits.

1836.  Lindberg and the Senior Decision Makers were required to exercise care, diligence and skill concerning the Debtors' businesses that a reasonably prudent person would exercise in comparable circumstances. As alleged *supra*, Lindberg and the Senior Decision Makers breached this duty, and failed to act as a reasonably prudent individual in comparable circumstances would have acted, and failed to act with the requisite degree of care, skill and diligence, by causing the Debtors to engage in the various fraudulent transactions detailed herein, and by causing the Debtors' assets to be included in the MOU and IALA, each being acts which no reasonably competent individual, acting in the best interests of the Debtors, would have carried out.

335

1837.  By orchestrating and implementing the foregoing putative "investments" that benefited Lindberg personally and his non-Debtor Lindberg Affiliates, and in breach of the aforementioned duties, the Senior Decision Makers caused harmed to the Debtors.

1838.  Lindberg and the Senior Decision Makers improperly received bonuses upon the closing of the foregoing "investments", personally benefitting Lindberg and the Senior Decision Makers and causing harm to the Debtors in breach of the aforementioned duties.

1839.  By implementing the foregoing transactions under the IALA and MOU that benefited Lindberg personally, his non-Debtor Lindberg Affiliates and the NCIC, the Senior Decision Makers caused harm to the Debtors in breach of the aforementioned duties. The Senior Decision Makers' actions failed to abide by the ordinary standards of reasonable and honest people.

1840.  Lindberg and the Senior Decision Makers knew their conduct was dishonest by those standards and/or knew that the actions taken were contrary to the interests of the Debtors and/or were recklessly indifferent as to whether the actions taken were contrary to the interests of the Debtors or not.

1841.  As a result, Lindberg and the Senior Decision Makers breached the fiduciary duties and the duty of care, skill and diligence that they owed to the Debtors.

## COUNT XV

**Avoidance and Recovery of Fraudulent Transfer of Assets Pursuant to Bermuda Law
(Improper Purpose Transaction)**

**(Debtor Investment Counterparties)**

1842.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

336

1843.  Lindberg and the Senior Decision Makers, by causing the Debtors' assets to be transferred to the Debtor Investment Counterparties, exercised a power for a substantial purpose outside the purposes for which that power had been conferred, constituting a breach of the "proper purpose" duty under Bermuda law.

1844.  To the extent that the Debtors transferred assets to the Debtor Investment Counterparties in breach of the proper purpose duty and/or to the extent that any such transfers were caused by such a breach, such transactions were void or, alternatively, voidable, and the Plaintiffs have elected to avoid them in commencing the present proceedings.

1845.  Plaintiffs are entitled to declaratory judgment that the transfers to the Debtor Investment Counterparties are void, thereby restoring the Debtors' position to that if the transactions had never been made.

### COUNT XVI
**Declaratory Relief Pursuant Bermuda Law as to the Effect of Transactions Purportedly Entered Into by the Debtors**

**(Lindberg; Lindberg Affiliates; Global Growth)**

1846.  Plaintiffs hereby incorporate paragraphs 1 through __ hereof as though fully set forth herein.

1847.  Lindberg did not respect the separateness of the Debtors, the Debtor Investment Counterparties, or the Lindberg Affiliates in his dealings with the Debtors, the Debtor Investment Counterparties and the Lindberg Affiliates.

1848.  The lack of internal controls at Global Growth allowed Lindberg to commingle assets and transfer money between the Debtors, the Debtor Investment Counterparties, and the Lindberg Affiliates freely whenever the need for funds arose (including without limitation the examples cited above).

337

1849. Lindberg failed to adhere to corporate formalities and appropriate governance procedures, including the lack of financial controls and accurate recordkeeping, the failure to properly perform due diligence before making investments, the failure to monitor investments or comply with loan covenants, the failure to obtain required corporate and regulatory consents, and the failure to maintain adequate capitalization.

1850. The purpose of these actions was to create a complex web of companies behind the Debtor Investment Counterparties into which the Debtors' funds disappeared and were concealed from the purview of creditors and regulators, thereby making it extremely difficult if not impossible for the Debtors to ever be repaid on loans or equity investments, to sell such investments or otherwise realize value therefrom.

1851. These transactions were shams as a matter of Bermuda law (the "Sham Transactions").

1852. Lindberg, Global Growth, and the Lindberg Affiliates, as parties to the Sham Transactions, did not intend to give effect to the purported terms of the Sham Transactions, but rather: (i) intended to create different legal rights and obligations to those contained in the Sham Transaction documents; or (ii) intended to use the purposed terms of the Sham Transaction to give a false impression to third parties.

1853. Lindberg used the Debtors, Global Growth, and Debtor Investment Counterparties and the Lindberg Affiliates as agents or nominees so that Lindberg could receive property for his personal use and benefit, as is more particularly pleaded herein. The Court is entitled to look through or otherwise disregard the separate legal personality of those other parties on principles of agency and/or under the "concealment principle" (to the extent they differ) when determining the liability of Lindberg and other parties.

338

1854. Further or alternatively, the Debtors effected countless Sham Transactions the true purpose, substance and effect of which was, as is more particularly pleaded *supra*, different from that appearing on the face of the transaction documents that were used to paper them. To the extent of that difference, the Sham Transactions were not intended to have the purported effect described on the face of the relevant documents, which were used to convey a false impression of these transactions to third parties and were (for that reason) Sham Transactions that had only the true effect pleaded more particularly *supra*.

## COUNT XVII
### Piercing the Corporate Veil Pursuant to North Carolina Law to Reach the Assets of Global Growth and the Lindberg Affiliates

1855. Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1856. Lindberg did not respect the separateness of the Debtors, the Debtor Investment Counterparties, or the Lindberg Affiliates in his dealings with the Debtors, the Debtor Investment Counterparties and the Lindberg Affiliates.

1857. The lack of internal controls at Global Growth allowed Lindberg to commingle assets and transfer money between the Debtors, the Debtor Investment Counterparties, and the Lindberg Affiliates freely whenever the need for funds arose (including without limitation the examples cited above).

1858. The commingling of assets was necessary and occurred because the Debtor Investment Counterparties and the Lindberg Affiliates were inadequately capitalized, often perpetually.

1859. Lindberg failed to adhere to corporate formalities and appropriate governance procedures, including the lack of financial controls and accurate recordkeeping, the failure to

properly perform due diligence before making investments, the failure to monitor investments or comply with loan covenants, the failure to obtain required corporate and regulatory consents, and the failure to maintain adequate capitalization.

1860.   Lindberg created and perpetuated a complex web of companies behind the Debtor Investment Counterparties - excessively fragmenting a single enterprise into separate corporate entities - into which the Debtors' funds disappeared and were concealed from the purview of creditors and regulators, thereby making it extremely difficult if not impossible for the Debtors to ever be repaid on loans or equity investments, to sell such investments or otherwise realize value therefrom.

1861.   Lindberg exercised complete domination over the Debtors so that none of the Debtors had a separate existence from any of Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates. Lindberg completely dominated not only the finances of Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates, but of policy and business practice so that none of Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates had at the time a separate mind, will or existence of its own.

1862.   This domination has been used to commit a fraud or wrong against the Debtors, to perpetrate the violation of a statutory or other positive legal duty, or to perform or allow a dishonest and unjust act and series of them in contravention of the Debtors' legal rights.

1863.   The control and concomitant fraud caused injury or unjust loss to the Debtors.

1864.   As a result, this Court should pierce the corporate veils of Global Growth and the Lindberg Affiliates to allow the Debtors, as creditors of and investors in the Debtor Investment

340

Counterparties, all of which are merely shell companies, to reach the assets of Global Growth and all of the Lindberg Affiliates.

## COUNT XVIII
### Piercing the Corporate Veils of the Debtor Investment Counterparties Pursuant to North Carolina Law to Reach the Assets of The Lindberg Affiliates as Subsequent Transferees

1865.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1866.  Lindberg did not respect the separateness of the Debtors, the Debtor Investment Counterparties, or the Lindberg Affiliates in his dealings with the Debtors, the Debtor Investment Counterparties and the Lindberg Affiliates.

1867.  The lack of internal controls at Global Growth allowed Lindberg to commingle assets and transfer money between the Debtors, the Debtor Investment Counterparties, and the Lindberg Affiliates freely whenever the need for funds arose (including without limitation the examples cited above).

1868.  The commingling of assets was necessary and occurred because the Debtor Investment Counterparties and the Lindberg Affiliates were inadequately capitalized, often perpetually.

1869.  Lindberg failed to adhere to corporate formalities and appropriate governance procedures, including the lack of financial controls and accurate recordkeeping, the failure to properly perform due diligence before making investments, the failure to monitor investments or comply with loan covenants, the failure to obtain required corporate and regulatory consents, and the failure to maintain adequate capitalization.

1870.  Lindberg created and perpetuated a complex web of companies behind the Debtor Investment Counterparties - excessively fragmenting a single enterprise into separate corporate

341

entities - into which the Debtors' funds disappeared and were concealed from the purview of creditors and regulators, thereby making it extremely difficult if not impossible for the Debtors to ever be repaid on loans or equity investments, to sell such investments or otherwise realize value therefrom.

1871.  Lindberg exercised complete domination over the Debtors so that none of the Debtors had a separate existence from any of Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates. Lindberg completely dominated not only the finances of Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates, but of policy and business practice so that none of Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates had at the time a separate mind, will or existence of its own.

1872.  This domination has been used to commit a fraud or wrong against the Debtors, to perpetrate the violation of a statutory or other positive legal duty, or to perform or allow a dishonest and unjust act and series of them in contravention of the Debtors' legal rights.

1873.  The control and concomitant fraud caused injury or unjust loss to the Debtors.

1874.  As a result, this Court should pierce the corporate veils of the Debtor Investment Counterparties to allow the Debtors to reach the assets of subsequent transferees including the Lindberg Affiliates, and the Operating Companies.

## COUNT XIX
### Imposition of a Constructive Trust Over the Assets of Lindberg and Lindberg Affiliates as Subsequent Transferees Pursuant to North Carolina Law

1875.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

342

1876.  Prior to the acts described herein, each of the Debtors held an interest in cash and other liquid assets.

1877.  The Plaintiffs, as the representatives of each of the Debtors, have a right to possession of these assets on behalf of the Debtors and the Debtors' respective creditors.

1878.  Each of the Debtors, through the direction of Lindberg, entered into and executed hundreds of transactions whereby the Debtors entered into various loans and preferred equity investments with the Lindberg Affiliates with knowledge of the effect such transactions would have on the Debtors' future creditors, with the actual and specific intent to hinder, delay, or defraud those creditors.

1879.  All subsequent transferees of the fraudulent transfers alleged herein have wrongfully acquired their respective interest in the Debtors' assets, continue to wrongfully possess said assets, and are not entitled to continued possession of said assets.

1880.  As a result of the hundreds of transactions, over $700 million of the Debtors' assets were wrongfully transferred from the Debtors, at the detriment of the Debtors' creditors.

1881.  The Lindberg Affiliates had no equitable title or rights to these assets.

### <u>COUNT XX</u>
**<u>Substantive Consolidation of the Debtors with Global Growth, the Debtor Investment Counterparties and Other Lindberg Affiliates</u>**

1882.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1883.  The Debtors, Global Growth, the Debtor Investment Counterparties, and the other Lindberg Affiliates can be substantively consolidated for the following reasons: (i) there are consolidated financial statements; (ii) there is a unity of interest and ownership among the Debtors, Global Growth, the Debtor Investment Counterparties, and the other Lindberg Affiliates

343

– Lindberg; (iii) it is impossible to segregate and ascertain the individual assets and liabilities of the Debtors, Global Growth, the Debtor Investment Counterparties, and Lindberg Affiliates; (iv) Lindberg caused the transfers of assets among the Debtors, Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates without formal observance of corporate formalities; (v) Lindberg caused the commingling of assets and business functions; and (vi) there has been a disregard of legal formalities.

1884.  In addition: (i) creditors dealt with the Debtors, Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates as a single economic unit and did not rely on their separate identity in extending credit; (ii) the affairs of the Debtors, Global Growth, the Debtor Investment Counterparties, and the Lindberg Affiliates are so entangled that consolidation will benefit all creditors; and (iii) substantive consolidation will yield an equitable treatment of creditors without any undue prejudice to any particular group.

## COUNT XXI
### Unfair and Deceptive Trade Practice Pursuant to North Carolina Law
### N.C. Gen. Stat. § 75-1.1

### (Lindberg; Senior Decision Makers)

1885.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1886.  Each of Lindberg, Herwig, Solow, Miller, and Bostic, by virtue of their respective positions at Global Growth and the Debtors, were in a relation of trust and confidence vis-à-vis the Debtors, and were required to act in good faith and with due regard for each of the Debtors' respective interest.

1887.  On December 22, 2022, Herwig pleaded guilty to one count of conspiracy to defraud the United States government.

344

1888. Each of Lindberg, Herwig, Solow, Miller, and Bostic's actions in initiating, authorizing, or otherwise binding the Debtors to the various transactions detailed *supra*, stand as unfair and deceptive trade practices under North Carolina General Statute § 75-1.1.

1889. The wrongful acts committed by each of Lindberg, Herwig, Solow, Miller, and Bostic were in or affecting commerce in North Carolina.

1890. The violation of North Carolina's Unfair and Deceptive Trade Practices Act by each of Lindberg, Herwig, Solow, Miller, and Bostic has resulted in direct and proximate damages to the Debtors.

## COUNT XXII
## Setoff Pursuant to North Carolina Law

### (NCIC)

1891. Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1892. The NCIC assert they are a creditor or otherwise hold a claim against PBLA, Northstar, and possibly other Debtors.

1893. As alleged herein, the Debtors have claims against, and were damaged by, the NCIC.

1894. NCIC and the Debtors owe mutual debts against each other, in that the debts are due to and from the same entities in the same capacity.

1895. To the extent Debtors do not achieve an affirmative recovery from NCIC on the claims alleged herein, Debtors have the right to apply the quantum of their damages to offset any liabilities any of the Debtors may owe NCIC.

SL1 1812077v17 114825.00001

## COUNT XXIII
## Breach of Loan Agreements Pursuant to North Carolina Law

### (Debtor Investment Counterparties)

1896. Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1897. The Debtors have valid loan agreements with the Debtor Investment Counterparties.

1898. Upon information and belief, each of the Debtor Investment Counterparties are either controlled or ultimately owned by Lindberg.

1899. The Debtor Investment Counterparties had actual or constructive knowledge that the Debtors lacked authority to enter into the MOU and/or IALA; that the MOU and/or IALA was not supported by adequate consideration as to the Debtors; and that the MOU and/or IALA was unlawful and invalid as a result of the various breaches of fiduciary duty in the execution of the MOU and/or IALA.

1900. By executing the MOU and/or IALA and amending the terms of the loan agreements without the BMA's prior written approval, the amendments to the loan agreements are invalid, and the attempt to amend breaches the relevant loan agreements.

1901. As a result of the Debtor Investment Counterparties' failure to make interest and principal payments in accordance with their loan agreement (in effect prior to the purported modification by the MOU and/or IALA), the Debtor Investment Counterparties are in default of their loan agreements.

1902. The Debtor Investment Counterparties are in breach of various non-monetary obligations imposed under the loan agreements, including the failure to provide financial reports.

346

1903.  The Debtors are therefore entitled to receive the full interest and other payments that are due and owing and all of their other contractual rights under the loan agreements, including any right to accelerate payments as a result of this default.

### COUNT XXIV
### Breach of Preferred Equity Agreements Pursuant to North Carolina Law

#### (Debtor Investment Counterparties)

1904.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1905.  The Debtors have valid preferred equity agreements with the Debtor Investment Counterparties.

1906.  Upon information and belief, each of the Debtor Investment Counterparties are either controlled or ultimately owned by Lindberg.

1907.  The Debtor Investment Counterparties had actual or constructive knowledge that the Debtors lacked authority to enter into the MOU and/or IALA; that the MOU and/or IALA was not supported by adequate consideration as to the Debtors; and that the MOU and/or IALA was unlawful and invalid as a result of the various breaches of fiduciary duty in the execution of the MOU and/or IALA.

1908.  By executing the MOU and/or IALA and amending the terms of preferred equity without the BMA's prior written approval, the amendments to the preferred equity agreements are invalid, and the attempt to amend breaches the relevant equity agreements.

1909.  As a result of the Debtor Investment Counterparties' failure to make distributions in accordance with their preferred equity agreement (in effect prior to the purported modification by the MOU and/or IALA), the Debtor Investment Counterparties are in default of their preferred equity agreements.

347

1910.  The Debtors are therefore entitled to receive all payments that are due and owing and all of their other contractual rights under the preferred equity agreements.

## COUNT XXV
### Declaratory Judgment To Void Acts of Lindberg, Herwig, CBL, and SNIC in Their Respective Capacity As Agents For the Debtors Pursuant to North Carolina Law

1911.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1912.  Each of Lindberg, Herwig, CBL, and SNIC, in their respective capacity as agent for the Debtors, lacked actual authority to bind any of the Debtors as principal to the MOU and/or IALA because the agents knew before, at, and after execution of the MOU and/or IALA that it was without the BMA's prior written consent.

1913.  Each of Lindberg, Herwig, CBL, and SNIC, in their respective capacity as agent for the Debtors, had no actual authority to bind the Debtors as principals, as the Debtors did not actually authorize any of Lindberg, Herwig, CBL, and SNIC to act on the Debtors' behalf, either in writing, orally, or otherwise with respect to the MOU and/or IALA.

1914.  Each of Lindberg, Herwig, CBL, and SNIC, in their respective capacity as agent for the Debtors, had no apparent authority to bind the Debtors as principals.

1915.  In the exercise of reasonable care, none of the parties to the MOU and/or IALA was justified in believing that the Debtors had conferred any authority upon any of Lindberg, Herwig, CBL, and SNIC to negotiate or otherwise execute the MOU and/or IALA.

1916.  Furthermore, as alleged *supra*, CBL and SNIC failed to remit interest payments to the Debtors received under loans adversely affected by the IALA.

1917.  Apparent authority does not exist where, as here, Lindberg, the Lindberg Affiliates, and NCIC knew they needed the prior approval of the BMA to impair the Debtors'

assets, yet they failed to obtain the required prior approval prior to executing the MOU and/or IALA.

1918.  The Debtors did not ratify the unauthorized acts of Lindberg, Herwig, CBL, or SNIC.

## COUNT XXVI
## Breach of Fiduciary Duty as Agent Pursuant to North Carolina Law

### (CBL and SNIC)

1919.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1920.  CBL and SNIC, acting as agents for the Debtors under various loan agreements and preferred equity investments, were each required to act as a fiduciary for each of the Debtors.

1921.  At the time of the negotiation and execution of the MOU and IALA, CBL and SNIC were acting as agents for the Debtors in their capacities as lenders under at least 29 loans to Lindberg Affiliates.

1922.  CBL and SNIC breached their fiduciary duties owed to the Debtors, including but not limited to the duty of loyalty and the implied covenant of good faith and fair dealing, by adversely modifying loan terms under the IALA for their own benefit, and to the Debtors' detriment.  Furthermore, as alleged *supra*, CBL and SNIC failed to remit interest payments to the Debtors received under loans adversely affected by the IALA.

1923.  Since execution of the IALA and MOU, CBL and SNIC have continued to breach their fiduciary duties owed to the Debtors as agents by improperly executing transactions for CBL's and SNIC's own benefit, tortiously interfering with the Debtors' contract rights under loan agreements, failing to remit interest due to the Debtors, and charging excessive fees.

349

1924.  CBL and SNIC breached their fiduciary duties owed to the Debtors by improperly diverting funds that belong to the Debtors and that should have been paid to the Debtors.

1925.  As a result, each of the Debtors has suffered substantial damages.

## COUNT XXVII
## Conversion Pursuant to North Carolina Law

### (CBL and SNIC)

1926.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1927.  CBL and SNIC were agents to the Debtors on various Investments, thereby owing a duty to safeguard the Debtors' Investments.

1928.  Rather than performing their duties as agents, CBL and SNIC improperly exercised dominion over, interfered with, and used the proceeds from, the Debtors' Investments for their own use and benefit in utter contempt of the Debtors' rights.

1929.  CBL and SNIC, as agents to the Debtors on various Investments, have willfully failed to remit funds belonging to the Debtors, violating their obligations to the Debtors.

1930.  CBL and SNIC intentionally converted property of the Debtors in order to enrich themselves, acting with malicious and reckless disregard of, or with actual intention to interfere with, Debtors' rights in their Investments.

1931.  As a direct and proximate result of the actions of CBL and SNIC, the Debtors have suffered and will continue to suffer damages.

350

## COUNT XXVIII
### Preliminary and Permanent Injunction Concerning Payment of Loan Interest and Principal Pursuant to North Carolina Law

### (NCIC)

1932.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1933.  All loan agreements whereby CBL or SNIC acted as agents to the Plaintiffs provide in relevant part that "Borrower shall have no right to specify the order or the accounts to which Agent shall allocate or apply any payments required to be made by Borrower to Agent on behalf of Lenders or otherwise received by Agent on behalf of Lenders under this Agreement when any such allocation or application is not specified elsewhere in this Agreement."

1934.  The NCIC, and CBL and SNIC as agents for the Debtors on twenty-nine (29) loan agreements, have breached this provision of the loan agreement, and will continue to breach this provision.

1935.  When asked how CBL and SNIC would allocate payments to lenders where a loan was partially paid down, Dinius testified that CBL and SNIC would allocate the payments based on information received from the borrowers—*i.e.*, Global Growth and the Lindberg Affiliates.

1936.  Dinius further testified that CBL and SNIC were instructed by Global Growth not to pay PBLA its proportional share of any partial paydown as Global Growth "intentionally excluded PBLA from . . . everything."

1937.  Dinius went so far as to say that if Global Growth or the Lindberg Affiliates directed CBL or SNIC to pay the entire paydown to CBL and none to PBLA, that CBL and SNIC would comply with the directive.

351

1938. In a July 1, 2019 email to Dinius, Stewart attached a flow of funds chart concerning the paydown of a loan to GBIG Holdings, advising that Northstar and PBLA were to receive small paydowns.

1939. Dinius responded that more needed to go to CBL, since there was ███████████ ████████████████.

1940. When asked what that statement meant, Dinius testified that in connection with the Revolving Credit Agreement, "where CBL agreed to increase the revolver from 15 million to 40 million and that Ares would loan GBIG Holdings 25 million to be paid out. And so it was attempting to get as much of that 25 million to the North Carolina companies as -- in consideration of the increase of the line of credit."

1941. Furthermore, CBL and SNIC, as agents for the Debtors on twenty-nine (29) loan agreements, have received three separate interest payments on said loan agreements in 2022, and have failed to remit said payments to the Debtors.

1942. Dinius also admitted that CBL and SNIC received three interest payments in May 2022, August 2022, and November 2022, and that the Plaintiffs have not received any remittances from those three payments.

1943. When asked why CBL and SNIC failed to remit the interest payments to the Debtors and other lenders, Dinius testified:

> We do not have sufficient information to allocate those payments and counsel has been working with Global Growth's counsel over many months to get that information. And we still do not have sufficient information to fully reconcile how much money the agents received. Q. How much money the agents received or how it should be allocated among the lenders? A. Well, we know how much we received, but we don't know how -- how that should be allocated. [sic]

1944. Dinius further testified that none of the three interest payments has been disbursed to any lenders, as CBL and SNIC await a reconciliation from Global Growth describing which interest payments attached to which loan.

1945. Based on the NCIC's past conduct, Plaintiffs reasonably believe that the NCIC may continue to pay themselves and other lenders other than proportionally – and not pay the Debtors any loan proceeds - in violation of the Plaintiffs' rights respecting the subject of this action, which would tend to render any Judgment and Order ineffectual, or if such actions are committed or continued during the pendency of this action, would produce injury to the Plaintiffs.

1946. Plaintiffs should be granted a preliminary and permanent injunction prohibiting the NCIC from such action because Plaintiffs do not have an adequate remedy at law and will suffer irreparable injury and prejudice if the NCIC are permitted to continue paying the lenders other than proportionally.

1947. To the extent any of the NCIC, as lender, received more than its proportional share of payment proceeds, the NCIC must be directed to disgorge said proceeds and hold said proceeds in constructive trust for the benefit of the Debtors.

1948. The NCIC will not suffer any injury or prejudice if Plaintiffs are granted injunctive relief because the relief sought will not adversely impact the operations of any of the NCIC while the merits of Plaintiffs' claims are fully and fairly decided.

1949. Based on the foregoing, the NCIC, and all those acting in concert with the NCIC, including Causey, Dinius, and their respective representatives and agents, should be enjoined from continuing to pay lenders under the loan agreements other than proportionally as to all lenders to said agreement, including where applicable PBLA, Northstar, Omnia, and PBIHL. To

353

the extent any of the NCIC, as lender, received more than its proportional share of payment proceeds, the NCIC must disgorge said proceeds and hold said proceeds in constructive trust for the benefit of the Debtors.

## COUNT XXIX
### Preliminary and Permanent Injunction Concerning Implementation of MOU Pursuant to North Carolina Law

### (NCIC)

1950.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1951.  As alleged *supra*, PBLA (if not all four Debtors) was a necessary party to the NC MOU Action under North Carolina law. Therefore, any attempt by the NCIC to enforce the Amended Judgment and Order and/or implement the MOU is a violation of the Recognition Orders and the stay under sections 362 and 1520 of the Bankruptcy Code as a matter of law because it: (i) *per se*, requires the enforcement of a judgment against the Debtors; (ii) requires the implementation of a prepetition contract—the MOU—against the Debtors, all of whom were either severed (PBLA) or not joined (Northstar, Omnia and PBIHL) as necessary parties in the NC MOU Action; (iii) would have collateral estoppel or *res judicata* effect on the Debtors and thereby undermine the Debtors' right to challenge the validity and enforceability of the MOU and the IALA; and (iv) would permit the NCIC to exercise dominion and control over the Debtor Investments.

1952.  To the extent not already prohibited by the Recognition Orders and the stay under sections 362 and 1520 of the Bankruptcy Code, the Plaintiffs seek preliminary and permanent injunctive relief prohibiting the NCIC from implementing the MOU against the Debtors, Debtors' Investments, or the Debtor Investment Counterparties.

354

1953.  Plaintiffs should be granted a preliminary and permanent injunction because they do not have an adequate remedy at law and will suffer irreparable injury and prejudice if the NCIC are permitted to implement the MOU against the Debtors, Debtors' Investments, or the Debtor Investment Counterparties.

1954.  The NCIC will not suffer any injury or prejudice if Plaintiffs are granted injunctive relief because the relief sought will not adversely impact the operations of any of the NCIC while the merits of Plaintiffs' claims are fully and fairly decided.

1955.  Based on the foregoing, the NCIC, and all those acting in concert with the NCIC, including Causey, Dinius, and their respective representatives and agents, should be enjoined from all actions in pursuit of or to otherwise implement the MOU against the Debtors, Debtors' Investments, or the Debtor Investment Counterparties.

## COUNT XXX
## Accounting Pursuant to North Carolina Law

### (CBL and SNIC)

1956.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1957.  As legal representatives of the Debtors, Plaintiffs are entitled to an accounting of any and all activity concerning the Debtors' loans and preferred equity investments where either CBL or SNIC acted as agent.

1958.  Plaintiffs repeatedly requested an accounting of any and all activity concerning the Debtors' loans and preferred equity investments where either CBL or SNIC acted as agent.

1959.  Despite demand, no such accounting has been provided by either CBL or SNIC.

## COUNT XXXI
## Fraud Pursuant to North Carolina Law

### (NCIC)

1960.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1961.  The NCIC, individually and collectively, concealed material facts from each of the Debtors concerning the use of the Debtors' assets to improperly fund the operations of the NCIC.

1962.  The NCIC, individually and collectively, concealed these material facts to deceive the Debtors, their respective creditors and their respective policyholders.

1963.  The NCIC, individually and collectively, knowingly took such actions with the intent to deceive the Debtors, their respective creditors and their respective policyholders.

1964.  Furthermore, as alleged *supra*, CBL and SNIC failed to remit interest payments to the Debtors received under loans adversely affected by the IALA

1965.  The actions by the NCIC, individually and collectively, did in fact deceive the Debtors, their respective creditors and their respective policyholders.

1966.  As a result, each of the Debtors suffered economic injury and damages.

## COUNT XXXII
## Proprietary Claim Pursuant to Bermuda Law

### (Lindberg; Lindberg Affiliates; Debtor Investment Counterparties; NCIC)

1967.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1968.  The Debtors have (or, will be declared to have as a result of the relief granted by this Court in the present proceedings) an equitable proprietary interest in certain of their assets

356

held by other persons as a result of the misappropriations of their property and avoidance of transactions pleaded herein.

1969.  The Debtors are no longer in possession of those assets.

1970.  Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC are each in possession of the "traceable proceeds" of the Debtors' assets, including: (i) an asset for which the Debtors' assets have been swapped; (ii) where the Debtors' Asset is money, an asset purchased with it; and/or (iii) where the Debtors' assets or its proceeds have been mixed with other property, a portion of that mixture.

1971.  The Debtors' legal interest in the assets or their "traceable proceeds" were not transferred to a bona fide purchaser for value without notice.

1972.  The assets that were caused to be transferred by the Debtors to Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC in breach of fiduciary duties owed to the Debtors (as pleaded herein) are to be treated as held by each of Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC on constructive trust for Plaintiffs.

1973.  In addition, those individuals and/or entities who received onward transfers of the traceable proceeds of the Debtors' assets either as volunteers or as purchasers with notice of the breach(es) of duty pursuant to which the Debtors' assets were transferred hold the sums received by them (or their traceable proceeds) on constructive trust for Debtors.

## COUNT XXXIII
### Dishonest Assistance Pursuant to Bermuda Law

**(Lindberg Affiliates; Debtor Investment Counterparties)**

1974.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

357

1975.  Herwig, in his capacity as a director of the Debtors, owed fiduciary and other duties of loyalty, honesty and care to each of the Debtors.

1976.  Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director), by virtue of a voluntary assumption of responsibility and fiduciary obligations and relationships, owed fiduciary and other duties of loyalty, honesty and care to each of the Debtors.

1977.  In misappropriating the Debtors' assets, Lindberg and the Senior Decision Makers each breached their fiduciary duties to the Debtors.

1978.  In creating and/or facilitating the creation of Sham Transactions, and fraudulently transferring and/or causing, directly or indirectly, the fraudulent transfer of the Debtors' assets as more particularly pleaded herein, the Lindberg Affiliates and Debtor Investment Counterparties knowingly induced, procured or assisted in Lindberg's and the Senior Decision Makers' breach of their fiduciary duties to the Debtors.

1979.  As alleged herein, there was a complete lack of corporate formalities or internal financial controls at Global Growth, and Lindberg and the Senior Decision Makers treated the Debtors, the Lindberg Affiliates, and the Debtor Investment Counterparties as one corporate and financial entity with no distinction among them. As a result, the knowledge and states of mind of Lindberg and the Senior Decision Makers are to be attributed to the Lindberg Affiliates and the Debtor Investment Counterparties at the time of each of the Sham Transactions and fraudulent transfers, such that the Lindberg Affiliates and the Debtor Investment Counterparties knew that Lindberg and the Senior Decision Makers were not entitled to act as they have done, and the Lindberg Affiliates and the Debtor Investment Counterparties acted dishonestly in participating in said transactions and receiving the Debtors' assets.

358

1980. By reason of the Lindberg Affiliates and Debtor Investment Counterparties' dishonest assistance in the breaches of fiduciary duty pleaded herein, the Debtors have suffered loss and damage.

## COUNT XXXIV
## Unconscionable Receipt Pursuant to Bermuda Law

### (Lindberg; Lindberg Affiliates; Debtor Investment Counterparties; NCIC)

1981. Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1982. Herwig was a director of PBLA, Northstar, Omnia, and PBIHL from 2017 through 2020. By virtue of that role, he owed the Debtors fiduciary duties, including but not limited to the duty of loyalty and the implied covenant of good faith and fair dealing, as well as the duties of honesty and care.

1983. Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director and Lindberg to the extent that he was a director of PBLA in 2017 only), by virtue of a voluntary assumption of responsibility and fiduciary obligations and relationships, owed fiduciary and other duties of loyalty, honesty and care to administer the Debtors' assets

1984. CBL and SNIC, as agents for the Debtors, owed a fiduciary duty of loyalty, honesty and care to administer the Debtors' assets.

1985. The Debtors' assets were misappropriated and transferred away by each of Lindberg, the Senior Decision Makers (other than Herwig by virtue of his status as a director), CBL and SNIC in breach of their fiduciary duties, and/or were transferred away because those fiduciaries were in breach of those duties.

1986. As a direct cause of the breaches of fiduciary duty, the Lindberg Affiliates received the Debtors' assets or their traceable proceeds.

1987. The Lindberg Affiliates retained the Debtors' assets for their own benefit. As alleged herein, there was a complete lack of corporate formalities or internal financial controls at Global Growth, and Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) treated the Debtors, the Lindberg Affiliates, and the Debtor Investment Counterparties as one corporate and financial entity with no distinction among them. As a result, the knowledge and states of mind of Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) are to be attributed to the Lindberg Affiliates such that the Lindberg Affiliates knew at the time of receipt of the Debtors' assets (or discovered while they still retained some part of the Debtors' assets) that the assets were traceable to a breach of fiduciary duty, and that it was unconscionable for the Lindberg Affiliates to retain the benefit of the receipt.

1988. As a direct cause of the breaches of fiduciary duty, the Debtor Investment Counterparties received the Debtors' assets or their traceable proceeds.

1989. The Debtor Investment Counterparties retained the Debtors' assets for their own benefit. As alleged herein, there was a complete lack of corporate formalities or internal financial controls at Global Growth, and Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) treated the Debtors, the Lindberg Affiliates, and the Debtor Investment Counterparties as one corporate and financial entity with no distinction among them. As a result, the knowledge and states of mind of Lindberg and the Senior Decision Makers (other than Herwig by virtue of his status as a director) are to be attributed to the Debtor Investment Counterparties such that the Debtor Investment Counterparties knew at the time of receipt of the Debtors' assets (or discovered while they still retained some part of the Debtors' assets) that the

360

assets were traceable to a breach of fiduciary duty, and that it was unconscionable for the Debtor Investment Counterparties to retain the benefit of the receipt.

1990. As a direct cause of the breaches of fiduciary duty, Lindberg received the Debtors' assets or their traceable proceeds.

1991. Lindberg retained the Debtors' assets for their own benefit. As alleged *supra*, the Rehabilitators, acting on behalf of the Lindberg, knew that the required BMA approval to execute the MOU and IALA was not provided by the BMA. Nonetheless, the MOU and IALA were executed. As a result, the NCIC knew at the time of receipt of the Debtors' assets (or discovered while they still retained some part of the Debtors' assets) that the assets were traceable to a breach of fiduciary duty, and that it was unconscionable for the NCIC to retain the benefit of the receipt.

1992. The Debtors have as a result of the unconscionable receipt as pleaded herein by Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties and the NCIC, suffered loss and damage equal to the value of the assets misappropriated and transferred away

### COUNT XXXV
### Unjust Enrichment Pursuant to North Carolina Law

### (Lindberg; Lindberg Affiliates; Debtor Investment Counterparties; NCIC)

1993. Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

1994. Each of Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC has been enriched by either a direct transfer of value from the Debtors to the defendant or an indirect transfer pursuant to a sequence of coordinated transactions, whereby the Debtors' assets have moved through intermediate entities as part of a coordinated plan.

361

1995.  Each of Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC has unfairly benefited by receiving and retaining the benefits of the use of the Debtors' assets: (i) for loans to, and preferred equity investments in, the Lindberg Affiliates and the Debtor Investment Counterparties, and (ii) the MOU and IALA, without justification and without providing any consideration to the Debtors, and Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC have each been unjustly enriched thereby.

1996.  Lindberg and the Senior Decision Makers improperly received bonuses upon the closing of the foregoing "investments," personally benefitting Lindberg and the Senior Decision Makers and causing harm to the Debtors.

1997.  It would be inequitable to allow any of Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC to retain the benefits that have been conferred on them by the Debtors.

1998.  The Plaintiffs, as representatives of the Debtors, do not have an adequate remedy at law.

## COUNT XXXVI
## Unjust Enrichment Pursuant to Bermuda Law

**(Lindberg; Senior Decision Makers; Lindberg Affiliates;
Debtor Investment Counterparties; NCIC)**

1999.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2000. Each of Lindberg, the Senior Decision Makers, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC has been enriched by either a direct transfer of value from the Debtors to the defendant or an indirect transfer pursuant to a sequence of coordinated transactions, whereby the Debtors' assets have moved through intermediate entities as part of a coordinated plan.

362

2001. The enrichment was unjust in that (i) as is pleaded *supra*, the Debtors agreed to transfer money or assets to any of Lindberg, the Senior Decision Makers, the Lindberg Affiliates, the Debtor Investment Counterparties, or NCIC on the condition that they would receive consideration for the same; (ii) in the cases pleaded *supra*, no consideration has been received; and (iii) the state of affairs contemplated as the basis or reason or the transfer of the Debtors' assets has, to that extent, failed to materialize or, if it did exist, has failed to sustain itself.

2002. Alternatively, the Debtors' assets were transferred from the Debtors to Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC by Lindberg, the Senior Decision Makers, and CBL and SNIC, each purportedly acting as Debtors' agent, without authority to do so and without consent of the Debtors, so that the transfers of value from the Debtors were made without a proper basis, unjustly enriching the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC.

2003. Alternatively, Lindberg and the Senior Decision Makers breached their respective fiduciary duties to the Debtors by causing the transfer of the Debtors' assets, so that the transfers of value from the Debtors to each of Lindberg, the Senior Decision Makers, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC pleaded *supra* were made without a proper basis, unjustly enriching Lindberg, the Senior Decision Makers, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC.

2004. Finally, Lindberg and the Senior Decision Makers improperly received bonuses upon the closing of the foregoing "investments," personally benefitting Lindberg and the Senior Decision Makers and causing harm to the Debtors, without any proper basis and for which they are obliged (but have failed) to account to the Debtors, and have therefore been enriched by the amount of those bonuses.

## COUNT XXXVII
## Recovery of Dividends or Distributions Pursuant to Section 54 of the Companies Act 1981

### (Lindberg)

2005.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2006.  Lindberg is the ultimate beneficial owner of each of the Debtors.

2007.  Upon information and belief, Lindberg and the Senior Decision Makers caused each of the Debtors to issue to Lindberg (or for his ultimate commercial benefit) a dividend or a distribution out of a contributed surplus in the manner more particularly described *supra,* including by way of entering into uncommercial transactions designed to transfer value away from the Debtors for the direct or indirect benefit of Lindberg without any (or any sufficient) countervailing benefit to the Debtors.

2008.  A Debtor could not declare or pay a dividend, or make a distribution out of contributed surplus, if there were reasonable grounds for believing that (i) a Debtor was, or would after the payment would be, unable to pay its liabilities as they become due; or (ii) the realizable value of a Debtors' assets would thereby be less than its liabilities (the "Section 54 Prohibition").

2009.  At the time these dividends or distributions out of contributed surplus were made, and in breach of the Section 54 Prohibition, there were reasonable grounds for believing that each of the Debtors was, or as a result of the payments would be, cash-flow or balance sheet insolvent.

364

## COUNT XXXVIII
### Recovery of "Disguised Distribution" of Capital Pursuant to Bermuda Law

### (Lindberg; Herwig)

2010.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2011.  Lindberg is the ultimate beneficial owner of each of the Debtors.

2012.  Herwig was a Director of each of the Debtors from 2017 through 2020.

2013.  The various transactions alleged *supra* amounted to an unlawful disguised distribution of the Debtors' capital to each of their direct and indirect shareholders, members and beneficial owners.

2014.  The true substance of the alleged transactions was an unlawful distribution of capital, and the labels and formalities attached to those transactions did not reflect their true nature.

2015.  Objectively construed, such payments were of the nature of an unlawful distribution of capital since they resulted in each of the Debtors paying out substantial sums for the benefit of their shareholders and members (direct and indirect) without receiving any concomitant benefit. There was no genuine commercial justification for such payments or transfer of assets to be made.

2016.  The intentions of those responsible for arranging and orchestrating the transactions alleged *supra* was to effect a distribution of the Debtors' funds for the benefit of their shareholders and members (direct and indirect) rather than to effect genuine commercial transactions.

365

2017.  In the circumstances, such disguised distributions of capital were ultra vires as to the Debtors and consequently were void. Lindberg and Herwig are liable to account for sums received as constructive trustees.

2018.  Further or alternatively, Herwig, as a director of each of the Debtors at the time each disguised distribution was made, knew or ought to have known that the payments made amounted to an unlawful distribution of the Debtors' capital. In particular, Herwig knew that the payments out of the Debtors for the benefits of Lindberg, their direct and indirect shareholders and members were made for the personal benefit of those recipients.

2019.  Further or alternatively, if Herwig was unaware of the facts which rendered the dividend unlawful then, in making causing or permitting these disguised distributions to be made, he failed to exercise his duty to take reasonable care and skill.

## COUNT XXXIX
## Avoidance and Recovery of Corporate Gift Pursuant to Bermuda Law

### (Lindberg)

2020.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2021.  Lindberg is the ultimate beneficial owner of each of the Debtors.

2022.  The transactions described *supra* amounted to an unlawful payment (in effect, a corporate gift) out of the Debtors' capital to Lindberg, each of the Debtors' indirect shareholder and ultimate beneficial owner because, in particular, the Debtors received no valid or sufficient consideration for the gratuitous disposition of their property.

2023.   In the circumstances, such unlawful corporate gifts were ultra vires the Debtors and consequently were void. Any recipient, including Lindberg, is liable to account for sums received as a constructive trustee.

## COUNT XL
### Procuring Breach of Contract Pursuant to Bermuda Law

**(Lindberg; Senior Decision Makers)**

2024.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2025.  To the extent that the Court is not satisfied that the Debtors' Investments are void, the Debtors have valid loan agreements and preferred equity agreements with the Debtor Investment Counterparties.

2026.  The loan agreements and preferred equity agreements were breached by the Debtor Investment Counterparties, causing the Debtors' loss.

2027.  Lindberg and the Senior Decision Makers had a sufficient degree of information about the Debtor Investment Counterparties to identify the relevant contracts and their relevant terms and any risk that these contracts were at risk of breach.

2028.  Lindberg and the Senior Decision Makers also had a sufficient degree of influence and control over the Debtor Investment Counterparties to mitigate that risk in advance and to prevent those breaches.

2029.  In knowingly failing to do so, Lindberg and the Senior Decision Makers must be taken to have knowingly procured the Debtor Investment Counterparties to breach their contractual obligations to the Debtors.

## COUNT XLI
### Conspiracy to Injure By Unlawful Means Pursuant to Bermuda Law

**(Lindberg; Senior Decision Makers; Lindberg Affiliates)**

2030.  Plaintiffs hereby incorporate by reference all allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

367

2031. Lindberg, the Senior Decision Makers, and the Lindberg Affiliates, in combination with one another, and pursuant to a common understanding and design, agreed to commit the various acts of malfeasance, breach of duty, and fraud alleged *supra*.

2032. Lindberg, the Senior Decision Makers, and the Lindberg Affiliates intended to injure the Debtors and to benefit themselves (as an end in itself or as a means of obtaining personal benefits or avoiding personal disadvantage), either by funding the Lindberg Personal Expense Companies or by artificially propping up the Lindberg Affiliates' finances, by unlawful means.

2033. The unlawful acts pleaded *supra* were carried out pursuant to the combination or agreement as a means of injuring the Debtors, and each conspiratorial act fell within the overall scope of the conspirators' common design and was known by them to be unlawful (alternatively, each should have known the fact that it was unlawful and/or turned a blind eye to that fact).

2034. The unlawful acts caused loss suffered by the Debtors.

## **PRAYERS FOR RELIEF**

2035. On **Count I**, Plaintiffs request that the Court enter Judgment and an Order that:

(i)  Declares the Lindberg Affiliates; Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally, shall be personally liable for such debts or other liabilities of Northstar, Omnia, and PBIHL as the Court may direct;

(ii)  Plaintiffs recover from the Lindberg Affiliates; Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally, damages in excess of $700 million, plus applicable interest; and

368

(iii)  Plaintiffs recover post-judgment interest from the Lindberg Affiliates; Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally.

2036.  On **Count II**, Plaintiffs request that the Court enter Judgment and an Order that:

(i)  Plaintiffs recover from the Lindberg Affiliates; Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally, damages in excess of $700 million, plus applicable interest;

(ii)  Plaintiffs recover post-judgment interest from the Lindberg Affiliates; Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally; and

(iii)  Plaintiffs recover punitive damages from the Lindberg Affiliates; Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally.

2037.  On **Count III**, Plaintiffs request that the Court enter Judgment and an Order that:

(i)  Plaintiffs recover from Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally, damages in excess of $700 million, plus applicable interest;

(ii)  Plaintiffs recover post-judgment interest from Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally; and

(iii)  Plaintiffs recover punitive damages Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally.

2038.  On **Count IV**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Avoiding and setting aside all transfers made from each of the Debtors to any of the Debtor Investment Counterparties;

(ii)  Avoiding and setting aside all transfers made from each of the Debtor Investment Counterparties to any of the Lindberg Affiliates;

369

(iii)  Avoiding and setting aside all transfers made from each of the Debtor Investment Counterparties to Lindberg;

(iv)  Avoiding and setting aside all subsequent transfers to any of the Lindberg Affiliates;

(v)  Avoiding and setting aside all subsequent transfers to Lindberg;

(vi)  Directing the Debtor Investment Counterparties, the Lindberg Affiliates as initial transferees, and the Lindberg Affiliates as subsequent transferees to turn over the property transferred or the value thereof to Plaintiffs; and

(vii)  Directing the Debtor Investment Counterparties, Lindberg as initial transferee, and Lindberg as subsequent transferee to turn over the property transferred or the value thereof to Plaintiffs.

2039.  On **Count V**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Avoiding and setting aside all transfers made from each of the Debtors to any of the Debtor Investment Counterparties;

(ii)  Avoiding and setting aside all transfers made from each of the Debtor Investment Counterparties to any of the Lindberg Affiliates;

(iii)  Avoiding and setting aside all transfers made from each of the Debtor Investment Counterparties to Lindberg;

(iv)  Avoiding and setting aside all subsequent transfers to any of the Lindberg Affiliates;

(v)  Avoiding and setting aside all subsequent transfers to Lindberg;

(vi) Directing the Debtor Investment Counterparties, the Lindberg Affiliates as initial transferees, and the Lindberg Affiliates as subsequent transferees to turn over the property transferred or the value thereof to Plaintiffs; and

(vii) Directing the Debtor Investment Counterparties, Lindberg as initial transferee, and Lindberg as subsequent transferee to turn over the property transferred or the value thereof to Plaintiffs.

2040. On **Count VI**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Avoiding and setting aside all transfers made from each of the Debtors to any of the Debtor Investment Counterparties;

(ii) Avoiding and setting aside all transfers made from each of the Debtor Investment Counterparties to any of the Lindberg Affiliates;

(iii) Avoiding and setting aside all transfers made from each of the Debtor Investment Counterparties to Lindberg;

(iv) Avoiding and setting aside all subsequent transfers to any of the Lindberg Affiliates;

(v) Avoiding and setting aside all subsequent transfers to Lindberg;

(vi) Directing the Debtor Investment Counterparties, the Lindberg Affiliates as initial transferees, and the Lindberg Affiliates as subsequent transferees to turn over the property transferred or the value thereof to Plaintiffs; and

(vii) Directing the Debtor Investment Counterparties, Lindberg as initial transferee, and Lindberg as subsequent transferee to turn over the property transferred or the value thereof to Plaintiffs.

2041. On **Count VII**, Plaintiffs request that the Court enter Judgment and an Order:

371

(i)  Avoiding and setting aside all transfers made from each of the Debtors to any of the NCIC;

(ii)  Avoiding and setting aside all transfers made from each of the Debtor Investment Counterparties to any of the NCIC; and

(iii)  Directing NCIC to turn over the property transferred or the value thereof to Plaintiffs

2042.  On **Count VIII**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Avoiding and setting aside all transfers made from each of the Debtors to any of the NCIC; and

(ii)  Directing NCIC to turn over the property transferred or the value thereof to Plaintiffs.

2043.  On **Count IX**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Avoiding and setting aside all transfers made from each of the Debtors to any of the NCIC; and

(ii)  Directing the NCIC to turn over the property transferred or the value thereof to Plaintiffs.

2044.  On **Count X**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Avoiding and setting aside all transfers made from each of the Debtors to any of the Debtor Investment Counterparties;

(ii)  Directing the Debtor Investment Counterparties to turn over the property transferred or the value thereof to Plaintiffs;

372

(iii) That the monies transferred the Debtor Investment Counterparties to any subsequent transferee be returned to the Debtors by the relevant Debtor Investment Counterparties;

(iv) Declaring that the proceeds of the transfers are held by the Debtor Investment Counterparties as constructive trustees for the Debtors; and

(v) Directing the Debtor Investment Counterparties to provide the Plaintiffs all necessary accounts and enquiries.

2045. On **Count XI**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Avoiding and setting aside all transfers made from any of the Debtor Investment Counterparties to any of Lindberg, the Lindberg Affiliates, NCIC, and any other ultimate recipient; and

(ii) Directing any of Lindberg, the Lindberg Affiliates, NCIC, and any other ultimate recipient to turn over the property transferred or the value thereof to Plaintiffs.

2046. On **Count XII**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Declaring the MOU and IALA are void and/or voidable and/or not binding upon the Debtors (or any of them);

(ii) Directing that Lindberg; Herwig; the Lindberg Affiliates; the Debtor Investment Counterparties; the NCIC; the SACs; EMAM; NEC; the MOU Affected Parties; and the IALA Affected Parties are obliged to pay to the Debtors those sums that they would have been obliged to pay under the terms of the loans and preferred equity purportedly modified by the MOU and IALA between the date of execution of the MOU and the date of judgment;

SL1 1812077v17 114825.00001

(iii) Directing Lindberg; Herwig; Lindberg Affiliates; Debtor Investment Counterparties; NCIC; SACs; EMAM; NEC; MOU Affected Parties; and IALA Affected Parties to provide the Plaintiffs all necessary accounts and enquiries.

2047. On **Count XIII**, Plaintiffs request that the Court enter Judgment and an Order that:

(i) Declaring the MOU and IALA void and/or voidable and/or not binding upon the Debtors (or any of them).

2048. On **Count XIV**, Plaintiffs request that the Court enter Judgment and an Order that:

(i) Plaintiffs recover from Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally, damages and or equitable compensation in excess of $700 million, plus applicable interest (pursuant to section 10 of the Bermuda Interest and Credit Charges (Regulation) Act 1975 or otherwise);

(ii) Plaintiffs recover post-judgment interest (and/or alternatively, compound interest) from Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally;

(iii) Declaring that the proceeds of any undisclosed and/or unauthorized profits made by the relevant fiduciaries in the capacities pleaded herein are held by Lindberg; Herwig; Solow; Miller; and Bostic as constructive trustees for the Debtors; and

(iv) Directing an accounting of any undisclosed and/or unauthorized profits made by the relevant fiduciaries in the capacities pleaded herein.

2049. On **Count XV**, Plaintiffs request that the Court enter Judgment and an Order:

374

(i) Declaring that the relevant transfers to the Debtor Investment Counterparties were entered into for a substantial improper purpose and in breach of the proper purpose duty;

(ii) Directing all necessary accounts and enquiries, including but not limited to those necessary to follow, trace and identify the traceable proceeds of the Debtors' assets received by Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC and held by Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC on constructive trust for the Debtors; and

(iii) Declaring that they are for that reason, void; alternatively that they are voidable (and if voidable, an order setting aside those transactions as voidable).

2050.  On **Count XVI**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Declaring that, to the extent alleged by the Plaintiffs herein, Lindberg was the agent or nominee of Global Growth and the Lindberg Affiliates in relation to Sham Transactions, such that Lindberg's actions (and all liabilities and remedies associated therewith) may be attributed to Global Growth and the Lindberg Affiliates;

(ii) Declaring that, to the extent it differs from the declaration sought immediately above, the Court may disregard the separate legal personality of Lindberg, the Lindberg Affiliates, and Global Growth on the basis of the "concealment principle" for the purposes of determining the liability (and remedies associated therewith) of Lindberg, the Lindberg Affiliates, Global Growth, and other parties;

(iii) Declaring that, to the extent that the purported purpose, substance and effect of Sham Transactions (as appearing on the face of the relevant transaction documents) differed from the purpose, substance and/or effect pleaded supra, the Sham

375

Transactions were shams whose true effect was that more particularly alleged by the Plaintiffs herein.

(iv) To the extent that, in consequence, any Sham Transaction is void or voidable, declaring the recipients of any money or assets of the Debtors transferred pursuant to such transactions to be constructive trustees of the same;

(v) Ordering those recipients to restore those assets to the Debtors; and

(vi) Ordering such accounts and enquiries as may be necessary.

2051.   On **Count XVII**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Piercing the corporate veils of Global Growth and the Lindberg Affiliates to allow the Debtors, as creditors of and investors in the Debtor Investment Counterparties, to reach the assets of Global Growth and all of the Lindberg Affiliates.

2052.   On **Count XVIII**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Piercing the corporate veils of the Debtor Investment Counterparties to allow the Debtors to reach the assets of the Lindberg Affiliates as subsequent transferees.

2053.   On **Count XIX**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Imposing a constructive trust over the assets of Lindberg; and

(ii) Imposing a constructive trust over the assets of the Lindberg Affiliates as subsequent transferees.

2054.   On **Count XX**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Substantively consolidating the assets and liabilities of the Debtors with the assets and liabilities of Global Growth, the Debtor Investment Counterparties and the other Lindberg Affiliates

376

2055. On **Count XXI**, Plaintiffs request that the Court enter Judgment and an Order that:

(i)  Plaintiffs recover from Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally, damages in excess of $700 million, as well as treble damages;

(ii)  Plaintiffs recover post-judgment interest from Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally; and

(iii)  Plaintiffs recover punitive damages Lindberg; Herwig; Solow; Miller; and Bostic, jointly and severally.

2056.  On **Count XXII**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Declaring that, to the extent Debtors do not achieve an affirmative recovery on their damage claims against NCIC, Debtors can apply the quantum of their damages to offset any liabilities any of the Debtors may owe to NCIC.

2057.  On **Count XXIII**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Awarding damages in accordance with the terms of the applicable loan agreements (without modification by the MOU or IALA); and

(ii)  Awarding interest at the default rate, late fees, costs and expenses as calculated, and attorneys' fees, etc. as set forth in the loan agreement.

2058.  On **Count XXIV**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Awarding damages in accordance with the terms of the applicable preferred equity agreements (without modification by the MOU or IALA); and

(ii)  For such other and further relief as is equitable and just.

2059.  On **Count XXV**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  For declaratory relief to void the acts of Lindberg, Herwig, CBL, and SNIC, in their respective capacity as agents for each Debtor, in purporting to amend and/or adversely affect the Debtors' assets under the MOU and/or IALA.

2060.  On **Count XXVI**, Plaintiffs request that the Court enter Judgment and an Order that:

(i)  Plaintiffs recover from CBL and SNIC, jointly and severally, damages in excess of $700 million, plus applicable interest;

(ii)  Plaintiffs recover post-judgment interest from CBL and SNIC, jointly and severally; and

(iii)  Plaintiffs recover punitive damages from CBL and SNIC, jointly and severally.

2061.  On **Count XXVII**, Plaintiffs request that the Court enter Judgment and an Order that:

(i)  Plaintiffs recover from CBL and SNIC, jointly and severally, damages in excess of $700 million, plus applicable interest; and

(ii)  Plaintiffs recover post-judgment interest from CBL and SNIC, jointly and severally.

2062.  On **Count XXVIII**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Granting a preliminary injunction, and then a permanent injunction, enjoining the NCIC, and all those acting in concert with them including Causey, Dinius, and their respective representatives and agents, from continuing to pay lenders under the loan agreements other than proportionally as to all lenders to said agreement, including where applicable PBLA, Northstar, Omnia, and PBIHL; and

378

(ii) To the extent any of the NCIC, as lender, received more than its proportional share of payment proceeds, directing the NCIC to disgorge said proceeds and hold said proceeds in constructive trust for the benefit of the Debtors.

2063. On **Count XXIX**, Plaintiffs request that the Court enter Judgment and an Order that:

(i) Granting a preliminary injunction, and then a permanent injunction, enjoining the NCIC, and all those acting in concert with the NCIC, including Causey, Dinius, and their respective representatives and agents, from implementing the MOU against the Debtors, Debtors' Investments, or the Debtor Investment Counterparties to the extent not already prohibited by the automatic stay and the Recognition Orders.

2064. On **Count XXX**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Directing CBL and SNIC to provide the Plaintiffs an accounting of any and all activity concerning the Debtors' loans and preferred equity investments where either CBL or SNIC acted as agent from September 20, 2017 to the present.

2065. On **Count XXXI**, Plaintiffs request that the Court enter Judgment and an Order that:

(i) Plaintiffs recover from the NCIC, jointly and severally, damages in excess of $700 million, plus applicable interest;

(ii) Plaintiffs recover post-judgment interest from the NCIC, jointly and severally; and

(iii) Plaintiffs recover punitive damages from the NCIC, jointly and severally.

2066. On **Count XXXII**, Plaintiffs request that the Court enter Judgment and an Order:

379

(i) Declaring the Debtors hold a continuing beneficial ownership of the traceable proceeds of their assets, and that said proceeds be restored to the Debtors;

(ii) Directing all necessary accounts and enquiries, including but not limited to those necessary to follow, trace and identify the traceable proceeds of the Debtors' assets received by Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC and held by Lindberg, the Lindberg Affiliates, the Debtor Investment Counterparties, and NCIC on constructive trust for the Debtors;

(iii) Directing that the traceable proceeds of the Debtors' assets be paid and/or otherwise restored to the Debtors; and

(iv) Subrogating and creating a new security interest in favor of the Debtors where and to the extent that the traceable proceeds of the Debtors' assets have been used to pay off a secured loan.

2067. On **Count XXXIII**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Plaintiffs recover from Lindberg Affiliates and Debtor Investment Counterparties, jointly and severally, equitable compensation in excess of $700 million (being the loss suffered by the Debtors) resulting from the breaches of fiduciary duty that any and all of the Lindberg Affiliates and Debtor Investment Counterparties dishonestly induced or assisted), plus compound and/or other applicable interest; and

(ii) Directing an accounting of profits of any and all of the Lindberg Affiliates and Debtor Investment Counterparties made through the dishonest assistance, and the disgorgement of said profits to the Plaintiffs.

380

2068. On **Count XXXIV**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  In an amount of the value of the Debtors' assets received by Lindberg, together with any profits derived from the Debtors' assets, or in the amount of the loss that the Debtors suffered as a consequence of the misappropriation of the Debtors' assets, plus applicable interest;

(ii)  In an amount of the value of the Debtors' assets received by the Lindberg Affiliates, together with any profits derived from the Debtors' assets, or in the amount of the loss that the Debtors suffered as a consequence of the misappropriation of the Debtors' assets, plus applicable interest;

(iii)  In an amount of the value of the Debtors' assets received by the Debtor Investment Counterparties, together with any profits derived from the Debtors assets, or in the amount of the loss that the Debtors suffered as a consequence of the misappropriation of the Debtors' assets, plus applicable interest; and

(iv)  In an amount of the value of the Debtors' assets received by the NCIC, together with any profits derived from the Debtors assets, or in the amount of the loss that the Debtors suffered as a consequence of the misappropriation of the Debtors' assets, plus applicable interest.

2069.  On **Count XXXV**, Plaintiffs request that the Court enter Judgment and an Order:

(i)  Against Lindberg, in an amount to be determined at trial;

(ii)   Against the Lindberg Affiliates, in an amount to be determined at trial;

(iii)  Against the Debtor Investment Counterparties, in an amount to be determined at trial; and

(iv) Against the NCIC, in an amount to be determined at trial, including pre- and post-judgment interest.

2070. On **Count XXXVI**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Against Lindberg, in an amount equivalent in value to the enrichment received;

(ii) Against the Lindberg Affiliates, in an amount equivalent in value to the enrichment received;

(iii) Against the Debtor Investment Counterparties, in an amount equivalent in value to the enrichment received; and

(iv) Against the NCIC, in an amount equivalent in value to the enrichment received, plus interest pursuant to section 10 of the Bermuda Interest and Credit Charges (Regulation) Act 1975 and/or equitable interest.

2071. On **Count XXXVII**, Plaintiffs request that the Court enter Judgment and an Order that:

(i) Declaring that such dividends and/or other distributions paid to Lindberg in breach of the Section 54 Prohibition are void;

(ii) Directing Lindberg to repay the amount of the dividends and/or distribution in an amount to be determined at trial; and

(iii) Declaring that the proceeds of any dividends and/or other distributions are held by Lindberg as constructive trustee for the Debtors.

2072. On **Count XXXVIII**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Declaring all disguised distributions to Lindberg are void;

382

(ii) Directing Lindberg to repay the amount of the unlawful distribution in an amount to be determined at trial;

(iii) Declaring that the proceeds of any dividends and/or other distributions are held by Lindberg as constructive trustee for the Debtors or alternatively are held on resulting trust for the Debtors; and

(iv) Directing Herwig to repay the amount of the unlawful distribution in an amount to be determined at trial, or alternatively to pay equitable compensation for a breach of his duty of care, skill and diligence by virtue of causing or allowing such distributions to be made in an amount to be determined at trial.

2073. On **Count XXXIX**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Declaring all such "corporate gifts" or equivalent dispositions to Lindberg are void;

(ii) Directing Lindberg to repay the amount of such "corporate gifts" or equivalent dispositions in an amount to be determined at trial; and

(iii) Declaring that the proceeds of any such "corporate gifts" or equivalent dispositions are held by Lindberg as constructive trustee for the Debtors or alternatively are held on resulting trust for the Debtors.

2074. On **Count XL**, Plaintiffs request that the Court enter Judgment and an Order:

(i) Plaintiffs recover from Lindberg and the Senior Decision Makers, jointly and severally, damages in excess of $700 million, plus applicable interest (pursuant to section 10 of the Bermuda Interest and Credit Charges (Regulation) Act 1975 or otherwise);

383

(ii)  Plaintiffs recover post-judgment interest from Lindberg and the Senior Decision Makers, jointly and severally.

2075.  On **Count XLI**, Plaintiffs request that the Court enter Judgment and an Order that:

(i)  Plaintiffs recover from Lindberg; the Senior Decision Makers; and Lindberg Affiliates, jointly and severally, damages in excess of $700 million, plus applicable interest (pursuant to section 10 of the Bermuda Interest and Credit Charges (Regulation) Act 1975 or otherwise); and

(ii)  Plaintiffs recover post-judgment interest from Lindberg; the Senior Decision Makers; and Lindberg Affiliates, jointly and severally.

Dated:  January 3, 2023
     New York, New York

STEVENS & LEE, P.C.

By:  */s Nicholas F. Kajon*
    Nicholas F. Kajon
    Eric M. Robinson
    Constantine D. Pourakis
    485 Madison Avenue, 20th Floor
    New York, New York 10022
    Telephone:  212-319-8500
    Facsimile:  212-319-8505
    nicholas.kajon@stevenslee.com
    eric.robinson@stevenslee.com
    constantine.pourakis@stevenslee.com

*Counsel for Plaintiffs*

384